## INVESTIGATIVE REPORT

TO: Jeffery Lorick, Compliance Manager

THRU: Peter Genova, Equal Opportunity Coordinator II

FROM: Lisa Postell, Equal Opportunity Coordinator I

DATE: May 29, 2019

RE: PA-19-003

TITLE: Samantha Ring v Boca Ciega Yacht Club, Inc.

### A. ALLEGATION/BASIS:

Denial of a reasonable accommodation / Terms/ Conditions

Disability / Retaliation / Sex / Religion

### B. JURISDICTIONAL DATA:

Alleged Violation: December 23, 2018 amended to February 8, 2019
Complaint Filed: January 02, 2019, amended complaint filed on April 2, 2019, again on April 15, 2019
Respondent's Type of Operation: Yacht Club

### C. ALLEGATIONS:

Samantha Ring (CP) is a person with a disability that requires a service animal, and has been a member of Boca Ciega Yacht Club, Inc. (BCYC) since 2007. CP states that she has been denied the use of her service animal in the Respondent's Clubhouse. In furtherance, CP states that once she filed an initial charge with Pinellas County Office of Human Rights (PCOHR) dated January 02, 2019, BCYC began a process of retaliation.

### D. POSITION OF RESPONDENT:

BCYC state that they are a Private Membership Club not subject to the requirements of the ADA or Section 70.214, Pinellas County Code.

### E. FINDINGS:

- The CP is a person with a disability.
- CP has been a member of BCYC since 2007.
- Boca Ciega Yacht Club is a place of public accommodation.

- On July 16, 2018, CP sent then Commodore, Larry Brown, a photograph of a doctor's note as to her need of a service animal.
- CP has been denied a reasonable accommodation due to her disability.

- November 14, 2018, CP complained to BCYC of disability discrimination.
- November 15, 2018, CP complained to BCYC of sex discrimination.
- November 21, 2018, CP complained to BCYC of sex/religion discrimination.
- December 2018, CP began complaining to PCOHR of denial of reasonable accommodation by BCYC.
- January 3, 2019, CP began complaining to City of Gulfport of discrimination by BCYC.
- January 22, 2019, BCYC received charge filed with PCOHR (disability).
- January 27, 2019, BCYC calls for an emergency meeting to suspend CP.
- January 31, 2019, BCYC suspends CP.
- April 3, 2019, BCYC received CP's amended charge filed with PCOHR. (retaliation)
- April 16, 2019, BCYC received CP's 2nd amended charge filed with PCOHR. (sex/religion)
- April 19, 2019, BCYC expels CP.

## F. JURISDICTION:

BCYC asserts that they are a bona-fide private Club and therefore are exempt from the Americans with Disabilities Act (ADA) or Chapter 70 of the Pinellas County Code, as amended (Chapter 70). (D-1)

Because neither the ADA nor Chapter 70 has a definitive definition of a private Club, case law or agency guidance is turned to in order to assist in distinguishing a private Club from a place of public accommodation. According to ADA guidance, in such matters Courts have considered factors such as:
1. The degree to which members control Club operations;
2. The selectivity of the membership process;
3. Whether substantial membership fees are charged;
4. To what extent the facilities are open to the public;
5. To what extent does the Club advertise or direct its publicity to anyone other than members;
6. To what extent the Club receives public funding;
7. Whether the Club was created specifically to avoid compliance with civil rights laws.

As to the degree to which members control Club operations, it is clear that the members of BCYC control Club operations by the instituting of By-Laws, rules and regulations for its members to follow. BCYC also oversees the calendar of events which are held upon the property. This element meets the private Club exemption.

As to the selectivity of membership process; although BCYC does have a membership process, and a membership committee, which is outlined in the By-Laws, the selectivity of membership is not sufficient to raise to a level of a private Club.

