# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**SAMANTHA RING,**

> **Plaintiff,**

**v.**                                                   **Case No.: 8:19-cv-00772-VMC-JSS**

**BOCA CIEGA YACHT CLUB, INC.,**

> **Defendant.**

_____/

## BCYC'S MOTION FOR SUMMARY JUDGMENT

In accordance with Federal Rule of Civil Procedure 56, Defendant Boca Ciega Yacht Club, Inc. (BCYC, the Club) moves this Court for summary judgment on Ms. Ring's claims. From the outset, BCYC is a genuinely private club, exempt from the public accommodation requirements of Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq.* (ADA) and the Florida Civil Rights Act (FCRA). That BCYC leases the clubhouse and surrounding grounds from the City of Gulfport does not alter BCYC's private club status, as the City has no control whatsoever over the internal governance and affairs of BCYC.

Even if Ms. Ring could overcome this hurdle, her disability claims would still fail, because she has presented no evidence to support that she is suffering from any condition that substantially impairs her ability to perform any major life activity, let alone demonstrated that her alleged service dog performs any work to alleviate any resulting impairment. Finally, BCYC neither took Ms. Ring's alleged disability into account nor retaliated against her. Instead, Ms. Ring was expelled for continually violating the Club's By-Laws and rules since 2014. Accordingly, BCYC is entitled to judgment as a matter of law on all claims.

## STATEMENT OF MATERIAL FACTS

1.  BCYC is a private sailing club, operated solely by volunteers [Nicholas Southard Dep., attached hereto as **Exhibit A**, 17: 3].

2.  BCYC is a Florida not-for-profit corporation that is tax-exempt under Section 501(c)(7) of the Internal Revenue Code. Copies of BCYC's original certificate of incorporation and recent tax status confirmation letter from the Internal Revenue Service are attached as **Exhibit B**.

3.  BCYC leases the clubhouse and adjacent grounds from the City of Gulfport. A copy of the Lease is attached as **Exhibit C**. Under the Lease, BCYC must maintain its status as a private club as a term and condition of the Lease [Exhibit C, p. 4, § 9 (use of the premises must be reserved to BCYC members only); Exhibit C, p. 6, § 15 (sale and/or consumption of alcoholic beverages on the premises must be reserved to members and their guests only, and the sale and consumption of such beverages "shall not be available to the general public," even if BCYC obtains a private club liquor license); Exhibit C, p. 6, § 16 (providing that if BCYC loses its status as a not-for-profit Florida corporation, the City of Gulfport may terminate the lease)].

4.  Under BCYC's Lease with the City of Gulfport, only one authorized live-aboard[1] is permitted in the BCYC basin [Exhibit C, p. 4, § 9, providing that "Lessee and its members shall not allow any person to live aboard any vessel docked or anchored within the

---

[1] A live-aboard is a person who lives aboard his/her boat instead of in a regular, land-based dwelling.

subject premises or any surrounding waters . . ." and crafting an exception for one authorized live-aboard].

5.      No Board member of BCYC serves on the Gulfport City Council, and no Gulfport City Council member is a member of BCYC; further, the City of Gulfport has never used the clubhouse for a specific function or event [Exhibit A, 245: 12–20].

6.      The BCYC clubhouse is only open to the general public on one day each year, Open House, also known as Fun Day [Exhibit A, 92: 22–25; 93: 1; 4–8]; [Larry Brown dep., attached as **Exhibit D**, 78: 16–18].

7.      The BCYC clubhouse is not indiscriminately open to members of the general public; moreover, BCYC has never rented out the clubhouse to members of the general public for a specific function or event not involving any members of BCYC [Exhibit A, 245: 8–11, 254: 11–15; Exhibit D, 78: 13–15].

8.      Other than on Fun Day, access to the BCYC clubhouse for any purpose, including attendance of any entertainment and educational events, is limited to BCYC members and their guests [Exhibit D, 81: 11–24].

9.      BCYC does not sell food or drink to members of the public on any day, including Fun Day,[2] nor does it provide lodging to members of the public at the clubhouse [Exhibit D, 78: 16–24].

10.     While BCYC offers adult sailing school to members of the public in the spring and fall on a limited space available basis, enrollment in BCYC's adult sail school includes a

---

[2] During Fun Day, BCYC provides free food to visitors [Exhibit B, 93: 3].

**COLE, SCOTT & KISSANE, P.A.**
4301 WEST BOY SCOUT BOULEVARD  ·  SUITE 400  ·  TAMPA, FLORIDA 33607  ·  (813) 289-9300  ·  (813) 286-2900 FAX

90-day limited membership in BCYC, which entitles sail school participants to access the BCYC clubhouse [Exhibit A, 93: 9–25; 94: 1–9; Exhibit D, 82: 11–13].

