**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

SAMANTHA RING,

       Plaintiff,      Case No. 8:19-cv-00772-VCM-JSS

vs.

BOCA CIEGA YACHT CLUB, INC.,

       Defendant.

_____/

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
**AND MEMORANDUM OF LAW IN SUPPORT**

   This is a Title III ADA discrimination case.[12] To prevail, a plaintiff generally has the burden of proving (1) that he or she is an individual with a disability; (2) that the defendant owns, leases, or operates a place of public accommodation; and (3) that defendant denied him or her full and equal enjoyment of goods, services, facilities or privileges offered by the defendant (4) on the basis of his or her disability. *Cohan v. Rist Props., LLC*, No. 2:14-cv-439-FtM-38DNF, 2015 WL 224640, at \*2 (M.D. Fla. Jan. 15, 2015) (quoting *Schiavo ex rel Schindler v. Schiavo,* 358 F. Supp.2d 1161, 1165 (M.D. Fla. 2005). Plaintiff, through undersigned counsel, moves for partial summary judgment under Fed. R. Civ. P. 56 on elements (1) through (4) because there is no triable issue of material fact and she is entitled to judgment as a matter of law.

---

[1] Title III of the Americans With Disabilities Act, 42 U.S.C. §§ 12181-12189 ("Title III"), which addresses "Public Accommodations and Services Operated by Private Entities," provides that "[n]o individual shall be discriminated against on the basis of disability in any place of public accommodation." 42 U.S.C. § 12182(a).

[2] This case is also a discrimination claim under the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01, *et seq.* ("FCRA"). In the Eleventh Circuit both claims are analyzed under the same framework. *Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1221 (11th Cir. 2000)(disability discrimination claims under FCRA analyzed under same framework as ADA claims).

## INTRODUCTION

Plaintiff is a person with a disability who requires the assistance of her service animal in certain settings. Plaintiff belonged to a social and sailing group, Defendant, Boca Ciega Yacht Club ("BCYC"), until BCYC refused to let her service animal in the building it leases for a dollar from the City of Gulfport, and then expelled Plaintiff for reporting its discriminatory conduct to the City Manager. Defendant claims it is a private club, exempt from the ADA and FCRA, and therefore free to discriminate. As to all four (4) factors of Title III discrimination, Plaintiff has proven her *prima facie* case, and the Court should enter summary judgment in her favor and find that she has substantially prevailed.

## I.   STATEMENT OF MATERIAL FACTS

1. Plaintiff Samantha Ring teaches middle school Spanish at Bay Point Middle School in St. Petersburg, Florida. Exhibit 2, Affidavit of Samantha Ring at ¶2.

2. Plaintiff suffers from and has a history of suffering from life-threatening allergies. *Id.* at ¶¶3, 6; Exhibit 3, Affidavit of J.D. Wohlers.

3. Plaintiff experiences anaphylaxis if exposed to an allergen trigger which has and could escalate to anaphylactic shock. *Id.* Her tongue swells and airways constrict causing her to have trouble breathing. Ex. 2, Ring Aff. at ¶¶ 3, 6.

4. Plaintiff carries a Medical Pack ("medi-pack") with her at all time which includes an epinephrine autoinjector commonly called an "EpiPen," an inhaler, her anxiety medication, a backup phone, and an extra pair of prescription eyeglasses. *Id.* at ¶5.

5. Plaintiff has had to use her EpiPen twice in the last two and a half months. *Id.* at ¶6, 7.

6. Plaintiff can physically demonstrate that her dog is a service dog which has been specially trained to seek, locate, and retrieve her Epipen, and get help if her Epipen fails or has been misplaced. *Id.* at ¶12.

7. Plaintiff is a sailor and joined BCYC in 2007. *Id.* at ¶16.

8. Plaintiff has taken dog training courses, read books, and watched educational and instructional videos on dog training. *Id.* at ¶10. She has a Master's in Montessori teaching and employs the same behavioral modification techniques in her dog training. *Id.*

9. Plaintiff obtained her service dog "Piper" in 2015 but did not seek permission to be accompanied by her Piper in the BCYC clubhouse until Piper had learned sufficient obedience skills for public access and had learned disability-related tasks. *Id.* at ¶¶8, 12, 18.

10. Without professional training Piper earned a "Canine Good Citizen" Certificate, given to dogs that demonstrate mastery of ten different skills related to obedience and proper socialization. *Id.* at ¶11. Piper passed the test the first time she took it. *Id.*

11. Plaintiff and her service dog are currently working via video conference with an experienced, professional service dog trainer, Dawn Scheu, to train Piper to detect sunflower seeds and alert Plaintiff to their presence. *Id.* at ¶14; Exhibit 4, Affidavit of Trainer Scheu at ¶7.

12. Trainer Scheu has more than 20 years experience in training dogs for scent detection. Ex. 4, Trainer Aff. at ¶3. Trainer Scheu helped write the standards for testing scent detection dogs and evaluates dogs for their fitness for public access and their ability to detect scents. *Id.* at ¶5, 14.

13. Trainer Scheu has confirmed that Piper was already a service dog when she began working with Plaintiff. *Id.* at ¶8. Piper had already learned to perform specific and discrete disability-related tasks including retrieving Plaintiff's emergency medical pack containing her EpiPen upon command, finding the medical pack if lost or misplaced, and seeking help if Plaintiff is having an anaphylactic reaction and needs assistance. *Id.* at ¶8.

14. Trainer Scheu attests that Piper is doing well in her training to detect sunflower seeds and will be able to take and pass all four of the tests required for scent detection service dogs within a few months. *Id.* at ¶14.

15. Plaintiff does not bring her service dog to work because of concerns regarding students with dog allergies, dog phobias, and that a dog's presence would be distracting to middle school students. Ex. 2, Ring Aff. at ¶15.

16. The risk of a bee sting at school is low and Plaintiff is almost never alone in the school building unlike the BCYC clubhouse which is often open to the elements and empty of other people. *Id.*

17. Trainer Scheu attested that Plaintiff does not need to bring her service animal to work for the animal to be a service animal, and that choosing not to bring her service animal does not

adversely impact the service animal's effectiveness at performing disability-related tasks for Plaintiff in places of public accommodation. *Id.* at ¶12.

18. When confident Piper was sufficiently trained, Plaintiff asked BCYC leadership about having Piper with her in the BCYC clubhouse. Ex. 2, Ring Aff. at ¶18.

19. Plaintiff provided information to BCYC's then-Commodore[3] Larry Brown regarding Piper's training and verification of her need for Piper based upon allergies and anxiety before bringing Piper to BCYC's clubhouse. *Id.* at ¶18; Exhibit 12, Index and Exhibits to Southard Deposition at 3:Ex. 1.

