Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SAMANTHA RING,
        Plaintiff,
v.        Case No.: 8:19-cv-00772-VCM-JSS
BOCA CIEGA YACHT CLUB, INC.,

        Defendant.
_____/

DEPOSITION OF:
LARRY BROWN

TAKEN BY:    Attorney for Plaintiff

DATE:    October 14, 2019

TIME:    9:33 a.m. - 12:48 p.m.

PLACE:    Executive Reporting Service
        13555 Automobile Boulevard
        Clearwater, Florida 33762

Examination of the witness taken before:
Jerry Lefler RPR CRR CM
Executive Reporting Service
Ulmerton Business Center
13555 Automobile Boulevard, Suite 100
Clearwater, Florida 33762

Page 2

1   APPEARANCES:
2
3   DENESE VENZA, ESQ.
    Venza Law, PLLC
    931 Village Boulevard, #905-322
4   West Palm Beach, Florida 33409
    Dvenza@venzalawpllc.com
5
    MARCY I. LAHART, ESQ.
6   Marcy I. Lahart, P.A.
    207 Southeast Tuscawilla Road
7   Micanopy, Florida 32667
    Marcy@floridaanimallawyer.com
8
    Counsel for Plaintiff
9
10  ELISABETH FONTUGNE, ESQ.
    Cole, Scott & Kissane
11  4301 West Boy Scout Boulevard, #400
    Tampa, Florida 33607
12  Elisabeth.Fontugne@csklegal.com
13  Counsel for Defendant
14
15
16
17
18
19
20
21
22
23  **EXHIBIT D**
24
25

Page 3

1                I N D E X
2                            PAGE
3   Direct Examination by Ms. Lahart      4
4   Cross-Examination by Ms. Fontugne    75
5   Redirect Examination by Ms. Lahart   79
6   Recross-Examination by Ms. Fontugne  91
7   Redirect Examination by Ms. Lahart   96
8   Certificate of Reporter Oath        102
9   Certificate of Court Reporter       103
10  Errata Sheet            104
11  Read and Sign Letter           105
12
13
14
15              E X H I B I T S
                             MARK
16  Brown
17  1   Note from Bayfront Health, 07/16/2018   16
18  2   Note to Samantha Ring from Larry Brown,   27
        Commodore 2018
19
20  3   String of emails            32
21
22  4   String of emails from Larry Brown       37
21
22  Defendant's
23  1   Email from Larry Brown to Samantha Ring,   94
        December 24, 2018
24
25

Page 4

1        THEREUPON,
2            LARRY BROWN
3   was adduced as the deponent herein, and being first
4   duly sworn upon oath, was questioned and testified
5   as follows:
6            DIRECT EXAMINATION
7   BY MS. LAHART:
8        Q.  Good morning.  Would you state your name for
9   the record, please?
10       A.  Larry Brown.
11       Q.  Mr. Brown, where do you live?
12       A.  ████████████████████████
13       Q.  Have you ever given a deposition before?
14       A.  Nope.
15       Q.  I'm sure that your attorney has given you some
16  pointers, but I will go over a few ground rules.
17       A.  Okay.
18       Q.  I'm going to be asking you questions.  The
19  court reporter to my right is going to be writing down
20  both my questions and your answers.
21       So, the natural human tendency when you know
22  what you're being asked is to kind of butt in and answer
23  the question.
24       A.  Right.
25       Q.  Please try not to do that so that the court

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)

6a633be1-a910-4deb-bc02-6eb59cc3a2af

## Page 5

1  reporter doesn't have to try and write down what two
2  people are saying at one time.
3      A.  Got you.
4      Q.  Your answers need to be "Yes" or "No" and not
5  "uh-uh" or "uh-huh," because they look a lot alike on
6  the transcript.
7      A.  How about "Got you"?
8      Q.  "Got you" is good.  I can work with "Got you."
9  If you need a break at any time, please just say so --
10     A.  Okay.
11     Q.  -- and we'll take one.  My intent is not to
12  torture you.
13     A.  Okay.
14     Q.  Mr. Brown, tell me about your educational
15  background.
16     A.  I graduated high school.  I've taken classes at
17  Hillsborough Community College, St. Pete Junior College.
18  That's about it.
19     Q.  How are you employed?
20     A.  I'm employed at Nielsen as an engineer.
21     Q.  What is Nielsen?
22     A.  Nielsen, as in "Nielsen ratings."
23     Q.  Okay.
24     A.  It's a media company.  Well, media measurement.
25     Q.  Got you.  What are your responsibilities as an

## Page 6

1  engineer for Nielsen?
2      A.  I work on operating systems and ancillary
3  software for little devices that go in your home that
4  watch what you're watching.
5          So, if you were selected by Nielsen, you'd go
6  in and press a number for yourself so that the system
7  knows that you're watching, and then as you flip through
8  channels we match up those channels with where they're
9  coming from and then give them credit for that viewer.
10     Q.  How long have you been working for Nielsen?
11     A.  Fifteen years.
12     Q.  Are you married?
13     A.  No.
14     Q.  Are you a sailor?
15     A.  Yes.
16     Q.  Do you have a boat?
17     A.  Yes.
18     Q.  Tell me about it.
19     A.  It's a 38-foot Horstman Trimaran, 22-feet wide.
20  It's -- so it's got three hulls.  And I'm converting it
21  from diesel to electric.  That's about it.
22     Q.  Where do you store it?
23     A.  I've got a property up in New Port Richey.
24     Q.  NPR.
25     A.  Uh-huh.

## Page 7

1      Q.  Are you a member Boca Ciega Yacht Club?
2      A.  Yes.
3      Q.  How long have you been a member.
4      A.  I think since '06, but I'm not positive of
5  that.
6      Q.  Okay.
7      A.  It's within years.
8      Q.  How did you come to join that organization?
9      A.  I actually drove by it a couple of different
10  times.  Because I used to drive around and look at
11  properties in different places and had come across it a
12  couple of times.  At some point, I had a conversation
13  with somebody and they said it was --
14     Q.  Do you remember --
15     A.  I don't remember.  Many years ago.  Like this
16  was way before I even joined.  And then at some point I
17  was driving by there and thought, "You know what?  I
18  should join it."  And did.
19     Q.  What made you want to join the club?
20     A.  To be around other people that are sailing, to
21  have access to the club boats that we have, to be out on
22  the water more often.
23     Q.  Have you ever stored a boat at Boca Ciega Yacht
24  Club or at the marina next door?
25     A.  I anchored my boat offshore.  I had a boat

## Page 8

1  before my current one that I did have at the marina.
2  And then anchored out as well for a period.
3      Q.  So, you said you've been a member since about
4  2006?
5      A.  Uh-huh.
6      Q.  So that's about 13 years?
7      A.  Wow.  It seems like a long time.
8      Q.  Have you held any leadership positions in the
9  club?
10     A.  Yes.  Rear Commodore, Vice Commodore,
11  Commodore.  I've taught in sail school.
12     Q.  What was the first position that you held?
13     A.  Rear Commodore.
14     Q.  And what is a Rear Commodore?
15     A.  Rear Commodore --
16     Q.  Is that like a Vice President?
17     A.  No.  It's like the guy who has to take care of
18  everything.  So they're in charge of the grounds, and
19  technically all of the different -- What's the word I'm
20  looking for?
21         All the different groups within the club, they
22  technically report to the Rear Commodore; although they
23  report to the board when we have board meetings.  If
24  they have an issue, they need something solved, they're
25  supposed to go to the Rear Commodore.

Executive Reporting Service

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)

6a633be1-a910-4deb-bc02-6eb59cc3a2af

Page 9

1    Q.  How long were you the Rear Commodore?
2    A.  A year.  They're all one-year positions.
3    Q.  Do you recall what year that was?
4    A.  No.  It's been about five years, I would guess.
5    Q.  Okay.
6    A.  And I went from Rear to Vice, and then I didn't
7  want to be Commodore.  I don't like speaking in front of
8  people.  I figured "Na."  Then later on I was away from
9  the club for a while.  It seemed like there were fewer
10  people pitching in to do things, so I went to a meeting
11  and they had one person doing three reports for
12  different positions, and I figured "Well, I need to
13  pitch back in."
14        So I figured I would do something, and then
15  within two weeks I got a call asking me to be Commodore.
16  Which was not what I was thinking.  But I figured I
17  never did it, and I may as well do it, so...
18    Q.  So you were the Commodore for one year?
19    A.  One year.
20    Q.  What year was that?
21    A.  That was last year.
22    Q.  2018?
23    A.  Yes.
24    Q.  Does the year run January to December?  How
25  does that work?

Page 10

1    A.  Yes, January to December.
2    Q.  How about now?  Do you have a leadership
3  position?
4    A.  I'm on the board.  Actually, I was on the board
5  before as well.  But the board -- you really just listen
6  to what they have to say, put in your input and then
7  vote.  And so it really isn't so much of a leadership
8  role.
9        I didn't think of that when you mentioned it.
10  But --
11    Q.  Okay.
12    A.  Yeah, that's part of being Commodore, is after
13  your year is up, then you do a year on the board.
14    Q.  Is that a penance?
15    A.  Yes.  No.  Actually it's great compared to
16  being Commodore.  Commodore, they really beat you up
17  when you're Commodore.
18    Q.  What do you mean by that?
19    A.  That whatever -- whatever issues are going on,
20  you feel like a kindergarten teacher, like squabbles
21  between people, and you're trying to satisfy everybody
22  and trying to get people to work together and not, you
23  know, butt heads.
24        Nobody really seems satisfied with the result,
25  because they want to get what they want, and nobody's

Page 11

1  ever happy.  So it's tough.
2    Q.  You mentioned that you were away from the club
3  for a while.
4    A.  Yeah.
5    Q.  Why was that?
6    A.  Just things going on.  I went through a
7  divorce, bought a house, things like that.  It was a
8  foreclosure, so I had to fix it up.
9    Q.  Did you maintain your membership during that
10  time?
11    A.  Yeah.
12    Q.  You just didn't use it much?
13    A.  Right, I just wasn't active.
14    Q.  How about now?
15    A.  Now I pretty much go to the meetings.  Because
16  I'm working on my boat and changing the engine out and
17  all that stuff, it's taking most of my time right now.
18  So other than going to the meetings and listening and
19  voting, that's pretty much it right now.
20    Q.  How many board members are there?
21    A.  There are -- there's eight.  Four -- each one
22  gets a two-year period, but four of them get voted out
23  one year and then the other four get voted out the
24  following year.  So they're staggered, so you're
25  changing out four of them every year.  But each one

Page 12

1  spends two years.
2    Q.  You said there are eight?
3    A.  There's eight.
4    Q.  Are there leadership positions other than the
5  ones that you mentioned:  Rear Commodore, Vice
6  Commodore, and Commodore?
7    A.  Well, there -- there's other positions,
8  like Treasurer.  I don't know if you consider them
9  leadership roles.  Maybe the -- I'm trying to think of
10  the name of it.  Dock Master keeps coming to my mind,
11  but it's not --
12    Q.  How about Flag Officers?
13    A.  Yeah.
14    Q.  What are "Flag Officers"?
15    A.  Those are the Rear Commodore, Vice Commodore,
16  Commodore, Secretary, Treasurer, Assistant Treasurer,
17  and this other one that I can't think of its name right
18  now.
19    Q.  Okay.  Are all --
20    A.  Fleet Captain.
21    Q.  Fleet Captain?
22    A.  Yes.
23    Q.  Are all of those people on the board?
24    A.  They are on the board, yes.
25    Q.  Is there anybody on the board that doesn't have

Executive Reporting Service

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)                                    6a633be1-a910-4deb-bc02-6eb59cc3a2af

Page 13

1　a title like that: Fleet Captain, Secretary, Treasurer?
2　　A.　The eight that I was describing, those eight
3　are just board members, so they don't -- I mean, they
4　could be a Committee Chair or something like that as
5　well, but they wouldn't be an officer.
6　　Q.　Okay.  So forgive me if I'm being obtuse, but
7　the eight board members, does that include the Rear
8　Commodore and the Vice Commodore --
9　　A.　No.
10　　Q.　-- and the Commodore?
11　　A.　They're separate.  So --
12　　Q.　Tell me how that works.
13　　A.　So, they're all considered board members as a
14　voting body.  But when you, "Say how many board members
15　are there?" I'm thinking of the people that are just,
16　you know, just the board.
17　　Q.　Okay.  So altogether?
18　　A.　Technically, altogether there's eight plus
19　those six.
20　　Q.　So 14.
21　　A.　Yes.  I believe.
22　　Q.　It's my understanding that Boca Ciega Yacht
23　Club is in the process of amending its bylaws.  Is that
24　correct?
25　　A.　I believe -- Oh, its bylaws?  No.  I don't know

Page 14

1　of any bylaw change right now.
2　　Q.　Are you changing something else regarding the
3　rules?
4　　A.　The Articles of Incorporation are being
5　changed.
6　　Q.　Articles of Incorporation.
7　　A.　And I'm not positive if they've been completely
8　voted.  There may be one more vote coming, I believe.
9　　Q.　Okay.
10　　A.　But -- Yes.
11　　Q.　What changes are being made?
12　　A.　We're changing some of the verbiage.  It was
13　really old.  It was written back in the '60s, and we're
14　kind of expanding our -- the idea behind the club.
15　　Because we're going to start allowing people --
16　I mean, we already are -- allowing people to come in
17　that paddle board or that kayak, things like that.  So
18　boating in general rather than specifically for sailing.
19　　Q.　So, you were telling me that you're expanding
20　the membership beyond --
21　　A.　Just sailing.
22　　Q.　-- sailing to people who enjoy other types of
23　water sports --
24　　A.　Right.
25　　Q.　-- like paddle boarding and wind surfing?

Page 15

1　　A.　Wind surfing is one, too, yeah.
2　　Q.　What else?
3　　A.　There were probably some legal enhancements to
4　clarify things that were vague before.  But I'm not
5　really sure.
6　　The lawyers really looked it over and gave us
7　recommendations, and we discussed it and hashed it out.
8　So it all seems basically the same.
9　　It's just, from our perspective, we're kind of
10　changing our -- I'm not really sure what the best word
11　for it is.  But our intentions behind the club to expand
12　it.  That's really our primary focus.
13　　Q.　When you say "legal enhancements" and your
14　lawyer "looked over it," was it the lawyer sitting to
15　your right?
16　　A.　Yes.  As far as I know.
17　　Q.　Okay.  Is one of the purposes of the amendments
18　to the Articles of Incorporation to make the club seem
19　more like a private club?
20　　A.　Not that I know of.
21　　Q.　Is one of the changes or proposed changes a
22　membership cap?
23　　A.　I don't recall.  It might.  We can get you a
24　copy of it.
25　　MS. RING:  I have a copy right here.

Page 16

1　　THE DEPONENT:  Okay.
2　BY MS. LAHART:
3　　Q.　What spurred this effort to amend the Articles
4　of Incorporation?
5　　A.　The wording in the original Articles of
6　Incorporation were not fair.
7　　Q.　How were they unfair?
8　　A.　There was some sentence in there that had to do
9　with it being a club of men, or something to that
10　effect, which it obviously is not anymore.
11　　Q.　Times change.
12　　A.　Yeah.
13　　Q.　Actually, what it said was "club of white men,"
14　wasn't it?
15　　A.　Oh.  Okay.
16　　MS. RING:  Actually --
17　　MS. LAHART:  No.
18　BY MS. LAHART:
19　　Q.　I'm going to hand you what we're going to mark
20　as Exhibit 1.
21　　A.　Okay.
22　　Q.　It's something that I know your counsel has
23　seen before, but go ahead and show it to her.
24　　(Plaintiff's Exhibit 1 was marked for
25　identification.)

4　(Pages 13 to 16)

Executive Reporting Service

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)

6a633be1-a910-4deb-bc02-6eb59cc3a2af

Page 17

1   BY MS. LAHART:
2       Q.  Have you ever seen that document before?
3       A.  Yes.
4       Q.  When did you see it?
5       A.  I saw it -- I can't give you a date.  I can
6   tell you it was probably around August.  But I can't --
7   I'd have to go back through my notes and give you an
8   actual, you know, date.
9       Q.  August of 2018?
10      A.  Yeah.  That would be my best guess.
11      Q.  Okay.  What is that document?  Please describe
12  it for the record.
13      A.  This is a document that, from my understanding,
14  Samantha asked a doctor to prepare for her.
15      Q.  Why did she ask the doctor to prepare that?
16      A.  I don't know why she asked the doctor, but I
17  assume that she wanted to have her dog used as a service
18  animal.  And the doctor agreed with her decision.
19      Q.  Okay.  Did she give that document to you?
20      A.  She forwarded it to me in a text, I believe.
21      Q.  Why did she do that?
22      A.  Because she wanted me to consider her dog a
23  service animal and that we should allow her to bring the
24  dog into the clubhouse.
25      Q.  You don't consider her dog a service animal?

Page 18

1       A.  I have not seen anything that the dog does that
2   warrants it to be a service animal personally.
3       Q.  This prescription says, "In order to help
4   alleviate these functional limitations due to her
5   anxiety and to assist her with her allergies, I support
6   Samantha's decision to have her service animal accompany
7   her at all times."
8           Do you have any reason to disbelieve that
9   Ms. Ring suffers from anxiety?
10      A.  I'm sure she does suffer from anxiety.
11      Q.  Do you have any reason to disbelieve that the
12  anxiety that she suffers is severe enough to qualify as
13  a disability?
14      A.  I don't.  That's just me.
15      Q.  You don't what?
16      A.  I don't believe that it justifies a disability.
17      Q.  Okay.  Her doctor apparently does.  Who is in a
18  better position to determine that, do you think?
19      A.  That's not what I --
20      Q.  You or the doctor?
21      A.  That's not what I read in that.
22          And you also described that as a
23  "prescription."  I don't see that as a prescription
24  either.  The doctor is not --
25      Q.  What would you call it?

Page 19

1       A.  I would call it a "letter of agreement."  The
2   doctor agrees that what she wants is reasonable.
3           Well, I don't have an argument with that.  The
4   doctor might agree that she thinks it's reasonable.
5   That's okay.
6           That's different than the doctor saying, "This
7   is what she needs."  If the doctor had said, "This is
8   what she needs," that would be different.
9       Q.  Oh.  So you have a problem with the way that
10  this letter was worded.
11      A.  Yes.
12      Q.  Did you make any attempt to ask for additional
13  information regarding her anxiety or her allergies?
14      A.  She made it very clear what her anxieties were
15  and what her allergies were.
16      Q.  Okay.  Could you answer my question?
17          After you received this letter, you didn't
18  think that it was sufficient to convince you that she
19  needed to have her dog as a service dog.
20      A.  Right.
21      Q.  Did you ask her for additional information
22  regarding her anxiety?
23      A.  No.
24      Q.  Did you ask her additional information
25  regarding her allergies?

Page 20

1       A.  As I said, she already stated them, so I didn't
2   need to ask her.
3       Q.  So that's, "No."
4       A.  That's, "No."  Why would I ask her, if I
5   already knew the answer?
6       Q.  Well, you just told me that this letter wasn't
7   adequate, in your mind --
8       A.  Uh-huh.
9       Q.  -- to qualify her to use a service dog at Boca
10  Ciega Yacht Club.
11      A.  Uh-huh.
12      Q.  Is that right?
13      A.  Right.
14      Q.  So if the letter had been worded differently,
15  would she have been able to bring her dog into the
16  clubhouse?
17      A.  I think so.
18      Q.  So instead of saying "especially trained
19  service animal that will help mitigate her anxiety," it
20  should have, "said she needs a specially trained service
21  animal to mitigate her anxiety."
22      A.  To function, or something to the effect that
23  she would need the dog in order to -- I don't know -- to
24  effectively get around.  Something to that effect.
25      Q.  So it's not enough that the dog mitigates the

Executive Reporting Service

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)

6a633be1-a910-4deb-bc02-6eb59cc3a2af

Page 21

1  symptoms of her disabilities?
2      A.  Well, you're saying "disabilities."  Again, I
3  don't believe that she's disabled.
4      Q.  Did you explain to Ms. Ring that you felt like
5  this letter wasn't adequate and --
6      A.  Yes.
7      Q.  What did you tell her?
8      A.  I don't recall exactly what I told her, but
9  obviously nothing changed.
10     Q.  Well, I think what you've told me is if she had
11  just gotten a letter that was worded differently, that
12  she would have been allowed to bring her dog into the
13  clubhouse.
14     A.  If she had brought some kind of a prescription,
15  something that the doctor said it was necessary for her
16  to conduct her daily activities, I could probably have
17  used that, yeah.
18     Q.  But you didn't tell her that?
19     A.  No.
20     Q.  Did you suggest that she put on a
21  demonstration?
22     A.  I suggested that -- I first made it clear that
23  she did not have to do this, and I suggested that if the
24  dog has some kind of -- if it's in training, they must
25  have some way to train it to have it do whatever it's

Page 22

1  supposed to do.  That if she were to do that, you know,
2  maybe she could change minds of people that are on the
3  board and I could get support and we could do it.
4      Q.  Okay.
5      A.  But I -- it was never a requirement or anything
6  like that.  But I figured they must train them somehow.
7  They must have something that they do to get the dog to
8  perform its function and practice, you know.
9      Q.  Did you ask her about the training the dog had
10  received?
11     A.  Yes.
12     Q.  What did she tell you?
13     A.  She -- I believe she sent me the names of the
14  company.  I think there were two of them.
15     Q.  Did you contact the trainers?
16     A.  No.
17     Q.  Tell me, if somebody suffers from anxiety,
18  panic attacks, and their dog assists them with that, how
19  would they demonstrate to you that the dog does that?
20         Would they have to have a panic attack in front
21  of you?
22     A.  I don't know.  How do they train them?  They
23  must train them somehow.  They don't -- the can't
24  emphatically tell the dog what they need to do, so they
25  must be doing something.  I don't know.

Page 23

1      Q.  But you made no efforts to contact the trainers
2  and find out how the dog was being trained.
3      A.  No.  I would think that that would be a private
4  matter between her and her trainers.
5      Q.  Suppose a new member comes to the club and they
6  have a dog that they tell you is trained to detect when
7  they're going to have an epileptic seizure.
8      A.  Uh-huh.
9      Q.  Would you let that person and their dog into
10  the clubhouse?
11     A.  Wait.  Describe it again.  I'm sorry.
12     Q.  The dog is trained to detect that they're going
13  to have an epileptic seizure.
14     A.  Uh-huh.  And -- yeah, sure.
15     Q.  If they just told you that.
16     A.  Yeah.
17     Q.  You wouldn't demand to see medical information.
18  You wouldn't need a letter from their doctor verifying
19  that they have epilepsy?
20     A.  Yeah.
21     Q.  You communicated to Ms. Ring that the reason
22  her dog wasn't allowed in the clubhouse was because Boca
23  Ciega Yacht Club is a private club, correct?
24     A.  No.  The reason she can't bring the dog into
25  the club is because the club has made rules that dogs

Page 24

1  can't be in the clubhouse.
2         They can be on the porch.  They can be on the
3  property, as long as they're attended by the owner or a
4  representative who is in control of the dog.
5      Q.  Okay.  Do you understand that she wanted that
6  rule to be waived for her because her dog is a service
7  dog?
8      A.  Yes.
9      Q.  Okay.  So it's your testimony that the reason
10  that Samantha was not allowed to bring the dog into the
11  clubhouse is not because Boca Ciega Yacht Club is a
12  private club?
13     A.  She was not allowed to bring the dog into the
14  club because the rules are that she cannot bring a dog
15  into the clubhouse.
16        And when she made an argument that this was
17  against the ADA, I looked through the ADA, and the ADA
18  says that it doesn't apply to private clubs.
19     Q.  Okay.  So the ADA doesn't apply to private
20  clubs.  Boca Ciega Yacht Club --
21     A.  Yeah.
22     Q.  -- does not have to accommodate persons with
23  disabilities.  Is that what you're telling me?
24     A.  I'm telling you that the ADA says that it does
25  not apply to religious organizations or private clubs.