BCYC state that their process of selecting new members is that "*the prospective members are to be over 21 years of age, of good moral character, who is financially responsible and agrees to*

2

*actively participate in the welfare of the Club. Prospective members must submit a complete application, submit to a background check, and pay their application fee, first quarter dues, and background fee up front."* (D-1)

BCYC has stated that only a few applications have been denied during the past few years. (D-1) When BCYC was asked how many applications have been denied in the past five (5) years, BCYC gave only four (4) specific persons who were denied; 1 applicant had a recent criminal background, 1 applicant was denied readmission due to previous history at BCYC, 1 applicant was denied due to living aboard his vessel against BCYC's lease with the City of Gulfport, 1 applicant was denied for lying on their application, and finally BCYC gave a general statement "Applications were rejected due to failure to pass background check". When further inquired Respondents state that of the one hundred and fifty (150) applications in the same five (5) year period, approximately one hundred and forty-two (142) applications were ultimately approved. (D-5)

After reviewing the information Respondents provided it was determined that 94.666% of all applications for prospective membership that were genuinely interested in joining the BCYC were approved.

This percentage of membership approval infers a non-genuine selectivity process and therefore this element fails.

As to whether substantial membership fees are charged; BCYC admits that their $145 per quarter dues cannot be considered as substantial. However, BCYC states that the initial "investment" in the amount of $395 are "not insignificant". (D-1)

Other bona-fide private Clubs have much higher initiation fees and dues compared to BCYC.
1.  St. Pete Yacht Club – intermediate $2,500 initiation fees, $2507 annual dues.
2.  Clearwater Yacht Club – Full-    $2,000 initiation fees, $220 monthly dues.
                                       Social-$1,000 initiation fees, $180 monthly dues.
3.  Carlouel Yacht Club – $15,000 raising to $20,000 6/1/19, $530 monthly dues.
4.  Tarpon Springs -                    $600 initiation fees, $127 monthly dues.

After reviewing the above range in fees and dues, $15,000 currently the most expensive, $600 being the least expensive initiation fee, and $530 the most expensive, $127 the least expensive monthly dues charged by other area private clubs, BCYC's dues and initial fees are not nearly as substantial and therefore this element fails.

As to what extent the facilities are open to the public; BCYC has presented a calendar of events to wit several of the events on BCYC property are open to the public in general. (D-4)

BCYC has a sail school in which any person may pay their fees and learn to sail. After any person pays their fees for the sail school, this person is automatically a non-voting member for three (3) months. There is no vetting process for these members during this time. (D-2)

3

The Sail Scouts use BCYC facilities for their purposes. While the youth participating in Sail Scouts are in their respective classes, their parents or guardians are allowed to freely use BCYC's Clubhouse and other facilities during this time. (C-2, C-14)

In addition, BCYC is also open to the public several times throughout the year; (D-4)
   1. 2018 Lighted Christmas Boat Parade (2018) not on 2019 calendar;
   2. Fall 2018 Adult Sail School (2018) not on 2019 calendar;
   3. Youth Sail School Registration (2018 & 2019);
   4. Spring 2019 Adult Sail School (2019) not on 2018 calendar;
   5. Annual Women's Challenge Regatta (2018 & 2019);
   6. BCYC Annual Open House (Fun Day) (2018 & 2019;
   7. Paint Your Own Wine Glass (2019) not on 2018 calendar;
   8. GHS Fundraiser (2019) not on 2018 calendar and;
   9. Celestial Navigation w/ Chris Kreitlein (2019) not on 2018 calendar;

Much of the guidance states that the use of a bona-fide private Club is for the exclusive use of members and their guests.

Given the time BCYC is open to the public for these events this element fails.

As to what extent does the Club advertises or directs its publicity to anyone other than members is next to be analyzed. BCYC attends boat trade shows to wit they readily recruit for new members to the general public that has attended these venues, advertises for their Open House (Fun Day) each year in The Gabber, (thegabber.com) (local to Gulfport area) advertises for the Women's Challenge Regatta each year in Southwinds Magazine (southwindsmagazine.com) (Florida, Southeast, Bahamas and Caribbean) and once in The Gabber, advertises for their Adult Sail School in the newspaper (greater Tampa Bay area) and Gulfport Merchants Chamber, (local to Gulfport area) and in 2016 had flyers printed for the Boat Parade. (D-5)

It is found that BCYC advertises their public events, but also recruits for new members at the boat show which is a public event.