11.     The Sea Scouts, a division of the Boy Scouts of America, also offers a youth sailing school at BCYC; youth sailing school participants are treated as Sea Scout members, who are in turn considered guests of the BCYC member volunteers who sponsor the Sea Scouts [Exhibit A, 110: 2–21; 111: 11–25; Exhibit D, 74: 16–19].

12.     BCYC is formally governed by a Board of member volunteers who are elected by the general membership and serve one-year terms. BCYC's policies and procedures are set forth in its By-Laws and Clubhouse Rules, copies of which are attached as **Exhibit E**.

13.     Membership in BCYC is open to any person of good moral character who is at least 21 years of age, can pass a criminal background check, and is willing to promote the mission of the Club. To apply for membership, applicants submit an application on BCYC's website, providing information about their household, identifying any past criminal convictions, and agreeing to abide by BCYC's By-Laws and rules if they are admitted to membership. Prospective members also authorize BCYC to conduct a criminal background check. Once an application is reviewed, the applicant attends an in-person meeting with the members of BCYC's Membership Committee. If the Committee vets the application, the prospective member is invited to the next scheduled general meeting, where new applications are submitted to the BCYC general membership for a vote. If the Committee does not vet the applicant or the general membership does not vote the prospective member in, the application is rejected.  [Exhibit A, 58: 16–19; 60: 4–24; 61: 23–25; 62: 1–3; 63: 6–8; 66: 7–23; 68: 14–25; 69: 1–6].

**COLE, SCOTT & KISSANE, P.A.**
4301 WEST BOY SCOUT BOULEVARD  ·  SUITE 400  ·  TAMPA, FLORIDA 33607  ·  (813) 289-9300  ·  (813) 286-2900 FAX

14.     Upon being admitted to BCYC, new members are provided with a key to the Clubhouse, which permits unlimited access to the facility at any time [Exhibit A, 66: 20–23; 243: 15–22; Exhibit D, 78: 6–9].

15.     Under Club rules, unless a BCYC member is on the premises, the Clubhouse doors are kept locked [Exhibit A, 256: 3–12].

16.     The gate that provides access to the dock adjacent to the BCYC basin is also kept locked; other than City of Gulfport Harbormaster Denis Frain, who might have a key, only members of BCYC have a key to this gate [Samantha Ring dep., attached as **Exhibit F**, 159: 12–25; 160: 1–12].

17.     Samantha Ring originally joined BCYC in 2007, and she obtained dog Piper around August 2015 [Exhibit F, 35: 9–11; 53: 15–16].

18.     On March 29, 2015, the BCYC Board recommended that Ms. Ring be expelled from the Club for living aboard her boat without authorization after other members reported her and BCYC received an inquiry from Mr. Frain, the Harbormaster. Ultimately, Ms. Ring met with three BCYC flag officers, and this First Motion for Expulsion was not presented to the general membership. On February 10, 2016, the BCYC Board again moved to expel Ms. Ring for the same reasons, but this second motion—a copy of which is attached as **Exhibit G**—was set aside as well.

19.     Sometime on or after July 16, 2018,[3] Ms. Ring texted then BCYC Commodore Larry Brown a photograph of a note prepared by medical resident Andres Santayana. This note

---

[3] While the note is dated July 16, 2018, neither Ms. Ring nor Mr. Brown was able to identify the date on which the photograph of the note was texted to Mr. Brown.

**COLE, SCOTT & KISSANE, P.A.**
4301 WEST BOY SCOUT BOULEVARD · SUITE 400 · TAMPA, FLORIDA 33607 · (813) 289-9300 · (813) 286-2900 FAX

identified Ms. Ring as a patient who suffered from anxiety as well as severe allergies to bees and sunflower seeds. In the note, Dr. Santayana stated that dog Piper alleviated Ms. Ring's anxiety, thereby improving her quality of life. He closed the note by adding that he supported Ms. Ring's decision to have dog Piper with her "at all times." [Dkt. 100-2].

20.     While Mr. Brown understood from the note that Ms. Ring was requesting an exception to BCYC's Clubhouse policy prohibiting dogs in the Clubhouse, he also knew that Ms. Ring wanted to bring the dog into the Clubhouse because the Clubhouse was more comfortable than her boat, and she was living aboard her boat with the dog [Exhibit D, 48: 24–25; 49: 1–25].

21.     Notwithstanding, Mr. Brown researched the ADA, then engaged Ms. Ring in a dialogue to determine whether there might be a way for her to convince the BCYC Board to grant the exception; once she made clear that she was not going to work with him, he encouraged her to file a charge with the Pinellas County Office of Human Rights [Exhibit D, 95: 4–25; 96: 1–16].