20. Defendant denied Plaintiff's service dog entrance into its facilities asserting that BCYC is a private club, Ex. 2, Ring Aff. at ¶18, and then expelled Plaintiff for seeking assistance in addressing BCYC's discriminatory conduct from the city of Gulfport. *Id.* at 6, 13-16; Exhibit 5, BCYC 01.2019 Minutes at 12; Ex. 12, Index & Exhibits to Southern Depo. at 4:Ex.2, 9:Ex.7, 12:Ex.10, 14:Ex.12, 15:Ex.13, 19:Ex.18, 21:Ex.20, 22:Ex.21.

21. Defendant denied Plaintiff, on the basis of her disability, access to not only the clubhouse area, but to all the goods, services, facilities, and privileges Defendant is able to offer because of its Lease with the City of Gulfport. Ex. 2, Ring Aff. at 5; Exhibit 6, Lease Agreement.

22. Defendant BCYC was originally called "The Sunshine City Boat Club" ["Sunshine City"] and was founded in the 1940s by "a bunch of characters" for the purpose of deceiving Tampa Bay government to "wangle" a dock for drinking activities. Exhibit 7, Facebook > BCYC > Profile > "About" > "*For the Joy of the Salty Sea and the Wind in Our Sails,*" https://www.facebook.com/pg/SialBCYC/about/?ref=page_internal 03/29/2019 print-out; Exhibit 8, Certificate for Reincorporation; Exhibit 9, Articles of Inc., Article 1. BCYC's Articles of Incorporation were authorized at a December 20, 1965, meeting. Ex. 8, Cert. Re-inc. In 1965, Sunshine City relocated to the City of Gulfport. Ex. 7, Facebook Profile; *Id.*

23. On February 10, 1966, a Certificate for Reincorporation and Articles of Incorporation of BCYC were filed with the Florida Department of State, changing Sunshine City's name to BCYC. Ex. 8, Cert. Re-inc.; Ex. 9, Art. of Inc. at Article 1. BCYC's Articles of Incorporation were authorized at a December 20, 1965, meeting. Ex. 8, Cert. Re-inc.

---

[3] See note 5, *infra.*

24. BCYC's purpose was to (1) promote safe boating activities in Pinellas County and adjacent areas; and (2) promote instruction and education in safe boating and nautical activities. Ex. 9, Art. of Inc. at Article 2.  Any white person of good character over eighteen, was eligible. *Id.* at Article 3.

25. BCYC's Mission in 2019 was (1) and (2), *supra*, and: "[3] to foster fellowship and camaraderie among the members and [4] to be an integral part of the Community of Gulfport." Exhibit 10,   BCYC > Facebook > BCYC > Profile > "About"> Mission https://www.facebook.com/pg/SialBCYC/about/?ref=page_internal 03/29/2019 print-out.

26. BCYC is "known for throwing a party or two, or 10" and can be described as "a very social, rum-loving, alcohol-loving group of people." Exhibit 11, Commodore[4] Nicholas Joseph Southard Deposition at 98:8-16.

27. On December 21, 2007, the City of Gulfport agreed to lease BCYC City property for thirteen (13) years. Ex. 6, Lease at 1:1. "Property" encompassed two waterfront parcels of land and dock/marina area, denoted as "Leased Premises." *Id.* at 1:1.; at 8-10: "Exhibit A," "Exhibit B," and Diagram to Lease. The City also agreed to lease the clubhouse building and parking area on the Leased Premises to BCYC for one dollar per year. Ex. 6, Lease at 1:3.

28. The waterfront access areas of the Leased Premises cannot be secured by a gate and are accessible at all times to everyone, including the general public. Exhibit 13, Aerial Google Maps Views; Exhibit 14, Aerial Map View Front Gate Open. BCYC's non-waterfont front gate/club entrance is left open. Ex. 14, Aerial Map Front Gate Open.

29. In 2018, applicants for membership filled out a written application[5] available online to join BCYC. Ex. 11, Southard Depo. at 57:10-59:4. Other than being over 21, there were no particular criterion or standards an applicant had to meet. *Id.* at 58:11-21. An applicant wasn't required to know how to read, how to write, own a boat, how to sail or operate a boat, nautical terms, or what a "Commodore" is. *Id.* at 58:22-60:3. Applicants didn't need a sponsor or a reference. *Id.* at 70:17-22. In 2019 the application process was the same. *Id.* at 70:23-71:8.

30. The Application requests name, address, date of birth, phone numbers, email, gender, spousal information, employer, emergency medical contact designee, and boat information (i.e., if a

---

[4] A "Commodore" could be described as the equivalent of a "President." *Id.* at 12:25-13:4.

[5] An applicant could have someone else fill out an application for him/her. *Id.* at 58:22-59:4.

boat is owned), and whether an applicant has been convicted of or pled nolo to a felony. Exhibit 15, BCYC Membership Application at 2-4.

31. In 2018 and before, an applicant paid $125.00 when applying; $35.00 of which was for a "background check" and the remainder for a membership "down payment." Ex. 11, Southard Depo. at 64:18-69:21. Applicants in the same household get a two-for-one deal and pay one initiation fee. *Id.* at 81:3-82:6.

32. The Application has been the same or similar since at least 2004. *Id.* at 58:2-10. BCYC's Commodore doesn't know if a criminal or background check is actually even done. *Id.* at 9:12-10:3.

33. After an application and payment are submitted, Gerri Angel decides if an applicant is "okay." Ex. 11, Southard Depo. at 60:4-62:6. If she does, an investigation check is done. *Id.* at 61:23-62:6. Once its back, the "[Membership] Committee" calls the applicant to come to BCYC's clubhouse. *Id.* at 62:7-63-8. That "Committee" is just Mrs. Angel. *Id.* at 62:7-63:5. Mrs. Angel is an 80-year old BCYC member and has made the calls for fifteen (15) years. *Id.* at 60:22-61:11. It's up to her what applicants are asked. *Id.* at 61:19-22. She asks questions based upon her experience and general questions about "why" an applicant wants to join BCYC. *Id.* at 60:4-61:18.

34. Once every month, except December, applicants' names are brought up to BCYC's board and then applicants are "voted in" at a general meeting. *Id.* at 63:11-14; 66:5-23; 71:19-72:1.

35.  Admission standards do not include sailing experience, home ownership, level of wealth, or level of education. *Id.* at 68:14-69:21.

36. Mrs. Angel decides whether to bring up an applicant's name to BCYC's Board. *Id.* at 67:7-15. If she does "It's fait accompli. It's already decided once [Gerri Angel] brings those people up." *Id.* at 67:7-16. If applicants are at the board meeting will be up for vote to become a member. *Id.* at 67:12-15. Voting is by a panel at the general meeting. *Id.* at 71:11-18.

37. In his sixteen (16) years with BCYC, at no general meeting BCYC's Commodore attended has an applicant not been voted in, and he knows of no applicant that has not been admitted. Ex. 11, Southard Depo. at 72:2-10. If an applicant's name is passed to BCYC's board, the only reason an applicant wouldn't be voted in is because he/she didn't show up to the general meeting. *Id.* at 72:11-17. If an applicant attends the general meeting, "they're in." *Id.* at 70:8-15.