6  (Pages 21 to 24)

Executive Reporting Service

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)                                    6a633be1-a910-4deb-bc02-6eb59cc3a2af

Page 25

1    Q.  Okay.  Can you answer my question?
2        Does the Boca Ciega Yacht Club have to
3    accommodate people with disabilities?  "Yes" or "No."
4    A.  I don't know.  I would assume yes.  But
5    apparently not by the ADA.
6    Q.  Why do you say that?
7    A.  Because it says in the ADA that it doesn't
8    apply to private clubs.
9    Q.  And what makes Boca Ciega Yacht Club a private
10   club?
11   A.  There's a whole bunch of reasons why it's a
12   private club.
13   Q.  Well, tell me.
14   A.  Well, you have to apply for membership.  You
15   have to go before a committee to tell them why you want
16   to be a member, explain all that stuff.  They do a
17   background check.  Then they bring you in and they vote
18   on whether to bring you into the club or not.
19   Q.  So because you have to apply and be approved by
20   a committee, that makes it a private club?
21   A.  In my opinion, yeah.  I'm sure there's a whole
22   lot of other legal descriptions for why a club would or
23   wouldn't be private.  And since then, I've discussed it
24   with the attorneys and they specified all the reasons
25   why it would be a private club.

Page 26

1        MS. FONTUGNE:  And I'm going to object on
2    the basis that we're not going to disclose any
3    conversations with the attorneys.
4        MS. LAHART:  Okay.  For the record, I'll
5    point out that I didn't ask you to disclose any
6    conversations with your attorneys.
7        THE DEPONENT:  Okay.
8    BY MS. LAHART:
9    Q.  Does the fact that Boca Ciega Yacht Club is a
10   private club mean that it can discriminate against
11   people of color?
12   A.  I don't know the answer to that.
13   Q.  Okay.  Can it discriminate against people who
14   are gay?
15   A.  I don't know the answer to that either.
16   Q.  But you do know that they don't have to
17   accommodate people with disabilities.
18   A.  I don't know that either.
19   Q.  Okay.
20   A.  I just know that the ADA is not the law that
21   would apply to us.  And I don't know of any other
22   reason.
23   Q.  No other reason for what?
24   A.  Any other reason why it would be illegal.
25   Q.  Do you recall writing Samantha a letter telling

Page 27

1    her that if she brought her dog to the clubhouse again,
2    you were going to fine her $150?
3    A.  Uh-huh.
4        MS. VENZA:  Is that a "Yes"?
5        THE DEPONENT:  Yes.
6        MS. VENZA:  Thank you.
7        THE DEPONENT:  Sorry.
8        MS. LAHART:  I'm going to hand you what
9    we'll mark as Exhibit 2.
10       (Plaintiff's Exhibit 2 was marked for
11   identification.)
12   BY MS. LAHART:
13   Q.  Is that the letter that you wrote to her?
14   A.  Yeah, that looks like it.
15   Q.  Okay.  And you stated in this letter, "You have
16   tried to argue that the club is not a private -- is not
17   private, and I've responded that until a court has
18   stated that we are not a private club, that we do not
19   agree with your assessment."
20   A.  Yeah.  That was probably a bit strong.  I'm
21   sure that a lower level resolution could be met, but at
22   the time "court" sounded appropriate.
23   Q.  So were you inviting Ms. Ring to sue the club
24   in order to resolve that issue?
25   A.  I wouldn't call it an "invitation."  But if

Page 28

1    that's what it came to, that's what it came to.
2    Q.  Well, it seems to me that you're communicating
3    to her that the only way that you're going to be
4    convinced that the club is a private club is for a
5    lawsuit to be brought and a judge to determine that.
6        That's basically what you're telling her, isn't
7    it?
8    A.  Okay.  You could construe that from that
9    document, sure.
10       Although -- One second.  I said that, "We will
11   discuss this with them if they contact us, but until any
12   of that comes to fruition, you know the rules and have
13   to abide by them."
14       So that opened up the fact that we would
15   discuss it with them.
16   Q.  Who is "them"?
17   A.  That was the rights group, which was the
18   Pinellas County Human Rights organization, I believe.
19   Q.  So you wanted the Pinellas County Office of
20   Human Rights to call you and explain the law to you?
21   A.  Well, she said that she was going to put a
22   claim in, and I told her to go ahead and do that and
23   that we would talk to them.
24   Q.  She did.
25   A.  Okay.

7  (Pages 25 to 28)

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)

6a633be1-a910-4deb-bc02-6eb59cc3a2af

Page 29

1    Q.  And the Pinellas County Office of Human Rights
2    determined that the Boca Ciega Yacht Club isn't a
3    private club, correct?
4        A.  Well, that's what she told me.  I did not hear
5    from them.  And they were -- they were basing their
6    decision or their feelings on what the situation was
7    solely based on her discussion with them.  She had not
8    talked with anybody at the club, that I'm aware of.
9        So if she paints a picture that's inaccurate,
10   they may think that, absolutely.
11       Q.  Okay.  You realize that an administrative
12   complaint was filed and that your attorney submitted
13   information to the Boca -- or to the Pinellas County
14   Office of Human Rights several times.
15       A.  Okay.
16       Q.  So they didn't just base it on Samantha's
17   opinion, did they?
18       A.  This was at the time that I was there.  What
19   you're describing happened later.
20       Q.  Right.  As we sit here today --
21       A.  Right.
22       Q.  -- the Pinellas County Office of Human Rights
23   has determined that the Boca Ciega Yacht Club is not a
24   private club.
25       A.  Okay.

Page 30

1        Q.  Correct?
2        A.  So -- No.
3        Q.  That's not correct?
4        A.  That's not my understanding.
5        Q.  Tell me your understanding.
6        A.  My understanding is that there's two parties
7    over there.  One is like an investigative-type group --
8        Q.  Uh-huh.
9        A.  -- that sends their findings to an
10   administrative group, and that that administrative group
11   then assesses the situation and makes a determination.
12       And my understanding is it never went to the
13   administrative group.
14       Q.  So you don't think that the findings in their
15   investigative report are valid?
16       A.  I don't think --
17       MS. FONTUGNE:  Object to form.  Go ahead.
18       THE DEPONENT:  I don't think that they were
19   complete.
20   BY MS. LAHART:
21       Q.  No?
22       A.  Well, nobody ever talked to me from that
23   organization, so how could they have investigated?
24       Q.  Well, your attorney -- they did talk to you
25   through your attorney.  Are you aware of that?

Page 31

1        A.  At some point this year they were discussing
2    things with our attorney, that's correct.
3        Q.  Do you feel that if there were additional
4    information provided to the investigator, that the
5    investigator would come up with a different conclusion?
6        MS. FONTUGNE:  Object to form.  Go ahead.
7        THE DEPONENT:  I don't really know what --
8    because I've never discussed anything with
9    anybody out of their office, I don't know what to
10   expect to have or have not done.
11   BY MS. LAHART:
12       Q.  Do you recall sending Ms. Ring an email on
13   January 2nd?
14       A.  I have no idea whether I sent her an email on
15   January 2nd.
16       Q.  Okay.
17       A.  This January 2nd, this year?
18       Q.  Yes.
19       A.  Okay.
20       Q.  Was there a time that Ms. Ring proposed an
21   amendment to the bylaws that said that you would not --
22   Boca Ciega Yacht Club does not discriminate based on
23   age, race, color, religion, national origin, et cetera?
24       A.  It sounds familiar.
25       Q.  Did that pass?

Page 32

1        A.  No, I don't believe it did.
2        Q.  Was it submitted to the board?
3        A.  Yes.
4        Q.  And the board voted it down?
5        A.  Yes.
6        MS. LAHART:  I'm going to hand you what we'll
7    mark for identification purposes as Exhibit 3.
8    please show it to your counsel.
9        (Plaintiff's Exhibit 3 was marked for
10   identification.)
11       THE DEPONENT:  Okay.
12   BY MS. LAHART:
13       Q.  Did you send that email?
14       A.  Yeah.
15       Q.  Okay.
16       A.  I think.
17       Q.  Well, is that your email address?
18       A.  Yep.
19       Q.  Do you have any reason to believe that anybody
20   else would send an email from your email address?
21       A.  I don't have a reason to believe that somebody
22   is, but somebody certainly could have.  But I -- it
23   sounds right.
24       Q.  Okay.  "We're no longer arguing about the ADA
25   to you.  We made it clear that we're waiting to hear

8  (Pages 29 to 32)

Executive Reporting Service

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)

6a633be1-a910-4deb-bc02-6eb59cc3a2af

Page 33

1  from your rights group while scheduling to meet with an
2  attorney."
3      A.  Uh-huh.
4      Q.  "Until we have answers on that subject, we will
5  continue to hold our members to current bylaws, no
6  matter your age, race, religion," et cetera.
7      A.  Right.  Because it doesn't matter whether
8  you're old or young or whether you're Jewish or
9  you're -- you know, whatever.  It doesn't matter.
10     Q.  Do you have any reason to think that Ms. Ring
11 is not Jewish?
12     A.  No.
13     Q.  So does this email mean that you would not make
14 allowances for someone based on age, race or religion,
15 if they needed one?
16     A.  No.  It's saying that everybody has to follow
17 the rules regardless of whatever.  We're not looking at
18 somebody as whether they're, you know, Jewish or not.
19     Q.  You stated in an email to Ms. Ring that, "This
20 sounds redundant, as we already have to abide by state
21 and federal law."
22         Did you mean state and federal law except for
23 the ADA?
24     A.  Yeah.
25     Q.  Did you participate in a call party in which

Page 34

1  members of the Boca Ciega Yacht Club called members and
2  asked them to support the effort to expel Ms. Ring?
3      A.  No.
4      Q.  Were you aware of such an event taking place?
5      A.  I think I heard about it when Samantha brought
6  it up.
7      Q.  Did you vote to expel Ms. Ring?
8      A.  Yes.
9      Q.  Why did you do that?
10     A.  Because -- Well, a number of reasons.  But I
11 think that she presented a problem to the club.  I think
12 there were a lot of in-fighting going on.  There was a
13 lot of turmoil that would go away with Samantha's
14 absence.
15         And I had exhausted whatever I had done or I
16 could think of to improve her image and to help her with
17 these other members and I just don't -- didn't see any
18 other way.
19     Q.  Okay.  Did you at some point say that you were
20 willing to spend most of the club's funds to defend the
21 right to exclude service animals from the clubhouse?
22     A.  I was willing to spend most of the funds for
23 our legal defense.  Which there's a legal defense fund.
24 But, yeah.  And, again, that had to do with the ADA.
25     Q.  What do you mean?

Page 35

1      A.  The fact that if there was some other law that
2  applied to us, then obviously we're not going to, you
3  know, argue.  The law is the law.  But the ADA
4  specifically, I did not believe, applied to us.
5      Q.  Do you still believe that?
6      A.  I still believe that.
7      Q.  Okay.  Nothing but a court order is going to
8  convince you otherwise?
9      A.  At this point, it seems like it's going to end
10 up that way.  But I don't know.  There could be, I
11 suppose.
12     Q.  What's your understanding of the status of the
13 complaint that Ms. Ring made with the Pinellas County
14 Office of Human Rights?
15     A.  The status of it?
16     Q.  Uh-huh.
17     A.  I understand that she didn't file something to
18 keep it going, and let it lapse.  And then she was given
19 a deadline to come up with whatever document she needed
20 to, and she did not do it.
21         Now, whether that was a decision or it was some
22 issue, I don't know.
23     Q.  Where did you get that understanding?
24     A.  I don't know.  Can I say?
25         MS. FONTUNGE:  Not if it involves

Page 36

1  communication with the lawyers.
2         THE DEPONENT:  I can't say.
3  BY MS. LAHART:
4      Q.  Did you get that from Nick Southard?
5      A.  I don't think so, but maybe.  I don't know.
6      Q.  Okay.  Are you aware that Ms. Ring voluntarily
7  dismissed the complaint with the Pinellas County Office
8  of Human Rights?
9      A.  No.  But that was certainly a possibility.
10     Q.  Are you aware of the different remedies that a
11 federal court can bestow as opposed to an administrative
12 law judge?
13         MS. FONTUNGE:  Object to form.
14         THE DEPONENT:  What's the question again?
15 I'm sorry.
16 BY MS. LAHART:
17     Q.  Are you aware of the different remedies that an
18 administrative law judge can award as opposed to a
19 federal judge?
20     A.  No.
21         MS. FONTUNGE:  Same objection.  He's a lay
22 witness.
23 BY MS. LAHART:
24     Q.  The answer is "No"?
25     A.  The answer is "No."

9  (Pages 33 to 36)

Executive Reporting Service

Page 37

1    Q.  So you're not aware of the fact that the
2  administrative law judge can't award damages, and a
3  federal judge can?
4    A.  No.
5    MS. LAHART:  I'm going to hand you another
6  exhibit or email that appears to be from you, and
7  ask you if you recall sending it.
8    We'll mark that as Exhibit 4.
9    (Plaintiff's Exhibit 4 was marked for
10  identification.)
11    THE DEPONENT:  Okay.  Again, it looks
12  familiar.
13  BY MS. LAHART:
14    Q.  You seem to take umbrage with the fact that
15  Ms. Ring contacted city officials.
16    A.  If "umbrage" is "dissatisfaction," yes.
17    Q.  Okay.  Why is that?
18    A.  Because we have a lease agreement we're trying
19  to achieve.  We have had leases in the past.  They last
20  for 10 years.  And they're kind of important to the club
21  to have a place to meet.
22    Q.  So because Boca Ciega Yacht Club leases land
23  from the city, Samantha Ring should not have complained
24  to the city regarding being discriminated against?
25    A.  Because she was going to the very people that

Page 38

1  we have to sign the lease with, because she knows that
2  we can't discuss it because the attorneys are working
3  through the issue and we're not supposed to be
4  discussing it.  And yet here she is going to the city to
5  try and get the city to do something about it.
6    Q.  You're not allowed to talk to the city?
7    A.  I assume you're not supposed to talk to anybody
8  when you're not supposed to talk to anybody.  I thought
9  that was the whole point in the attorney, you know,
10  thing, that they discuss it and you have to be quiet and
11  not talk about it until they've come up with whatever
12  they're going to come up with.
13    Q.  So the issue, as you see it, is that she went
14  to the city, but you're not allowed to talk to the city
15  because your, attorney told you not to.
16    A.  Yeah.
17    Q.  Okay.  Wouldn't the entire problem just be
18  solved if you let her bring her dog into the clubhouse?
19    A.  Sure.
20    Q.  Are you aware that there's a constitutionally
21  protected right to petition your government?
22    A.  Yeah, probably.
23    Q.  Does that -- Do club members give up that right
24  when they join the Boca Ciega Yacht Club?
25    A.  No.

Page 39

1    Q.  Have you had an opportunity to review the
2  investigative report that came out of the Pinellas
3  County Office of Human Rights investigation?
4    A.  No.
5    MS. LAHART:  Okay.  We're going to take a break
6  and I'm going to let you read through that.
7    THE DEPONENT:  Okay.
8    (Recess held at this time.)
9    MS. FONTUGNE:  Before we get started, I'm
10  going to lodge an objection to presenting a lay
11  witness with a very long document for 34 minutes,
12  a document that contains legal conclusions
13  without having the benefit of speaking with
14  counsel to elucidate any need for clarification.
15  All right.
16  BY MS. LAHART:
17    Q.  For the record, Mr. Brown, the document that I
18  asked you to read is entitled "Investigative Report"
19  that's dated May 29th, 2019.
20    A.  Uh-huh.
21    Q.  And it is from Lisa Postal(sic) to Jeffrey
22  Lorick, correct?
23    MS. VENZA:  Can you verbalize your response,
24  please, sir?
25    THE DEPONENT:  Yes.  It's to Jeffrey

Page 40

1  Lorick -- I can't read the signature.  From Lisa
2  Pastall, yeah.
3  BY MS. LAHART:
4    Q.  Okay.  The date of that is May 29th, correct?
5    A.  Yes.
6    Q.  So your attorney has had four and a half months
7  to go over this with you, if she chose, correct?
8    A.  If she chose, yeah.
9    MS. FONTUGNE:  Object to the form.  You can
10  answer.
11  BY MS. LAHART:
12    Q.  You've never seen this report before today,
13  correct?
14    A.  Correct.
15    Q.  And you're on the Board of Directors --
16    A.  Yes.
17    Q.  -- of the Boca Ciega Yacht Club.
18    A.  Uh-huh.
19    Q.  If you as a board member haven't seen it, I can
20  be pretty sure that the general membership hasn't seen
21  it, correct?
22    A.  Correct.
23    MS. FONTUGNE:  Object to form.
24  BY MS. LAHART:
25    Q.  I noticed that you were chuckling to yourself a

10  (Pages 37 to 40)

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)

6a633be1-a910-4deb-bc02-6eb59cc3a2af

Page 41

1   few times as you were reading through this document.
2   What about it was funny?
3       A.  Oh, different things.  The -- I have to go back
4   through it and read them.  If you'd asked me at the
5   time, I could have answered.
6       I mean, generally it's like a laundry list of
7   all the bad things that somebody could do to somebody.
8   And that's just not -- not what's going on.
9       Q.  Okay.  Tell me what's false about this.
10      A.  Well, the thing is, is that I know that there
11  have been a number of times that Samantha did not like
12  the conclusion from something, she didn't like a
13  decision that was made, she didn't like being
14  reprimanded in some way, that it would always be that
15  she's Jewish or that she's female or that she's single.
16      Can I get some water?
17      MS. FONTUGNE:  I've got it.  Hold on.
18      MS. LAHART:  Stop while your attorney is out
19  of the room.
20      THE DEPONENT:  And the bit about, you know,
21  the "white men" thing, or the original AOIs.
22  Just things that, you know, they would want to --
23  I mean -- I don't know.
24      Which one is it?  Do we hate Jewish
25  people?  Do we hate women?  Do we hate single

Page 42

1   women?  Do we hate dogs?
2       What -- It's just a laundry list of the
3   things that could be -- anything that's
4   identifying for Samantha seems to be something
5   that we're after her for.
6       So go ahead.
7   BY MS. LAHART:
8       Q.  Are there any statements in this document you
9   found that were factually inaccurate?
10      A.  There's probably some.  A lot of it I wasn't
11  around for, like I wasn't privy to.  But, you know, some
12  things are, like, bent out of proportion.
13      Like the live-aboard issue, you know.  Like, I
14  didn't know that her previous discussions had been when
15  I came in as Commodore as far as the live-aboard was
16  concerned, and later she told me that Lee had told her
17  that she should withdraw her name as being, you know,
18  considered for it.
19      But at the time, she told me that she was
20  withdrawing her name.  I didn't know why.  I just knew
21  that she was withdrawing her name.
22      So as time went on, eventually, months later,
23  Richard wanted to be the live-aboard.  So I said,
24  "Okay."
25      Well, what are the procedures for making him

Page 43

1   the live-aboard?
2       Then with Samantha found out and she was upset
3   that, you know, "What's going on?  Why are you giving
4   this to Richard?"
5       And it's like, "Well, you had withdrawn your
6   name."
7       "Well, that was because Lee had told me" -- You
8   know.  I had no idea.  So I said, "Okay.  Well, we'll
9   consider you for the live-aboard."
10      "Well, I just signed a lease."
11      Okay.  I can't do anything about that.
12      So then ultimately she came back and said that
13  irregardless of that lease, she still wanted to be the
14  live-aboard.  And so we had a vote and they gave it to
15  Richard.
16      So it's -- it just reads like it's some
17  underlying retaliation or something because of who she
18  is rather than just business as usual, you know.
19      If she had said that she wanted the live-aboard
20  slip, then I would have started asking, "Why are we not
21  doing the live-aboard slip?  And she wants to be in it.
22  Let's do it."
23      But that's not what she said.  So I can only go
24  with what I'm told.
25      Q.  So there was a misunderstanding about the

Page 44

1   live-aboard situation.  Was there anything else in the
2   investigative report that was inaccurate?
3       A.  Well, I'm -- I can't just blankety say that
4   all of this stuff is absolutely correct.  I can go
5   through it and look for things that are inaccurate.
6       Q.  I think your attorney would probably object to
7   that.
8       A.  I mean, it would only be based on my
9   recollection or what I think is correct.
10      Q.  Okay.  Were you involved in the decision to
11  hire a private investigator to investigate Ms. Ring?
12      A.  No.
13      Q.  Having read the report of the Pinellas County
14  Office of Equal Opportunity, do you still think that the
15  Boca Ciega Yacht Club is a private club?
16      MS. FONTUGNE:  Object to form.
17      THE DEPONENT:  Yes.
18  BY MS. LAHART:
19      Q.  Why do you think that?
20      MS. FONTUGNE:  Objection.
21      THE DEPONENT:  I'm sorry?
22      MS. FONTUGNE:  Objection.  Go ahead.  You
23  can still answer the question.
24      THE WITNESS:  Okay.  So that's another
25  thing, too, is that it seems like the person who

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)

6a633be1-a910-4deb-bc02-6eb59cc3a2af

Page 45

1    wrote this has a real bias.
2        I mean, they're, like, trying to show
3    that we fail in every regard of what a private
4    club is.
5        And, you know, there is a reason why we
6    have the lease that we have, is that we gave up
7    assets that were given to us initially to build
8    and improve, and we built and improved them, and
9    then they took them back in exchange for that
10   dollar a year, or whatever it is, lease.
11       So they got something out of both of
12   those two leases that afforded them to basically
13   have a very small lease amount.
14       So this next lease that comes up, we've
15   got nothing else to give them. We given them the
16   basin. We've given them the dry slips. All
17   that's left is the building.
18       We can't give them that, because we use
19   it. So I don't know what's going to happen the
20   next time we have to do a lease.
21       But it's not -- I'm not sure what this
22   other yacht club down in Miami -- I don't know
23   what their agreements were. I don't know why
24   theirs was a dollar a year. And I don't know --
25   you know, I don't know what their situation was.

Page 46

1        Something about them not being able to
2    be a club if they didn't have the property.
3        Well, that's not the case for us. We
4    could still be a club if we lost the property.
5    BY MS. LAHART:
6        Q.  Okay. You say you gave them the basin. Boca
7    Ciega Yacht Club owned the basin?
8        A.  We built all of the slips and put all the
9    pilings in. Like, our members did that.
10       Q.  Okay.
11       A.  And that was -- there's another yacht club next
12   to us that they have their basin, and they take the
13   proceeds from those slip rentals to pay their lease.
14       So we were doing the same thing up until they
15   said, "Well, we'll just give you a dollar a year and
16   we'll take that money directly and then you don't have
17   to mess with it."
18       So they agreed at the time, and so we lost
19   that. Now we're losing the other thing. And now we're
20   out of things to give them.
21       Q.  Do you know the appraised value of the
22   improvements that Boca Ciega Yacht Club has made?
23       A.  I don't. I know roughly how much we paid, but
24   I don't know what that changed the proper value to.
25       Q.  What did you pay?