For the reasons stated above, this element fails.

As to what extent the Club receives public funding, although BCYC does not receive public funding by virtue of actual monies for their benefit, BCYC, however, does receive a gracious lease of public land for their use for a minimal stipend of one dollar ($1.00) per year from the City of Gulfport. (D-2)

4

As we look at the relationship between BCYC and the City of Gulfport, we refer to *Golden v Biscayne Bay Yacht Club*:

In *Golden v Biscayne Bay Yacht Club, 521 F.2d 344*, the court held that:

> "It is apparent from the relationship between the City of Miami and the Club that without the City's lease of the bed of the bay the Club could not exist. The very nature of the Club required that there exist dock and mooring facilities for the vessels of its members. No Showing was made that the City was compelled to grant the lease. Indeed, the city relied on the Club's operations of dock facilities on the leasehold to supply the degree required. So much more is involved that simple ownership and lease. The effectuation of the lease required the mutual cooperation of the city and the Club. Aside from the fact that the lease was essential to the Club's function, and the Club's function was essential to this "public use" validity of the lease, the City provided substantial financial aid to the Club by making the bay bottom land available for the token rental of $1.00 per year".

> "So Too this Court has held that the leasing of government owned property to private entities which discriminate on the basis of race, is sufficient nexus between private and public conduct to establish "state action". See *Wimbish v. Pinellas County, Florida, 5 Cir., 1965, 342 f.2d 804*. This position was emphatically endorsed by Justice White concurring in Gilmore." (E-1)

As in *Golden*, BCYC leases land from the City of Gulfport for $1.00 per year. Thus, making the relationship between BCYC and the City of Gulfport a sufficient nexus to establish state action.

By the Court's finding in *Golden*, we suggest BCYC is not a private Club due to state action and therefore this element fails.

As to whether the Club was created specifically to avoid compliance with civil rights laws is next to be analyzed.

BCYC presented the Articles of Incorporation. BCYC specifically mentions, Article 3, Members states: (D-6)

> *"Any white person of good character, over eighteen years of age, shall be eligible for membership in the Boca Ciega Yacht Club, Inc. They shall be admitted to membership upon application to the membership committee, with recommendation of some person already a member, and upon majority vote of approval of the board of directors."*

BCYC attempts to use *Cornelius v. Benevolent Protective Order of Elks*, an out of Circuit, non-binding case to show they believe this case lends to BCYC being a private club.

*Cornelius* involved black individuals that filed a complaint against a club. The Court noted that none of the black individuals had applied to the club and thus lacked standing to sue the club on some grounds. Furthermore, the Court applied a similar number of factors to determine that the club was a private club. As is relevant here, based on BCYC's request, we consider factor D from *Cornelius*, which states, "the history of the organization, e.g., was created or did it make insubstantial changes in its prior operation in order to avoid the impact of civil rights legislation?"

Because BCYC directs PCOHR's attention to *Cornelius*, we additionally consider several of the factors that that Court used in making the private club determination. Assuming without determining that prong D is relevant here, this factor mitigates against finding that BCYC is a private club because, having been founded in the 1940's, and previously excluding black members, the BCYC has made substantial changes to its prior operations, as it now permits black members. Thus, because BCYC is aligned its behavior to fit within the parameters of the Civil Rights Act, consideration of factor D suggests that it is not a private club.

For the reasons read above, this element fails.

It is found that Boca Ciega Yacht Club, Inc. is <u>NOT</u> a bona-fide private Club, therefore does not receive an exemption from Chapter 70 of the Pinellas County Code, as amended, (Chapter 70).

Therefore, Pinellas County Office of Human Rights has the authority to investigate allegations of discrimination against Boca Ciega Yacht Club, Inc.