22.     On December 23, 2018, then BCYC Commodore Larry Brown issued Ms. Ring a written reprimand for violating the Club's pet policy by bringing dog Piper into the Clubhouse, and warned her that any subsequent violation would trigger the imposition of a fine [Exhibit D, 26: 25; 27: 1–5; Dkt. 100-3].

23.     By January 9, 2019, the BCYC Board had obtained conclusive evidence that Ms. Ring had provided the Club with four different addresses, none of which could be confirmed as legitimate [Exhibit A, 39: 9–25; Exhibit G (exhibit letters sent by BCYC to Ms. Ring at two different addresses, received via return mail and marked "return to sender")].

**COLE, SCOTT & KISSANE, P.A.**
4301 WEST BOY SCOUT BOULEVARD · SUITE 400 · TAMPA, FLORIDA 33607 · (813) 289-9300 · (813) 286-2900 FAX

24.     On January 21, 2019, Ms. Ring was caught bringing dog Piper into the BCYC Clubhouse again. Then BCYC Commodore Nick Southard confirmed that a fine would be imposed [Exhibit A, 129: 12–17; Dkt. 100-4 (copy of Notice of Fine)].

25.     On January 22, 2019, BCYC obtained conclusive evidence that Ms. Ring was siphoning electricity for free from a 110-Volt unmetered electrical supply installed on the dock and provided by the City of Gulfport to BCYC members for temporary use only [Exhibit A, 186: 1–25].

26.     The following photographs, taken by Richard Walters on January 22, depict an electrical cord plugged by Ms. Ring into the 110-Volt unmetered outlet to obtain a continuous supply of electricity on her boat during the day, while she was at work:







27.     On January 31, 2019, Ms. Ring's membership privileges were suspended by the

BCYC Board for committing fraud on the City of Gulfport by living aboard her boat without

permission and stealing electricity from the City's public supply. A copy of the Motion for

Suspension appears on the record under Dkt. 100-5. On April 19, 2019, an overwhelming

majority of the general membership voted to expel Ms. Ring from BCYC, on the basis that she

had been living on her boat without permission and violating club rules for years.

28.     During her deposition, Ms. Ring testified that she needed to bring dog Piper

into the Clubhouse with her because she could not leave the dog tied up outside [Exhibit F,

120: 6–9, 13–25; 121: 1–5; 122: 6–8, 12–25; 123: 1].

29.     When asked how her severe allergies as well as her anxiety and panic attacks affected her ability to perform tasks in daily life, Ms. Ring only described a very regimented morning routine that she followed at home [Exhibit F, 145: 2–25; 146: 1–25; 147: 1–25].

30.     Ms. Ring then testified that she experienced a panic attack at the school approximately once a year; she had suffered an allergic reaction to wasp venom in 2013, had last been stung by a bee in Kindergarten, and had experienced an allergic reaction to sunflower seeds when she was young [Exhibit F, 22: 22–25; 23: 1–19; 29: 9–16; 149: 6–15].

31.     Ms. Ring testified that she had called in sick to work on account of her anxiety three days per school year on average, during the past few years [Exhibit F, 155: 19–25].

32.     For his part, medical resident Dr. Andres Santayana, named as a treating physician expert by Ms. Ring in this case, was unable to identify any major life activity that Ms. Ring was substantially impaired in performing as a result of her severe allergies to bee venom and sunflower seeds, as well as severe anxiety with panic attacks [Andres Santayana dep. excerpt, attached as **Exhibit H**, 75: 17–25; 76: 1–18].

33.     During the majority of her long membership in BCYC, Ms. Ring worked as a full-time schoolteacher for the Pinellas County School District. Ms. Ring was originally recruited by the Pinellas County School District in 2000, and she is still employed by the Pinellas County School District as a full-time middle school Spanish teacher at Bay Point Middle School [Exhibit F, 11: 22–24; 12: 4–6; 12: 25; 13: 1–3, 9–11].

34.     Ms. Dena Collins, who appeared for deposition as the corporate representative of Bay Point Middle School, testified that Ms. Ring's attendance record during the 2019-2020

**COLE, SCOTT & KISSANE, P.A.**
4301 WEST BOY SCOUT BOULEVARD · SUITE 400 · TAMPA, FLORIDA 33607 · (813) 289-9300 · (813) 286-2900 FAX

school year had been normal and predictable [Dena Collins dep., attached as **Exhibit I**, 16: 23–25; 17: 1].

36.     Ms. Ring teaches Spanish to 18-25 middle school students each school day, during six 47-50 minute periods [Exhibit I, 11: 17–25; 18: 1–7].

36.     According to Ms. Collins, Ms. Ring is an effective teacher; she manages her classroom well, and keeps her unique, sometimes disruptive middle school students engaged [Exhibit I, 29: 6–23].