38. At no time before Plaintiff brought this lawsuit did BCYC have a membership cap. *Id*. at 72:22-73:9; 79:20-23. In 2018-2019 BCYC had about 200 members. *Id.* at 101:9-11.

39. In May of 2019, after the lawsuit was initiated, BCYC proposed a new limit on membership, changes to the admission process, or new membership probationary period. *Id*. at 79:23-80:5.

40. In 2019, annual membership was $145.00 per quarter, per household. Ex. 15, Application at 1; Ex. 11, Southard Depo. *Id.* at 80:22-82:23. Members pay no renewal fees or any other fees of any kind. *Id.* at 82:12-19. Once in, members pay only quarterly dues. *Id.* at 82:17-19.

41. "*The Windward*" is a publication by BCYC available to the general public through its website. *Id*. at 56:15-21; 85:23-88:6. At times it has members' contact information such as a phone number and email address. *Id.* at 87:20-24.

42. BCYC advertises events and its sailing school which are open to the general public in "*The Gabber*," a Gulfport publication. *Id.* at 89:23-90, 92:14-18. BCYC also recruits new members through a sales leaflet brochure passed out at boat shows. *Id.* at 98:18-99:24.

43. On March 29, 2019, BCYC advertised on its website that membership is "Just $1.05 per day." *Id*. at 95:8-11.

44. Anyone from the general public can have access to BCYC for free for 90 days without going through an application process or background check. *Id*. at 93:9-94:4; 94:13-16; 96:5-97:6. They can bring guests and have access to BCYC's facilities. *Id.* at 93:6-13; 94:20-25. They only need to pay a fee for sailing instruction. *Id.* at 94:13-16. Sailing school lasts two weeks and students have unfettered access to BCYC's facilities. *Id.* at 103:4-11.

45. Non-member "Sea Scouts,"[6] who are minors that don't drive, and their parents and chauffeurs, have access to BCYC's facilities once during the week and on weekends for part of the year. *Id*. at 107:15-108:11; 109:4-9; 112:13-19. They are not accompanied by a BCYC member while at BCYC. *Id.* 109:4-112:12.

46. BCYC holds an annual Open House to promote its activities. *Id.* at 92:14-21. Anyone from the general public can attend for free and access its facilities without being accompanied by a BCYC member. *Id.* at 92:22-93:8. BCYC holds other events which allow the public and nonmembers to freely access its facilities including fishing tournaments, casino nights, boat shows, and regattas. Exhibit 16, BCYC Calendar at 3-8, 12-29.

---

[6] Sea Scouts are the sailing equivalent of "Boy Scouts." Ex. 11, Southard Depo. at 107:15-20.

47. BCYC actively advertises, solicits, promotes itself, its sailing schools, and Open House, and/or "encourage[es] new membership" on Facebook, on its website, and in "*The Gabber*. Ex. 11, Southard Depo. at 88:3-89:22; 90:6-13; 92:14-21; 95:1-25; Ex. 7, Facebook Profile; Ex. 16, Calendar at and 2.

48. Per its Lease with the City of Gulfport, members of the Gulfport Lions Club, Gulfport Yacht Club, Inc., Gulfport Youth Sailing, Inc, and the City's invitees and those invitees' guests have access "to the beach area behind Lions Club clubhouse." Ex. 6, Lease at 4, [Item] "7. Beach Access."

49. In 2016 BCYC served as the registration site for Gulfport's Pink Flamingo Tour of Homes, a public event hosted by the City of Gulfport. Ex. 16, BCYC Calendar at 6. The tour itself occurs off of BCYC property. *Id.*

50. BCYC allows the members and guests of other clubs, such as the Florida Women's Sailing Association, the Bay Sailors, and the Gulfport Historical Society, unfettered access and unrestricted movement in, on, and to BCYC's property and facilities. Ex. 2, Ring Aff.; Exhibit 16, BCYC Calendar & Minutes Excerpts at 4. From 2009 to the present, BCYC hosted events and gatherings to nonmembers such as ROTC at USF, Gulfport Elementary School, Eckerd College, East Lake High School Drama Club. Ex. 16, Calendar at 1, 2, 3, 6, respectively. In February 2019, nonmember Chris Krietlein used BCYC to teach his course on Celestial Navigation. Ex. 5, BCYC 01.2019 Minutes at 5:10.

51. Yearly, BCYC gives away a free membership. Ex. 11, Southard Depo. at 103:12-15. The winner pays no money, completes no application, undergoes no background check or identity verification, and has unfettered access to BCYC's property and facilities. *Id.* at 103:12-104:6.

52. BCYC members host wedding events, receptions, and parties for birthdays, Sweet 16s, graduations, anniversaries, retirement, promotions, baby showers, coming out, etc. at BCYC. *Id.* at 104:7-107:6. There are no caps on guests and events could have more than one hundred non-BCYC members, all of whom could have unfettered access to BCYC facilities. *Id.* at 106:9-14; 105:10-23.

53. BCYC has up to 11 potluck dinners a year to which members bring guests. *Id.* at 99:25-100:4. There is no limit on guests. *Id.* at 100:5-15. BCYC also hosts a Christmas Boat Parade to which members bring guests. *Id.* at 102:11-24. Guests are members of the public. *Id.* at 102:23-24.

54. No background check is done on BCYC's members' guests, and guests are not given any identification, guest passes, wrist bands, or hand stamps. *Id.* at 100:20-101:3. Members don't really know who is a guest as opposed to a member. *Id.* at 101:4-8. Guests don't pay any fees. *Id.* at 102:9-10.

55. Members of the general public, "without knowing a soul" at BCYC, can have unfettered access to BCYC's facilities. Exhibit 5, BCYC 01.2019 Minutes at 3.

56. Nonmembers of BCYC, including both guests of member and "members of the general public," have unfettered access to BCYC's facilities. Exhibit 17, Affidavit of Charon Wood; Exhibit 18, Notarized Declaration of Kelli LaPuma; Exhibit 19, Notarized Declaration of Renee S. Best; Ex. 14, Aerial Map View Front Gate Open. Some nonmembers have visited more than hundred times and have not been required to show identification, asked for identification, asked to sign a "sign-in" sheet or Visitor's Log, asked for a security deposit, or asked to justify their presence. Ex. 17, Wood Aff.; Ex. 18, LaPuma Aff., Ex. 19 Best Aff.

57. BCYC is a place of exhibition, entertainment, public gathering, education, exercise and recreation, an establishment serving food and drink, and is used for public transportation. Ex. 16, Calendar at 1-30; Ex. 7, History; Ex. 10, Mission; Ex. 5, BCYC 01.2019 Mins. at 2, 3, 5.