Page 47

1        A.  I think it was around 130,000. And we'd
2    probably do more if they could get us another good
3    lease.
4        Q.  Did you choose Samantha to head up the
5    Christmas parade?
6        A.  I did.
7        Q.  I want to go back to a question that I asked
8    you earlier about a hypothetical person who has a dog
9    with them and says that they need the dog for their
10   epilepsy.
11       A.  Uh-huh.
12       MS. FONTUGNE: I'm going to object to the
13   hypothetical. Go ahead.
14   BY MS. LAHART:
15       Q.  And you said that if the person said to you,
16   "This is my service dog. It helps me -- it detects when
17   I'm going to have an epileptic seizure," you would let
18   that person into the clubhouse.
19       A.  Uh-huh.
20       MS. VENZA: Is that a "Yes"?
21       THE DEPONENT: Yes. I'm sorry.
22   BY MS. LAHART:
23       Q.  You would let a hypothetical person into the
24   clubhouse, but you won't let a person who has been a
25   member for more than a decade. Why is that?

Page 48

1        A.  So, when I started at the club, or early on in
2    my membership with the club, I saw Samantha with her
3    dog. And the dog was her pet at the time and it was out
4    of control. Just barked at people, lunged at people.
5        Like it -- I think it was because it was on the
6    boat, and this is a dog that was bred to be out, to run,
7    to use a lot of energy, and that it's trapped during the
8    day. I'm assuming that's why it behaved that way. But
9    she clearly did not have control over the dog.
10       And so it was like at the end of the leash all
11   the time. Meaning it's like up off the ground at the
12   end of the leash, like pulling her.
13       And it's like -- you know, I felt at the time
14   that the dog needed someplace where it could, you know,
15   run around and get more exercise and whatnot and that it
16   would probably be calmer, and that she just wasn't being
17   stern enough with it, was my guess.
18       But as time went on, she got it into training,
19   and so that training had improved. The dog is not
20   always at the end of the leash and it wasn't always
21   barking at everybody and it was much better behaved as
22   time went on. But it -- I mean, it still had its issue,
23   but she was doing better. Okay.
24       And then Samantha had complained about not
25   being able to bring the dog into the clubhouse. It's

12   (Pages 45 to 48)

Executive Reporting Service

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)

6a633be1-a910-4deb-bc02-6eb59cc3a2af

Page 49

1   winter time; she's staying on her boat.  She's -- would
2   be -- she wanted to be in the clubhouse.
3           And I'm sure she did, because it was freezing
4   outside.  And she wanted to be able to bring the dog in,
5   because she couldn't leave it outside, because she's
6   got, you know, to have control of the dog at all times.
7           And so I understand that that is a reasonable
8   thing to want to do, to bring the dog into the
9   clubhouse.  But the rules are that you can't bring the
10  dog into the clubhouse.  And so that is a problem,
11  because the way that she's living.  She's living on the
12  boat.
13          If she was in an apartment, she wouldn't have
14  this issue.  If she was just, you know, somebody that
15  came down and used the property the way most people do,
16  that's not an issue here.
17          It's because -- I mean, I understand it.  But
18  it's just not fair that we break the rules because she's
19  in the situation that she's in, living on the boat.
20          And so then after that was -- she is saying
21  that, "Well, it's a service animal, and that that's what
22  the training has been for, is for a service animal."
23          So it's just, to me, another excuse as to why
24  she needs to be able to bring the dog into the
25  clubhouse.

Page 50

1       Q.  So you would allow a random person who said
2   that they needed their dog for epilepsy, but you won't
3   allow Samantha, because you don't believe that Piper is
4   a service dog?
5       A.  Right.
6       Q.  We have been here for about two and a half
7   hours now, I think.
8       A.  Okay.
9       Q.  Is Piper in the room?
10      A.  Uh-huh.
11      Q.  Has Piper --
12      MS. VENZA:  Is that "Yes"?
13      THE WITNESS:  Yes.  Sorry.
14  BY MS. LAHART:
15      Q.  Has --
16      A.  I'm think the problem with us being close
17  together, too, because then I only want to -- I'm
18  speaking with you.  Sorry.
19      Q.  Has Piper lunged or barked?
20      A.  Nope.
21      Q.  In fact, she's pretty much just laid there
22  quietly the entire time we've been here, correct?
23      A.  Yep.
24      Q.  Is it still your position that Ms. Ring can't
25  control Piper?

Page 51

1       A.  I don't know.  It seems like she's under
2   control now.  Or he's under control.
3       MS. RING:  She.
4       THE DEPONENT:  She.  Sorry.
5   BY MS. LAHART:
6       Q.  Could you pull up that email?
7       MS. RING:  Yes.
8   BY MS. LAHART:
9       Q.  Mr. Brown, I apologize that I don't have a hard
10  copy of this for you.  I was having serious Internet
11  connection problems in my little hometown of Micanopy.
12          I'm going to show both you and your counsel an
13  opportunity to read this on Ms. Ring's computer.
14      A.  It's a document?
15      Q.  It's an email.  It's a short one.
16      A.  Okay.  Okay.
17      Q.  Thank you.
18          Since I don't have a hard copy, I can put in
19  the record I'm going to read this.  It's from Larry
20  Brown, Tuesday, December 25th, 2018, 9:15 a.m., to
21  Samantha Ring, cc BCYC board.
22  Allbcyyboard@sailbcyc.org.  "Subject:  My response to
23  the letter of reprimand.  This is precisely the issue,
24  Samantha.  You take medication and see a therapist for
25  your anxiety and compulsive issues.  Those issues are

Page 52

1   having the club respond to accusations that we don't
2   follow the law and that we are discriminatory, that
3   we're going after you.  You're using whatever tool at
4   your disposal because you have some level of OCD.  Piper
5   is not going to prevent your OCD, nor are you going to
6   be without anxiety with Piper at your side.  There is no
7   job a service animal does to prevent these issues, but
8   these issues do cause these accusations.  I hope you can
9   see this, but believe it less likely and we spend -- we
10  will spend a lot of the club's money to retain our right
11  to manage what members can and cannot do in our own
12  club.  We want you to follow those rules so we can move
13  on, but we feel it's an important point.  I hope you get
14  a chance to spend some time thinking about the great
15  things about the club that make it worth being a member
16  of this Christmas day and can set this thing down for a
17  while.  But if you don't, I'll understand.  If you
18  respond to this, know that I'm listening even if I don't
19  reply.  I think enough has been said for the holiday.
20  For other's sake in this email chain, maybe you should
21  just direct any other dialogue to just me.  Merry
22  Christmas, Larry."
23          Did you send that email?
24      A.  I think so.
25      Q.  "You take medication and see a therapist for

13  (Pages 49 to 52)

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)

6a633be1-a910-4deb-bc02-6eb59cc3a2af

Page 53

1    your anxiety."  How did you know that?
2        A.   She told me at some point.
3        Q.   And you didn't have any reason to disbelieve
4    her?
5        A.   No.
6        Q.   It's your position that a service animal cannot
7    help somebody with OCD or anxiety?
8        A.   Not that I know of.
9        Q.   Did you do any research to determine that, or
10   is that just your opinion?
11       A.   Well, my opinion is based on some research.
12       Q.   What research?
13       A.   The web.
14       Q.   When did you do that research?
15       A.   Back when she was describing what the issues
16   were and that we needed to abide by the ADA, and that
17   she needed her dog as a service animal, et cetera, et
18   cetera.
19       Q.   Did Ms. Ring ever tell you that she has
20   occasional panic attacks?
21       A.   Yeah.
22       Q.   Do you have any reason to disbelieve that?
23       A.   No.  It's --
24       Q.   You say, "We will spend a lot of the club's
25   money to retain our right to manage what members can and

Page 54

1    cannot do in our own club."
2            Isn't insurance paying for the defense --
3        A.   Yes.
4        Q.   -- of this lawsuit?
5        A.   I didn't realize that was an option at the
6    time.
7        Q.   Okay.  If you were spending your own money, the
8    club's money, would we still be here today?
9        A.   I don't know.  It depends on how much it costs
10   and what the board wanted to do.
11       Q.   "We want you to follow those rules so we can
12   move on, but we feel it's an important point."
13           It's an important point that --
14       A.   That we be able to manage the club.
15       Q.   Okay.  So if you let Samantha Ring bring her
16   dog, Piper, into the clubhouse, that means that you
17   can't manage the club?
18       A.   Right.  That somebody can say, "Well, I'll, you
19   know, make -- I'll go to lawyers and I'll have you sued
20   or I'll have you punished for not doing what you should
21   be doing," and then we just cave and do whatever they
22   want us to do.  I don't think that's fair.
23       Q.   Has that been a big problem at the club?
24       A.   No.
25       Q.   Other than Ms. Ring, has that been an issue at

Page 55

1    all?
2        A.   No.
3        Q.   What information would you need to determine
4    whether the anxiety that you apparently recognize
5    Ms. Ring suffers rises to the level of a disability?
6        A.   That's a good question.  I guess I would know
7    it when I see it.
8            If somebody presents me with something defining
9    that says that's the case, then, you know -- and they're
10   an authority.
11       Q.   You said that even after reading the
12   investigative report, you believe that Boca Ciega Yacht
13   Club is a private club.
14       A.   Yeah.
15       Q.   Why do you want it to be a private club?
16           MS. FONTUGNE:  Objection.
17           THE DEPONENT:  Why do I want it to be a
18   private club?
19   BY MS. LAHART:
20       Q.   Why not just voluntarily comply with the ADA?
21       A.   Well, because I believe that Samantha is trying
22   to use this as leverage.  It compels me to want to push
23   back, because I don't believe this is the case.
24           I don't believe this falls under the ADA
25   anyway.  But if you put things in a ranking of why she

Page 56

1    shouldn't be able to use this as leverage to make us do
2    what she wants us to do, the first one would be that the
3    ADA does not apply to a private club.  So that would be
4    my first-level response.
5            But even if they were to say that it wasn't a
6    private club -- Which they're trying to say that here.
7    But, honestly, it's just -- it's like every possible
8    thing they could use to try and make it sound like it's
9    not, is what they're doing.
10           It's not like, you know, there's one particular
11   thing that is, you know, substantially clear that it is
12   not a private club.  Like, I don't agree with what
13   they've got here.
14           So I don't know if that answers your question.
15       Q.   Okay.  So if Samantha Ring threw in the towel
16   and said, "I'm dismissing my lawsuit.  I don't want to
17   be a member of the club anymore," would you still want
18   Boca Ciega Yacht Club to be a private club?
19           MS. FONTUGNE:  Objection.  You can answer
20   the question, if you can.
21           THE DEPONENT:  Yes.
22   BY MS. LAHART:
23       Q.   Why?
24       A.   I think that the idea of having a club with
25   people that are like-minded, that want to do the same

14  (Pages 53 to 56)

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)

6a633be1-a910-4deb-bc02-6eb59cc3a2af

Page 57

1  things, should be able to come together as a group and
2  do that thing that they like to do together.
3        And so if having it being a public club means
4  that just anybody can be a member, then what's the point
5  in having it as a club?
6     Q.  So if you couldn't be selective about --
7     A.  Right.
8     Q.  -- your members --
9     A.  Right.
10     Q.  -- that would lead to the detriment of the Boca
11  Ciega Yacht Club?
12     A.  Yeah.  Then it would just be -- I don't know --
13  a building that everybody shares.
14     Q.  You could still charge a membership fee,
15  correct?
16     A.  Yeah.
17     Q.  So not everybody would share.  It would only be
18  people who paid a membership fee.
19     A.  Yeah.  But that's still -- it's still just a
20  bunch of people using a building.  I mean --
21     Q.  Wouldn't they all be people interested in
22  sailing or other sorts of water sports?
23     A.  That's the thing.  If it wasn't a private club,
24  then anybody could be a member.  So they could be
25  fishermen and like to go there and hang out and talk

Page 58

1  about fishing.
2        Well, I don't want to be a part of a fishing
3  club.  I want to be part of a sailing club.
4        And even the fact that now that we're opening
5  up to general boaters, I'm okay with kayaks and paddle
6  boards, but power boating and fishing, it's not really
7  my thing.  And if we end up with a bunch of people that,
8  you know, outnumber the people that like human power and
9  wind power, then I probably wouldn't stay in the club.
10     Q.  Didn't the club just start a fishing club?
11     A.  Yeah.
12     Q.  Are you going to quit?
13     A.  Well, we'll see what happens.
14     Q.  Okay.  Is it your understanding that there
15  couldn't be a public club dedicated to sailing?
16        MS. FONTUNGE:  Objection.  You can answer,
17  if you can.
18        THE DEPONENT:  It could be.
19        MS. LAHART:  All right.  Off the record.
20        (Discussion held off the record.)
21        THE DEPONENT:  But couldn't -- just a
22  procedural question.  If you ask me something
23  that I'm not supposed to answer, shouldn't she
24  tell me?
25        MS. LAHART:  She should say, "Objection as

Page 59

1  to form."
2        THE DEPONENT:  Right.
3        MS. LAHART:  If she's directing you not to
4  answer a question, she will tell you, "Don't
5  answer the question."
6        MS. FONTUNGE:  And I'm not directing you
7  don't answer the question.
8        THE DEPONENT:  Because sometimes I'm not
9  sure.  But okay.  Okay.
10        MS. LAHART:  What was the question?
11        (Record read at this point.)
12        THE WITNESS:  I guess there could be.
13  BY MS. LAHART:
14     Q.  Do you use the St. Pete Yacht Club?
15     A.  Do I use it?
16     Q.  The St. Pete Sailing center.  I apologize.
17     A.  No.  I've not used the St. Pete Sailing Center.
18     Q.  Are you familiar with it?
19     A.  I'm familiar with it as being something that
20  the St. Pete Yacht Club funds, or whatever.
21     Q.  Okay.  Are you familiar with the lease between
22  the city and Boca Ciega Yacht Club?
23     A.  Yes.
24     Q.  There's a provision in the lease that says,
25  "lessees shall observe all sanitation and other laws,

Page 60

1  ordinances, rules or regulations of the State of
2  Florida, the United States, and the City of Gulfport
3  concerning the operation and use of the subject
4  property."
5        It doesn't say "except for the ADA," does it?
6     A.  No.
7     Q.  So why do you feel like this lease provision
8  doesn't require you to follow the ADA?
9        MS. FONTUNGE:  Object to form.
10        THE DEPONENT:  Well, okay.  So they're
11  requiring us to follow the law, and as the ADA
12  reads, private clubs are excluded from the
13  provisions of that law.
14  BY MS. LAHART:
15     Q.  Have you ever seen anything that said "Private
16  clubs on public land are exempt from the law"?
17     A.  Nope.
18        MS. FONTUNGE:  Objection.
19  BY MS. LAHART:
20     Q.  I'd like to ask you about some of the
21  affirmative defenses that were lodged to Ms. Ring's
22  initial complaint.
23     A.  Okay.
24     Q.  "Plaintiff Samantha Ring's purported request
25  for an accommodation poses a safety concern to persons

15  (Pages 57 to 60)

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)

6a633be1-a910-4deb-bc02-6eb59cc3a2af

Page 61

1   and property under the ADA."  Do you agree with that?
2        MS. FONTUGNE:  Objection.
3        THE DEPONENT:  Say it again.  Sorry.
4   BY MS. LAHART:
5        Q.  "Plaintiff Samantha Ring's purported request
6   for an accommodation poses a safety concern to persons
7   and property under the ADA."
8        MS. FONTUGNE:  Same objection.
9        THE DEPONENT:  Sure.
10  BY MS. LAHART:
11       Q.  Do you agree with that?
12       A.  Yeah.
13       Q.  Why?
14       A.  Because when Piper would lunge out, then
15  somebody could fall.  Somebody could -- I now -- I
16  know -- She can hang on to Piper.  At least, I've not
17  seen the dog, you know, get away from her myself.
18       But I don't know what Piper was lurching for.
19  I don't know if she was just wanting to get petted.  I
20  don't know if she was -- I don't know what she was
21  doing.
22       But the member at the time was turned and
23  walking away from them.  And had that been some other
24  member or some other situation, they could have backed,
25  you know, jumped back to avoid the animal and tripped

Page 62

1   over something or -- I don't know.
2        Or maybe the dog was meaning to bite him.  I
3   don't know the answer.
4        All I know is that the dog jumped at the
5   person.  The person had to back up to avoid the dog.  He
6   was walking away at the time, so he didn't have to back
7   up.  But had it been another situation, it could have
8   been harmful, yes.
9        Q.  Okay.  And that was before the dog had received
10  considerable training, correct?
11       A.  No.  That was -- That was -- That was in a
12  meeting I think this year.  It was -- Well, no.  Because
13  it was the Treasurer that was walking away.
14       The end of last year, the beginning of this
15  year.  It was somewhere in that time frame.  It was
16  definitely after this was all under way.
17       Q.  As we sit here today, are you aware of whether
18  the dog was jumping playfully or aggressively?
19       A.  Yeah.  I don't know.
20       Q.  And has the dog ever aggressively jumped at
21  you?
22       A.  At me?  No.
23       Q.  Was it Rick Peterson that said that?
24       A.  Who --
25       Q.  That the dog had lunged -- Who was the person

Page 63

1   the dog allegedly lunged at?
2        A.  His name is drawing a blank.  He was my
3   Treasurer.
4        Q.  Tony Angel?
5        A.  No.  No.  It will come to me.  I don't --
6        Q.  Okay.  "I don't know" is a perfectly valid
7   answer, if it's the truth.
8        Do you know what a "Canine Good Citizenship
9   Certificate" is?
10       A.  Nope.
11       Q.  Among the affirmative defenses is a statement
12  that, "Boca Ciega Yacht Club has evidence that
13  Ms. Ring's dog, Piper, poses an actual threat to the
14  safety of other club members."
15       Other than this incident of allegedly lunging,
16  what evidence is there that the dog is a safety threat?
17       A.  Okay.  It wasn't really alleged, because I
18  watched it happen.  So this is not a third-party thing.
19  I was in that meeting and I saw the dog lunge at the guy
20  that I can't remember his name.
21       Q.  Right.
22       A.  I will give you his name.
23       Q.  What other evidence do you have that the dog
24  poses an actual threat to the safety of other club
25  members?

Page 64

1        A.  That's the only one that I know of.
2        Q.  Okay.  "Plaintiff Samantha Ring's purported
3   request for accommodation poses a significant risk to
4   the health or safety of others that cannot be eliminated
5   or modified" -- I'm sorry.  Let me try that again.
6        "Plaintiff Samantha Ring's purported request
7   for accommodation poses a significant risk to the health
8   or safety of others that cannot be eliminated by a
9   modification of policies, practices or procedures or by
10  the provision of auxiliary aids or services."
11       Do you believe that to be a true statement?
12       MS. FONTUGNE:  Objection.
13       THE DEPONENT:  I wouldn't agree with it, no.
14  BY MS. LAHART:
15       Q.  "Plaintiff Samantha Ring's purported request
16  for accommodation imposes an undue burden on Boca Ciega
17  Yacht Club."  Do you agree with that?
18       MS. FONTUGNE:  Objection.
19       THE DEPONENT:  Yeah.
20  BY MS. LAHART:
21       Q.  Why is that?
22       A.  The reason that it could cause injury.
23       Q.  Because the dog lunged at somebody once, that's
24  an undue burden on the club?
25       A.  Yeah.  That the dog is prone to do that.  Like

16  (Pages 61 to 64)

Executive Reporting Service

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)

6a633be1-a910-4deb-bc02-6eb59cc3a2af

Page 65

1 that's -- that's a recent episode that I've seen.
2 I have seen other times in the parking lot with
3 the dog on its hind legs, front paws going, trying to
4 get at somebody.
5 Again, I don't know that that's not something
6 friendly, but it's not a service dog-type behavior.
7 Service dogs are supposed to be along their
8 side and calm, and they're trained to do that. And this
9 is not -- this is not a trained service animal, that I
10 know of.
11 Q. Okay. Is Piper behaving as a trained service
12 animal today?
13 A. Yeah.
14 Q. "Plaintiff Samantha Ring's purported request
15 for accommodation is not feasible under the ADA." Would
16 you agree with that?
17 A. No.
18 Q. "Plaintiff's claimed injuries, if any, are
19 attributable in whole or in part to the actions of
20 Ms. Ring, third parties unknown to the Boca Ciega Yacht
21 Club, and/or events occurring beyond Boca Ciega Yacht
22 Club's reasonable control" --
23 A. Right.
24 Q. -- "so that Boca Ciega Yacht Club's liability
25 must be eliminated or limited in proportion to the

Page 66

1 liability of other actors, including Ms. Ring."
2 MS. FONTUGNE: Object to form.
3 THE DEPONENT: Can we start at the
4 beginning? I didn't understand the context and
5 so I kind of lost you halfway through there.
6 BY MS. LAHART:
7 Q. I understand. "Plaintiff's claimed injuries,
8 if any" --
9 A. "Plaintiff's claimed injuries, if any." Okay.
10 Q. "Are attributable in whole or in part to the
11 action of Ms. Ring."
12 A. Okay.
13 Q. "Third parties unknown to Boca Ciega Yacht
14 Club" --
15 A. Okay.
16 Q. -- "and/or events occurring beyond Boca Ciega
17 Yacht Club's reasonable control."
18 A. Okay.
19 Q. Are you -- How did Ms. Ring contribute to her
20 claimed injuries?
21 A. I don't know.
22 Q. Okay. Do you know of any events beyond Boca
23 Ciega Yacht Club's reasonable control that have injured
24 Ms. Ring?
25 A. I don't know how she's injured, so I don't know

Page 67

1 who would have caused them.
2 Q. Okay. Fair enough.
3 MS. LAHART: I'm sure you'll be happy to
4 know that I am close to wrapping up, but I need a
5 couple minutes to confer with my esteemed
6 co-counsel. Can we take a two-minute break?
7 THE DEPONENT: Sure.
8 (Recess held at this time.)
9 MS. LAHART: Back on the record.
10 BY MS. LAHART:
11 Q. You can remember way back to when we started
12 your deposition, I showed you a picture of the note from
13 the doctor.
14 A. Yes.
15 Q. And I asked you when you had seen it the first
16 time.
17 A. Yes.
18 Q. You said you would have to go back and check
19 your notes.
20 A. Right.
21 Q. What notes were you referring to?
22 A. The texts. Actually -- Actually, you know
23 what? I don't even know what that date was for the
24 text. So, I think I deleted my texts, because we had
25 talked about something confidential or something.