## G. Denial of a Reasonable Accommodation:

In order to meet the prima facie elements of **denial of a reasonable accommodation**, the CP must prove that:

      1.  CP is a member of the protected class;

2.   Respondent owned, leased, or operated a place of public accommodation;
3.   Respondent discriminated against plaintiff on the basis of her disability.

As to the first element, the CP is a person with a disability who requires the use of a service animal.  As will be discussed below, the first element has been met.

As to the second element, BCYC leased public land from the City of Gulfport for their organization to wit they hold themselves out as a private Club and therefore are not subjected to the requirements of the ADA or Section 70.214, Pinellas County Code.  For reasons discussed above, the second element has been met.

As to the third element, The CP states, and BCYC admits that CP has been denied her service animal at the Clubhouse.  The third element has been met. (B-1, D-1, C-1)

The CP is a disabled person who requires a service animal.  CP has been a member of BCYC since 2007.

The CP asserts that BCYC had knowledge of her disability and the need for her service animal.  CP states, and BCYC concedes, that on July 16, 2018, she sent a text to the then Commodore, Larry Brown, with a picture of her doctor's note stating the need for her service animal. (B-1), (D-1)

However, BCYC admittedly continued to deny CP access to the Clubhouse with her service animal. (D-1)

After BCYC received information concerning CP's conditions and need for her service animal, BCYC states they did nothing to accommodate the CP, BCYC simply stated that they were a private Club and were not subjected to the ADA. (D-1)

BCYC further has stated that CP did not formally request a reasonable accommodation due to her disability. (D-1) After review of BCYC's By-Laws and Rules and Regulations, both the current versions and immediate past version, there is no mechanism in either version to wit a person can make such a request. (D-2)

Furthermore, BCYC states that even if BCYC was subjected to the ADA, CP would not be allowed the accommodation for two (2) stated reasons:
1.   CP does not have control over her service animal, thus under the ADA allows BCYC to restrict the service animal from the property
2.   BCYC would challenge claimed disability and need for her service animal.  (D-1)

As to the CP not having control over her service animal, BCYC alleges several instances in which CP's service animal "growls and lunges at other members, runs after a cat, escapes Ms. Ring even when she is holding the leash in her hand". (D-1)

CP states the allegation of her animal running after the working cat, Mia, on the property is from an incident that happened in 2015.  CP states the animal that had ran after Mia was a pet, not

service animal, CP previously owned named Harry. CP states that Harry passed away in August 2015, and the same month CP obtained her current service animal Piper. (C-2)

CP states that the allegations of growling and lunging towards other members occurred when Piper was threatened and scared by bike riders that came from behind them on a walking trail and startled Piper, CP's service animal. (C-1) CP further states that her service animal did not growl at a member as alleged in their information, that this was an accusation from someone who was in the Clubhouse while CP's service animal was outside on the porch where she could not properly be seen by the person making the allegation. (C-1)

CP has produced several statements from different individuals who has witnessed and/or trained her service animal, Piper, to the service animal's behavior and temperament. CP has provided documentation of Piper's training to become a service animal. (C-6) All these statements provide sufficient evidence that CP's service animal is under CP's control while working.

As to BCYC's statement that they would challenge claimed disability and need for her service animal. (D-1) As previously stated CP states, and BCYC concedes, that on July 16, 2018, she sent a text to the then Commodore, Larry Brown, with a picture of her doctor's note stating the need for her service animal. It was at that time BCYC should have entered into the interactive process and requested additional information from the CP as to her disability status and the nexus for the need of a service animal. BCYC failed to enter into this interactive process thereby denying the CP of her rights under Chapter 70.