37.     Ms. Collins testified that Ms. Ring had never requested any reasonable accommodations from her at Bay Point Middle School, had not requested Family Medical leave Act leave from her, had never approached her with a request to bring a service animal to the school, and had only informed her of an allergy to sunflower seeds [Exhibit I, 6: 21–25; 7: 1–20; 13: 14–22; 21: 4–6; 28: 19–24; 31: 8–18].

38.     Based on her review of Ms. Ring's complete personnel file from the Pinellas County School District, Ms. Collins testified that Ms. Ring had worked for at least several years as a full-time teacher, at full capacity, posting full hours annually for many years; she had not disclosed any health impairments on an employee information form in August 2016 [Exhibit I, 19: 1–25; 20: 1–5; 21: 21–24].

## MEMORANDUM OF LAW

### A.  STANDARD

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with

affidavits, if any', which it believes demonstrates the absence of a genuine issue of material fact." *Id.* at 323. Once the movant makes this demonstration, the burden of production shifts to the non-moving party, who "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Under Federal Rule of Civil Procedure 56, the district court's function in ruling on a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). A dispute about a material fact is genuine if the evidence is such that a reasonable fact-finder could return a verdict for the non-moving party. *Barfield v. Brierton*, 883 F. 2d 923, 933 (11th Cir. 1989). In this context, the moving party has no burden other than "pointing out to the district Court . . . that there is an absence of evidence to support [plaintiff's] case." *Celotex*, 477 U.S. at 325 (1986). "Summary judgment for a defendant is appropriate when the plaintiff fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (quotation omitted). This is such a case.

## B.  ARGUMENT

### I.   BCYC is a private club not subject to Title III of the ADA or the FCRA

Title III of the ADA stands for the "[g]eneral rule" that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment" of the facilities or accommodations of "any place of public accommodation by any person who owns, leases

11

(or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). In this action, Ms. Ring claims that BCYC is a place of public accommodation, and in this purported capacity, violated Title III when it declined to allow her to bring her alleged service animal into the BCYC Clubhouse to accommodate her claimed disability. Because BCYC is a private Club not subject to the requirements of the ADA, Ms. Ring's Title III and FCRA claims fail as a matter of law.

To prevail under Title III and the FCRA, Ms. Ring must prove: (1) that she is disabled within the meaning of the ADA and the FCRA; (2) that BCYC is a private entity that owns, leases, or operates a place of public accommodation; and (3) that she was denied public accommodations by BCYC because of her disability. 42 U.S.C. § 12182 (a). *Schiavo ex rel Schindler v. Schiavo*, 403 F.3d 1289, 1299 (11th Cir. 2005); *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 730 (9th Cir. 2007). From the outset, BCYC is not a place of public accommodation within the meaning of the ADA or the FCRA. Consequently, Ms. Ring's claims are due to be summarily dismissed.

Any organization that qualifies as a "private club [] or establishment exempted from coverage under Title II of the Civil Rights Act of 1964" is also excluded from coverage under Title III of the ADA. 42 U.S.C. § 12187. The FCRA, which is modeled on the ADA, expressly provides that "lodge halls or other similar facilities of private organizations which are made available for public use occasionally or periodically" do not qualify as public accommodations under the FCRA as a matter of law. Fla. Stat. § 760.07. The phrase "private organizations" is not defined within the FCRA, and "no reported Florida cases have discussed the "private organization" exemption to the FCRA." *Rasmussen v. Cent. Fla. Council BSA, Inc.*, No. 6:07-

cv-1091-Orl-19UAM, 2008 U.S. Dist. LEXIS 17936 at *34 (M.D. Fla. Mar. 7 2008). Notwithstanding, there can be no question that BCYC, in its capacity as a club, qualifies as an organization under the plain meaning of that term. *Id.*

The analysis turns on whether BCYC is a "private club or establishment not in fact open to the public," 42 U.S.C. § 2000a(e), or instead, is open "indiscriminately to other members of the general public." *Jankey v. Twentieth Century Fox Film Corp.*, 14 F. Supp. 1174, 1178 (C.D. Cal. 1998), *aff'd* 212 F. 3d 1159 (9th Cir. 2000). The ADA does not provide a list of criteria to guide organizations in determining whether they might qualify as "private clubs" for the purpose of claiming the exemption. While "[t]he statute sets forth a factual test of sorts . . . 'not in fact open to the public,' [] it does not define 'private club'." *Wright v. Cork Club*, 315 F. Supp. 1143, 1150 (S.D. Tex. 1970) (footnote omitted).