58. BCYC Member Jenn Buckley is paid by BCYC to do work for it. Ex. 5, BCYC 01.2019 Minutes at 1, 4, 5, 10, 11; Exhibit 20, J Buckley 2018 Business Record; Exhibit 21, J Buckley 2019 Business Record. BCYC employs and pays a bookkeeper to replace the role of its Assistant Treasurer. Ex. 5, BCYC 01.2019 Minutes at 5:7. BCYC receives income from members and nonmembers through activities, merchandise sales, dry slip rentals, dinghy rack rentals, sail schools (adult and youth), design regattas, *The Windword*, and races. *Id.* at 7.

59. Plaintiff joined BCYC in 2007. Dkt. 100, Third Amended Complaint at 2, ¶ 6. At that time, no member obtained "any vested right, interest or privilege of, in or to the asset or franchise of Club, nor any right, interest, or privileges which may be transferable, assignable, or inheritable, or which shall continue after he or she ceases to be a member." Exhibit 22, 2007 BCYC By-Laws Excerpt. That has not changed. Exhibit 23, July 2018 BCYC By-Laws Excerpt.

## II. LEGAL STANDARD

Summary judgment is appropriate when the movant shows there is no genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. (56)(a); *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Fennell v. Gilstrap*, 559 F.3d 1212, 1216 (11th Cir. 2009). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (citing *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Which facts are material depends on the substantive law applicable to the case. *Anderson*, 477 U.S. at 248.

The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). That burden is discharged by showing or pointing out to the Court that there is an absence of evidence to support the non-moving party's case. *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001) (citation omitted). If the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir. 1981).

### III.  ANALYSIS

### A.  PIPER HAS BEEN INDIVIDUALLY TRAINED TO PERFORM DISABILITY-RELATED TASKS TO ASSIST PLAINTIFF, A PERSON WITH A DISABILITY, AND IS THEREFORE A SERVICE ANIMAL.

For ADA purposes, a service animal is "any guide dog, signal dog, or other animal individually trained to do work or perform tasks for the benefit of an individual with a disability…" 28 C.F.R. § 36.104.[7] BCYC cannot refute that Piper has been trained to retrieve Plaintiff's emergency medical pack, to find the pack if it is lost or misplaced, or to find help if

---

[7] Alerting individuals to the presence of allergens and retrieving items such as medicine are two examples of disability-related tasks. 28 C.F.R. § 36.104.

Plaintiff is incapacitated by an allergic reaction. Exh. 2, Ring Aff. at ¶12; Exh. 4, Trainer Aff. at ¶8. BCYC cannot refute that Piper is being trained, and successfully so, to detected sunflower seeds. Exh. 4, Trainer Aff. at ¶14. Even if Piper were not already performing disability-related tasks, under Florida law, Piper would be allowed to accompany Ring in all places of public accommodation. Fla. Stat. § 413.08(8)(2019)("Any trainer of a service animal, while engaged in the training of such an animal, has the same rights and privileges with respect to access to public facilities and the same liability for damage as is provided for those persons described in subsection (3) accompanied by service animals.").

Even though Piper is being trained to detect sunflower seeds under the guidance of a professional service dog trainer that specializes in teaching scent detection, the ADA has no requirement that a service dog be professionally trained. Plaintiff herself trained Piper to retrieve her emergency medical pack and to locate the pack when it is misplaced. Ex. 2, Ring Aff. at ¶¶ 10-12; Ex. 4, Trainer Scheu Aff. at ¶8. The only relevant inquiry when determining whether an animal is a "service animal" under the ADA is whether the animal performs tasks that help to ameliorate the disabled person's disability or disabilities. *Miller v. Ladd*, No. CV 08-05595 NJV, 2010 U.S. Dist. LEXIS 73050 (N.D. Cal. July 20, 2010).

An episodic impairment such as an allergy is considered a "disability" if it substantially limits a major life activity "when active." 29 C.F.R. §1630.2(j)(1)(vii). When Plaintiff suffers an allergic reaction, her allergy substantially limits her ability to breathe. (Ex. 2, Ring Aff. at ¶¶ 3, 6.) Under the ADA "a major life activity also includes the operation of a major bodily function" such as respiration. 42 U.S.C. § 12101(2)(B). Under the ADA her allergies are disabilities.

Plaintiff was first diagnosed with life-threatening allergies when a young child. Ex. 3, J.D. Wohlers Aff. Now an adult, she still has a severe allergic reaction to bee stings and

sunflower seeds causing her tongue to swell and throat to constrict, inhibiting or otherwise preventing her from breathing. Ex. 2, Ring Aff. at ¶¶ 3, 6. If an allergen exposure is severe enough, Plaintiff could die without her EpiPen. Ex. 2, Ring Aff. at ¶¶ 3, 4, 9. The danger of Plaintiff suffering an anaphylactic reaction is not merely hypothetical, twice in the last two and a half months Plaintiff has had to use her EpiPen when inadvertently and unexpectedly exposed to sunflower seeds. *Id.* at ¶6. BCYC cannot refute that Plaintiff has allergies that are life-threatening or that Piper's assistance could literally save Plaintiff's life if she were to suffer an allergic reaction when alone and unable to find or reach her EpiPen.

In *J.D. v. Colonial Williamsburg Found.*, No. 4:17cv101, 2018 U.S. Dist. LEXIS 94589 (E.D. Va. Mar. 27, 2018), the father of an 11-year old boy ("J.D.") with a sensitivity to gluten brought food that had been prepared at home for his son into a restaurant. J.D and his father were visiting the restaurant as part of a class trip to Colonial Willamsburg. The restaurant had a policy of not allowing outside food and forced father and son to eat at a picnic table behind the restaurant rather than letting them eat the gluten free meal brought from home inside the restaurant with J.D.'s classmates. In defending a suit brought under the ADA, the restaurant argued that J.D.'s gluten insensitivity did not substantially limit him in a major life activity because J.D. could avoid symptoms by avoiding gluten. In denying the restaurant's motion for summary judgment on the issue of whether the child was disabled, the court stated that "[i]f a plaintiff experiences disabling symptoms when he suffers an allergic, or gluten-caused, reaction, he can be considered disabled under the ADAAA, even if such symptoms are episodic." This holding was affirmed by the United States Court of Appeals for the Fourth Circuit. See *J.D. v. Colonial Williamsburg Found.*, 925 F.3d 663 (4th Cir. 2019).

Congress requires a Court to construe the statutory text "broadly in favor of expansive coverage," keeping in mind that the inquiry of whether an impairment substantially limits an individual in a major life activity "is not meant to be a demanding standard." *J.D. v. Colonial Williamsburg Found* at 669, citing 28 C.F.R. § 36.105(d)(1)(i). While J.D. suffered "serious consequences" if he ingested even a small amount of gluten, the minor child's symptoms were not life-threatening. In Plaintiff's case however, the symptoms of her severe allergic reaction include not being able to breathe. Ex. 2, at ¶¶3, 6, 9.