Page 68

1 Q. Who is "we"?
2 A. Samantha and I. This was -- This was way back.
3 But somehow I still have the photo. Like my
4 phone kept the photo, but the texts weren't there.
5 Q. Okay. When you said "notes," you didn't mean
6 that you had taken handwritten notes or anything like
7 that. Okay.
8 Did you review anything in preparation for your
9 deposition today?
10 A. That note. There may have been another email
11 that I looked for. I can't remember why, though. Or
12 which one it was. Sorry.
13 Q. Okay. When did you do that?
14 A. This morning. It was just something off the
15 top of my head that I wanted to check.
16 Q. Before Samantha had informed you that Piper was
17 being trained to be a service animal and she wanted to
18 be able to bring Piper into the club --
19 A. I just remembered. The other email that I
20 looked up was the one that listed what she was claiming
21 as, you know, the "killing bees" and, you know, what the
22 issues would be.
23 Q. Okay.
24 A. Just to kind of refresh my memory. Sorry. Go
25 ahead.

Executive Reporting Service

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)                          6a633be1-a910-4deb-bc02-6eb59cc3a2af

Page 69

1    Q. Where was I? Oh.
2        Before she asked to, or asserted a right to be
3    able to bring the dog into the clubhouse based on the
4    ADA, had you looked at the ADA? Were you aware of the
5    private club exemption?
6    A. No.
7    Q. When did you actually look up the ADA and
8    discover that exemption?
9    A. The first time she mentioned it.
10   Q. Okay. So before she requested an
11   accommodation, there was no belief that the Boca Ciega
12   Yacht Club was a private club.
13       MS. FONTUNGE: Objection.
14       THE DEPONENT: I didn't even know -- I mean,
15   I thought it was a private club. I thought it
16   was always a private club.
17       I mean, I thought that was the whole
18   idea of voting people in, and you had to, you
19   know, be voted in and then you could be voted
20   out. That that was what a private club does.
21       So -- But not a legal sense or anything
22   more than that.
23   BY MS. LAHART:
24   Q. So you never thought that the club was exempt
25   from the ADA until Ms. Ring asked for an accommodation;

Page 70

1    is that correct?
2    A. I didn't --
3        MS. FONTUNGE: Objection.
4        THE DEPONENT: -- know what the ADA was.
5    BY MS. LAHART:
6    Q. I had asked you about why you thought Boca
7    Ciega Yacht Club was a private club, and you said,
8    "Because you have to apply for membership" --
9    A. Uh-huh.
10   Q. -- "go to a committee and explain why you want
11   to be a member" --
12   A. Uh-huh.
13   Q. -- "and be approved by the committee."
14   A. Uh-huh.
15   Q. Has that process always been in place?
16   A. I don't know. It's been that way since I've
17   been there. But I haven't been there that long.
18   Q. So when you joined the club, you went in front
19   of a committee?
20   A. Uh-huh.
21       MS. VENZA: Is that a "Yes"?
22       THE DEPONENT: Yes. Sorry.
23   BY MS. LAHART:
24   Q. Have there been any changes to the process
25   since you've been a member?

Page 71

1    A. I don't think so. I don't recall it being
2    different than it is now. Or if there was, maybe a
3    small change or something. I -- Not that I know of.
4    Q. Maybe a small change? What are you referring
5    to? Anything?
6    A. Like, you know, the way that she conducts the
7    interview process and, you know, you show up with other
8    people or you show up by yourself. You know, those
9    kinds of things may have changed, and I just wouldn't
10   know about it because I'm not part of that committee.
11   Q. Okay.
12   A. The voting part is the same.
13   Q. Is it a vote by the entire membership or just
14   by the board?
15   A. By the people that show up in the general
16   meeting.
17   Q. How many is that typically? High to low.
18   A. I would say probably 50-ish.
19   Q. Is one of the purposes of the club for social
20   reasons?
21   A. Yeah.
22   Q. Would you be unwilling to socialize with
23   somebody who doesn't sail?
24   A. No. I mean, I would socialize with somebody
25   that doesn't sail.

Page 72

1    Q. When someone applies to be a member, are they
2    required to have a sailboat?
3    A. No.
4    Q. Are they quizzed on nautical terms?
5    A. No.
6    Q. Mr. Brown, we served Interrogatories and
7    Requests for Production upon your counsel. Did you see
8    those documents?
9    A. Say that again. Because I --
10   Q. Did you see a document called "Interrogatories"
11   that was a series of questions about this lawsuit?
12   A. I don't know.
13   Q. Did you see a document called a "Request for
14   Production" that asked for specific documents related to
15   the lawsuit?
16   A. I don't know. I don't think so.
17       MS. LAHART: Well, I am going to state on
18   the record that we served discovery on your
19   counsel and the answers were due on Friday.
20       We deliberately set depositions after
21   the time limit discovery was supposed to be
22   produced and we didn't get it until eight o'clock
23   last night.
24       At that point, I was driving, Ms. Venza was
25   driving. We did not have access to a printer.

Executive Reporting Service

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)                    6a633be1-a910-4deb-bc02-6eb59cc3a2af

Page 73

```
 1   So I have not had an opportunity to review any of
 2   that discovery.
 3          And for that purpose, I am not going to
 4   end your deposition. I'm going to, when I'm done
 5   asking you questions, keep it open, because if
 6   there's anything in that discovery that I need to
 7   ask you about, I'm going to have to ask you to
 8   come back.
 9          THE DEPONENT: Okay.
10          MS. VENZA: Discovery was due on Thursday,
11   the 10th.
12          MS. LAHART: Sorry. My bad.
13   BY MS. LAHART:
14      Q.  Do you remember anybody being denied membership
15   into the club?
16      A.  In the meetings that I have been in, which
17   maybe -- you know, the general meetings -- maybe around
18   40 or 50 different meetings that I've been in, I --
19   nobody has been turned down.
20      Q.  Okay. An applicant -- Anybody can apply to be
21   a member, right?
22      A.  Uh-huh.
23      Q.  You don't have to be specifically invited to
24   join the club.
25      A.  Right. And I would expect that anybody that
```

Page 74

```
 1   didn't want to be a member because they weren't
 2   interested in sailing, that that committee would have
 3   said, "Well, that's kind of what we do here," so, you
 4   know, would have discouraged them from joining.
 5          Go ahead.
 6      Q.  But you also have parties, pot lucks.
 7      A.  Uh-huh.
 8      Q.  You drink rum.
 9      A.  Uh-huh.
10          MS. VENZA: Is that, "Yes"?
11          THE WITNESS: Yes. Sorry. Yes. Yes. Yes.
12   BY MS. LAHART:
13      Q.  There's no requirement that somebody know how
14   to sail when they join.
15      A.  Correct.
16      Q.  Do the Sea Scouts have to be a member of the
17   Boca Ciega Yacht Club?
18      A.  The Sea Scouts are not members, but the two
19   guys that run it are both members.
20      Q.  Do their parents have to be members?
21      A.  No.
22      Q.  When their parents bring the kids for their
23   sailing lessons, can the parents go into the clubhouse?
24      A.  They do.
25      Q.  Are other peoples' pets ever allowed into the
```

Page 75

```
 1   clubhouse?
 2      A.  No. So -- I mean, if somebody had asked for
 3   some exemption, like what we were talking about before,
 4   then possibly something could be done. But nobody has
 5   asked that, that I'm aware of.
 6      Q.  How about the Westerfields' cat? Has the
 7   Westerfield's cat ever been in the clubhouse?
 8      A.  I don't know. I don't think so. I've seen him
 9   bring him up, like -- he was taking him down to the vet
10   and he brought him back and he was out in the front of
11   the building and on the front porch. But I don't think
12   he went inside.
13      Q.  If the Westerfields had tried to bring the cat
14   inside, would that have been an issue?
15      A.  Yeah. I mean, he'd need to bring it out. It's
16   a pet.
17          MS. LAHART: All right. I have no further
18   questions. Thank you.
19          MS. FONTUNGE: I have a few follow-ups.
20   I'll try to keep it short, because we have been
21   here a long time.
22               CROSS-EXAMINATION
23   BY MS. FONTUNGE:
24      Q.  First of all, Mr. Brown, you're not a lawyer,
25   correct?
```

Page 76

```
 1      A.  Correct.
 2      Q.  And you haven't received any sort of legal
 3   training, paralegal training, have you?
 4      A.  No.
 5      Q.  Would you say that you're qualified to
 6   interpret the ADA?
 7      A.  No.
 8      Q.  Would you say that you're qualified to
 9   interpret any conclusion reached by the Pinellas County
10   Office of Human Rights in preparing their investigative
11   report?
12      A.  No.
13      Q.  Now, you were asked about the lease, and you
14   were asked about a provision in the lease that has to do
15   with what -- you know, the fact that as part of the
16   lease, Boca Ciega Yacht Club will abide by all laws,
17   regulations, ordinances of the City of Gulfport.
18          That would be all those laws and ordinances
19   that actually apply to the club, correct?
20      A.  Yes.
21      Q.  Now, earlier you testified that you were
22   familiar with the lease. Are you familiar with the
23   provision of the lease that has to do with alcoholic
24   beverage concessions under which the club is expressly
25   prohibited from dispensing alcoholic beverages to the
```

Executive Reporting Service

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)

6a633be1-a910-4deb-bc02-6eb59cc3a2af

Page 77

1  general public if the club decides to purchase a liquor
2  license?
3      A.  It's been brought up to me, yes.
4      Q.  Okay.  Are you aware that the lease
5  specifically restricts the use of the clubhouse to club
6  members and their guests?
7      A.  Correct.
8      Q.  Now, early on in your deposition you were asked
9  about the amendments that were being made to the
10  Articles of Incorporation.  Were you part of the
11  committee who was working on that amendment?
12      A.  I was not part of the committee that was
13  working on it, but as a board member, it was brought up.
14      Q.  Okay.  You were presented with a hypothetical
15  about a random person who had proved that they suffered
16  from an epileptic seizure disorder.  Do you remember
17  that hypothetical?
18      MS. LAHART:  Objection as to form.
19      THE DEPONENT:  Yes.
20      MS. LAHART:  I didn't say anything about
21  proof.
22  BY MS. FONTUGNE:
23      Q.  Now, you were asked about a random person.  If
24  that person was not a club member, that person would not
25  be allowed in the club to begin with, correct?

Page 78

1      A.  Well, if they were accompanied by a member,
2  they would.  But on their own, no, they would not.
3      Q.  So what I hear you saying is that they would
4  have to be a guest of a member?
5      A.  Yes.
6      Q.  Now, when somebody joins Boca Ciega Yacht Club,
7  they're provided with at least one key to the clubhouse,
8  correct?
9      A.  Correct.
10      Q.  Is any member of the public provided with a key
11  to the clubhouse?
12      A.  No.
13      Q.  Is the club indiscriminately open to members of
14  the public?
15      A.  No.
16      Q.  Other than Fun Day, is the club, the clubhouse
17  itself, open to the public at large?
18      A.  No.
19      Q.  Does the club have food and beverages for sale
20  on the premises?
21      A.  No.
22      Q.  Since you've been a member, have you ever seen
23  the clubhouse used by anyone as a place of lodging?
24      A.  No.
25      Q.  Now, you were asked about an email that you had

Page 79

1  sent to Ms. Ring, and you testified earlier that
2  probably you had learned about anxiety and OCD -- First
3  of all, OCD, for the record, what is that?
4      A.  Obsessive compulsive disorder.
5      Q.  Okay.  And you mentioned something about seeing
6  a therapist.  Did Ms. Ring ever provide you with the
7  name of any therapist that she was seeing?
8      A.  No.
9      Q.  Do you have any way to verify this information
10  concerning anxiety, OCD, and seeing a therapist?
11      A.  No.
12      Q.  Now, as far as the note from Dr. Santiana that
13  you were shown at the beginning of this deposition, did
14  you have occasion to actually talk to Dr. Santiana?
15      A.  No.
16      MS. FONTUGNE:  All right.  I don't have any
17  questions for now.  I'm sure that you'll have
18  more questions now.
19      MS. LAHART:  Yes.
20      REDIRECT EXAMINATION
21  BY MS. LAHART:
22      Q.  Mr. Brown --
23      A.  Yes.
24      Q.  -- my feeling was that the investigative report
25  was pretty much written in understandable lay language.

Page 80

1  Did you understand it?
2      A.  Most of it.
3      Q.  Does the club -- Does the club have a liquor
4  license?
5      A.  No.
6      Q.  Do you know who is on the committee to rewrite
7  the Articles of Incorporation?
8      A.  I know Dan is heading it up, and Dick is on the
9  committee.  Those are the only two that I know of.  And
10  of course the Commodore's part of every committee, so...
11      Q.  Dan --
12      A.  Chestnut.
13      Q.  -- Chestnut.
14      A.  And Dick Risk.
15      Q.  Going back to the hypothetical person with
16  epilepsy.  Let's say that a person on Fun Day comes to
17  Boca Ciega Yacht Club with a dog on a leash and says, "I
18  have epilepsy."  Or actually doesn't even have on say
19  that.  Says, "I need my dog" --
20      A.  Yeah.
21      Q.  Let me finish my question.
22      A.  I'm sorry.
23      Q.  "I need my dog because of a disability."  Would
24  you let that person in the clubhouse?
25      A.  Yes.

Executive Reporting Service

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)                                    6a633be1-a910-4deb-bc02-6eb59cc3a2af

Page 81

```
1    MS. FONTUGNE:  Objection.
2  BY MS. LAHART:
3    Q.  If somebody came to the clubhouse door during
4  Fun Day with a dog, what questions would you ask that
5  person before you let them in?
6    A.  Well, I would say that, "We don't allow dogs
7  into the clubhouse."
8    Q.  Okay.  And if the person said, "This is my
9  service dog"?
10   A.  Then I'd say, "Okay."
11   Q.  What about Paint Your own Wine Glass Night?
12 Are members of the public allowed in the clubhouse on
13 Paint Our Own Wine Glass Night?
14   A.  For any event that's held at the club, other
15 than Fun Day, there has to be a club member who is
16 responsible for any of the activity that happens as
17 their guests.
18      So if somebody is going to host a regatta, then
19 they're responsible for everything that's going on in
20 the regatta, that they make sure everything gets taken
21 care of and does whatever needs to happen.
22   Q.  Okay.  So if --
23   A.  So I think Lisa did the Paint the Wine Glass
24 thing, so they would be her guests.
25   Q.  Okay.  So if you have a regatta, is there any
```

Page 82

```
1  screening of the people that participate in that regatta
2  before the event?
3    A.  No.
4    Q.  Somebody joins adult sail school.  Is there any
5  screening of that person before they --
6    A.  No.
7    Q.  -- become a member?
8    A.  Sorry.
9    Q.  That's okay.
10   A.  No.
11   Q.  Somebody is taking part in adult sail school,
12 are they allowed to use the clubhouse?
13   A.  Yes.  Which this falls under the same as any of
14 the other.  Like the wine thing, there's a teacher,
15 there's an instructor there, who is a member, who is
16 making sure that everything is taken care of and what --
17 you know, people aren't just running around doing
18 whatever they want.  They're this for the class.
19   Q.  But the participants don't have to be members,
20 correct?
21   A.  Correct.
22   Q.  Your counsel asked you about the email that you
23 sent to my client that said that you know that she sees
24 a therapist and takes medication.
25   A.  Uh-huh.
```

Page 83

```
1    Q.  Did you ever ask the name of the therapist?
2    A.  No.
3    Q.  Do you have any reason to disbelieve that she
4  sees a therapist?
5    A.  No.
6    Q.  Do you have any reason to disbelieve that she
7  takes medication?
8    A.  No.
9    Q.  Your counsel asked you if you had spoken with
10 the doctor that wrote the letter that was the first
11 exhibit to this lawsuit.
12   A.  Right.
13   Q.  Did you ask Ms. Ring if you could speak with
14 that doctor?
15   A.  No.
16   Q.  Did you make any attempt to follow up with that
17 doctor?
18   A.  No.
19   Q.  During youth sailing school, are the parents of
20 the participants allowed to --
21   A.  I don't know.
22   Q.  Okay.  Fair enough.
23      Did Ms. Ring send you a picture of somebody
24 else's dog in the clubhouse?
25   A.  Yep.
```

Page 84

```
1    Q.  Do you know why that dog was allowed in the
2  clubhouse?
3    A.  Well, apparently Joel didn't realize that she
4  had the dog, or -- I don't know -- I don't know if he
5  didn't realize that she had the dog.  I don't know what
6  the situation was mounting up to the point that the dog
7  was in the clubhouse with that person.
8      But it was brought up to him and he talked to
9  the parent, and the parent has not brought the dog back
10 in since then.
11   Q.  Has Paul Stiffler's dog ever been in the
12 clubhouse?
13   A.  I don't know.
14   Q.  You stated that because you've seen Piper lunge
15 at someone, that you feel that it would be a safety
16 risk --
17   A.  Yeah.
18   Q.  -- to allow Piper into the clubhouse.
19      Does that apply to all service dogs?  Do you
20 feel that --
21   A.  No.
22   Q.  -- having service dogs, in general, in the club
23 would not --
24   A.  Right.  I think -- I think service dogs -- I
25 mean, I expect that they're typically trained as
```

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)                                    6a633be1-a910-4deb-bc02-6eb59cc3a2af

Page 85

1  puppies, and how they behave and how they're -- because
2  I've seen many of them that are just, you know, spot-on
3  under command. Nobody pets them. Nobody -- There's
4  no -- It's a very serious thing. It's not -- definitely
5  not a pet.
6      Q. So it's not an undue burden to accommodate
7  service animals. It's only an undue burden to
8  accommodate Piper, correct?
9      A. Yeah. I think at some point Piper could be as
10 good as a service animal. It's certainly possible.
11     I don't know how you determine that that's now
12 the case, but I guess -- I guess after a while of being
13 around people on the front porch and stuff that, you
14 know, she stopped doing it, that, okay, maybe it's okay.
15 I don't know.
16     Q. Are you aware that Florida law requires people
17 who are training service animals to have the same access
18 to public accommodations that people with trained
19 service animals have?
20        MS. FONTUNGE: Objection.
21        THE DEPONENT: No.
22 BY MS. LAHART:
23     Q. Did Samantha Ring ask to bring Piper in the
24 clubhouse right after the dog was acquired or was there
25 a time period after the dog was acquired?

Page 86

1      A. Say that again.
2      Q. Did Samantha ask to bring Piper into the
3  clubhouse right after she got the dog?
4      A. I don't know.
5        MS. LAHART: Nothing further.
6        MS. FONTUNGE: I have a few more.
7        MS. LAHART: Wait, wait, wait. I'm sorry.
8  I spoke too soon.
9  BY MS. LAHART:
10     Q. Are you a medical doctor?
11     A. No.
12     Q. Physician's assistant?
13     A. No.
14     Q. Any training as a nurse?
15     A. No.
16     Q. Paramedic?
17     A. No.
18     Q. EMT?
19     A. No.
20     Q. Are you qualified to evaluate disability?
21        MS. FONTUNGE: Objection.
22        THE DEPONENT: I don't know the answer to
23 that question. Qualified to whom?
24        Like, I don't have -- I don't have any
25 degree in it. I don't have any, you know,

Page 87

1  schooling for it.
2  BY MS. LAHART:
3      Q. Are you qualified to determine whether or not
4  someone has a medical need for a service animal?
5        MS. FONTUNGE: Objection.
6        THE DEPONENT: Again, it would depend on
7  who's requiring qualification and what they need
8  for those qualifications.
9  BY MS. LAHART:
10     Q. Going back to your attorney's questions about
11 qualifications, and she pointed out that you're not an
12 attorney.
13     A. Uh-huh.
14     Q. Doesn't that cut both ways? Doesn't that
15 mean that because you're not a doctor, you're not
16 qualified to review a medical note?
17        MS. FONTUNGE: Objection.
18        THE DEPONENT: I kind of understand what
19 you're saying, but what's the question exactly?
20 BY MS. LAHART:
21     Q. What exactly are your qualifications to review
22 the note that Ms. Ring gave you and say that's not
23 adequate?
24     A. I didn't say it wasn't adequate. But, I mean,
25 I understand, by and large, what it's saying. To me,

Page 88

1  I'm qualified.
2      But to somebody else, I may not be qualified,
3  because I may interpret it incorrectly, because there's
4  legal jargon in there that may be different than what I
5  think that it is.
6      So it depends on who you're asking as to
7  whether I'm qualified or not.
8      Q. Okay. You just said that the letter is not
9  adequate -- not inadequate. Is that your testimony?
10     A. That this letter is?
11     Q. No. The letter from Dr. --
12     A. Oh. I got you.
13     Q. It's the letter that is the first exhibit --
14     A. Correct.
15     Q. -- to your deposition.
16     A. Correct. I think that -- I think that's -- I
17 think that it is an attempt by Samantha to make this
18 seem like the doctor is ordering it, when in fact the
19 doctor is simply saying that they agree with her
20 decision.
21     Which is what she would do to try and get the
22 dog into the clubhouse. The doctor's not taking any
23 risk by saying, "This is what she needs." He's just
24 saying he agrees with her.
25     Q. Okay.

22  (Pages 85 to 88)

Executive Reporting Service

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)                    6a633be1-a910-4deb-bc02-6eb59cc3a2af

Page 89

1    A.  Which --
2    Q.  If a doctor --
3    A.  I understand.
4    Q.  -- simply agrees that his or her patient
5  benefits from having a service animal, that's not
6  enough?
7    A.  Correct.
8    MS. FONTUNE:  Objection.
9    MS. LAHART:  Okay.
10  BY MS. LAHART:
11    Q.  Do you have any reason to dispute the person
12  that signed this letter is a doctor?
13    A.  Thats' a good question.  I hadn't thought about
14  it.  But it's possible.
15    Q.  Did you --
16    A.  But, again, they weren't -- they weren't
17  stating that she needed the dog.
18    If she was stating that she needed the dog,
19  then, you know, I would probably -- Well, no.  If she
20  said she needed the dog, we would have probably moved in
21  a different direction.
22    And honestly, I think that different direction
23  would have been to see if she could get a different
24  service animal that wasn't her pet.
25    Q.  Have you ever heard of Bayfront Hospital?

Page 90

1    A.  Yes.
2    Q.  Is it a real hospital?
3    A.  Yeah.
4    Q.  Do you have any training in animal behavior?
5    A.  Training, no.
6    Q.  Do you have any training in veterinary
7  medicine?
8    A.  No.
9    Q.  Is it true that the Boca Ciega Yacht Club
10  charges a membership fee of $145 per quarter?
11    A.  I think so.
12    Q.  And that the Boca Ciega Yacht Club advertises
13  that's just $1.59 per day?
14    A.  I don't know.
15    Q.  Among the benefits of membership posted upon
16  the website are that, "Everyone interested in
17  sailboating, sail racing, or social activities and will
18  help to maintain our club can be member of BCYC."  Is
19  that a correct statement?
20    A.  Well, no.  I think the "social activity,"
21  probably a little loose with that.
22    Q.  Does the website also state that, "Boca Ciega
23  Yacht Club is known for throwing a party or two, or 10,
24  like its monthly pot lucks, with sailing as a backdrop
25  to its self-described rum-loving roots"?