CP has since provided PCOHR with a doctor's note stating that CP is disabled and that her service animal is recommended by her physician. (C-4) CP has also provided information on the types of services in which her service animal provides as well as documentation of training. (C-6)

CP states on April 1, 2019, she emailed Board members verifying if they were voting for her expulsion that evening and inquiring if she could bring her service animal with her to the meeting. Sheri Ogorek replied, "Yes the expulsion vote is tonight, and it is correct that Piper is not allowed in the Clubhouse." (C-5) On April 14, 2019, CP requested permission from Nick Southard, to bring her service animal with her to the expulsion meeting. Mr. Southard denied this request. (C-5) This is furtherance that CP has been denied a reasonable accommodation request.

CP has provided sufficient evidence to overcome the two (2) reasons BCYC has stated for disallowing her service animal on the grounds and the direct statement that BCYC did in fact deny CP her service animal in the Clubhouse without the interactive process as required by law, the CP prevails in her charge of being denied a reasonable accommodation.

Therefore, there is sufficient evidence to prove discrimination due to disability has occurred.

**H. Retaliation:**

To meet the prima facie elements of **retaliation**, the CP must prove that:

1. CP engaged in a protected activity;
2. CP suffered an adverse action; and
3. There is a causal connection between the participation in the protected activity and the adverse action.

CP made several complaints of discriminatory treatment to BCYC, City of Gulfport and PCOHR. The first element has been met.

CP received a violation and fine for having her service animal in the Clubhouse and has been suspended and expelled from the Club after making said complaints. The second element has been met.

In the notice BCYC gave CP stating the reasons for expulsion, includes, "Even more damning are the negative emails Ms. Ring has sent – as a Club member, not as a resident of Gulfport – to the City Manager, the Mayor, the Harbormaster, and other city staff, complaining about her treatment at BCYC." The third element has been met.

> Background:
> CP filed a separate retaliation charge on March 25, 2019, PA-19-005. After further review, PCOHR requested that CP withdrawal the retaliation charge and amend her initial charge, PA-19-003, to include her allegations of retaliation. (B-2)
>
> CP signed and returned the amended charge form PA-19-003 and withdrawal form for PA-19-005 on April 2, 2019.
>
> BCYC was served the amended charge form and withdrawal form via email on April 3, 2019. (B-6)

CP began complaining to BCYC of discriminatory treatment due to her disability documented as early as November 14, 2018. (C-14)

CP began complaining to BCYC of discriminatory treatment due to her sex documented as early as November 15, 2018. (C-14)

CP began complaining to BCYC of discriminatory treatment due to her sex and religion documented as early as November 21, 2018. (C-14)

CP then began contacting PCOHR in December 2018 to file a discrimination complaint due to her disability. CP copied some BCYC board members on some of the emails to PCOHR. (C-14)

Starting in January 3, 2019, CP began reaching out to the City of Gulfport, who holds the lease to the property for BCYC, complaining of the discriminatory treatment she was receiving from BCYC. (C-13)

CP's timeline: (C-1)

9

January 21, 2019, CP was approached by Nick in the Clubhouse, while with her service animal, telling CP she will get a fine and kicking CP and her service animal out of the Clubhouse.

January 22, 2019, BCYC admits to receiving the complaint filed by CP from PCOHR.

January 26, 2019, CP receives one hundred and fifty-dollar ($150) fine for having her service animal in the Club house.

January 27, 2019, CP received an emergency motion to suspend without explanation.

January 29, 2019, after many requests, CP received charges against her for her suspension.

January 31, 2019, suspension meeting. CP not allowed service animal or witnesses.
......

CP states on March 29, 2019, BCYC sent her ninety (90) pages of reasons in which it was recommending expulsion from the Club. In BCYC's own allegations against CP in favor of expulsion, BCYC states, "Samantha Ring has undermined the Club's mission by sending damaging e-mails to the City, further jeopardizing the Club's relationship with the Landlord." (C-10) as well as "Even more damning are the negative emails Ms. Ring has sent – as a Club member, not as a resident of Gulfport – to the City Manager, the Mayor, the Harbormaster, and other city staff, complaining about her treatment at BCYC." (C-10) CP states her emails to the City of Gulfport were to notify the city of the discriminatory treatment in which she continued to receive from BCYC. (C-13)