In *United States v. Lansdowne Swim Club*, 713 F. Supp. 785, 796-97 (E.D. Penn. 1989), the Federal District Court for the Eastern District of Pennsylvania conducted a comprehensive review of judicial decisions involving the private club exemption, and enunciated eight factors to consider in determining whether the exemption applies. Under the *Lansdowne Swim Club* test, there is no question that BCYC qualifies as a private club not subject to the requirements of the ADA or the FCRA.

a)  The genuine selectivity of the group in the admission of its members

First, the Club imposes meaningful restrictions on membership. As Mr. Southard testified, filling out an application and submitting to a criminal background check are only the first steps in the process; prospective members are screened, interviewed, and vetted in, and only then invited to a general meeting where they must still be voted in by the general

membership [Exhibit A, 58: 16–19; 60: 4–24; 61: 23–25; 62: 1–3; 63: 6–8; 66: 7–23; 68: 14–25; 69: 1–6]. The layers of this process screen out applicants who have no real interest [Exhibit C, 25: 9–18]. Unlike the swimming club at issue in *Lansdowne*, which provided "an open and unrestricted invitation" to prospective members whose background and character were not screened, BCYC's application process contains enough hurdles to render membership selective. *See Lansdowne Swim Club*, 713 F. Supp. at 800-02 (E.D. Penn. 1989).

   b) <u>The membership's control over the operations of the establishment</u>

   BCYC is a self-governed private volunteer organization that imposes participation requirements on members. *See* Exhibit G (By-Laws detailing all of the responsibilities that BCYC members must fulfill to remain in good standing; Clubhouse rules detailing work day requirements). As Mr. Southard explained, membership demands active participation, and imposes responsibilities on members [Exhibit A, 140: 4–12]. While BCYC is composed of volunteers, it nonetheless embodies the "attributes of self-government and member-ownership traditionally associated with private clubs." *Pappion v. R-Ranch Prop. Owners Ass'n*, 10 F. Supp. 3d. 1017, 1019, 1024 (E.D. Cal. 2015) (quotation omitted). While BCYC members do not invest funds as a property owners would, they nonetheless perform the functions that owners would perform. They maintain the premises, organize events, and bring the members together to serve the Club's mission.

   The BCYC By-Laws and Clubhouse Rules were generated by BCYC [Exhibit A, 161: 6–12]. Every aspect of BCYC's operations is directed by its volunteer members. While the Lease with the City of Gulfport imposes restrictions on BCYC's use of the premises, the Lease itself is conditioned upon BCYC maintaining its status as a tax exempt Florida not-for-profit

corporation operating as a private club closed to the general public. *See* Exhibit C. Ms. Ring herself testified that BCYC volunteers, not City employees, drafted the terms of the current Lease [Exhibit A, 163: 7–17].

c) BCYC's history and purpose support private club status

BCYC was incorporated in 1965, well before the ADA was implemented. The Club's stated purpose is to promote safe boating and boating education, and foster fellowship and camaraderie among the members. *See* Exhibit G. As a Club created solely for the benefit of its members, BCYC is not a public accommodation. Just as the recreational facility offered by the R-Ranch Property Owners' Association to its members, the BCYC Clubhouse is solely dedicated to the use of Club members and their guests, even under the terms of the Club's Lease with the City of Gulfport. *See Pappion*, 110 F. Supp. 3d. at 1026.

d) The use of the facilities by non-members

BCYC is only open to the members of the general public on one day per year, Fun Day. "While regular use of the facility by non-members contradicts private status, allowing owners to bring guests onto the property does not strip defendants of their ADA exemption as a private establishment." *Pappion v. R-Ranch Prop. Owners' Ass'n*, 110 F. Supp. 1017, 1023 (E.D. Ca 2015). "[O]ccasional use of an exempt . . . private facility by the general public is not sufficient to convert that facility into a public accommodation under the ADA." Kelsey v. University Club of Orlando, 845 F. Supp. 1526, 1529 (M.D. Fla. 1994). Here, guests have access to the BCYC Clubhouse only through the direct or indirect sponsorship of a BCYC member. Without this sponsorship, access to the Clubhouse is closed.

**COLE, SCOTT & KISSANE, P.A.**
4301 WEST BOY SCOUT BOULEVARD · SUITE 400 · TAMPA, FLORIDA 33607 · (813) 289-9300 · (813) 286-2900 FAX

Further, BCYC will only host an event at the Clubhouse if a BCYC member requests that BCYC host the event and agrees to sponsor the event. As Mr. Southard and Mr. Brown testified, sponsorship by a member is the only vehicle through which non-members may gain access to the BCYC Clubhouse; further, BCYC never rents the Clubhouse or charges for private events, such as weddings and wedding receptions for BCYC members or their guests conducted on the premises [Exhibit A, 154: 1–15].