Code of Federal Regulations Section 36.105(d)(1)(ii) provides that "the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis." Simply put, Plaintiff suffers an episodic condition that is not just substantially limiting when active, but potentially deadly. There can be no question as to whether her allergies constitute disabilities for purposes pf the ADA. *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1269 (11th Cir. 2014) ("The ADA, therefore, now provides that the phrase 'substantially limits' "shall be interpreted consistently with the findings and purposes of the [ADAAA],' *id*. at § 12102(4)(B), and that 'an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active' *id*. at § 12102(4)(D).").

**B. ALLOWING PLAINTIFF'S SERVICE ANIMAL TO ACCOMPANY HER IN THE CLUBHOUSE IS A REASONABLE MODIFICATION.**

When an entity regulated under Title III fails to accommodate a person with a disability, whether the entity is liable for failing to make the accommodation turns on (1) whether the requested accommodation to the program was reasonable; (2) whether it was necessary to assure meaningful access; and (3) whether it would represent 'a fundamental alteration in the nature of [the] program. *Matheis v. CSL Plasma, Inc.*, 936 F.3d 171 (3d Cir. 2019) (quoting *Alexander v. Choate*, 469 U.S. 287, 105 S. Ct. 712, 83 L. Ed. 2d 661 (1985)). The plaintiff bears the initial

burden of establishing that the desired accommodation is reasonable and necessary, while the defendant bears the burden of showing that it would fundamentally alter the nature of the program. *J.D. by Doherty v. Colonial Williamsburg Found.,* 925 F.3d 663, 671 (4th Cir. 2019).

The use of service animals is, with few specific exceptions, always reasonable as a matter of law. See *Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 118-19 (3d Cir. 2018) ("[I]f the exceptions are inapplicable, a disabled individual's proposed accommodation of the use of her service animal is reasonable under the ADA as a matter of law.")  The Department of Justice ("DOJ") promulgated regulations regarding service animals which provide that public accommodations "[g]enerally…<u>shall</u> modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability." 28 C.F.R. § 36.302(c)(1). This regulation has been interpreted to mean that use of a service animal by a disabled individual "is reasonable under the ADA as a matter of law" so long as no DOJ-promulgated regulation supersedes this general rule.  *Matheis v. CSL Plasma, Inc.*, 936 F.3d 171, 179 (3d Cir. 2019).

The DOJ has also specified the very limited circumstances when service animals may be excluded from a place of public accommodation:  if granting access would "fundamentally alter" the nature of the program, or pose a "direct threat" to the health or safety of others, or if the animal is either "out of control" or "not housebroken." Subject to these exceptions, however, the regulations mandate that "[i]ndividuals with disabilities shall be permitted to be accompanied by their service animals in all areas of [a covered actor's facilities] where…program participants… are allowed to go." *Berardelli* at 120. (internal citations omitted). See also *Matheis v. CSL Plasma, Inc*. at 179. ("The service-animal regulations satisfy [Plaintiff's] initial burden to show an accommodation is reasonable; [Defendant] must establish that an exception to those regulations applies.")

Plaintiff has demonstrated that she needs her service animal to fully enjoy the amenities offered by BCYC, particularly the clubhouse, which has unscreened windows that are frequently opened and where she has not infrequently found herself completely alone. Ex. 2, Ring Aff. at ¶ 18.  The use of a service animal in a place of public accommodation is reasonable as a matter of law. Allowing Piper in the BCYC clubhouse would not fundamentally alter the nature of the services provided by BCY. BCYC could still operate as a sailing and social club notwithstanding a service animal's occasional presence. See *Sabal Palm Condos. of Pine Island Ridge Ass'n v. Fischer*, 6 F. Supp. 3d 1272, 1281 (S.D. Fla. 2014) ("Sabal Palm is a condominium association. Its raison d'être is to provide housing. Allowing a disabled resident to keep a service dog would not fundamentally alter Sabal Palm because Sabal Palm would still be able to offer housing.)

BCYC has illegally discriminated against the Plaintiff by failing to modify its rule that dogs are not allowed in the clubhouse.

## C.  BCYC IS A PLACE OF A PUBLIC ACCOMMODATION.

### 1.  BCYC BEARS THE BURDEN OF PROVING IT IS A PRIVATE CLUB.

Part III of the ADA forbids discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.' 42 U. S. C. § 12182(a).  Because of the importance of federal discrimination laws, courts have narrowly construed exemptions under the ADA and place the burden upon the party claiming the exemption. *Quijano v. Univ. Fed. Credit Union*, 617 F.2d 129, 131-32 (5th Cir. 1980); *Nesmith v. YMCA,* 397 F.2d 96, 101 (4th Cir. 1968) ("The burden of proof rest[s] upon the [defendant] to substantiate its claim to private club status...."); *Bommarito v. Grosse Pointe Yacht Club,* 2007 WL 925791 at *4 (E.D. Mich. Mar. 26, 2007) ("Because of

the importance of federal discrimination laws, courts ... place the burden upon the party claiming

the exemption").[8]

> ### 2.     BCYC FALLS WITHIN SEVERAL OF THE SPECIFICALLY-ENUMERATED PLACES OF PUBLIC ACCOMMODATION AS DEFINED BY THE ADA.

A "place of public accommodation" is a facility whose operations affect commerce and

falls within one of the twelve broad categories of facilities listed in the statute.  See 42 U.S.C. §

12181(7). These categories include such facilities as places of "exhibition or entertainment,"

"lecture hall or other place of public gathering," "a place of education," establishments serving

food or drink, and places of "exercise or recreation" any one of which applies to BCYC. Section

301 of Title III, 42 U.S.C. § 12181(7)(B), (C),(D),(J), and/or (L); and see generally 28 C.F.R. Pt.

36, App. B at 622-23.

BCYC, a self-designated social and sailing group, falls squarely within the umbrage of

Title III's statutory definition of public accommodation.  42 U.S.C. § 12181(7(7)(B), (C),(D),(J),

and (L). BCYC proudly boasts of its alcoholic-squatting roots of deceptions that led to it

"eventually wangl[ing] a lease out of the city" of St. Petersburg, before relocating to the City of

Gulfport.  *Id.*  While its publicly-claimed "Mission" in the year 2019 has been somewhat

sanitized, i.e., "to promote safe boating activities in Pinellas County and waters adjacent thereto;

to promote instruction and education in safe boating and all nautical activities; to foster

fellowship and camaraderie among the members; and to be an integral part of the Community of

Gulfport," BCYC's cleaned-up goals place it even further among possible ADA enumerations of

---

[8] Whether BCYC is a "private club" meriting exemption from the ADA, ADA regulations, and its prescripts is only achieved by BCYC's successfully pleading same as an affirmative defense. Plaintiff contends, for the reasons identified in her Motion to Strike Some of Defendant's Affirmative Defenses and Memorandum of Law in Support [Dkt. 114] ("Motion to Strike") which she expressly incorporates herein, that BCYC has not properly pled such as an affirmative defense and is therefore precluded from asserting it.

places of public accommodation. 42 U.S.C. § 12181(7)(B), (C),(D),(J), and/or (L); Ex. 7, BCYC Facebook Profile; Ex. 8, Cert. of Re-Inc.