Page 91

1    A.  Say that again.  What's the --
2    Q.  It's actually not important.
3    A.  Okay.
4    Q.  What exactly are the standards of criteria for
5  admission into the Boca Ciega Yacht Club?
6    A.  A passion for sailing.  Yeah.  As far as I
7  know.
8    Q.  Do you recruit members at the boat show?
9    A.  Yeah.
10    Q.  Do you advertise for members in "The Gabber"?
11    A.  I don't know.
12    MS. LAHART:  Okay.  We're really done now.
13    MS. FONTUNE:  All right.  I have a few
14  follow-ups.
15    RECROSS-EXAMINATION
16  BY MS. FONTUNE:
17    Q.  Mr. Brown, you were asked whether you were
18  qualified as a doctor, as any sort of medical
19  professional.  Do you remember that?
20    A.  Yeah.
21    Q.  Okay.  But Ms. Ring sent you the note from
22  Dr. Santiana, correct?
23    A.  Yes.
24    Q.  Do you know whether she sent the note to anyone
25  else on BCYC?

Page 92

1    A.  No.
2    Q.  Okay.  As far as your membership, you've been a
3  member, you said, since about 2006?
4    A.  I believe so.
5    Q.  Did you meet Ms. Ring in 2007 when she joined
6  the club?
7    A.  I don't know.  I don't know how long it's been.
8    Q.  Is it fair to say that it's been more than a
9  few years?
10    A.  Yes.
11    Q.  Okay.  During all the time that you've known
12  Ms. Ring and that you've seen Ms. Ring in the Boca Ciega
13  Yacht Club clubhouse, have you ever observed her having
14  any difficulty with talking?
15    A.  No.
16    Q.  Have you ever observed her have any difficulty
17  with walking or ambulating around the clubhouse?
18    A.  No.
19    Q.  Have you ever seen her have any difficulty with
20  eating, if she's eating on the premises?
21    A.  No.
22    Q.  Have you ever seen her have any difficulty with
23  reading, if she's reading something while she's in the
24  clubhouse?
25    A.  No.

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)

6a633be1-a910-4deb-bc02-6eb59cc3a2af

Page 93

1  Q.  And in all the time that you've known Ms. Ring,
2  have you ever observed or had any reports by any other
3  club members of Ms. Ring getting stung by a bee?
4  A.  No.
5  Q.  What about Ms. Ring needing medical attention
6  while she's at the clubhouse, where someone had to call
7  paramedics?
8  A.  No.
9  Q.  Have you ever heard or have you ever witnessed
10  Ms. Ring have an allergic reaction to sunflower seeds or
11  sunflower oil that is in food?
12  A.  No.
13  Q.  During all the time that you've known Ms. Ring
14  and that you've seen her in the BCYC clubhouse, have you
15  ever actually seen her have an anxiety attack?
16  A.  No.
17  Q.  Have you ever seen Ms. Ring have a panic attack
18  at the clubhouse?
19  A.  No.
20  Q.  Now, Mr. Brown, we talked about an email that
21  you had sent to Ms. Ring on December 25th.  Do you
22  remember that?
23  A.  I have to know the --
24  Q.  It's been listed here as Exhibit 4.
25  A.  Okay.

Page 94

1  Q.  And I'm actually not going to ask you any
2  questions about it.  But I'm going to introduce an email
3  that you sent the day before.  This will be Defense
4  Exhibit Number 1.  I don't have any other exhibits.
5  (Defendant's Exhibit 1 was marked for
6  identification.)
7  BY MS. FONTUGNE:
8  Q.  Do you recognize your email address on this
9  email?
10  A.  Yes.
11  Q.  And who is the email addressed to?
12  A.  Samantha Ring, carbon copy BCYC board and BCYC
13  chairs.
14  Q.  Okay.  Do you recognize this email?  I'll give
15  you a chance to read it.
16  A.  Yeah, right.  This is when I was looking it up,
17  right.  Okay.
18  Q.  Mr. Brown, looking at the first page of the
19  document, do you see a case number and a date at the
20  very top of the page?
21  A.  Okay.  Yes.
22  Q.  What is the date, please?
23  A.  The date is 6/19/19.
24  Q.  And I'll represent to you that this -- a copy
25  of this email was filed as an exhibit in this case by

Page 95

1  plaintiff's counsel.
2  Now, I'm not going to ask you any specific
3  questions about this document, so we can put it aside.
4  But what I did want to ask you is this:  When Ms. Ring
5  approached you about requesting an accommodation for her
6  dog, Piper, to come into the clubhouse, is it fair to
7  say that you did some research and made good faith
8  efforts to investigate whether the club was subject to
9  the ADA?
10  A.  Yeah.
11  Q.  And you did this in spite of not being a
12  lawyer, correct?
13  A.  Correct.
14  Q.  And after you did this research, you engaged in
15  a dialogue with Ms. Ring to try to find a solution to
16  the problem; is that right?
17  A.  Yes.
18  Q.  And you tried to work with Ms. Ring to make an
19  exception for the dog so that it would be allowed into
20  the clubhouse.  Is that your recollection?
21  A.  Yes.
22  MS. VENZA:  Leading.
23  BY MS. FONTUGNE:
24  Q.  Now -- Let me see that exhibit for a minute.
25  Now, do you recall that Ms. Ring told you that

Page 96

1  she had spoken to the Pinellas County Office of Human
2  Rights?
3  A.  Yes.
4  Q.  And when you were trying to work with her and
5  you saw that she was not open to your suggestions, you
6  actually encouraged her to go and file a complaint with
7  the agency, didn't you?
8  A.  Yes.
9  MS. VENZA:  I'm going to object to form and
10  the absolute abuse of the cross -- the
11  opportunity to recross.  This is all leading.
12  BY MS. FONTUGNE:
13  Q.  Well, let me put it to you this way:  Did you
14  encourage Ms. Ring to go and file a complaint with the
15  Pinellas County Office of Human Rights?
16  A.  I said she should.
17  MS. FONTUGNE:  Okay.  No further questions.
18  MS. LAHART:  Well, unfortunately your
19  attorney has opened up quite a few, so...
20  REDIRECT EXAMINATION
21  BY MS. LAHART:
22  Q.  Did you ever have a conversation with Lee Nell
23  about the ADA?
24  A.  Yes.  I mean, I've discussed this with him.
25  Q.  What was the nature of that discussion?

24  (Pages 93 to 96)

Executive Reporting Service

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)

6a633be1-a910-4deb-bc02-6eb59cc3a2af

Page 97

1   A.   Just confirming my take, you know, from this
2   description of how it's supposed to work.
3   Q.   And Lee Nell is an attorney?
4   A.   He was an attorney.
5   Q.   So you did consult an attorney.
6   A.   He's not an attorney.  He was one.  So I was
7   not -- I was not consulting him as an attorney.  I was
8   consulting him as the previous Commodore.
9   Q.   Okay.  My feeling is once you're a lawyer,
10  you're always a lawyer.
11  A.   Okay.
12  Q.   You may not be actively practicing.  But I
13  guess that's just a matter of opinion.
14       In a response to a question from your counsel,
15  she asked you, "Although you're not a doctor, you're the
16  person that Ms. Ring sent the letter to."
17  A.   Uh-huh.
18  Q.   You were the Commodore at the time, right?
19  A.   Yes.
20  Q.   And that's why she sent you the letter.
21  A.   Yes.  I assume.
22  Q.   She didn't send you the letter because you had
23  any medical expertise.
24       MS. FONTUGNE:  Objection.
25       THE DEPONENT:  I can't tell you why she sent

Page 98

1   it to me, but I would guess that's it, yes.
2   BY MS. LAHART:
3   Q.   Did she send the letter to you because she was
4   trying to convince you she should be able to bring her
5   service dog into the clubhouse?
6       MS. FONTUGNE:  Objection.
7       THE WITNESS:  Yes.
8   BY MS. LAHART:
9   Q.   Have you ever seen her eat sunflowers?
10  A.   Nope.
11      MS. FONTUGNE:  Objection.
12  BY MS. LAHART:
13  Q.   Do you have any reason whatsoever to disbelieve
14  that she has an allergy to sunflowers?
15  A.   Nope.
16  Q.   Sunflower seeds?
17  A.   No.
18  Q.   Do you have any reason whatsoever to disbelieve
19  that she has an allergy to bees?
20  A.   Nope.
21  Q.   Does the fact that you have not personally
22  observed her have a panic attack means that she doesn't
23  suffer from panic attacks?
24  A.   Nope.
25  Q.   Tell me about the good faith dialogue that you

Page 99

1   had with Ms. Ring.
2   A.   I'm not sure what -- which dialogue you're
3   referring to.
4   Q.   Well, it was when your attorney was asking you
5   leading questions and she said you entered into a
6   dialogue with Ms. Ring regarding -- We can even have the
7   court reporter read the question back.
8   A.   Yeah.  What's your question now?
9       MS. LAHART:  I'd like the court reporter to
10  read the question back.
11      (Record read at this point.)
12  BY MS. LAHART:
13  Q.   Tell me about that.  Tell me about that
14  dialogue.
15  A.   We spoke about her not having the dog in the
16  club, and that she felt that her discussion with the
17  Pinellas County, you know, human rights group, that they
18  were telling her that we were not a private club.
19      And the thing is that I needed to discuss it
20  with them, because they only had her side of the
21  description and I needed to make sure that, you know,
22  they understood everything that's going on.
23      And so that would have bearing on their
24  decision.  If they're just basing it on what she's told
25  them, I don't know what she's told them.

Page 100

1   Q.   So you needed to discuss it with them.  Did you
2   contact them?
3   A.   No.
4   Q.   Tell me, other than telling Ms. Ring to, "Go
5   file a complaint with the Pinellas County Office of
6   Human Rights," how you tried to work things out.
7   A.   I didn't tell her to did it.  She said she
8   wanted to do it, and she thought that that would be too
9   abrasive, that it would be a problem.  And I said, "No.
10  If that's where you need to go, then that's where you
11  need to go."
12  Q.   Okay.  Other than that, how did you try to work
13  things out with her?
14  A.   I'm not sure what you mean.  Like, what else
15  can I offer?  I've offered her to have this group that
16  she says is behind her contact me and we'll discuss it.
17  That's --
18  Q.   Okay.
19  A.   That's a way to resolve it.
20  Q.   You made no effort to contact that group,
21  correct?
22  A.   Correct.
23  Q.   And you're aware that the investigative report
24  was written after they had both sides of the story.
25  A.   I don't know -- I assume that they had some

Executive Reporting Service

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)                                    6a633be1-a910-4deb-bc02-6eb59cc3a2af

## Page 101

1    course of discussion, because they've got some responses
2    in here. But I don't know what all this investigative
3    reporter knew or didn't know.
4        Q. Okay. Why don't we -- I'm going to hand you a
5    couple letters from your attorney. You don't have to
6    read it, but skim through it, please.
7        A. Okay. Wait. Okay.
8        Q. So the Pinellas County Office of Human Rights
9    did get both sides of the story, correct?
10       MS. FONTUGNE: Objection.
11       THE DEPONENT: They got -- They got a
12   response to their concerns.
13       MS. LAHART: Okay.
14       MS. FONTUGNE: Anything else?
15       MS. LAHART: We might be done now.
16       MS. FONTUGNE: I don't have anything else.
17       MS. LAHART: Excellent.
18       COURT REPORTER: Read or waive?
19       MS. FONTUGNE: We're going to read, please.
20       (Said deponent wished to read and sign
21   the deposition, and the taking of this deposition
22   was concluded at 12:48 p.m.)
23
24
25

## Page 102

1        CERTIFICATE OF REPORTER OATH
2
3    STATE OF FLORIDA
4
5    COUNTY OF PINELLAS
6
7
8        I, the undersigned authority, certify that
9    LARRY BROWN personally appeared before me on October 14,
10   2019, at 9:33 a.m. and was duly sworn.
11       WITNESS my hand and official seal this
12   October 14, 2019.
13
14
15
16
17
18
19
20       Jerry P. Lefler RPR CRR CM
         Notary expires May 17, 2022
21
22
23
24
25

## Page 103

1        CERTIFICATE OF COURT REPORTER
2
3    STATE OF FLORIDA
4
5    COUNTY OF PINELLAS
6
7        I, Jerry P. Lefler, Court Reporter, certify that I
8    was authorized to and did stenographically report the
         deposition of LARRY BROWN; that a review of the
9    transcript was requested; and that the transcript is a
         true and correct record of my stenographic notes.
10       I FURTHER CERTIFY that I am not a relative,
11   employee, or attorney, or counsel of the parties, nor am
         I a relative or employee of any of the parties'
12   attorneys or counsel connected with the action, nor am I
         financially interested in the action.
13       DATED this October 14, 2019.
14
15
16
17
18
19
20       Jerry P. Lefler RPR CRR CM
21
22
23
24
25

## Page 104

1    PLEASE ATTACH TO THE DEPOSITION OF: LARRY BROWN
     TAKEN ON OCTOBER 14, 2019, IN THE CASE OF RING VS BOCA
2    CIEGA YACHT CLUB
             ERRATA SHEET
3
4        DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES
5
     Page No.   Line No.   Change      Reason
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   Under penalties of perjury, I declare that I have
19   read the foregoing document and that the facts
     stated therein are true.
20
21   DATE          LARRY BROWN
                   (10142019lb)
22
23
24
25

                        26  (Pages 101 to 104)

Executive Reporting Service

Page 105

```
 1              Executive Reporting Service
            13555 Automobile Boulevard, Suite 100
 2               Clearwater, Florida 33762
                    (727) 823-4155
 3
                   November 27, 2019
 4
 5   ELISABETH FONTUGNE, ESQ.
     Cole, Scott & Kissane
 6   4301 West Boy Scout Boulevard, #400
     Tampa, Florida 33607
 7   Elisabeth.Fontugne@csklegal.com
 8   Re:  RING VS BOCA CIEGA YACHT CLUB
 9   Dear Ms. Fontugne:
10       The deposition of LARRY BROWN taken on
     October 14, 2019, in the above-styled case is ready
11   for review.  Please have your client make an
     appointment to review the transcript in our office.
12
         In the alternative, if you have ordered a copy
13   of the transcript, and will be handling reading and
     signing, have your client note any corrections on
14   the errata sheet provided.
15       The review must be complete on or before
     December 28, 2019, and the errata sheet returned
16   to: Executive Reporting Service, 13555 Automobile
     Boulevard, Suite 100, Clearwater, Florida 33762, so
17   it may be included with the original transcript.
18       Please contact our office if there are any
     questions you may have.  Thank you for your prompt
19   and careful attention to this matter.
20               Sincerely,
21
22
23
             Executive Reporting Service
24
25
```

27  (Page 105)

Executive Reporting Service

Electronically signed by Jerry Lefler (101-146-393-3289)
Electronically signed by Jerry Lefler (101-146-393-3289)

6a633be1-a910-4deb-bc02-6eb59cc3a2af

| A | | | | |
|---|---|---|---|---|
| **a.m** 1:15 51:20 102:10 | **actors** 66:1 **actual** 17:8 63:13,24 | **agreements** 45:23 **agrees** 19:2 | **amount** 45:13 **anchored** 7:25 8:2 | **apologize** 51:9 59:16 **apparently** |

**a.m** 1:15 51:20
102:10
**abide** 28:13
33:20 53:16
76:16
**able** 20:15 46:1
48:25 49:4,24
54:14 56:1
57:1 68:18
69:3 98:4
**above-styled**
105:10
**abrasive** 100:9
**absence** 34:14
**absolute** 96:10
**absolutely** 29:10
44:4
**abuse** 96:10
**access** 7:21
72:25 85:17
**accommodate**
24:22 25:3
26:17 85:6,8
**accommodation**
60:25 61:6
64:3,7,16
65:15 69:11,25
95:5
**accommodati...**
85:18
**accompanied**
78:1
**accompany** 18:6
**accusations** 52:1
52:8
**achieve** 37:19
**acquired** 85:24
85:25
**action** 66:11
103:11,12
**actions** 65:19
**active** 11:13
**actively** 97:12
**activities** 21:16
90:17
**activity** 81:16
90:20

**actors** 66:1
**actual** 17:8
63:13,24
**ADA** 24:17,17
24:17,19,24
25:5,7 26:20
32:24 33:23
34:24 35:3
53:16 55:20,24
56:3 60:5,8,11
61:1,7 65:15
69:4,4,7,25
70:4 76:6 95:9
96:23
**additional** 19:12
19:21,24 31:3
**address** 32:17
32:20 94:8
**addressed** 94:11
**adduced** 4:3
**adequate** 20:7
21:5 87:23,24
88:9
**administrative**
29:11 30:10,10
30:13 36:11,18
37:2
**admission** 91:5
**adult** 82:4,11
**advertise** 91:10
**advertises** 90:12
**affirmative**
60:21 63:11
**afforded** 45:12
**age** 31:23 33:6
33:14
**agency** 96:7
**aggressively**
62:18,20
**ago** 7:15
**agree** 19:4 27:19
56:12 61:1,11
64:13,17 65:16
88:19
**agreed** 17:18
46:18
**agreement** 19:1
37:18

**agreements**
45:23
**agrees** 19:2
88:24 89:4
**ahead** 16:23
28:22 30:17
31:6 42:6
44:22 47:13
68:25 74:5
**aids** 64:10
**alcoholic** 76:23
76:25
**alike** 5:5
**Allbcyyboard...**
51:22
**alleged** 63:17
**allegedly** 63:1
63:15
**allergic** 93:10
**allergies** 18:5
19:13,15,25
**allergy** 98:14,19
**alleviate** 18:4
**allow** 17:23 50:1
50:3 81:6
84:18
**allowances**
33:14
**allowed** 21:12
23:22 24:10,13
38:6,14 74:25
77:25 81:12
82:12 83:20
84:1 95:19
**allowing** 14:15
14:16
**alternative**
105:12
**altogether** 13:17
13:18
**ambulating**
92:17
**amend** 16:3
**amending** 13:23
**amendment**
31:21 77:11
**amendments**
15:17 77:9

**amount** 45:13
**anchored** 7:25
8:2
**ancillary** 6:2
**and/or** 65:21
66:16
**Angel** 63:4
**animal** 17:18,23
17:25 18:2,6
20:19,21 49:21
49:22 52:7
53:6,17 61:25
65:9,12 68:17
85:10 87:4
89:5,24 90:4
**animals** 34:21
85:7,17,19
**answer** 4:22
19:16 20:5
25:1 26:12,15
36:24,25 40:10
44:23 56:19
58:16,23 59:4
59:5,7 62:3
63:7 86:22
**answered** 41:5
**answers** 4:20
5:4 33:4 56:14
72:19
**anxieties** 19:14
**anxiety** 18:5,9
18:10,12 19:13
19:22 20:19,21
22:17 51:25
52:6 53:1,7
55:4 79:2,10
93:15
**anybody** 12:25
29:8 31:9
32:19 38:7,8
57:4,24 73:14
73:20,25
**anymore** 16:10
56:17
**anyway** 55:25
**AOIs** 41:21
**apartment**
49:13

**apologize** 51:9
59:16
**apparently**
18:17 25:5
55:4 84:3
**APPEARAN...**
2:1
**appeared** 102:9
**appears** 37:6
**applicant** 73:20
**applied** 35:2,4
**applies** 72:1
**apply** 24:18,19
24:25 25:8,14
25:19 26:21
56:3 70:8
73:20 76:19
84:19
**appointment**
105:11
**appraised** 46:21
**approached**
95:5
**appropriate**
27:22
**approved** 25:19
70:13
**argue** 27:16
35:3
**arguing** 32:24
**argument** 19:3
24:16
**Articles** 14:4,6
15:18 16:3,5
77:10 80:7
**aside** 95:3
**asked** 4:22
17:14,16 34:2
39:18 41:4
47:7 67:15
69:2,25 70:6
72:14 75:2,5
76:13,14 77:8
77:23 78:25
82:22 83:9
91:17 97:15
**asking** 4:18 9:15
43:20 73:5

88:6 99:4
**asserted** 69:2
**assesses** 30:11
**assessment**
 27:19
**assets** 45:7
**assist** 18:5
**assistant** 12:16
 86:12
**assists** 22:18
**assume** 17:17
 25:4 38:7
 97:21 100:25
**assuming** 48:8
**ATTACH** 104:1
**attack** 22:20
 93:15,17 98:22
**attacks** 22:18
 53:20 98:23
**attempt** 19:12
 83:16 88:17
**attended** 24:3
**attention** 93:5
 105:19
**attorney** 1:13
 4:15 29:12
 30:24,25 31:2
 33:2 38:9,15
 40:6 41:18
 44:6 87:12
 96:19 97:3,4,5
 97:6,7 99:4
 101:5 103:10
**attorney's** 87:10
**attorneys** 25:24
 26:3,6 38:2
 103:11
**attributable**
 65:19 66:10
**August** 17:6,9
**authority** 55:10
 102:8
**authorized**
 103:7
**Automobile**
 1:17,24 105:1
 105:16
**auxiliary** 64:10

**avoid** 61:25 62:5
**award** 36:18
 37:2
**aware** 29:8
 30:25 34:4
 36:6,10,17
 37:1 38:20
 62:17 69:4
 75:5 77:4
 85:16 100:23

**B**

**B** 3:14
**back** 9:13 14:13
 17:7 41:3
 43:12 45:9
 47:7 53:15
 55:23 61:25
 62:5,6 67:9,11
 67:18 68:2
 73:8 75:10
 80:15 84:9
 87:10 99:7,10
**backdrop** 90:24
**backed** 61:24
**background**
 5:15 25:17
**bad** 41:7 73:12
**barked** 48:4
 50:19
**barking** 48:21
**base** 29:16
**based** 29:7
 31:22 33:14
 44:8 53:11
 69:3
**basically** 15:8
 28:6 45:12
**basin** 45:16 46:6
 46:7,12
**basing** 29:5
 99:24
**basis** 26:2
**Bayfront** 3:17
 89:25
**BCYC** 51:21
 90:18 91:25
 93:14 94:12,12

**Beach** 2:4
**bearing** 99:23
**beat** 10:16
**bee** 93:3
**bees** 68:21 98:19
**beginning** 62:14
 66:4 79:13
**behave** 85:1
**behaved** 48:8,21
**behaving** 65:11
**behavior** 65:6
 90:4
**belief** 69:11
**believe** 13:21,25
 14:8 17:20
 18:16 21:3
 22:13 28:18
 32:1,19,21
 35:4,5,6 50:3
 52:9 55:12,21
 55:23,24 64:11
 92:4
**benefit** 39:13
**benefits** 89:5
 90:15
**bent** 42:12
**best** 15:10 17:10
**bestow** 36:11
**better** 18:18
 48:21,23
**beverage** 76:24
**beverages** 76:25
 78:19
**beyond** 14:20
 65:21 66:16,22
**bias** 45:1
**big** 54:23
**bit** 27:20 41:20
**bite** 62:2
**blank** 63:2
**blankely** 44:3
**board** 8:23,23
 10:4,4,5,13
 11:20 12:23,24
 12:25 13:3,7
 13:13,14,16
 14:17 22:3
 32:2,4 40:15