CP further states that many of the allegations in the expulsion list are items that have been several years ago and have previously been dealt with by a previous Board. After reviewing BCYC's list of reasons for expulsion sent to CP, PCOHR determined that many of the offenses listed are several years old and are pretextual in an attempt for the current Board to expel her from the Club. (C-9)

PCOHR is aware that after CP received the list of reasons for her expulsion, CP retained an attorney to file a civil case in Federal Court on April 1, 2019. The copy of the Federal complaint that was provided to PCOHR, on its face, does not appear to show that the Complainant is seeking to litigate her Pinellas County Code related disputes in that tribunal. (C-11, D-3)

After reviewing the information, although BCYC received the complaint filed by CP on January 22, 2019, CP made several documented complaints to BCYC itself as well as to the City of Gulfport which BCYC is aware. Furthermore, CP copied BCYC board members on several emails to PCOHR regarding her complaint. (C-13)

An allegation of retaliation can be made against an organization when a person engages in protected activity and then suffers adverse action from that organization because of their participation in such protected activity. Here CP filed not only complaints with board members, but also filed complaints of discriminatory treatment with two external agencies with BCYC's knowledge. After CP began complaining to the external agencies, BCYC board members began suspension and expulsion procedures.

10

The fact that in BCYC's expulsion reasons, they state in the beginning, "Even more damning are the negative emails Ms. Ring has sent – as a Club member, not as a resident of Gulfport – to the City Manager, the Mayor, the Harbormaster, and other city staff, complaining about her treatment at BCYC" lends credibility to a charge of retaliation.

Furthermore, the timing of the complaints to the suspension and expulsion lends even more credibility to a charge of retaliation.

As for the violation and fine for having her service animal in the Club house, CP was previously warned not to have her service animal in the Clubhouse and told that she would be fined if she were in violation again. CP complained to BCYC that her dog was a service animal and that she was being discriminated against due to her disability. CP documented her complaints to BCYC beginning November 2018, to PCOHR beginning December 2018 and to the City of Gulfport beginning early January 2019. CP had her service animal in the Clubhouse on January 21, 2019 and was subsequently fined. There is sufficient evidence to prove this violation and fine were retaliation for engaging in protected activity.

CP has provided sufficient evidence to show she complained to BCYC, City of Gulfport and PCOHR, prior to BCYC beginning the suspension and expulsion process.

Therefore, there is sufficient evidence to prove retaliation has occurred.

**I. Religion:**

In order to meet the prima facie elements of **disparate treatment**, the CP must prove that:

1. CP is a member of the protected class; (Jewish)
2. Respondent knew of the protected class;
3. CP was denied use of the establishment;
4. Others not of the CP's protected class were treated more favorably.

CP is of the Jewish faith. The first element is met.

BCYC acknowledge knowing CP's Jewish faith. The second element is met.

CP was suspended and then expelled from the Club. The third element is met.

No non-Jewish person has been suspended and expelled from the Club. The fourth element is met.

CP alleges that the Board member, Tony Angel, that submitted and presented the suspension and expulsion process, previously stated to her, "We don't like you because you are a pushy Jewish girl". CP further alleges that the notice of her suspension was emailed to her on Holocaust Memorial Day. (B-3)

CP states that upon being notified of the date of the expulsion vote, CP requested that the vote be moved to the May meeting due to her observance of Passover, her religious holiday. CP states BCYC's response was to provide her with three dates in which to move the entire meeting, two of which fell during the observance of Passover. CP states she declined to move the entire meeting as to not inconvenience the entire membership. (B-3)

CP further states that in the minutes of a meeting held on April 8, 2019, it was stated, "Tonight, we are trying to avoid any other charges from Samantha as she has now asked, since she is to be proclaiming to be of the Jewish faith, that we move our General Membership meeting from April

19th to another date to avoid the beginning of the Jewish Passover Celebration which begins on April 19th and ends April 27th." (B-3)