e)   The purpose of the Club's existence

The purpose of BCYC is stated in its By-Laws: To promote safe boating activities, boating education, and fellowship between members. Exhibit G, p. 1, Mission Statement. The Club only collects membership dues, dinghy storage fees, and sailing course fees, all of which are payable by members and prospective members. Exhibit G, p. 1, § 6 (a). These dues, fees, and charges are established by the Board. Exhibit G, p. 5, § 2.01. Neither the Board nor any Flag Officer has the authority to use Club funds to make a donation or contribution for political purposes, use the Clubhouse to aid any political party or candidate, or use the Clubhouse for the benefit of any private business. Exhibit G, p. 7, § 3.02(i). Taken together, the Club's Mission Statement, along with its By-Laws and Rules, make clear that the purpose of the Club is to serve its membership and promote sailing, which requires access to the waterfront and cooperation with the City of Gulfport. BCYC's status as a private club is reinforced by the prohibition on using Club funds and Club facilities to promote other purposes not related to the mission of the Club.

f)   The advertisement efforts made by the Club do not defeat private club status

While the Club does advertise membership at boat shops on a limited basis, it does not keep mailing lists of prospective members or mail flyers to the general public to advertise itself to prospective members. Instead, the bulk of BCYC's advertising efforts are conducted through its website. "Prudently increasing membership to increase revenue while not abandoning selective membership practices exhibits nothing more than fiscal responsibility." *EEOC v. Chicago Club*, 86 F. 3d 1423, 1435 (7th Cir. 1996). While this Club is a non-profit organization, it still expends funds to maintain the Clubhouse and the surrounding docks, organize member events, and conduct Club operations. The Club's selective attempts to increase membership cannot serve to revoke the Club's private status, especially considering that number of members has remained stable around 200 over the years [Exhibit A, 12: 21–24].

g) <u>The Club is a tax exempt, not for profit organization that observes strict formalities</u>
That the Club is a tax exempt organization not for profit strongly supports private status. *Pappion*, 110 F. Supp. at 1025 (E. D. Ca. 2015).  As for governance, BCYC relies on a 16-member Board of Directors whose composition is extremely specific. *See* Exhibit G, pp.6-7, §§ 3.01, 3.04. Elections involve a nomination committee and a general membership ballot vote. Exhibit G, pp. 11-14, §§ 6.01-6.05. Further, the Board has the authority to enforce Club Policies and create Committees. Exhibit G. The BCYC By-Laws and Rules are distributed to new members [Exhibit F, 161: 1–4].

Under the *Lansdowne Swim Club* test, BCYC qualifies as a bona fide private club exempt from the public accommodations requirements of Title III of the ADA. Prospective members are objectively screened, and the final decision of admitting a new member depends

on securing a majority vote from the membership at large. Once admitted, a member is expected to participate in the Club, follow its By-Laws and Policies, and also follow the restrictions imposed on members by the Club's lease with the City of Gulfport.   The meaningful restrictions imposed on the Club's membership are demanding, which strongly supports that BCYC is a private club exempt from the requirements of Title III. "To hold otherwise would make the criteria for a private club a definition without meaning, an exemption under Title VII and ADA with no organization able to qualify." *Kelsey*, 845 F. Supp. at 1530 (M.D. Fla. 1994).

## II.    BCYC is a private club whose members' First Amendment right to assemble must be upheld

In *Golden v. Biscayne Bay Yacht Club*, 530 F. 2d 16 (5th Cir. 1976), the Fifth Circuit of Appeals was presented with a set of circumstances nearly identical to those at issue in this case. There, a private yacht club leased bay bottoms in Biscayne Bay from the City of Miami. *Id*. at 17. The district court had found that the Biscayne Bay Yacht Club was genuinely private, but nonetheless relied on the lease with the City of Miami to hold that there was sufficient state involvement with the membership policies of the club to render the club a state actor under the Fourteenth Constitutional Amendment. *Id.* After initially upholding the judgment,[4] the Fifth Circuit held a rehearing *en banc* to reverse its first ruling on a single basis:

> So far as can be determined from a diligent search of the precedents, this is the first time in the history of Fourteenth Amendment jurisprudence that a federal district court has undertaken the supervision of membership policies in a genuinely private club.

> *Id.* at 3.

---

[4] In its investigative report, the PCOHR relied heavily on this first decision, though it was overturned by the same court *en banc* fewer than six months later [Dkt. 100-7].