BCYC receives income from members and nonmembers through its activities, merchandise sales, dry slip rentals, dinghy rack rentals, sail schools (adult and youth), design regattas, *The Windword*, and races. Ex. 5, BCYC 01.2019 Minutes at 7. It holds an Open House to promote its activities. Ex. 11, Southard Depo. at 92:14-21. Food and beverages and promotional activities are the essence of this four-hour annual event. BCYC holds recreation and exercise events regularly including fishing tournaments, casino nights, boat shows, boat races, and regattas. Exhibit 16, BCYC Calendar at 3-8, 12-29.

BCYC is also a place of education. It regularly conducts sailing schools and programs for Sea Scouts which it actively advertises, solicits, promotes on Facebook, on its website, and in the community publication *The Gabber*. Ex. 11, Southard Depo. at 88:3-89:22; 90:6-13; 92:14-21; 95:1-25; Ex. 7, Facebook Profile; Ex. 16, Calendar at  and 2.

Per its Lease with the City of Gulfport, members of the Gulfport Lions Club, Gulfport Yacht Club, Inc., Gulfport Youth Sailing, Inc, and the City's invitees and those invitees' guests have access to its premises. Ex. 6, Lease at 4, [Item] "7. Beach Access." In 2016 BCYC served as the registration site for Gulfport's Pink Flamingo Tour of Homes, a public event hosted by the City of Gulfport. Ex. 16, BCYC Calendar at 6. All of these events are or incite public gatherings.

BCYC has even hosted events and gatherings for the ROTC at USF, Gulfport Elementary School, Eckerd College, East Lake High School Drama Club. Ex. 16, Calendar at 1, 2, 3, 6, respectively. In February 2019, a nonmember Chris Krietlein used BCYC to teach his course on Celestial Navigation. Ex. 5, BCYC 01.2019 Minutes at 5:10. All of these which put BCYC under the umbrellas of public accommodation.

**D. BCYC HAS NO SELECTIVITY, ITS ADMISSION PROCESS IS A FARCE, ITS HISTORY AND PURPOSE ARE CANNOT CARRY THE BURDEN OF PROVING THAT IT FALLS WITHIN THE PRIVATE CLUB EXEMPTION AS ALL FACTORS WEIGH HEAVILY IN FAVOR OF A PUBLIC ACCOMMODATION FINDING.**

Again, it is BCYC, not Plaintiff, who bears the burden of proving its status (of private club vs. public accommodation). *Nesmith v. YMCA*, 397 F.2d 96, 101 (4th Cir. 1968)*; Bommarito v. Grosse Pointe Yacht Club,* 2007 WL 925791 at *4 (E.D. Mich. Mar. 26, 2007).

While the Eleventh Circuit has not yet addressed the issue of what a party who does not fall within the named list of public accommodation entities must establish to attain the freedom to discriminate with impunity and escape the ADA, it has demonstrated an expansive approach as described by the U.S. Supreme Court. See *Rendon v. Valleycrest Prods Ltd*., 294 F.3d 1279 (11th Cir. 2002)(contestant hotline, which was an automated fast finger telephone selection process for a television quiz show, was a place of public accommodation*)*.

And, "although…the relevant statutes do not specifically define what a 'private club' is, the cases interpreting the term have identified some key (often overlapping) characteristics." *Kalani v. Castle Village LLC*, 14 F. Supp. 3d 1359, 1372 (E.D. Cal. 2014). *United States v. Lansdowne Swim Club*, 713 F.Supp. 785 (E.D.Pa.1989), aff'd, 894 F.2d 83 (3rd Cir.1990), has been described as "exhaustively and persuasively analyzing the 'private club' exemption and setting out key characteristics" and its eight factors of consideration have been looked to by other District Courts as instructive: 1) the genuine selectivity of the group in the admission of its members; 2) the membership's control over the operations of the establishment; 3) the history of the organization; 4) the use of the facility by nonmembers; 5) the purpose of the club's existence; 6) whether the club advertises for members; 7) whether the club is for profit or nonprofit; and 8) the formalities observed by the club, such as bylaws, meeting, membership cards, etc. *U.S. by Kalani* at 1372; *United States v. Lansdowne Swim Club,* 713 F. Supp. 785 (E.D. Pa. 1989).

**1.  BCYC's application process is not genuinely selective.**

Because "genuine selectivity is an integral characteristic of a private club," courts have found this factor to be "the most important ... in ascertaining private club status." *Lansdowne*, 713 F.Supp. at 797 (internal citations omitted); accord *EEOC v. Chicago Club*, 86 F.3d 1423, 1436 (7th Cir. 1996) ("[S]elective membership practices are the essence of private clubs"); *Reimer v. Kuki'o Golf and Beach Club, Inc.,* 2013 WL 1501522 at *2 (D. Haw. Apr. 11, 2013) ("whether a facility is genuinely `private,' and therefore exempt [from the ADA]," is "the selectivity of the group in admitting members").

According to the Eastern District Court, a variety of characteristics may reflect genuine selectivity, including: formality of admission procedures; standards or criteria for admission; the membership's control over the selection of new members; the numerical limit on club membership; the substantiality of the membership fee; and the extent to which applicants have been denied admission. *Lansdowne*, 713 F .Supp. at 797-98. In the case at bar, everyone of these variables defrocks the Defendant's "private club" cloak.

**a.   there are no standards or criteria for admission into BCYC**

There is no selectivity for BCYC's membership. To apply, one only need fill out an application (or have someone else fill it out for them). Ex. 11, Southard Depo. at 57:10-60-3. As conceded by BCYC's President/Commodore, an applicant doesn't need to know how to read, write, own a boat, how to sail or operate a boat, know nautical terms or even what a "Commodore" is before applying for membership. *Id.* Applicants don't need a sponsor, nor do they even need a reference. *Id.* at 70:17-22. Other than being over age 21, there is no particular criterion or standard an applicant must meet before applying. *Id.* at 58:11-21.

BCYC's Membership Application is accessible and available to anyone with internet access. Ex. 15, Membership Application. Given that public libraries provide internet access to all members of the public and smart phones with internet access are ubiquitous, applying for BCYC membership is literally an option for anyone in the world. This complete absence of control over who even applies for BCYC membership, weighs heavily in favor of a BCYC's public accommodation status. *EEOC v. Chicago Club,* 86 F.3d 1423, 1436 (7th Cir. 1996) (finding social club's membership process selective, partly because club controls which individuals are extended invitations to membership); *Reimer v. Kuki'o Golf and Beach Club, Inc*., 2013 WL 1501522 at *3 (D. Haw. Apr. 11, 2013) (finding golf and beach club's membership process selective, partly because "membership is by invitation only").