40:19 51:21
 54:10 71:14
 77:13 94:12
**boarding** 14:25
**boards** 58:6
**boat** 6:16 7:23
 7:25,25 11:16
 48:6 49:1,12
 49:19 91:8
**boaters** 58:5
**boating** 14:18
 58:6
**boats** 7:21
**Boca** 1:6 7:1,23
 13:22 20:9
 23:22 24:11,20
 25:2,9 26:9
 29:2,13,23
 31:22 34:1
 37:22 38:24
 40:17 44:15
 46:6,22 55:12
 56:18 57:10
 59:22 63:12
 64:16 65:20,21
 65:24 66:13,16
 66:22 69:11
 70:6 74:17
 76:16 78:6
 80:17 90:9,12
 90:22 91:5
 92:12 104:1
 105:8
**body** 13:14
**bought** 11:7
**Boulevard** 1:17
 1:24 2:3,11
 105:1,6,16
**Boy** 2:11 105:6
**break** 5:9 39:5
 49:18 67:6
**bred** 48:6
**bring** 17:23
 20:15 21:12
 23:24 24:10,13
 24:14 25:17,18
 38:18 48:25
 49:4,8,9,24

54:15 68:18
 69:3 74:22
 75:9,13,15
 85:23 86:2
 98:4
**brought** 21:14
 27:1 28:5 34:5
 75:10 77:3,13
 84:8,9
**Brown** 1:12 3:16
 3:18,20,23 4:2
 4:10,11 5:14
 39:17 51:9,20
 72:6 75:24
 79:22 91:17
 93:20 94:18
 102:9 103:8
 104:1,21
 105:10
**build** 45:7
**building** 45:17
 57:13,20 75:11
**built** 45:8 46:8
**bunch** 25:11
 57:20 58:7
**burden** 64:16,24
 85:6,7
**business** 1:24
 43:18
**butt** 4:22 10:23
**bylaw** 14:1
**bylaws** 13:23,25
 31:21 33:5

**C**

**call** 9:15 18:25
 19:1 27:25
 28:20 33:25
 93:6
**called** 34:1
 72:10,13
**calm** 65:8
**calmer** 48:16
**Canine** 63:8
**cap** 15:22
**Captain** 12:20
 12:21 13:1
**carbon** 94:12

**care** 8:17 81:21
  82:16
**careful** 105:19
**case** 1:5 46:3
  55:9,23 85:12
  94:19,25 104:1
  105:10
**cat** 75:6,7,13
**cause** 52:8 64:22
**caused** 67:1
**cave** 54:21
**cc** 51:21
**center** 1:24
  59:16,17
**certainly** 32:22
  36:9 85:10
**Certificate** 3:8,9
  63:9 102:1
  103:1
**certify** 102:8
  103:7,10
**cetera** 31:23
  33:6 53:17,18
**chain** 52:20
**Chair** 13:4
**chairs** 94:13
**chance** 52:14
  94:15
**change** 14:1
  16:11 22:2
  71:3,4 104:5
**changed** 14:5
  21:9 46:24
  71:9
**changes** 14:11
  15:21,21 70:24
  104:4
**changing** 11:16
  11:25 14:2,12
  15:10
**channels** 6:8,8
**charge** 8:18
  57:14
**charges** 90:10
**check** 25:17
  67:18 68:15
**Chestnut** 80:12
  80:13

**choose** 47:4
**chose** 40:7,8
**Christmas** 47:5
  52:16,22
**chuckling** 40:25
**Ciega** 1:6 7:1,23
  13:22 20:10
  23:23 24:11,20
  25:2,9 26:9
  29:2,23 31:22
  34:1 37:22
  38:24 40:17
  44:15 46:7,22
  55:12 56:18
  57:11 59:22
  63:12 64:16
  65:20,21,24
  66:13,16,23
  69:11 70:7
  74:17 76:16
  78:6 80:17
  90:9,12,22
  91:5 92:12
  104:2 105:8
**Citizenship** 63:8
**city** 37:15,23,24
  38:4,5,6,14,14
  59:22 60:2
  76:17
**claim** 28:22
**claimed** 65:18
  66:7,9,20
**claiming** 68:20
**clarification**
  39:14
**clarify** 15:4
**class** 82:18
**classes** 5:16
**clear** 19:14
  21:22 32:25
  56:11
**clearly** 48:9
**Clearwater** 1:17
  1:25 105:2,16
**client** 82:23
  105:11,13
**close** 50:16 67:4
**club** 1:6 7:1,19

7:21,24 8:9,21
9:9 11:2 13:23
14:14 15:11,18
15:19 16:9,13
20:10 23:5,23
23:23,25,25
24:11,12,14,20
25:2,9,10,12
25:18,20,22,25
26:9,10 27:16
27:18,23 28:4
28:4 29:2,3,8
29:23,24 31:22
34:1,11 37:20
37:22 38:23,24
40:17 44:15,15
45:4,22 46:2,4
46:7,11,22
48:1,2 52:1,12
52:15 54:1,14
54:17,23 55:13
55:13,15,18
56:3,6,12,17
56:18,18,24
57:3,5,11,23
58:3,3,9,10,10
58:15 59:14,20
59:22 63:12,14
63:24 64:17,24
65:21 66:14
68:18 69:5,12
69:12,15,16,20
69:24 70:7,7
70:18 71:19
73:15,24 74:17
76:16,19,24
77:1,5,24,25
78:6,13,16,19
80:3,3,17
81:14,15 84:22
90:9,12,18,23
91:5 92:6,13
93:3 95:8
99:16,18 104:2
105:8
**club's** 34:20
  52:10 53:24
  54:8 65:22,24

66:17,23
**clubhouse** 17:24
  20:16 21:13
  23:10,22 24:1
  24:11,15 27:1
  34:21 38:18
  47:18,24 48:25
  49:2,9,10,25
  54:16 69:3
  74:23 75:1,7
  77:5 78:7,11
  78:16,23 80:24
  81:3,7,12
  82:12 83:24
  84:2,7,12,18
  85:24 86:3
  88:22 92:13,17
  92:24 93:6,14
  93:18 95:6,20
  98:5
**clubs** 24:18,20
  24:25 25:8
  60:12,16
**CM** 1:23 102:20
  103:19
**co-counsel** 67:6
**Cole** 2:10 105:5
**College** 5:17,17
**color** 26:11
  31:23
**come** 7:8,11
  14:16 31:5
  35:19 38:11,12
  57:1 63:5 73:8
  95:6
**comes** 23:5
  28:12 45:14
  80:16
**coming** 6:9
  12:10 14:8
**command** 85:3
**committee** 13:4
  25:15,20 70:10
  70:13,19 71:10
  74:2 77:11,12
  80:6,9,10
**Commodore**
  3:18 8:10,10

8:11,13,14,15
8:22,25 9:1,7
9:15,18 10:12
10:16,16,17
12:5,6,6,15,15
12:16 13:8,8
13:10 42:15
97:8,18
**Commodore's**
  80:10
**communicated**
  23:21
**communicating**
  28:2
**communication**
  36:1
**Community**
  5:17
**company** 5:24
  22:14
**compared** 10:15
**compels** 55:22
**complained**
  37:23 48:24
**complaint** 29:12
  35:13 36:7
  60:22 96:6,14
  100:5
**complete** 30:19
  105:15
**completely** 14:7
**comply** 55:20
**compulsive**
  51:25 79:4
**computer** 51:13
**concern** 60:25
  61:6
**concerned** 42:16
**concerning** 60:3
  79:10
**concerns** 101:12
**concessions**
  76:24
**concluded**
  101:22
**conclusion** 31:5
  41:12 76:9
**conclusions**

39:12
**conduct** 21:16
**conducts** 71:6
**confer** 67:5
**confidential**
   67:25
**confirming** 97:1
**connected**
   103:11
**connection**
   51:11
**consider** 12:8
   17:22,25 43:9
**considerable**
   62:10
**considered**
   13:13 42:18
**constitutionally**
   38:20
**construe** 28:8
**consult** 97:5
**consulting** 97:7
   97:8
**contact** 22:15
   23:1 28:11
   100:2,16,20
   105:18
**contacted** 37:15
**contains** 39:12
**context** 66:4
**continue** 33:5
**contribute**
   66:19
**control** 24:4
   48:4,9 49:6
   50:25 51:2,2
   65:22 66:17,23
**conversation**
   7:12 96:22
**conversations**
   26:3,6
**converting** 6:20
**convince** 19:18
   35:8 98:4
**convinced** 28:4
**copy** 15:24,25
   51:10,18 94:12
   94:24 105:12

**correct** 13:24
   23:23 29:3
   30:1,3 31:2
   39:22 40:4,7
   40:13,14,21,22
   44:4,9 50:22
   57:15 62:10
   70:1 74:15
   75:25 76:1,19
   77:7,25 78:8,9
   82:20,21 85:8
   88:14,16 89:7
   90:19 91:22
   95:12,13
   100:21,22
   101:9 103:9
**corrections**
   105:13
**costs** 54:9
**counsel** 2:8,13
   16:22 32:8
   39:14 51:12
   72:7,19 82:22
   83:9 95:1
   97:14 103:10
   103:11
**County** 28:18,19
   29:1,13,22
   35:13 36:7
   39:3 44:13
   76:9 96:1,15
   99:17 100:5
   101:8 102:5
   103:5
**couple** 7:9,12
   67:5 101:5
**course** 80:10
   101:1
**court** 1:1 3:9
   4:19,25 27:17
   27:22 35:7
   36:11 99:7,9
   101:18 103:1,7
**credit** 6:9
**criteria** 91:4
**cross** 96:10
**Cross-Examin...**
   3:4 75:22

**CRR** 1:23
   102:20 103:19
**current** 8:1 33:5
**cut** 87:14

**D**

**D** 3:1
**daily** 21:16
**damages** 37:2
**Dan** 80:8,11
**date** 1:14 17:5,8
   40:4 67:23
   94:19,22,23
   104:21
**dated** 39:19
   103:13
**day** 48:8 52:16
   78:16 80:16
   81:4,15 90:13
   94:3
**deadline** 35:19
**Dear** 105:9
**decade** 47:25
**December** 3:23
   9:24 10:1
   51:20 93:21
   105:15
**decides** 77:1
**decision** 17:18
   18:6 29:6
   35:21 41:13
   44:10 88:20
   99:24
**declare** 104:18
**dedicated** 58:15
**defend** 34:20
**Defendant** 1:7
   2:13
**Defendant's**
   3:22 94:5
**defense** 34:23,23
   54:2 94:3
**defenses** 60:21
   63:11
**defining** 55:8
**definitely** 62:16
   85:4
**degree** 86:25

**deleted** 67:24
**deliberately**
   72:20
**demand** 23:17
**demonstrate**
   22:19
**demonstration**
   21:21
**DENESE** 2:2
**denied** 73:14
**depend** 87:6
**depends** 54:9
   88:6
**deponent** 4:3
   16:1 26:7 27:5
   27:7 30:18
   31:7 32:11
   36:2,14 37:11
   39:7,25 41:20
   44:17,21 47:21
   51:4 55:17
   56:21 58:18,21
   59:2,8 60:10
   61:3,9 64:13
   64:19 66:3
   67:7 69:14
   70:4,22 73:9
   77:19 85:21
   86:22 87:6,18
   97:25 101:11
   101:20
**deposition** 1:12
   4:13 67:12
   68:9 73:4 77:8
   79:13 88:15
   101:21,21
   103:8 104:1
   105:10
**depositions**
   72:20
**describe** 17:11
   23:11
**described** 18:22
**describing** 13:2
   29:19 53:15
**description** 97:2
   99:21
**descriptions**

25:22
**detect** 23:6,12
**detects** 47:16
**determination**
   30:11
**determine** 18:18
   28:5 53:9 55:3
   85:11 87:3
**determined** 29:2
   29:23
**detriment** 57:10
**devices** 6:3
**dialogue** 52:21
   95:15 98:25
   99:2,6,14
**Dick** 80:8,14
**diesel** 6:21
**different** 7:9,11
   8:19,21 9:12
   19:6,8 31:5
   36:10,17 41:3
   71:2 73:18
   88:4 89:21,22
   89:23
**differently**
   20:14 21:11
**difficulty** 92:14
   92:16,19,22
**direct** 3:3 4:6
   52:21
**directing** 59:3,6
**direction** 89:21
   89:22
**directly** 46:16
**Directors** 40:15
**disabilities** 21:1
   21:2 24:23
   25:3 26:17
**disability** 18:13
   18:16 55:5
   80:23 86:20
**disabled** 21:3
**disbelieve** 18:8
   18:11 53:3,22
   83:3,6 98:13
   98:18
**disclose** 26:2,5
**discouraged**

74:4
discover 69:8
discovery 72:18
  72:21 73:2,6
  73:10
discriminate
  26:10,13 31:22
discriminated
  37:24
discriminatory
  52:2
discuss 28:11,15
  38:2,10 99:19
  100:1,16
discussed 15:7
  25:23 31:8
  96:24
discussing 31:1
  38:4
discussion 29:7
  58:20 96:25
  99:16 101:1
discussions
  42:14
dismissed 36:7
dismissing
  56:16
disorder 77:16
  79:4
dispensing
  76:25
disposal 52:4
dispute 89:11
dissatisfaction
  37:16
DISTRICT 1:1
  1:1
DIVISION 1:2
divorce 11:7
Dock 12:10
doctor 17:14,15
  17:16,18 18:17
  18:20,24 19:2
  19:4,6,7 21:15
  23:18 67:13
  83:10,14,17
  86:10 87:15
  88:18,19 89:2

89:12 91:18
  97:15
doctor's 88:22
document 17:2
  17:11,13,19
  28:9 35:19
  39:11,12,17
  41:1 42:8
  51:14 72:10,13
  94:19 95:3
  104:19
documents 72:8
  72:14
dog 17:17,22,24
  17:25 18:1
  19:19,19 20:9
  20:15,23,25
  21:12,24 22:7
  22:9,18,19,24
  23:2,6,9,12,22
  23:24 24:4,6,7
  24:10,13,14
  27:1 38:18
  47:8,9,16 48:3
  48:3,6,9,14,19
  48:25 49:4,6,8
  49:10,24 50:2
  50:4 53:17
  54:16 61:17
  62:2,4,5,9,18
  62:20,25 63:1
  63:13,16,19,23
  64:23,25 65:3
  69:3 80:17,19
  80:23 81:4,9
  83:24 84:1,4,5
  84:6,9,11
  85:24,25 86:3
  88:22 89:17,18
  89:20 95:6,19
  98:5 99:15
dog-type 65:6
dogs 23:25 42:1
  65:7 81:6
  84:19,22,24
doing 9:11 22:25
  43:21 46:14
  48:23 54:20,21

56:9 61:21
  82:17 85:14
dollar 45:10,24
  46:15
door 7:24 81:3
Dr 79:12,14
  88:11 91:22
drawing 63:2
drink 74:8
drive 7:10
driving 7:17
  72:24,25
drove 7:9
dry 45:16
due 18:4 72:19
  73:10
duly 4:4 102:10
Dvenza@venz...
  2:4

E
E 3:1,14
earlier 47:8
  76:21 79:1
early 48:1 77:8
eat 98:9
eating 92:20,20
educational
  5:14
effect 16:10
  20:22,24
effectively 20:24
effort 16:3 34:2
  100:20
efforts 23:1 95:8
eight 11:21 12:2
  12:3 13:2,2,7
  13:18 72:22
either 18:24
  26:15,18
electric 6:21
eliminated 64:4
  64:8 65:25
ELISABETH
  2:10 105:5
Elisabeth.Fon...
  2:12 105:7
else's 83:24

elucidate 39:14
email 3:23 31:12
  31:14 32:13,17
  32:20,20 33:13
  33:19 37:6
  51:6,15 52:20
  52:23 68:10,19
  78:25 82:22
  93:20 94:2,8,9
  94:11,14,25
emails 3:19,20
emphatically
  22:24
employed 5:19
  5:20
employee
  103:10,11
EMT 86:18
encourage 96:14
encouraged
  96:6
energy 48:7
engaged 95:14
engine 11:16
engineer 5:20
  6:1
enhancements
  15:3,13
enjoy 14:22
ENTER 104:4
entered 99:5
entire 38:17
  50:22 71:13
entitled 39:18
epilepsy 23:19
  47:10 50:2
  80:16,18
epileptic 23:7,13
  47:17 77:16
episode 65:1
Equal 44:14
errata 3:10
  104:3 105:14
  105:15
especially 20:18
ESQ 2:2,5,10
  105:5
esteemed 67:5

et 31:23 33:6
  53:17,17
evaluate 86:20
event 34:4 81:14
  82:2
events 65:21
  66:16,22
eventually 42:22
everybody
  10:21 33:16
  48:21 57:13,17
evidence 63:12
  63:16,23
exactly 21:8
  87:19,21 91:4
Examination
  1:22 3:3,5,7
  4:6 79:20
  96:20
Excellent
  101:17
exception 95:19
exchange 45:9
exclude 34:21
excluded 60:12
excuse 49:23
Executive 1:16
  1:23 105:1,16
  105:23
exempt 60:16
  69:24
exemption 69:5
  69:8 75:3
exercise 48:15
exhausted 34:15
exhibit 16:20,24
  27:9,10 32:7,9
  37:6,8,9 83:11
  88:13 93:24
  94:4,5,25
  95:24
exhibits 94:4
expand 15:11
expanding
  14:14,19
expect 31:10
  73:25 84:25
expel 34:2,7

**expertise** 97:23
**expires** 102:20
**explain** 21:4
  25:16 28:20
  70:10
**expressly** 76:24

**F**

**fact** 26:9 28:14
  35:1 37:1,14
  50:21 58:4
  76:15 88:18
  98:21
**facts** 104:19
**factually** 42:9
**fail** 45:3
**fair** 16:6 49:18
  54:22 67:2
  83:22 92:8
  95:6
**faith** 95:7 98:25
**fall** 61:15
**falls** 55:24 82:13
**false** 41:9
**familiar** 31:24
  37:12 59:18,19
  59:21 76:22,22
**far** 15:16 42:15
  79:12 91:6
  92:2
**feasible** 65:15
**federal** 33:21,22
  36:11,19 37:3
**fee** 57:14,18
  90:10
**feel** 10:20 31:3
  52:13 54:12
  60:7 84:15,20
**feeling** 79:24
  97:9
**feelings** 29:6
**felt** 21:4 48:13
  99:16
**female** 41:15
**fewer** 9:9
**Fifteen** 6:11
**figured** 9:8,12
  9:14,16 22:6

**file** 35:17 96:6
  96:14 100:5
**filed** 29:12 94:25
**financially**
  103:12
**find** 23:2 95:15
**findings** 30:9,14
**fine** 27:2
**finish** 80:21
**first** 4:3 8:12
  21:22 56:2
  67:15 69:9
  75:24 79:2
  83:10 88:13
  94:18
**first-level** 56:4
**fishermen** 57:25
**fishing** 58:1,2,6
  58:10
**five** 9:4
**fix** 11:8
**Flag** 12:12,14
**Fleet** 12:20,21
  13:1
**flip** 6:7
**Florida** 1:1,17
  1:25 2:4,7,11
  60:2 85:16
  102:3 103:3
  105:2,6,16
**focus** 15:12
**follow** 33:16
  52:2,12 54:11
  60:8,11 83:16
**follow-ups**
  75:19 91:14
**following** 11:24
**follows** 4:5
**Fontugne** 2:10
  3:4,6 26:1
  30:17 31:6
  35:25 36:13,21
  39:9 40:9,23
  41:17 44:16,20
  44:22 47:12
  55:16 56:19
  58:16 59:6
  60:9,18 61:2,8

64:12,18 66:2
69:13 70:3
75:19,23 77:22
79:16 81:1
85:20 86:6,21
87:5,17 89:8
91:13,16 94:7
95:23 96:12,17
97:24 98:6,11
101:10,14,16
101:19 105:5,9
**food** 78:19 93:11
**foreclosure** 11:8
**foregoing**
  104:19
**forgive** 13:6
**form** 30:17 31:6
  36:13 40:9,23
  44:16 59:1
  60:9 66:2
  77:18 96:9
**forwarded**
  17:20
**found** 42:9 43:2
**four** 11:21,22,23
  11:25 40:6
**frame** 62:15
**freezing** 49:3
**Friday** 72:19
**friendly** 65:6
**front** 9:7 22:20
  65:3 70:18
  75:10,11 85:13
**fruition** 28:12
**Fun** 78:16 80:16
  81:4,15
**function** 20:22
  22:8
**functional** 18:4
**fund** 34:23
**funds** 34:20,22
  59:20
**funny** 41:2
**further** 75:17
  86:5 96:17
  103:10

**G**

**Gabber** 91:10
**gay** 26:14
**general** 14:18
  40:20 58:5
  71:15 73:17
  77:1 84:22
**generally** 41:6
**getting** 93:3
**give** 6:9 17:5,7
  17:19 38:23
  45:15,18 46:15
  46:20 63:22
  94:14
**given** 4:13,15
  35:18 45:7,15
  45:16
**giving** 43:3
**Glass** 81:11,13
  81:23
**go** 4:16 6:3,5
  8:25 11:15
  16:23 17:7
  25:15 28:22
  30:17 31:6
  34:13 40:7
  41:3 42:6
  43:23 44:4,22
  47:7,13 54:19
  57:25 67:18
  68:24 70:10
  74:5,23 96:6
  96:14 100:4,10
  100:11
**going** 4:18,19
  10:19 11:6,18
  14:15 16:19,19
  23:7,12 26:1,2
  27:2,8 28:3,21
  32:6 34:12
  35:2,7,9,18
  37:5,25 38:4
  38:12 39:5,6
  39:10 41:8
  43:3 45:19
  47:12,17 51:12
  51:19 52:3,5,5
  58:12 65:3
  72:17 73:3,4,7

80:15 81:18,19
87:10 94:1,2
95:2 96:9
99:22 101:4,19
**good** 4:8 5:8
  47:2 55:6 63:8
  85:10 89:13
  95:7 98:25
**gotten** 21:11
**government**
  38:21
**graduated** 5:16
**great** 10:15
  52:14
**ground** 4:16
  48:11
**grounds** 8:18
**group** 28:17
  30:7,10,10,13
  33:1 57:1
  99:17 100:15
  100:20
**groups** 8:21
**guess** 9:4 17:10
  48:17 55:6
  59:12 85:12,12
  97:13 98:1
**guest** 78:4
**guests** 77:6
  81:17,24
**Gulfport** 60:2
  76:17
**guy** 8:17 63:19
**guys** 74:19

**H**

**H** 3:14
**half** 40:6 50:6
**halfway** 66:5
**hand** 16:19 27:8
  32:6 37:5
  101:4 102:11
**handling** 105:13
**handwritten**
  68:6
**hang** 57:25
  61:16
**happen** 45:19

63:18 81:21
**happened** 29:19
**happens** 58:13
81:16
**happy** 11:1 67:3
**Harbor** 4:12
**hard** 51:9,18
**harmful** 62:8
**hashed** 15:7
**hate** 41:24,25,25
42:1
**head** 47:4 68:15
**heading** 80:8
**heads** 10:23
**health** 3:17 64:4
64:7
**hear** 29:4 32:25
78:3
**heard** 34:5
89:25 93:9
**held** 8:8,12 39:8
58:20 67:8
81:14
**help** 18:3 20:19
34:16 53:7
90:18
**helps** 47:16
**high** 5:16 71:17
**Hillsborough**
5:17
**hind** 65:3
**hire** 44:11
**hold** 33:5 41:17
**holiday** 52:19
**home** 6:3
**hometown**
51:11
**honestly** 56:7
89:22
**hope** 52:8,13
**Horstman** 6:19
**hospital** 89:25
90:2
**host** 81:18
**hours** 50:7
**house** 11:7
**hulls** 6:20
**human** 4:21