BCYCs response to the claim of religious discrimination is that Mr. Angel never made the comment listed in this allegation. Instead, CP inexplicably approached Mr. Angel and Mr. Fuller on the Clubhouse porch on July 4, 2018 after getting angry about having to collect her food from the porch fridge, and asked them: "Why do you hate me?" Mr. Angel then answered: "Because you act like a Jewish princess", to convey that CP was acting like a spoiled child in getting angry about the fridge. (D-8)

BCYC states that CP was provided the suspension notice on January 29, 2019 and Holocaust Memorial Day fell on January 27, 2019. (D-8)

BCYC states the By-Laws would not permit moving the expulsion meeting to May 2019. (D-8)

BCYC states no Board member or general member questioned CP's observance of the Jewish Passover or challenged her request for accommodation. (D-7)

As to Mr. Angel calling CP a "Jewish Princess", although CP disagrees with the exact phrasing, none the less, the statement shows a bias Mr. Angel has towards CP. And as Mr. Angel is a board member, and as Mr. Angel is the board member that motioned for CPs expulsion, is furtherance of the animus towards CP. (C-10) BCYC states that the contentious interaction between Mr. Angel and CP was merely a simple reflection of two members who did not like each other. (D-7) This would be correct if Mr. Angel was not a current board member with the authority to motion for suspensions and expulsions of members. Mr. Angel's position as a board member is tantamount to a manager in an employment matter or a landlord in housing and therefore his position rises to a higher level the just a mere member.

As to the expulsion vote meeting, since April 19, 2019 fell on the first day of Passover, BCYC gave CP the choice of three dates to have the expulsion vote meeting. As CP asked to have the vote moved and not the entire meeting as to not inconvenience the entire membership, CP declined having the expulsion vote meeting moved. (D-7, C-3) The accommodation requested does not have to be granted if a reasonable alternative is offered. Here BCYC offered CP two (2) additional dates, one (1) which fell outside of her observance of Passover, and CP declined to accept this alternative reasonable accommodation. BCYC attempted to accommodate CPs religious beliefs in this regard.

12

As to the date on which CP received notice of suspension. Although CP may have received the hardcopy of the suspension notice on January 29, 2019, the suspension notice was emailed and received by the CP on January 27, 2019 Holocaust Memorial Day. This email came from webmaster@sailbcyc.org and the signature line was Nick Southard, Commodore. (C-14)

As to comments of CP's observance of her faith. In the minutes of the April 8, 2019 Special Board Meeting Mr. Nick Southard, Commodore, was discussing the pending complaints filed by CP and stated, "Tonight, we are trying to avoid any other charges from Samantha as she has now asked, since she is to be proclaiming to be of the Jewish faith, that we move our General

Membership meeting from April 19th to another date, to avoid the beginning of the Jewish Passover Celebration (which begins on April 19 and ends on April 27th)." (C-12)

After reviewing the information, if one took each incident individually it may not reach a level of discrimination to a reasonable person, one derogatory name, a notice emailed on a sacred day, or a disparaging remark made. However, when you consider that these three incidents were done by Board members, who have the authority to vote for or against certain amenities, committees or programs that individual members may want to take advantage of, then the bias shown by the actions of these Board members could lead a reasonable person to believe discrimination occurred.

Therefore, there is sufficient evidence to prove discrimination due to religion has occurred.

**J: Sex:**

In order to meet the prima facie elements of **disparate treatment**, the CP must prove that:

1. CP is a member of the protected class; (female)
2. Others not of the CP's protected class were treated more favorably.

CP is a female. The first element is met.

Although CP and other females have applied for live-aboard status, only males have been selected. The second element has been met.