**COLE, SCOTT & KISSANE, P.A.**
4301 WEST BOY SCOUT BOULEVARD · SUITE 400 · TAMPA, FLORIDA 33607 · (813) 289-9300 · (813) 286-2900 FAX

Just as the Biscayne Bay Yacht Club, BCYC leases its Clubhouse and surrounding grounds from the City of Gulfport. *Id.* at 4. But just as in *Biscayne Bay Yacht Club*, "the city [of Gulfport] had no part, and took no part, in the operations or internal policies of the Club." *Id.* at 4. There, just as here, the sole nexus between the City of Gulfport and BCYC is the Lease between the Club and the City. *Id.* at 23. But unlike the City of Gulfport, the City of Miami had enacted an ordinance that expressly subjected all of its lessees to the requirements of all of the laws that applied to the city itself. *Id.* at 24 (Brown, J., dissenting). This did not alter the majority's opinion. *Id.* at 23.

Just as the Fourteenth Amendment cannot render BCYC a state actor, so can the First Amendment provide protection to BCYC against the City of Gulfport or the judiciary undertaking the supervision of its internal affairs. As Mr. Brown testified in response to a question about why he would want BCYC to be a private club:

> **I think that the idea of having a club with people that are like-minded, that want to do the same things, should be able to come together as a group and do that thing that they like to do together. And so if having it being a public club means that just anybody can be a member, then what's the point of having it as a club?**

[Exhibit D, 56: 15–25; 57: 1–5].

Indeed. If volunteers cannot join together to further a common purpose without heavy-handed governmental interference, the First Amendment would protect very little. The ADA, enacted 14 years after the Fifth Circuit rendered its final opinion in *Biscayne Bay Yacht Club*, likewise strikes a balance between the public and private spheres. "We agree with the district court that the ADA does not impose a civility code." *Krist v. Kolombos Rest.*, 688 F. 3d 89, 97 (2d. Cir. 2012). So should this Court, though Ms. Ring would petition for a contrary result.

### III.   Ms. Ring is not disabled within the meaning of the ADA

Throughout this action, Ms. Ring has consistently identified the following conditions as the basis for her claimed status as a qualified individual with a disability:

- Severe anxiety with panic attacks;

- Severe allergy to bee venom;[5]

- Severe allergy to sunflower seeds.

[Dkt. 1, ¶ 4; Dkt. 47, ¶ 4; Dkt. 100, ¶ 4].

Throughout this action, BCYC has disputed that Ms. Ring's claimed disabilities substantially impair her ability to perform any major life activity. To date, Ms. Ring has not positively identified any major life activity that she is substantially impaired in performing as a result of these conditions. On December 4, 2019, the undersigned deposed Plaintiff's treating physician expert, third-year Bayfront Health medical resident Andres Santayana, MD, and found that he was utterly unable to describe Ms. Ring's functional limitations referenced in the note:

Q:   Dr. Santayana, do you think that Ms. Ring is disabled?

**A:   Without knowing the definition . . . Sorry. In terms of my personal interpretation of disability, I would say she has at least some small amount. A very small factor of disability, yes.**

Q:   Okay. So what is that factor?

**A:   That she has to limit her normal daily life activities due to her conditions.**

---

[5] In the operative Complaint, this allergy is referred to as an allergy to "bee stings" [Dkt. 100, ¶ 4].

**COLE, SCOTT & KISSANE, P.A.**
4301 WEST BOY SCOUT BOULEVARD - SUITE 400 - TAMPA, FLORIDA 33607 - (813) 289-9300 - (813) 286-2900 FAX

Q:     Okay. Is that something that you know that's affected her ability to perform her job at all?

**A:     I do not know.**

Q:     Did she ever mention that to you?

**A:     Not that I recall.**

Q:     Has she ever mentioned something in particular that she could not do because of these allergies?

**A:     Not a thing in particular, but that it affected her daily life.**

Q:     Okay. So how does it affect her normal daily life?

**A:     In that it causes her increased anxiety worrying about the exposure to bees and how she obtained the dog to help her deal with those things.**

Q:     So how does her anxiety stop her from doing anything that any regular person can go out and do?

**A:     I'm not aware of it stopping her from doing anything in particular.**

[Andres Santayana dep., 75: 17–25; 76: 1–18].[6]

Tellingly, Ms. Ring herself testified that the reason that she requested an exception

from the Club's pet policy was that she could not leave dog Piper tied up outside:

Q:     When you made that request to Larry Brown and you conveyed to him that you needed to bring Piper into the clubhouse, what reasons did you provide Larry Brown for the request? [...]

A:     **So I told Larry that you're not allowed to have . . . Lee Nell had told me specifically you're not allowed to leave your dog tied up. So like you couldn't tie her up and run to the bathroom or tie her up when you run to get a cup of coffee. And I . . . and he told me because ADA doesn't allow you to tie up a service animal, and I realized and recognized that he was right. And I said, you're absolutely right. And I don't want to tie her up and do that, so I do have the right to bring her into the**

---

[6] A copy of the corresponding excerpt of Dr. Santayana's testimony is attached hereto as **Exhibit I.**

21

**COLE, SCOTT & KISSANE, P.A.**

**clubhouse and that's what I'll do from now on because you're not supposed to tie your dog up and leave it, even if it's to use the bathroom. That's really not the best option, anyway, and I do have the right to bring her into the clubhouse and so that is how that will be resolved . . .**

[Samantha Ring dep., 120: 6–9, 13–25; 121: 1–5].