With the exception of one question, the Membership "Application" itself requires only biographical information, i.e., name, address, date of birth, phone numbers, email, gender, spousal

information, employer, emergency medical contact designee, and boat information ("if you own a boat"). Ex. 15, Membership Application. The only question of any arguable discerning nature is whether an applicant has been convicted or pled nolo contender "to a felony" (applicants' misdemeanor convictions are of no interest to BCYC), which an applicant is given an opportunity to explain away. *Id.* A criminal background check may not even be done (Ex. 11, Southard Depo. at 9:21-10:5; 37:13-38:21; 61:23-6:6), which means dishonest felons still have a shot of becoming a BCYC member.

The cost for applying and for membership in BCYC is insubstantial. See *id.* at 65:2-21., Its "application process" is informal and non-selective. After submitting an applicatoin and payment, an applicant gets a call from BCYC Member, Gerri Angel, who asks "why" the applicant wants to join and other "general vetting questions," without the benefit or a script or instructions, but based solely upon her "experience" and personal preferences. Ex. 11, Southard Depo. at 60:4-61:25. While on paper BCYC reports a "Membership Committee" comprised of a few BCYC members, the reality is that such "Committee" is a one-woman show, as only Ms. Angel makes the phone call, the main purpose of which is to ask the applicant to come in so that an applicant's questions about BCYC can be answered. *Id.* at 60:4-64:23. If she decides that an applicant is "okay," a "background check" may ensue, the content of which BCYC's President/Commodore isn't sure of, nor whether one is actually even done. *Id.* And while applicants' names are forwarded by Mrs. Angel to the BCYC's Board of Directors, the truth is, in the BCYC's President/Commodore's own words, once Gerri Angel passes up an applicant's name: "It's fait accompli. It's already decided once she brings those people up." *Id.* at 67:7-11.

BCYC's membership standards do not include evaluation of substantive demarcations such as sailing or boating experience, home ownership, level of wealth, or level of education. Ex. 11, Southard Depo. at 68:9-69:7. In contrast, true private clubs exhibit a "plan or purpose of exclusiveness." See *Sullivan v. Little Hunting Park, Inc*., 396 U.S. 229, 236, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) ("The Virginia trial court rested on its conclusion that Little Hunting Park was a private social club. But we find nothing of the kind on this record. There was no plan or purpose of exclusiveness. It is open to every white person within the geographic area, there being no selective element other than race."); *Tillman v. Wheaton-Haven Recreation Ass'n, Inc*., 410 U.S. 431, 438, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973) ("[t]he only restrictions are the stated maximum number of memberships and ... the requirement of formal board or membership approval"). In *Sullivan*, every person who was a resident of the relevant area and purchased a membership, was welcome as a member, so long as that person was white.

Ironically, while BCYC's roots were founded in a similar selectivity of being open "to any white person of good character" any such selectivity has been amended, modified, redacted, and otherwise dissolved as the only requirement for applying to BCYC is to be of drinking age. Ex. 9, BCYC Art. of Inc.; Ex. 11, Southard Depo. at 58:11-21. BCYC exhibits no plan or purpose of exclusivity and exhibits even less than was shown in *Sullivan* and *Tillman*.

**b.   BCYC's admission procedure is informal and non-substantive**

At BCYC's general monthly meetings, applications for membership are theoretically voted on. Ex. 11, Southard Depo. at 70:8-17. In his sixteen (16) years of affiliation with BCYC, its Commodore is not aware of even one time that someone who applied for membership in BCYC was not voted in. *Id.* at 72:2-17.

While BCYC members vote to admit new members, the vote is perfunctory. If an applicant gets "the Angel call" and "shows up" at BCYC, he or she is automatically voted in. *Id.*     In other words, despite 176 meetings which included new member applications voting, not a single person was ever denied membership. *Id.*

**c.   there are no numerical limits on BCYC membership**

The existence of caps on club membership often weighs in favor of a finding of selectivity, and thus private club status. As to BCYC, the scales tip diametrically opposite; prior to 2018, BCYC had no cap whatsoever on membership. Ex. 11, Southard Depo. 72:22-73:1. Any caps on membership contemplated by BCYC came only after Plaintiff filed her complaint with the Pinellas County Office of Human Rights and the within lawsuit. *Id.* at 77:19-22.

**d.     both the admission and the membership fees into BCYC are insubstantial**

In *Lobel v Woodland Golf Club of Auburndale*, 260 F.Supp. 127 (U.S. D. Ct. D. Mass. 2017), fees deemed "substantial" for membership in a golf club weighing in favor of a selectivity finding was a nonrefundable $55,000 initiation fee, after which a family of four paid approximately $14,000 per year in dues, assessment, and food minimums.

In sharp contrast, the fees that gain an applicant the right to call him/herself a BCYC "member" are, by BCYC's own Commodore's estimation and as advertised on its website, a "bargain" at "*Just $1.05 per day.*" Ex. 11, Southard Depo. at 95:8-11. While membership fees in the nearby St. Pete Yacht Club are $2,400.00 per year, BCYC's membership fees are only $435.00 per family per year. *Id.* at 91:4-92:13.

**2.**   **BCYC's members' absence of any vested interest or ownership stake exemplifies the absence of a members' control over BCYC's operations and thus the absence of private club status.**

BCYC members have no vested right, interest, or privilege in BCYC, thus no stake in BCYC's property, which actually belongs to the citizens of Gulfport. This exemplifies their  lack of control and BCYC's absence of private-club status. See *Pappion v. R-Ranch Property Owners Ass'n*, 110 F.Supp.3d 1017, 1019 (E.D. Cal. 2015); *U.S. by Katzenbach v. Jordan*, 302 F. Supp. 370, 376 (E.D. La. 1969); Reimer, 2013 WL 1501522 at *3.

**3.**   **BCYC's rum-running, dock-squatting, lease-wangling history and current existence do not engender private club protection.**

BCYC proudly boasts in social media of its 1940s roots of deceiving local government to manipulate prime real estate for a dock perch for drinking "activities." Ex. 7, Facebook; Ex. 10, Mission Statement. As of 2019, not all that much has changed. BCYC's Commodore acknowledges that BCYC is a very social, rum-loving, alcohol-loving group of people. Ex. 11, Southard Depo. at 97:7-98-3. Not only does BCYC exist courtesy of its one-dollar-a-year "sweetheart" deal with the City of Gulfport for prime waterfront real estate including a clubhouse, dock, a parking lot, and wet and dry boat slips from which to perpetuate its "rhumb-running" activities, but it profits from that deal as well. Ex. 6, Lease at 1: 1.; Ex. 5, BCYC 01.2019 Minutes at 7-9. Neither its history, "rum-loving" roots, nor current existence of "throwing a party or two, or 10" merit a finding of "private club" exemption. Ex. 11, Southard Depo at 97:7-98:3; Ex. 7, Facebook. BCYC exhibits no plan or purpose of exclusivity, exposing its "private club" claim for the discrimination shield it is. See *Kalani v Castle Village, LLC*, 14 F.Supp.3d 1359, 1372 (E.D. Cal. 2014); citing *Sullivan v. Little Hunting Park, Inc*., 396 U.S. 229, 236, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969).