28:18,20 29:1
29:14,22 35:14
36:8 39:3 58:8
76:10 96:1,15
99:17 100:6
101:8
**hypothetical**
47:8,13,23
77:14,17 80:15

**I**

**idea** 14:14 31:14
43:8 56:24
69:18
**identification**
16:25 27:11
32:7,10 37:10
94:6
**identifying** 42:4
**illegal** 26:24
**image** 34:16
**important** 37:20
52:13 54:12,13
91:2
**imposes** 64:16
**improve** 34:16
45:8
**improved** 45:8
48:19
**improvements**
46:22
**in-fighting**
34:12
**inaccurate** 29:9
42:9 44:2,5
**inadequate** 88:9
**incident** 63:15
**include** 13:7
**included** 105:17
**including** 66:1
**Incorporation**
14:4,6 15:18
16:4,6 77:10
80:7
**incorrectly** 88:3
**Indian** 4:12
**indiscriminat...**
78:13

**information**
19:13,21,24
23:17 29:13
31:4 55:3 79:9
**informed** 68:16
**initial** 60:22
**initially** 45:7
**injured** 66:23,25
**injuries** 65:18
66:7,9,20
**injury** 64:22
**input** 10:6
**inside** 75:12,14
**instructor** 82:15
**insurance** 54:2
**intent** 5:11
**intentions** 15:11
**interested** 57:21
74:2 90:16
**Internet** 51:10
**interpret** 76:6,9
88:3
**Interrogatories**
72:6,10
**interview** 71:7
**introduce** 94:2
**investigate**
44:11 95:8
**investigated**
30:23
**investigation**
39:3
**investigative**
30:15 39:2,18
44:2 55:12
76:10 79:24
100:23 101:2
**investigative-t...**
30:7
**investigator**
31:4,5 44:11
**invitation** 27:25
**invited** 73:23
**inviting** 27:23
**involved** 44:10
**involves** 35:25
**irregardless**

43:13
**issue** 8:24 27:24
35:22 38:3,13
42:13 48:22
49:14,16 51:23
54:25 75:14
**issues** 10:19
51:25,25 52:7
52:8 53:15
68:22

**J**

**January** 9:24
10:1 31:13,15
31:17
**jargon** 88:4
**Jeffrey** 39:21,25
**Jerry** 1:23
102:20 103:7
103:19
**Jewish** 33:8,11
33:18 41:15,24
**job** 52:7
**Joel** 84:3
**join** 7:8,18,19
38:24 73:24
74:14
**joined** 7:16
70:18 92:5
**joining** 74:4
**joins** 78:6 82:4
**judge** 28:5 36:12
36:18,19 37:2
37:3
**jumped** 61:25
62:4,20
**jumping** 62:18
**Junior** 5:17
**justifies** 18:16

**K**

**kayak** 14:17
**kayaks** 58:5
**keep** 35:18 73:5
75:20
**keeps** 12:10
**kept** 68:4
**key** 78:7,10
**kids** 74:22

**killing** 68:21
**kind** 4:22 14:14
15:9 21:14,24
37:20 66:5
68:24 74:3
87:18
**kindergarten**
10:20
**kinds** 71:9
**Kissane** 2:10
105:5
**knew** 20:5 42:20
101:3
**know** 4:21 7:17
10:23 12:8
13:16,25 15:16
15:20 16:22
17:8,16 20:23
22:1,8,22,25
25:4 26:12,15
26:16,18,20,21
28:12 31:7,9
33:9,18 35:3
35:10,22,24
36:5 38:9
41:10,20,22,23
42:11,13,14,17
42:20 43:3,8
43:18 45:5,19
45:22,23,24,25
45:25 46:21,23
46:24 48:13,14
49:6,14 51:1
52:18 53:1,8
54:9,19 55:6,9
56:10,11,14
57:12 58:8
61:16,17,18,19
61:20,20,25
62:1,3,4,19
63:6,8 64:1
65:5,10 66:21
66:22,25,25
67:4,22,23
68:21,21 69:14
69:19 70:4,16
71:3,6,7,8,10
72:12,16 73:17

74:4,13 75:8
76:15 80:6,8,9
82:17,23 83:21
84:1,4,4,5,13
85:2,11,14,15
86:4,22,25
89:19 90:14
91:7,11,24
92:7,7 93:23
97:1 99:17,21
99:25 100:25
101:2,3
**known** 90:23
92:11 93:1,13
**knows** 6:7 38:1

**L**

**Lahart** 2:5,6 3:3
3:5,7 4:7 16:2
16:17,18 17:1
26:4,8 27:8,12
30:20 31:11
32:6,12 36:3
36:16,23 37:5
37:13 39:5,16
40:3,11,24
41:18 42:7
44:18 46:5
47:14,22 50:14
51:5,8 55:19
56:22 58:19,25
59:3,10,13
60:14,19 61:4
61:10 64:14,20
66:6 67:3,9,10
69:23 70:5,23
72:17 73:12,13
74:12 75:17
77:18,20 79:19
79:21 81:2
85:22 86:5,7,9
87:2,9,20 89:9
89:10 91:12
96:18,21 98:2
98:8,12 99:9
99:12 101:13
101:15,17
**laid** 50:21

**land** 37:22 60:16
**language** 79:25
**lapse** 35:18
**large** 78:17
87:25
**Larry** 1:12 3:18
3:20,23 4:2,10
51:19 52:22
102:9 103:8
104:1,21
105:10
**laundry** 41:6
42:2
**law** 2:3 26:20
28:20 33:21,22
35:1,3,3 36:12
36:18 37:2
52:2 60:11,13
60:16 85:16
**laws** 59:25 76:16
76:18
**lawsuit** 28:5
54:4 56:16
72:11,15 83:11
**lawyer** 15:14,14
75:24 95:12
97:9,10
**lawyers** 15:6
36:1 54:19
**lay** 36:21 39:10
79:25
**lead** 57:10
**leadership** 8:8
10:2,7 12:4,9
**leading** 95:22
96:11 99:5
**learned** 79:2
**lease** 37:18 38:1
43:10,13 45:6
45:10,13,14,20
46:13 47:3
59:21,24 60:7
76:13,14,16,22
76:23 77:4
**leases** 37:19,22
45:12
**leash** 48:10,12
48:20 80:17

**leave** 49:5
**Lee** 42:16 43:7
96:22 97:3
**Lefler** 1:23
102:20 103:7
103:19
**left** 45:17
**legal** 15:3,13
25:22 34:23,23
39:12 69:21
76:2 88:4
**legs** 65:3
**lessees** 59:25
**lessons** 74:23
**Let's** 43:22
80:16
**letter** 3:11 19:1
19:10,17 20:6
20:14 21:5,11
23:18 26:25
27:13,15 51:23
83:10 88:8,10
88:11,13 89:12
97:16,20,22
98:3
**letters** 101:5
**level** 27:21 52:4
55:5
**leverage** 55:22
56:1
**liability** 65:24
66:1
**license** 77:2 80:4
**like-minded**
56:25
**limit** 72:21
**limitations** 18:4
**limited** 65:25
**Line** 104:5
**liquor** 77:1 80:3
**Lisa** 39:21 40:1
81:23
**list** 41:6 42:2
**listed** 68:20
93:24
**listen** 10:5
**listening** 11:18
52:18

**little** 6:3 51:11
90:21
**live** 4:11
**live-aboard**
42:13,15,23
43:1,9,14,19
43:21 44:1
**living** 49:11,11
49:19
**lodge** 39:10
**lodged** 60:21
**lodging** 78:23
**long** 6:10 7:3 8:7
9:1 24:3 39:11
70:17 75:21
92:7
**longer** 32:24
**look** 5:5 7:10
44:5 69:7
**looked** 15:6,14
24:17 68:11,20
69:4
**looking** 8:20
33:17 94:16,18
**looks** 27:14
37:11
**loose** 90:21
**Lorick** 39:22
40:1
**losing** 46:19
**lost** 46:4,18 66:5
**lot** 5:5 25:22
34:12,13 42:10
48:7 52:10
53:24 65:2
**low** 71:17
**lower** 27:21
**lucks** 74:6 90:24
**lunge** 61:14
63:19 84:14
**lunged** 48:4
50:19 62:25
63:1 64:23
**lunging** 63:15
**lurching** 61:18

**M**

**maintain** 11:9

90:18
**making** 42:25
82:16
**manage** 52:11
53:25 54:14,17
**Marcy** 2:5,6
**Marcy@flori...**
2:7
**marina** 7:24 8:1
**mark** 3:15 16:19
27:9 32:7 37:8
**marked** 16:24
27:10 32:9
37:9 94:5
**married** 6:12
**Master** 12:10
**match** 6:8
**matter** 23:4 33:6
33:7,9 97:13
105:19
**mean** 10:18 13:3
14:16 26:10
33:13,22 34:25
41:6,23 44:8
45:2 48:22
49:17 57:20
68:5 69:14,17
71:24 75:2,15
84:25 87:15,24
96:24 100:14
**meaning** 48:11
62:2
**means** 54:16
57:3 98:22
**measurement**
5:24
**media** 5:24,24
**medical** 23:17
86:10 87:4,16
91:18 93:5
97:23
**medication**
51:24 52:25
82:24 83:7
**medicine** 90:7
**meet** 33:1 37:21
92:5
**meeting** 9:10

62:12 63:19
71:16
**meetings** 8:23
11:15,18 73:16
73:17,18
**member** 7:1,3
8:3 23:5 25:16
40:19 47:25
52:15 56:17
57:4,24 61:22
61:24 70:11,25
72:1 73:21
74:1,16 77:13
77:24 78:1,4
78:10,22 81:15
82:7,15 90:18
92:3
**members** 11:20
13:3,7,13,14
33:5 34:1,1,17
38:23 46:9
52:11 53:25
57:8 63:14,25
74:18,19,20
77:6 78:13
81:12 82:19
91:8,10 93:3
**membership**
11:9 14:20
15:22 25:14
40:20 48:2
57:14,18 70:8
71:13 73:14
90:10,15 92:2
**memory** 68:24
**men** 16:9,13
41:21
**mentioned** 10:9
11:2 12:5 69:9
79:5
**Merry** 52:21
**mess** 46:17
**met** 27:21
**Miami** 45:22
**Micanopy** 2:7
51:11
**MIDDLE** 1:1
**mind** 12:10 20:7

**minds** 22:2
**minute** 95:24
**minutes** 39:11
67:5
**misunderstan...**
43:25
**mitigate** 20:19
20:21
**mitigates** 20:25
**modification**
64:9
**modified** 64:5
**money** 46:16
52:10 53:25
54:7,8
**monthly** 90:24
**months** 40:6
42:22
**morning** 4:8
68:14
**mounting** 84:6
**move** 52:12
54:12
**moved** 89:20

**N**

**N** 3:1
**name** 4:8 12:10
12:17 42:17,20
42:21 43:6
63:2,20,22
79:7 83:1
**names** 22:13
**national** 31:23
**natural** 4:21
**nature** 96:25
**nautical** 72:4
**necessary** 21:15
**need** 5:4,9 8:24
9:12 20:2,23
22:24 23:18
39:14 47:9
55:3 67:4 73:6
75:15 80:19,23
87:4,7 100:10
100:11
**needed** 19:19
33:15 35:19

48:14 50:2
53:16,17 89:17
89:18,20 99:19
99:21 100:1
**needing** 93:5
**needs** 19:7,8
20:20 49:24
81:21 88:23
**Nell** 96:22 97:3
**never** 9:17 22:5
30:12 31:8
40:12 69:24
**new** 6:23 23:5
**Nick** 36:4
**Nielsen** 5:20,21
5:22,22 6:1,5
6:10
**night** 72:23
81:11,13
**nobody's** 10:25
**Nope** 4:14 50:20
60:17 63:10
98:10,15,20,24
**Notary** 102:20
**note** 3:17,18
67:12 68:10
79:12 87:16,22
91:21,24
105:13
**notes** 17:7 67:19
67:21 68:5,6
103:9
**noticed** 40:25
**November**
105:3
**NPR** 6:24
**number** 6:6
34:10 41:11
94:4,19
**nurse** 86:14

**O**

**o'clock** 72:22
**oath** 3:8 4:4
102:1
**object** 26:1
30:17 31:6
36:13 40:9,23

44:6,16 47:12
60:9 66:2 96:9
**objection** 36:21
39:10 44:20,22
55:16 56:19
58:16,25 60:18
61:2,8 64:12
64:18 69:13
70:3 77:18
81:1 85:20
86:21 87:5,17
89:8 97:24
98:6,11 101:10
**observe** 59:25
**observed** 92:13
92:16 93:2
98:22
**Obsessive** 79:4
**obtuse** 13:6
**obviously** 16:10
21:9 35:2
**occasion** 79:14
**occasional** 53:20
**occurring** 65:21
66:16
**OCD** 52:4,5
53:7 79:2,3,10
**October** 1:14
102:9,12
103:13 104:1
105:10
**offer** 100:15
**offered** 100:15
**office** 28:19 29:1
29:14,22 31:9
35:14 36:7
39:3 44:14
76:10 96:1,15
100:5 101:8
105:11,18
**officer** 13:5
**Officers** 12:12
12:14
**official** 102:11
**officials** 37:15
**offshore** 7:25
**Oh** 13:25 16:15
19:9 41:3 69:1

88:12
**oil** 93:11
**okay** 4:17 5:10
5:13,23 7:6 9:5
10:11 12:19
13:6,17 14:9
15:17 16:1,15
16:21 17:11,19
18:17 19:5,16
22:4 24:5,9,19
25:1 26:4,7,13
26:19 27:15
28:8,25 29:11
29:15,25 31:16
31:19 32:11,15
32:24 34:19
35:7 36:6
37:11,17 38:17
39:5,7 40:4
41:9 42:24
43:8,11 44:10
44:24 46:6,10
48:23 50:8
51:16,16 54:7
54:15 56:15
58:5,14 59:9,9
59:21 60:10,23
62:9 63:6,17
64:2 65:11
66:9,12,15,18
66:22 67:2
68:5,7,13,23
69:10 71:11
73:9,20 77:4
77:14 79:5
81:8,10,22,25
82:9 83:22
85:14,14 88:8
88:25 89:9
91:3,12,21
92:2,11 93:25
94:14,17,21
96:17 97:9,11
100:12,18
101:4,7,7,13
**old** 14:13 33:8
**once** 64:23 97:9
**one-year** 9:2

**ones** 12:5
**open** 73:5 78:13
  78:17 96:5
**opened** 28:14
  96:19
**opening** 58:4
**operating** 6:2
**operation** 60:3
**opinion** 25:21
  29:17 53:10,11
  97:13
**opportunity**
  39:1 44:14
  51:13 73:1
  96:11
**opposed** 36:11
  36:18
**option** 54:5
**order** 18:3 20:23
  27:24 35:7
**ordered** 105:12
**ordering** 88:18
**ordinances** 60:1
  76:17,18
**organization** 7:8
  28:18 30:23
**organizations**
  24:25
**origin** 31:23
**original** 16:5
  41:21 105:17
**other's** 52:20
**outnumber** 58:8
**outside** 49:4,5
**owned** 46:7
**owner** 24:3

**P**

**P** 102:20 103:7
  103:19
**P.A** 2:6
**p.m** 1:15 101:22
**paddle** 14:17,25
  58:5
**page** 3:2 94:18
  94:20 104:5
**paid** 46:23 57:18
**Paint** 81:11,13

81:23
**paints** 29:9
**Palm** 2:4 4:12
**panic** 22:18,20
  53:20 93:17
  98:22,23
**parade** 47:5
**paralegal** 76:3
**Paramedic**
  86:16
**paramedics**
  93:7
**parent** 84:9,9
**parents** 74:20
  74:22,23 83:19
**parking** 65:2
**part** 10:12 58:2
  58:3 65:19
  66:10 71:10,12
  76:15 77:10,12
  80:10 82:11
**participants**
  82:19 83:20
**participate**
  33:25 82:1
**particular** 56:10
**parties** 30:6
  65:20 66:13
  74:6 103:10
**parties'** 103:11
**party** 33:25
  90:23
**pass** 31:25
**passion** 91:6
**Pastall** 40:2
**patient** 89:4
**Paul** 84:11
**paws** 65:3
**pay** 46:13,25
**paying** 54:2
**penalties** 104:18
**penance** 10:14
**people** 5:2 7:20
  9:8,10 10:21
  10:22 12:23
  13:15 14:15,16
  14:22 22:2
  25:3 26:11,13

26:17 37:25
  41:25 48:4,4
  49:15 56:25
  57:18,20,21
  58:7,8 69:18
  71:8,15 82:1
  82:17 85:13,16
  85:18
**peoples'** 74:25
**perfectly** 63:6
**perform** 22:8
**period** 8:2 11:22
  85:25
**perjury** 104:18
**person** 9:11 23:9
  44:25 47:8,15
  47:18,23,24
  50:1 62:5,5,25
  77:15,23,24,24
  80:15,16,24
  81:5,8 82:5
  84:7 89:11
  97:16
**personally** 18:2
  98:21 102:9
**persons** 24:22
  60:25 61:6
**perspective** 15:9
**pet** 48:3 75:16
  85:5 89:24
**Pete** 5:17 59:14
  59:16,17,20
**Peterson** 62:23
**petition** 38:21
**pets** 74:25 85:3
**petted** 61:19
**phone** 68:4
**photo** 68:3,4
**Physician's**
  86:12
**picture** 29:9
  67:12 83:23
**pilings** 46:9
**Pinellas** 28:18
  28:19 29:1,13
  29:22 35:13
  36:7 39:2
  44:13 76:9

96:1,15 99:17
  100:5 101:8
  102:5 103:5
**Piper** 50:3,9,11
  50:19,25 52:4
  52:6 54:16
  61:14,16,18
  63:13 65:11
  68:16,18 84:14
  84:18 85:8,9
  85:23 86:2
  95:6
**pitch** 9:13
**pitching** 9:10
**place** 1:16 34:4
  37:21 70:15
  78:23
**places** 7:11
**Plaintiff** 1:4,13
  2:8 60:24 61:5
  64:2,6,15
  65:14
**plaintiff's** 16:24
  27:10 32:9
  37:9 65:18
  66:7,9 95:1
**playfully** 62:18
**please** 4:9,25 5:9
  17:11 32:8
  39:24 94:22
  101:6,19 104:1
  105:11,18
**PLLC** 2:3
**plus** 13:18
**point** 7:12,16
  26:5 31:1
  34:19 35:9
  38:9 52:13
  53:2 54:12,13
  57:4 59:11
  72:24 84:6
  85:9 99:11
**pointed** 87:11
**pointers** 4:16
**policies** 64:9
**porch** 24:2
  75:11 85:13
**Port** 6:23

**poses** 60:25 61:6
  63:13,24 64:3
  64:7
**position** 8:12
  10:3 18:18
  50:24 53:6
**positions** 8:8 9:2
  9:12 12:4,7
**positive** 7:4 14:7
**possibility** 36:9
**possible** 56:7
  85:10 89:14
**possibly** 75:4
**Postal(sic)** 39:21
**posted** 90:15
**pot** 74:6 90:24
**power** 58:6,8,9
**practice** 22:8
**practices** 64:9
**practicing** 97:12
**precisely** 51:23
**premises** 78:20
  92:20
**preparation**
  68:8
**prepare** 17:14
  17:15
**preparing** 76:10
**prescription**
  18:3,23,23
  21:14
**presented** 34:11
  77:14
**presenting**
  39:10
**presents** 55:8
**President** 8:16
**press** 6:6
**pretty** 11:15,19
  40:20 50:21
  79:25
**prevent** 52:5,7
**previous** 42:14
  97:8
**primary** 15:12
**printer** 72:25
**private** 15:19
  23:3,23 24:12

24:18,19,25
25:8,9,12,20
25:23,25 26:10
27:16,17,18
28:4 29:3,24
44:11,15 45:3
55:13,15,18
56:3,6,12,18
57:23 60:12,15
69:5,12,15,16
69:20 70:7
99:18
**privy** 42:11
**probably** 15:3
17:6 21:16
27:20 38:22
42:10 44:6
47:2 48:16
58:9 71:18
79:2 89:19,20
90:21
**problem** 19:9
34:11 38:17
49:10 50:16
54:23 95:16
100:9
**problems** 51:11
**procedural**
58:22
**procedures**
42:25 64:9
**proceeds** 46:13
**process** 13:23
70:15,24 71:7
**produced** 72:22
**Production** 72:7
72:14
**professional**
91:19
**prohibited**
76:25
**prompt** 105:18
**prone** 64:25
**proof** 77:21
**proper** 46:24
**properties** 7:11
**property** 6:23
24:3 46:2,4

49:15 60:4
61:1,7
**proportion**
42:12 65:25
**proposed** 15:21
31:20
**protected** 38:21
**proved** 77:15
**provide** 79:6
**provided** 31:4
78:7,10 105:14
**provision** 59:24
60:7 64:10
76:14,23
**provisions** 60:13
**public** 57:3
58:15 60:16
77:1 78:10,14
78:17 81:12
85:18
**pull** 51:6
**pulling** 48:12
**punished** 54:20
**puppies** 85:1
**purchase** 77:1
**purported** 60:24
61:5 64:2,6,15
65:14
**purpose** 73:3
**purposes** 15:17
32:7 71:19
**push** 55:22
**put** 10:6 21:20
28:21 46:8
51:18 55:25
95:3 96:13

**Q**

**qualification**
87:7
**qualifications**
87:8,11,21
**qualified** 76:5,8
86:20,23 87:3
87:16 88:1,2,7
91:18
**qualify** 18:12
20:9

**quarter** 90:10
**question** 4:23
19:16 25:1
36:14 44:23
47:7 55:6
56:14,20 58:22
59:4,5,7,10
80:21 86:23
87:19 89:13
97:14 99:7,8
99:10
**questioned** 4:4
**questions** 4:18
4:20 72:11
73:5 75:18
79:17,18 81:4
87:10 94:2
95:3 96:17
99:5 105:18
**quiet** 38:10
**quietly** 50:22
**quit** 58:12
**quite** 96:19
**quizzed** 72:4

**R**

**race** 31:23 33:6
33:14
**racing** 90:17
**random** 50:1
77:15,23
**ranking** 55:25
**ratings** 5:22
**reached** 76:9
**reaction** 93:10
**read** 3:11 18:21
39:6,18 40:1
41:4 44:13
51:13,19 59:11
94:15 99:7,10
99:11 101:6,18
101:19,20
104:19
**reading** 41:1
55:11 92:23,23
105:13
**reads** 43:16
60:12

**ready** 105:10
**real** 45:1 90:2
**realize** 29:11
54:5 84:3,5
**really** 10:5,7,16
10:24 14:13
15:5,6,10,12
31:7 58:6
63:17 91:12
**Rear** 8:10,13,14
8:15,22,25 9:1
9:6 12:5,15
13:7
**reason** 18:8,11
23:21,24 24:9
26:22,23,24
32:19,21 33:10
45:5 53:3,22
64:22 83:3,6
89:11 98:13,18
104:5
**reasonable** 19:2
19:4 49:7
65:22 66:17,23
**reasons** 25:11
25:24 34:10
71:20
**recall** 9:3 15:23
21:8 26:25
31:12 37:7
71:1 95:25
**received** 19:17
22:10 62:9
76:2
**Recess** 39:8 67:8
**recognize** 55:4
94:8,14
**recollection**
44:9 95:20
**recommendat...**
15:7
**record** 4:9 17:12
26:4 39:17
51:19 58:19,20
59:11 67:9
72:18 79:3
99:11 103:9
**recross** 96:11