CP alleges that she was blocked from being a live-aboard at the Club. Although CP was approved by the committee, CP was told the Club would no longer have a live-aboard. After CP signed a lease at another location, suddenly a male was allowed to become a live-aboard even though he did not meet the requirements per Club rules. This was the second time CP was passed over as a live-aboard for a male. (B-3)

CP further alleges to her knowledge, BCYC has not allowed a single female to be a live-aboard. (B-3)

BCYC's response to the claim of sex discrimination is CP's live-aboard application was given full consideration. While the live-aboard Committee vetted CP's application in 2017, the Board never voted on the live-aboard that year, as there was no 35-foot slip available for live-aboard

and the Committee itself recommended to the Board that no live-aboard was needed. After CP moved her boat to another marina in 2017, no one was allowed to be a live-aboard, as the Board had accepted the Committee's recommendation that no live-aboard was needed. (D-7)

BCYC reserves the right to supplement its response to this allegation, as its investigation is still in progress. (D-7) (This is in response to the allegation that BCYC has not allowed a single female to be a live-aboard)

As to sex discrimination with regard to the live-aboard. Two (2) members, Dr. Judith Woodruff, female, Mr. Danny Hollinger, male applied to be the live-aboard at the Club. Neither Dr. Woodruff nor Mr. Hollinger had been Club members for three years as the Club By-Laws required. At this time Club By-Laws were amended to waive the three-year membership requirement. In April 2017, a Live-aboard Committee was established, and Commodore Lee Nell appointed Richard Walters to head the committee. In May 2017, the Live-aboard Committee suggested that the three-year membership requirement be reinstated. In June 2017, there were three (3) applicants for the live-aboard position, CP, Dr. Woodruff and Mr. Hollinger. Soon after, Mr. Hollinger unexpectedly passed away, then Dr. Woodruff withdrew her application. (D-7) July 2017, CP was the only applicant remaining. BCYC states there were no 35' slips available in the marina adjacent to the Clubhouse so the Board's vote was put on hold. The Live-aboard Committee suggested to the Board that they no longer needed a live-aboard at the Club and the Board agreed. (D-7) August 6, 2016, Richard Walters, the former Live-aboard Committee Chair, applied to be the live-aboard. BCYC Board accepted his application. CP then interjected and stated she would like to apply to be the live-aboard. The Board tabled the vote for CP to put in her application. CP emailed her application on August 17, 2018. September 2018 the Board voted Mr. Walters to be the Live-aboard at the Club.

- Late 2016-2017 two members applied 1 male, 1 female
- Around this time the By-Laws for the three-year requirement amended
- April 2017, live-aboard committee established
- May 2017, three-year requirement reinstated
- June 2017, general membership told three applicants including CP
- Mr. Hollinger passed away
- Dr. Woodruff withdrew her application
- July 2017, CP only applicant left
- No 35' slips next to Clubhouse
- Board stated there would no longer be a live-aboard at the Club
- 2018 Live-aboard Committee was disbanded by default
- August 6, 2018, Richard Walters applied to be the live-aboard
- August 6, 2018, CP reminded the Board of her interest in becoming the live-aboard
- August 17, 2018, Commodore Larry Brown approached CP about leaving her service animal on her boat
- August 17, 2018 CP applied to be the live-aboard
- September 2018, Board voted Mr. Walters as live-aboard

Although BCYC has not been able to state if there have been any females as a live-aboard, they have been able to state legitimate non-(sex)discriminatory reasons why CP was not selected as

14

the live-aboard. However, there is some question as to the timing to CP being the only applicant and there not being a 35' slip available and the decision to no longer have a live-aboard at the Club. With that said, there is no evidence it is due to CP's sex.

Therefore, there is insufficient evidence to prove discrimination due to sex has occurred.

## K. CONCLUSIONS:

It has been found that PCOHR has the authority to investigate BCYC as a place of public accommodation.

Therefore, based upon the available evidence, there is reasonable cause to believe that an unlawful act of discrimination based on disability, religion and retaliation has occurred.

Further, based upon the available evidence, there is no reasonable cause to believe that an unlawful act of discrimination based on sex has occurred.

RECOMMENDATION _CAUSE Expect SEX No CAUSE_

Signature _O. Li_       Date _Jn. 5-2019_