Ms. Ring then clarified that this issue—having to leave the dog tied up outside— had

created problems for her well before her submission of Dr. Santayana's note to Larry Brown:

Q:    This issue with tying . . . leaving Piper tied outside while you go in the clubhouse, was that also an issue in 2017? [...]

A:    **An issue for who?**

Q:    For you. Was it an issue for you when you came to the clubhouse in 2017 to have to tie the dog outside when you went inside the clubhouse?

A:    **Yes, I would have to find somebody. I don't want to tie her up if I had to use the bathroom or anything like that. I'd have to go and have a friend meet me at the clubhouse so they can watch Piper if I have to go use the potty or if I want to get a cup of water or if I want to do anything. I couldn't just, like anybody else, just walk in and use the bathroom. I'd have to find a babysitter for Piper, or I'd have to tie her up if nobody was around and just hurry up and go in and pee and come right back out. And if I say "pee" one more time we're going to have to take a pee break.**

[Samantha Ring dep., 122: 6–8, 12–25; 123: 1].

Whether Ms. Ring had to suffer the inconvenience of having to call a friend when she

visited the Clubhouse because she did not want to leave Piper tied up outside is utterly

irrelevant to her disability claims in this case.

**COLE, SCOTT & KISSANE, P.A.**
4301 WEST BOY SCOUT BOULEVARD  -  SUITE 400  -  TAMPA, FLORIDA 33607  -  (813) 289-9300  -  (813) 286-2900 FAX

## CONCLUSION

BCYC is a genuinely private club, operated and controlled by its volunteer members. It is not a place of public accommodation. Its doors and gate are locked to outsiders, and non-members can only access the Clubhouse through the sponsorship of a BCYC member. That BCYC leases the Clubhouse from the City of Gulfport does not alter this result, as the City has no involvement whatsoever in the Club's governance or internal affairs. Just as the Fourteenth Amendment cannot render BCYC a state actor through the sole nexus of the Lease, so can the First Amendment preclude any municipal or judicial supervision of the policies and internal affairs of this genuinely private club. In bringing this action, Ms. Ring would rely upon the ADA and the FCRA to impose a code of civility so strong as to eviscerate policies that she herself agreed to follow as a member of the Club, but instead violated for years regardless of claiming disability status under the ADA or presenting her dog as a purported service animal. There was no discrimination, nor was there any retaliation. There was no disability under the ADA. As the record evidence shows, no genuine issue of material fact remains on these points. Consequently, BCYC is entitled to judgment as a matter of law on Ms. Ring's claims.

Dated this 17th Day of January, 2020.

Respectfully submitted,

s/Elisabeth A. Fontugne
BRIAN D. RUBENSTEIN
Florida Bar No.: 16997
ELISABETH A FONTUGNE
Florida Bar No.: 115954

**COLE, SCOTT & KISSANE, P.A.**
4301 WEST BOY SCOUT BOULEVARD · SUITE 400 · TAMPA, FLORIDA 33607 · (813) 289-9300 · (813) 286-2900 FAX

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of January, 2020, I filed a true and accurate copy of this document using the ECF/ CM system, which will provide notification to the following: Ms. Marcy I. LaHart, Esq., c/o Marcy I. LaHart, P.A., 207 S.E. Tuscawilla Rd., Minacopy, FL 32667, (352) 545-7001 (T), (888) 400-1464 (F), marcy@floridaanimallawyer.com; and Ms. Deneze Venza, c/o Venza Law, PLLC, 931 Village Blvd., #905-322, West Palm Beach, FL 33409, (561) 596-6329 (T), dvenza@venzalawpllc.com.

> COLE, SCOTT & KISSANE, P.A.
> *Counsel for Defendant Boca Ciega Yacht Club, Inc.*
> 4301 West Boy Scout Boulevard
> Suite 400
> Tampa, Florida 33607
> Telephone (813) 864-9324
> Facsimile (813) 286-2900
> Primary e-mail:
> brian.rubenstein@csklegal.com
> Secondary e-mail:
> elisabeth.fontugne@csklegal.com
> Alternate e-mails: patricia.toney@csklegal.com
> hollis.simmons@csklegal.com
>
>
> By:   s/ Elisabeth A Fontugne
>      BRIAN D. RUBENSTEIN
>      Florida Bar No.: 16997
>      ELISABETH A FONTUGNE
>      Florida Bar No.: 115954