**4.**   **Non-members, including both guests of members and "members of the general public," have frequent unfettered use and access to BCYC's facilities.**

The extent to which BCYC limits its facilities to members and their guests and/or exercises control over non-members access are all factor to be considered. See *Jankey v. Twentieth Century Fox Film Corp,* 14 F.Supp.2d 1174, 1178 (C.D. Cal. 1998)(*citing Kelsey v. Univ. Club*, 845 F.Supp. 1526, 1529 (M.D.Fla.1994)). BCYC's non-members encompass (1) guests of members, (2) members of the general public, and (3) hidden members of the general public (i.e., other clubs, guests of the City of Gulfport, sailing school students, Sea Scouts students and their parents and other chauffeurs,

etc.) and are also factors which expose BCYC's claim of entitlement to private club exemption as unmeritorious.

Nonmembers of BCYC, including both guests of member and "members of the general public," have unfettered access to BCYC's facilities. Ex. 17, CW Aff.; Ex. 18, KL Aff.; Ex. 19, RB Aff. Despite more than hundred visits to BCYC, nonmembers have not been asked for identification, been required to show identification, been asked to sign anything such as a "sign-in" sheet or Visitor's Log, been asked to leave a security deposit, or even been asked to justify their presence. *Id.* During events deemed "open to the public" by BCYC, there are no restrictions on access. Ex. 11, Southard Depo. at 93:4-6.

While courts have held that a "limited guest policy" does not strip Defendants of an ADA exemption as a private establishment, guest policies and general public policies in which guests are permitted "unfettered use of facilities" do. See *Bennett v. Tupelo Country Club*, 2006 U.S. Dist. LEXIS 1624, at *6, 2006 WL 37310, at *2-3 (N.D.Miss. Jan. 5, 2006) (finding that the Tupelo Country Club was not private because they allowed non-members to use the Club in a similar capacity to members); *EEOC v. University Club of Chicago*, 763 F. Supp. 985, 987–88 (N.D.Ill.1991) (holding the University Club of Chicago was not private because non-members were allowed essentially the same privileges as members regardless of whether or not the guest is accompanied by a member); *Wright vs. Cork Club*, 315 F. Supp. 1143 at 1154 (S.D. Tex. 1970) (finding a social club where the "facilities are regularly used by nonmembers who are not bona fide guests" is not a private club).

Unlike the Defendant in *Kelsey v. University Club of Orlando, Inc*., 845 F. Supp. 1526 (M.D. Fla. 1994), BCYC's members are not required to accompany their guests when guests use BCYC facilities, nor is there any control on who, how many, or how often a BCYC member can bring guests. Ex. 11, Southard Depo. at 100:17-101:11. Regular use by nonmembers contradicts private status. See generally *Jankey*, 14 F.Supp.2d at 1178.

Moreover, as advertised on BCYC's website, anyone who attends a sailing program at BCYC is automatically given, a three-month membership in BCYC for free. Such individuals are automatically allowed three months of unfettered, unrestricted, unsupervised months of access to BCYC's facilities without any application, vetting, BCYC membership fee payment[9], or background check. Ex. 11, Southard Depo. at 93:9-95:25.

The same situation applies to "Sea Scouts," the sailing equivalent of "Boy Scouts." Sea Scouts, typically minors who don't drive, and their parents or others who chauffeur them, have unfettered access to BCYC's facilities for at least two weeks, and maybe more, several times throughout the year. *Id.* None have been vetted, paid a membership fee, undergone a background check of any type, or submitted an application. *Id.* In addition to the "hidden public" of sailing school attendees and enveloping Sea Scouts, the lease with the City of Gulfport dictates that BCYC "shall allow members of the Gulfport Lions Club, Gulfport Yacht Club, Inc., Gulfport Youth Sailing, Inc," and the City's invitees and those invitees' guests unfettered access "to the beach area behind Lions Club clubhouse."

Several times throughout a calendar year, BCYC allows the members and guests of other clubs, such as the Florida Women's Sailing Association, the Bay Sailors, and the Gulfport Historical Society, unfettered access and unrestricted movement in, on, and to BCYC's property and facilities.

Finally, there are the guests and their invitees of those BCYC members having and hosting events such as weddings, receptions, birthday parties, graduations, retirement, etc. at BCYC. There are no caps on the number of guests a member can invite at any time or any one time, and literally hundreds of "unvetted," non-fee paying, no background, criminal, or identification check individuals have unfettered access and unrestricted movement in, on, and to BCYC's property and facilities. This does not substantiate private club exemption status. See *Lobel v Woodland Golf Club of Auburndale*, 260 F.Supp.3d 127 (D. Mass. 2017).

---

[9] Individuals just pay for sailing lessons. *Id.*

BCYC does not require members to pay a guest fee, cover any charges incurred by the guest, or accompany the guest during his or her time at BCYC's facilities. The absence of anyone of these things is indicative of public accommodation status.

**5.      BCYC heavily advertises and markets on social media.**

Establishments that advertise and solicit members do not fall within the private club exemption. See *Lobel v Woodlawn Golf Club of Auburndale*, 260 F.Supp.3d 127 (D. Mass. 2017). In particular, any advertising designed to increase patronage of the club and the use of their facilities cuts against private club status. *Id.* When considering this factor, then, the critical question is whether and, if so, to what extent and in what manner BCYC publicly advertises to solicit members or to promote the use of the facilities or services by the general public.

BCYC actively advertises, solicits, and/or "encourages membership" on Facebook, on its website, and in "the Gabber" a local publication, in its quest to actively for new members.

Saying that BCYC is a "private club" is akin to saying *The Emperor's New Clothes* fit him well.

### III.   CONCLUSION

WHEREFORE, Plaintiff respectfully requests that the Court enter summary judgment in her favor on all counts and find that she substantially prevailed, and all further appropriate relief.

Respectfully submitted,

| | |
|---|---|
| MARCY I. LAHART, P.A. | VENZA LAW, PLLC |
| 207 SE Tuscawilla Road | 931 Village Boulevard, #905-322 |
| Micanopy, FL 32667 | West Palm Beach, FL 33409 |
| Telephone: (352) 545-7001 | office: (561) 596-6329 |
| Facsimile: (888) 400-1464 | email: dvenza@venzalawpllc.com |
| marcy@floridaanimallawyer.com | |
| BY: *s/ Marcy I. LaHart* | BY: *s/ Denese Venza* |
| Marcy I. LaHart, Esq. | Denese Venza, Esq. |
| Florida Bar No. 0967009 | Florida Bar No. 599220 |
| *Counsel for Plaintiff* | *Counsel for Plaintiff* |

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on 24th day of January, 2020 a true and correct copy of the foregoing has been furnished via CM/ECF electronic mail service to the Clerk of the Court. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

BY: *s/ Denese Venza*
*Counsel for Plaintiff*