**Recross-Exa...**
3:6 91:15
**recruit** 91:8
**Redirect** 3:5,7
79:20 96:20
**redundant**
33:20
**referring** 67:21
71:4 99:3
**refresh** 68:24
**regard** 45:3
**regarding** 14:2
19:13,22,25
37:24 99:6
**regardless** 33:17
**regatta** 81:18,20
81:25 82:1
**regulations** 60:1
76:17
**related** 72:14
**relative** 103:10
103:11
**religion** 31:23
33:6,14
**religious** 24:25
**remedies** 36:10
36:17
**remember** 7:14
7:15 63:20
67:11 68:11
73:14 77:16
91:19 93:22
**remembered**
68:19
**rentals** 46:13
**reply** 52:19
**report** 8:22,23
30:15 39:2,18
40:12 44:2,13
55:12 76:11
79:24 100:23
103:7
**reporter** 3:8,9
4:19 5:1 99:7,9
101:3,18 102:1
103:1,7
**Reporting** 1:16
1:23 105:1,16

105:23
**reports** 9:11
93:2
**represent** 94:24
**representative**
24:4
**reprimand**
51:23
**reprimanded**
41:14
**request** 60:24
61:5 64:3,6,15
65:14 72:13
**requested** 69:10
103:8
**requesting** 95:5
**Requests** 72:7
**require** 60:8
**required** 72:2
**requirement**
22:5 74:13
**requires** 85:16
**requiring** 60:11
87:7
**research** 53:9,11
53:12,14 95:7
95:14
**resolution** 27:21
**resolve** 27:24
100:19
**respond** 52:1,18
**responded**
27:17
**response** 39:23
51:22 56:4
97:14 101:12
**responses** 101:1
**responsibilities**
5:25
**responsible**
81:16,19
**restricts** 77:5
**result** 10:24
**retain** 52:10
53:25
**retaliation**
43:17
**returned** 105:15

**review** 39:1 68:8
73:1 87:16,21
103:8 105:11
105:11,15
**rewrite** 80:6
**Richard** 42:23
43:4,15
**Richey** 6:23
**Rick** 62:23
**right** 4:19,24
11:13,17,19
12:17 14:1,24
15:15,25 19:20
20:12,13 29:20
29:21 32:23
33:7 34:21
38:21,23 39:15
50:5 52:10
53:25 54:18
57:7,9 58:19
59:2 63:21
65:23 67:20
69:2 73:21,25
75:17 79:16
83:12 84:24
85:24 86:3
91:13 94:16,17
95:16 97:18
**rights** 28:17,18
28:20 29:1,14
29:22 33:1
35:14 36:8
39:3 76:10
96:2,15 99:17
100:6 101:8
**Ring** 1:3 3:18,23
15:25 16:16
18:9 21:4
23:21 27:23
31:12,20 33:10
33:19 34:2,7
35:13 36:6
37:15,23 44:11
50:24 51:3,7
51:21 53:19
54:15,25 55:5
56:15 65:20
66:1,11,19,24

69:25 79:1,6
83:13,23 85:23
87:22 91:21
92:5,12,12
93:1,3,5,10,13
93:17,21 94:12
95:4,15,18,25
96:14 97:16
99:1,6 100:4
104:1 105:8
**Ring's** 51:13
60:21,24 61:5
63:13 64:2,6
64:15 65:14
**rises** 55:5
**risk** 64:3,7
80:14 84:16
88:23
**Road** 2:6
**role** 10:8
**roles** 12:9
**room** 41:19 50:9
**roots** 90:25
**roughly** 46:23
**RPR** 1:23
102:20 103:19
**rule** 24:6
**rules** 4:16 14:3
23:25 24:14
28:12 33:17
49:9,18 52:12
54:11 60:1
**rum** 74:8
**rum-loving**
90:25
**run** 9:24 48:6,15
74:19
**running** 82:17

**S**

**S** 3:14
**safety** 60:25
61:6 63:14,16
63:24 64:4,8
84:15
**sail** 8:11 71:23
71:25 74:14
82:4,11 90:17

**sailboat** 72:2
**sailboating**
90:17
**sailing** 7:20
14:18,21,22
57:22 58:3,15
59:16,17 74:2
74:23 83:19
90:24 91:6
**sailor** 6:14
**sake** 52:20
**sale** 78:19
**Samantha** 1:3
3:18,23 17:14
24:10 26:25
34:5 37:23
41:11 42:4
43:2 47:4 48:2
48:24 50:3
51:21,24 54:15
55:21 56:15
60:24 61:5
64:2,6,15
65:14 68:2,16
85:23 86:2
88:17 94:12
**Samantha's**
18:6 29:16
34:13
**sanitation** 59:25
**Santiana** 79:12
79:14 91:22
**satisfied** 10:24
**satisfy** 10:21
**saw** 17:5 48:2
63:19 96:5
**saying** 5:2 19:6
20:18 21:2
33:16 49:20
78:3 87:19,25
88:19,23,24
**says** 18:3 24:18
24:24 25:7
47:9 55:9
59:24 80:17,19
100:16
**scheduling** 33:1
**school** 5:16 8:11

82:4,11 83:19
**schooling** 87:1
**Scott** 2:10 105:5
**Scout** 2:11 105:6
**Scouts** 74:16,18
**screening** 82:1,5
**Sea** 74:16,18
**seal** 102:11
**second** 28:10
**Secretary** 12:16
13:1
**see** 17:4 18:23
23:17 34:17
38:13 51:24
52:9,25 55:7
58:13 72:7,10
72:13 89:23
94:19 95:24
**seeds** 93:10
98:16
**seeing** 79:5,7,10
**seen** 16:23 17:2
18:1 40:12,19
40:20 60:15
61:17 65:1,2
67:15 75:8
78:22 84:14
85:2 92:12,19
92:22 93:14,15
93:17 98:9
**sees** 82:23 83:4
**seizure** 23:7,13
47:17 77:16
**selected** 6:5
**selective** 57:6
**self-described**
90:25
**send** 32:13,20
52:23 83:23
97:22 98:3
**sending** 31:12
37:7
**sends** 30:9
**sense** 69:21
**sent** 22:13 31:14
79:1 82:23
91:21,24 93:21
94:3 97:16,20

97:25
**sentence** 16:8
**separate** 13:11
**series** 72:11
**serious** 51:10
85:4
**served** 72:6,18
**service** 1:16,23
17:17,23,25
18:2,6 19:19
20:9,19,20
24:6 34:21
47:16 49:21,22
50:4 52:7 53:6
53:17 65:6,7,9
65:11 68:17
81:9 84:19,22
84:24 85:7,10
85:17,19 87:4
89:5,24 98:5
105:1,16,23
**services** 64:10
**set** 52:16 72:20
**severe** 18:12
**share** 57:17
**shares** 57:13
**sheet** 3:10 104:3
105:14,15
**short** 51:15
75:20
**show** 16:23 32:8
45:2 51:12
71:7,8,15 91:8
**showed** 67:12
**shown** 79:13
**side** 52:6 65:8
99:20
**sides** 100:24
101:9
**sign** 3:11 38:1
101:20
**signature** 40:1
**signed** 43:10
89:12
**significant** 64:3
64:7
**signing** 105:13
**simply** 88:19

89:4
**Sincerely**
105:20
**single** 41:15,25
**sir** 39:24
**sit** 29:20 62:17
**sitting** 15:14
**situation** 29:6
30:11 44:1
45:25 49:19
61:24 62:7
84:6
**six** 13:19
**skim** 101:6
**slip** 43:20,21
46:13
**slips** 45:16 46:8
**small** 45:13 71:3
71:4
**social** 71:19
90:17,20
**socialize** 71:22
71:24
**software** 6:3
**solely** 29:7
**solution** 95:15
**solved** 8:24
38:18
**somebody** 7:13
22:17 32:21,22
33:18 41:7,7
49:14 53:7
54:18 55:8
61:15,15 64:23
65:4 71:23,24
74:13 75:2
78:6 81:3,18
82:4,11 83:23
88:2
**someplace** 48:14
**soon** 86:8
**sorry** 23:11 27:7
36:15 44:21
47:21 50:13,18
51:4 61:3 64:5
68:12,24 70:22
73:12 74:11
80:22 82:8

86:7
**sort** 76:2 91:18
**sorts** 57:22
**sound** 56:8
**sounded** 27:22
**sounds** 31:24
32:23 33:20
**South** 4:12
**Southard** 36:4
**Southeast** 2:6
**speak** 83:13
**speaking** 9:7
39:13 50:18
**specially** 20:20
**specific** 72:14
95:2
**specifically**
14:18 35:4
73:23 77:5
**specified** 25:24
**spend** 34:20,22
52:9,10,14
53:24
**spending** 54:7
**spends** 12:1
**spite** 95:11
**spoke** 86:8
99:15
**spoken** 83:9
96:1
**sports** 14:23
57:22
**spot-on** 85:2
**spurred** 16:3
**squabbles** 10:20
**St** 5:17 59:14,16
59:17,20
**staggered** 11:24
**standards** 91:4
**start** 14:15
58:10 66:3
**started** 39:9
43:20 48:1
67:11
**state** 4:8 33:20
33:22 60:1
72:17 90:22
102:3 103:3

**stated** 20:1
27:15,18 33:19
84:14 104:19
**statement** 63:11
64:11 90:19
**statements** 42:8
**States** 1:1 60:2
**stating** 89:17,18
**status** 35:12,15
**stay** 58:9
**staying** 49:1
**stenographic**
103:9
**stenographica...**
103:7
**stern** 48:17
**Stiffler's** 84:11
**Stop** 41:18
**stopped** 85:14
**store** 6:22
**stored** 7:23
**story** 100:24
101:9
**String** 3:19,20
**strong** 27:20
**stuff** 11:17
25:16 44:4
85:13
**stung** 93:3
**subject** 33:4
51:22 60:3
95:8
**submitted** 29:12
32:2
**substantially**
56:11
**sue** 27:23
**sued** 54:19
**suffer** 18:10
98:23
**suffered** 77:15
**suffers** 18:9,12
22:17 55:5
**sufficient** 19:18
**suggest** 21:20
**suggested** 21:22
21:23
**suggestions** 96:5

**Suite** 1:24 105:1
105:16
**sunflower** 93:10
93:11 98:16
**sunflowers** 98:9
98:14
**support** 18:5
22:3 34:2
**suppose** 23:5
35:11
**supposed** 8:25
22:1 38:3,7,8
58:23 65:7
72:21 97:2
**sure** 4:15 15:5
15:10 18:10
23:14 25:21
27:21 28:9
38:19 40:20
45:21 49:3
59:9 61:9 67:3
67:7 79:17
81:20 82:16
99:2,21 100:14
**surfing** 14:25
15:1
**sworn** 4:4
102:10
**symptoms** 21:1
**system** 6:6
**systems** 6:2

**T**

**T** 3:14
**take** 5:11 8:17
37:14 39:5
46:12,16 51:24
52:25 67:6
97:1
**taken** 1:13,22
5:16 68:6
81:20 82:16
104:1 105:10
**takes** 82:24 83:7
**talk** 28:23 30:24
38:6,7,8,11,14
57:25 79:14
**talked** 29:8

30:22 67:25
84:8 93:20
**talking** 75:3
92:14
**Tampa** 1:2 2:11
105:6
**taught** 8:11
**teacher** 10:20
82:14
**technically** 8:19
8:22 13:18
**tell** 5:14 6:18
13:12 17:6
21:7,18 22:12
22:17,24 23:6
25:13,15 30:5
41:9 53:19
58:24 59:4
97:25 98:25
99:13,13 100:4
100:7
**telling** 14:19
24:23,24 26:25
28:6 99:18
100:4
**tendency** 4:21
**terms** 72:4
**testified** 4:4
76:21 79:1
**testimony** 24:9
88:9
**text** 17:20 67:24
**texts** 67:22,24
68:4
**Thank** 27:6
51:17 75:18
105:18
**Thats'** 89:13
**theirs** 45:24
**therapist** 51:24
52:25 79:6,7
79:10 82:24
83:1,4
**thing** 38:10
41:10,21 44:25
46:14,19 49:8
52:16 56:8,11
57:2,23 58:7

63:18 81:24
82:14 85:4
99:19
**things** 9:10 11:6
11:7 14:17
15:4 31:2 41:3
41:7,22 42:3
42:12 44:5
46:20 52:15
55:25 57:1
71:9 100:6,13
**think** 7:4 10:9
12:9,17 18:18
19:18 20:17
21:10 22:14
23:3 29:10
30:14,16,18
32:16 33:10
34:5,11,11,16
36:5 44:6,9,14
44:19 47:1
48:5 50:7,16
52:19,24 54:22
56:24 62:12
67:24 71:1
72:16 75:8,11
81:23 84:24,24
85:9 88:5,16
88:16,17 89:22
90:11,20
**thinking** 9:16
13:15 52:14
**thinks** 19:4
**third** 65:20
66:13
**third-party**
63:18
**thought** 7:17
38:8 69:15,15
69:17,24 70:6
89:13 100:8
**threat** 63:13,16
63:24
**three** 6:20 9:11
**threw** 56:15
**throwing** 90:23
**Thursday** 73:10
**time** 1:15 5:2,9

8:7 11:10,17
27:22 29:18
31:20 39:8
41:5 42:19,22
45:20 46:18
48:3,11,13,18
48:22 49:1
50:22 52:14
54:6 61:22
62:6,15 67:8
67:16 69:9
72:21 75:21
85:25 92:11
93:1,13 97:18
**times** 7:10,12
16:11 18:7
29:14 41:1,11
49:6 65:2
**title** 13:1
**today** 29:20
40:12 54:8
62:17 65:12
68:9
**told** 20:6 21:8
21:10 23:15
28:22 29:4
38:15 42:16,16
42:19 43:7,24
53:2 95:25
99:24,25
**Tony** 63:4
**tool** 52:3
**top** 68:15 94:20
**torture** 5:12
**tough** 11:1
**towel** 56:15
**Trail** 4:12
**train** 21:25 22:6
22:22,23
**trained** 20:18,20
23:2,6,12 65:8
65:9,11 68:17
84:25 85:18
**trainers** 22:15
23:1,4
**training** 21:24
22:9 48:18,19
49:22 62:10

76:3,3 85:17
86:14 90:4,5,6
**transcript** 5:6
103:8,8 104:4
105:11,13,17
**trapped** 48:7
**Treasurer** 12:8
12:16,16 13:1
62:13 63:3
**tried** 27:16
75:13 95:18
100:6
**Trimaran** 6:19
**tripped** 61:25
**true** 64:11 90:9
103:9 104:19
**truth** 63:7
**try** 4:25 5:1 38:5
56:8 64:5
75:20 88:21
95:15 100:12
**trying** 10:21,22
12:9 37:18
45:2 55:21
56:6 65:3 96:4
98:4
**Tuesday** 51:20
**turmoil** 34:13
**turned** 61:22
73:19
**Tuscawilla** 2:6
**two** 5:1 9:15
12:1 22:14
30:6 45:12
50:6 74:18
80:9 90:23
**two-minute** 67:6
**two-year** 11:22
**types** 14:22
**typically** 71:17
84:25

**U**

**uh-huh** 5:5 6:25
8:5 20:8,11
23:8,14 27:3
30:8 33:3
35:16 39:20

40:18 47:11,19
50:10 70:9,12
70:14,20 73:22
74:7,9 82:25
87:13 97:17
**uh-uh** 5:5
**Ulmerton** 1:24
**ultimately** 43:12
**umbrage** 37:14
37:16
**underlying**
43:17
**undersigned**
102:8
**understand** 24:5
35:17 49:7,17
52:17 66:4,7
80:1 87:18,25
89:3
**understandable**
79:25
**understanding**
13:22 17:13
30:4,5,6,12
35:12,23 58:14
**understood**
99:22
**undue** 64:16,24
85:6,7
**unfair** 16:7
**unfortunately**
96:18
**United** 1:1 60:2
**unknown** 65:20
66:13
**unwilling** 71:22
**upset** 43:2
**use** 11:12 20:9
45:18 48:7
55:22 56:1,8
59:14,15 60:3
77:5 82:12
**usual** 43:18

**V**

**v** 1:5
**vague** 15:4
**valid** 30:15 63:6

value 46:21,24
Venza 2:2,3 27:4
   27:6 39:23
   47:20 50:12
   70:21 72:24
   73:10 74:10
   95:22 96:9
verbalize 39:23
verbiage 14:12
verify 79:9
verifying 23:18
vet 75:9
veterinary 90:6
Vice 8:10,16 9:6
   12:5,15 13:8
viewer 6:9
Village 2:3
voluntarily 36:6
   55:20
vote 10:7 14:8
   25:17 34:7
   43:14 71:13
voted 11:22,23
   14:8 32:4
   69:19,19
voting 11:19
   13:14 69:18
   71:12
VS 104:1 105:8

**W**

wait 23:11 86:7
   86:7,7 101:7
waiting 32:25
waive 101:18
waived 24:6
walking 61:23
   62:6,13 92:17
want 7:19 9:7
   10:25,25 25:15
   41:22 47:7
   49:8 50:17
   52:12 54:11,22
   55:15,17,22
   56:16,17,25
   58:2,3 70:10
   74:1 82:18
   95:4

wanted 17:17,22
   24:5 28:19
   42:23 43:13,19
   49:2,4 54:10
   68:15,17 100:8
wanting 61:19
wants 19:2
   43:21 56:2
warrants 18:2
wasn't 11:13
   16:14 20:6
   21:5 23:22
   42:10,11 48:16
   48:20 56:5
   57:23 63:17
   87:24 89:24
watch 6:4
watched 63:18
watching 6:4,7
water 7:22
   14:23 41:16
   57:22
way 7:16 19:9
   21:25 28:3
   34:18 35:10
   41:14 48:8
   49:11,15 62:16
   67:11 68:2
   70:16 71:6
   79:9 96:13
   100:19
ways 87:14
we'll 5:11 27:9
   32:6 37:8 43:8
   46:15,16 58:13
   100:16
we're 14:12,13
   14:15 15:9
   16:19 26:2
   32:24,25 33:17
   35:2 37:18
   38:3 39:5 42:5
   46:19,19 52:3
   58:4 91:12
   101:19
we've 45:14,16
   50:22
web 53:13

website 90:16,22
weeks 9:15
went 9:6,10 11:6
   30:12 38:13
   42:22 48:18,22
   70:18 75:12
weren't 68:4
   74:1 89:16,16
West 2:4,11
   105:6
Westerfield's
   75:7
Westerfields
   75:13
Westerfields'
   75:6
whatnot 48:15
whatsoever
   98:13,18
white 16:13
   41:21
wide 6:19
willing 34:20,22
wind 14:25 15:1
   58:9
wine 81:11,13
   81:23 82:14
winter 49:1
wished 101:20
withdraw 42:17
withdrawing
   42:20,21
withdrawn 43:5
witness 1:22
   36:22 39:11
   44:24 50:13
   59:12 74:11
   98:7 102:11
witnessed 93:9
women 41:25
   42:1
word 8:19 15:10
worded 19:10
   20:14 21:11
wording 16:5
work 5:8 6:2
   9:25 10:22
   95:18 96:4

97:2 100:6,12
working 6:10
   11:16 38:2
   77:11,13
works 13:12
worth 52:15
wouldn't 13:5
   23:17,18 25:23
   27:25 38:17
   49:13 57:21
   58:9 64:13
   71:9
Wow 8:7
wrapping 67:4
write 5:1 104:4
writing 4:19
   26:25
written 14:13
   79:25 100:24
wrote 27:13
   45:1 83:10

**X**

X 3:1,14

**Y**

yacht 1:6 7:1,23
   13:22 20:10
   23:23 24:11,20
   25:2,9 26:9
   29:2,23 31:22
   34:1 37:22
   38:24 40:17
   44:15 45:22
   46:7,11,22
   55:12 56:18
   57:11 59:14,20
   59:22 63:12
   64:17 65:20,21
   65:24 66:13,17
   66:23 69:12
   70:7 74:17
   76:16 78:6
   80:17 90:9,12
   90:23 91:5
   92:13 104:2
   105:8
yeah 10:12 11:4
   11:11 12:13

15:1 16:12
   17:10 21:17
   23:14,16,20
   24:21 25:21
   27:14,20 32:14
   33:24 34:24
   38:16,22 40:2
   40:8 53:21
   55:14 57:12,16
   57:19 58:11
   61:12 62:19
   64:19,25 65:13
   71:21 75:15
   80:20 84:17
   85:9 90:3 91:6
   91:9,20 94:16
   95:10 99:8
year 9:2,3,18,19
   9:20,21,24
   10:13,13 11:23
   11:24,25 31:1
   31:17 45:10,24
   46:15 62:12,14
   62:15
years 6:11 7:7
   7:15 8:6 9:4
   12:1 37:20
   92:9
Yep 32:18 50:23
   83:25
young 33:8
youth 83:19

**Z**

**0**

06 7:4
07/16/2018 3:17

**1**

1 3:17,23 16:20
   16:24 94:4,5
1.59 90:13
10 37:20 90:23
100 1:24 105:1
   105:16
10142019lb
   104:21
102 3:8

**103** 3:9
**104** 3:10
**105** 3:11
**10th** 73:11
**12:48** 1:15
  101:22
**13** 8:6
**130,000** 47:1
**13555** 1:17,24
  105:1,16
**14** 1:14 13:20
  102:9,12
  103:13 104:1
  105:10
**1400** 4:12
**145** 90:10
**150** 27:2
**16** 3:17
**17** 102:20

**2**

**2** 3:18 27:9,10
**2006** 8:4 92:3
**2007** 92:5
**2018** 3:18,23
  9:22 17:9
  51:20
**2019** 1:14 39:19
  102:10,12
  103:13 104:1
  105:3,10,15
**2022** 102:20
**207** 2:6
**22-feet** 6:19
**24** 3:23
**25th** 51:20 93:21
**27** 3:18 105:3
**28** 105:15
**29th** 39:19 40:4
**2nd** 31:13,15,17

**3**

**3** 3:19 32:7,9
**32** 3:19
**32667** 2:7
**33409** 2:4
**33607** 2:11
  105:6
**33762** 1:17,25

  105:2,16
**34** 39:11
**34683** 4:12
**37** 3:20
**38-foot** 6:19

**4**

**4** 3:3,20 37:8,9
  93:24
**40** 73:18
**400** 2:11 105:6
**4301** 2:11 105:6

**5**

**50** 73:18
**50-ish** 71:18

**6**

**6/19/19** 94:23
**60s** 14:13

**7**

**727** 105:2
**75** 3:4
**79** 3:5

**8**

**8:19-cv-00772...**
  1:5
**823-4155** 105:2

**9**

**9:15** 51:20
**9:33** 1:15 102:10
**905-322** 2:3
**91** 3:6
**931** 2:3
**94** 3:23
**96** 3:7