## Page 1

```
 1              UNITES STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                   TAMPA, DIVISION

 3

 4

 5    SAMANTHA RING,

 6         Plaintiff,

 7    Vs               CASE NO:  8:19-cv-00772-VMC-JSS

 8    BOCA CIEGA YACHT CLUB, INC.,

 9         Defendant.

10    _____

11

12         DEPOSITION OF ANDREAS SANTAYANA, M.D.
              Taken by Counsel for the Defendant

13
                Wednesday, December 4, 2019
14                9:15 a.m. - 11:50 a.m.
                    (Pages 1 - 105)

15

16

17

18              Bayfront Health Family Care
                   700 6th Street South
19                St. Petersburg, Florida

20

21

22

      Reported by:
23    LYNDA B. LUNSETH
      Notary Public, State of Florida
24    Esquire Deposition Solutions - Tampa, Florida
      813.221.2535  FAX:  813.221.0755
25    Job No: J4737593
```

## Page 2

```
 1    APPEARANCES:
 2    On Behalf of Plaintiff:
 3         DENESE VENZA, ESQUIRE
           Venza Law, PLLC
 4         931 Village Boulevard
           #905-322
 5         West Palm Beach, Florida 33409
           561.159.6329
 6              - and -
           MARCY I. LAHART, ESQUIRE
 7         Marcy I. LaHart, P.A.
           207 SE Tuscawilla Road
 8         Micanopy, Florida 32667
           352.545.7001
 9
10    On Behalf of the Defendant:
11         ELIZABETH A. FONTUGNE, ESQUIRE
           Cole, Scott & Kissane, P.A.
12         4301 West Boy Scout Boulevard
           Suite 400
13         Tampa, Florida 33607
           813.864.9324
14
15
16
17
       ALSO PRESENT:  Crystal Banks, RN
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                 I N D E X
 2                                          PAGE
 3    WITNESS:  (DEFENDANT'S)
 4    ANDRES SANTAYANA, M.D.
           Direct examination by Ms. Fontugne.....  5
 5         Cross-examination by Ms. LaHart........ 85
           Cross-examination by Ms. Venza......... 88
 6         Redirect examination by Ms. Fontugne... 98
           Recross-examination by Ms. LaHart...... 102
 7
      Certificate of Reporter.................... 104
 8
      Certificate of Oath........................ 105
 9
10
11
12
13
14
15
16              E X H I B I T S
17    No.        DESCRIPTION               PAGE
18    DEFENDANT'S
19    Exhibit 1  License verification............  17
20    Exhibit 2  7/16/2018 Progress note by
                 Dr. Santayana................... 20
21
      Exhibit 3  7/16/2018 Letter written by
22               Dr. Santayana................... 34
23    Exhibit 4   Progress note by Dr. Carley
                  Befler......................... 47
24
                 (Continued on page 4)
25
```

WITNESS:  (DEFENDANT'S)
ANDRES SANTAYANA, M.D.
     Direct examination by Ms. Fontugne.....  5
     Cross-examination by Ms. LaHart........ 85
     Cross-examination by Ms. Venza......... 88
     Redirect examination by Ms. Fontugne... 98
     Recross-examination by Ms. LaHart...... 102

Certificate of Reporter.................... 104
Certificate of Oath........................ 105

No.        DESCRIPTION               PAGE
DEFENDANT'S
Exhibit 1  License verification............  17
Exhibit 2  7/16/2018 Progress note by
           Dr. Santayana................... 20
Exhibit 3  7/16/2018 Letter written by
           Dr. Santayana................... 34
Exhibit 4   Progress note by Dr. Carley
            Befler......................... 47

(Continued on page 4)

## Page 4

```
 1         (Exhibits continued.)
                                          PAGE
 2
      Exhibit 5  8/8/2018 Progress note by
 3               Dr. Santayana................... 48
 4    Exhibit 6  8/8/2018 Progress note.......... 50
 5
      Exhibit 7  3/13/2019  Progress note by
 6               Dr. McCaleb.................... 51
 7    Exhibit 8  4/1 2019 Letter written by
                 Dr. Santayana................... 53
 8
      Exhibit 9  Plaintiff's rule disclosures.... 60
 9
10
11
12
13
14
15
16
17
18
19
20
21
22    EXHIBIT H
23
24
25
```

(Exhibits continued.)
                                          PAGE
Exhibit 5  8/8/2018 Progress note by
           Dr. Santayana................... 48
Exhibit 6  8/8/2018 Progress note.......... 50
Exhibit 7  3/13/2019  Progress note by
           Dr. McCaleb.................... 51
Exhibit 8  4/1 2019 Letter written by
           Dr. Santayana................... 53
Exhibit 9  Plaintiff's rule disclosures.... 60

**EXHIBIT H**



Page 5

1          The deposition was reported by Lynda B.
2    Lunseth, Notary Public, State of Florida at Large, in
3    the above cause.
4          - - - - - - - - - -
5          THE COURT REPORTER:  Raise your right hand,
6    please, sir.  Do you swear or affirm that the
7    testimony you give will be the truth, the whole
8    truth, and nothing but the truth?
9          THE WITNESS:  I do.
10         THE COURT REPORTER:  Thank you.
11              ANDRES SANTAYANA, M.D.,
12   the witness herein, having been first duly sworn or
13   affirmed, was examined and testified as follows:
14              DIRECT EXAMINATION
15   BY MS. FONTUGNE:
16    Q.  Dr. Santayana, can you please state your full
17   name for the record?
18    A.  Andres Santayana.
19    Q.  Dr. Santayana, have you ever been deposed
20   before, what we're doing today?
21    A.  I have not.
22    Q.  So let me just go over how this works.  I'm
23   going to be asking you questions.  Our court reporter
24   is going to be taking down my questions and your
25   answers.  If there's anything that I ask you that is

Page 6

1    not clear or you're not sure what I'm asking you,
2    please ask me to clarify and I'll do that.  If you need
3    to take a break at any point during this deposition,
4    please let us know and we'll do that for whatever
5    reason.
6          And finally, as we go along if you remember
7    anything that you would like to add to an answer to a
8    previous question, we can certainly go back and do
9    that, I just ask that we finish with the question that
10   we're dealing with first and then we can go back.  Do
11   you have any questions for me before we get started?
12    A.  No.
13    Q.  Dr. Santayana, what is your current occupation?
14    A.  I'm a family medicine resident physician.
15    Q.  How long have you been with the residency
16   program over here with Bayfront?
17    A.  This is my third year.
18    Q.  When are you scheduled to finish, complete your
19   residency?
20    A.  The end of June, 2020.
21    Q.  Once you complete your residency in June of
22   2020, what is your plan at that point?
23    A.  I will most likely be staying on as a faculty
24   position here at the Bayfront.
25    Q.  Now, I understand that the residency here at

Page 7

1    Bayfront is fairly competitive; is that right?
2     A.  I'm --
3     Q.  Let me clarify that a little bit.  So from my
4    understanding the program only accepts about 8
5    residents or so in each specialty; is that right?
6     A.  Correct.
7     Q.  Is there a preference to medical school
8    students who graduate from medical schools here in
9    Florida as opposed to somewhere else?
10    A.  To the best of my knowledge, I don't believe
11   there's any preference to Florida medical students.
12    Q.  Where did you attend medical school?
13    A.  University of South Florida in Tampa.
14    Q.  What year did you graduate?
15    A.  2017.
16    Q.  Did you complete some sort of internship before
17   starting here in your residency?
18    A.  No.
19    Q.  Now, once you graduated from medical school,
20   what is it that you need to do to earn -- to earn your
21   license to practice medicine?
22    A.  What -- can you specify a little more?
23    Q.  So do you have a license to practice medicine
24   right now in the state of Florida?
25    A.  I do.

Page 8

1     Q.  Okay.  Other than graduating from medical
2    school, do you have to do anything else to obtain your
3    license?
4     A.  To obtain a Florida license you need to
5    complete one year of postgraduate training.
6     Q.  And so that one year of postgraduate training,
7    was that performed in this program, your residency
8    program here?
9     A.  Yes.
10    Q.  Is there any exam that you need to take at the
11   end of the one year in order to get the license?
12    A.  Yes.  The final USMLE board exam.
13    Q.  How long is that exam?
14    A.  It's over two days, 8 hours each day.
15    Q.  As far as the topics that are on the
16   examination other than just medical education, are
17   there any topics that have to do with any particular
18   branch or specialty of medicine?
19    A.  The exam mainly consists of still kind of
20   general medical, which does cover a breadth of
21   different specialties.
22    Q.  Okay.  Medical school.  When you went to
23   medical school at USF, how long was that program?
24    A.  It's a 4-year program.
25    Q.  Before you attend the medical school, where did



Page 9

1  you go to undergraduate?
2      A.  At the University of Florida in Gainesville.
3      Q.  What was your major there?
4      A.  Biology.
5      Q.  While you were in medical school were there any
6  courses that had to do with mental as opposed to
7  physical or diseases?
8      A.  Yes.
9      Q.  Did you have any -- did you take any classes
10 when you were in school at USF in medical school that
11 had to do specifically with anxiety disorders?
12     A.  Not a specific anxiety class, no.
13     Q.  Did you have any courses where anxiety
14 disorders were discussed?
15     A.  Yes.
16     Q.  As part of that class, did the professor go
17 over the different classifications of anxiety disorders
18 that there are?
19     A.  From what I remember, yes.
20     Q.  Okay.  Do you remember whether when you took
21 your USMLE board after completing one year of residency
22 here, whether any questions on the exam had to do with
23 anxiety disorders?
24     A.  I couldn't recall any specific questions, no.
25     Q.  While you were in medical school at USF, did

Page 10

1  you take any classes where the topic for discussion was
2  performing functional assessments on patients?
3      A.  Describe that, "functional assessments"?
4      Q.  Yes.  Some assessments for example, for the
5  purpose of determining disability, say just going over
6  what the patient can and can't do with typical daily
7  activities?
8      A.  Not specifically, no.
9      Q.  As part of your residency here at Bayfront,
10 have you had any training on how to conduct a
11 functional assessment limitation?
12     A.  Not specific to that, no.
13     Q.  Since you've been a resident here at Bayfront,
14 have you had any patient ask you to complete any forms
15 that were going to be submitted to the Social Security
16 Administration or any other agency at the state or
17 federal level that would be conducting disability
18 determination?
19     A.  I have.  Yes.
20     Q.  Okay.  And let's go -- let's go over that.
21 When was the last time you can remember that you had a
22 patient that requested that?  It doesn't need to be
23 exact.  Was it this year, or was it last year?
24     A.  Probably one last year.
25     Q.  One last year?

Page 11

1      A.  Um-hmm.
2      Q.  Other than the one last year, have you had any
3  other patients who have asked you to complete any
4  functional assessments as required by the Social
5  Security Administration?
6      A.  No.
7      Q.  The patient who asked you to complete those
8  forms -- perform a functional assessment -- did that
9  patient have any history of having an anxiety disorder?
10     A.  I don't believe so.  I believe it was physical.
11     Q.  Okay.  When I say "anxiety disorder," do you
12 think of primarily a physical disorder, a mental
13 disorder, or a combination of both?
14     A.  Probably a mental disorder.
15     Q.  When a patient tells you of having panic
16 attacks, is that a manifestation of an anxiety disorder
17 or is it a separate disorder?
18     A.  It's more of a spectrum, so not always
19 separate.
20     Q.  All right.  So if we have a spectrum, let's go
21 through the spectrum.
22     A.  All right.
23     Q.  What's the mildest -- I mean, I'm talking in
24 terms of, you know, the effect on a patient's life?
25 What's -- does the mildest form have a name in

Page 12

1  particular?
2      A.  From -- how I think of it, probably just fall
3  under general anxiety.
4      Q.  Okay.  And so if we look at the other end of
5  the spectrum where the effect on the patient's life is
6  the most intense or severe, what would you have in mind
7  when you look at the other end of the spectrum?
8      A.  It can be a multi-effect.  So it might be
9  generalized anxiety with other features.
10     Q.  Can you give me some examples of the other
11 features?
12     A.  I think of people with severe social anxiety --
13 individuals with PTSD may fall under that.  Individuals
14 with severe panic attacks that would affect their daily
15 living.  There are many different types.
16     Q.  Since you've been here at the residency
17 program, have you seen -- have you -- what proportion
18 of your patients that you've seen have had some sort of
19 anxiety disorder across the spectrum?
20     A.  Don't know that I'd be able to give you an
21 exact --
22     Q.  Of course not.
23     A.  -- proportion, but I would say at least 10 to
24 15 percent of my patients.
25     Q.  When you see a patient who comes in with an



Page 13

1 anxiety disorder, what sort of signs or symptoms do
2 they have that you can observe objectively?
3    A. Some may not have any objective findings that
4 can be observed. Some might have observable findings
5 that may or may not be consistent with anxiety. They
6 could have other issues going on as well.
7    Q. During your time here at the residency, have
8 you ever had a patient come in who didn't say anything
9 to you about anxiety, but who you diagnosed with an
10 anxiety disorder for the first time?
11    A. No. I wouldn't diagnose anyone with anxiety
12 without speaking with them about it.
13    Q. Without speaking?
14    A. Speaking to the patient.
15    Q. Without speaking to the patient. Okay. And so
16 would this be typically something that the patient
17 would tell you?
18    A. Typically. Sometimes you can do screening for
19 depression and anxiety.
20    Q. And so when you perform those screenings, what
21 screening or what tests do you use?
22    A. I know we have some standardized
23 questionnaires. For depression it's PHQ scale.
24 Depression GAD, general anxiety disorder. GAD,
25 standardized questions.

Page 14

1    Q. And in your experience in administering these,
2 having patients fill out these questionnaires, how
3 reliable are the questionnaires?
4    A. I would say they're decently reliable.
5    Q. Now, Dr. Santayana, the preparation of this
6 deposition, have you reviewed any of the deposition
7 transcripts from depositions that have been taken in
8 the case?
9    A. No.
10    Q. Have you reviewed any of Samantha Ring's
11 medical records from any other provider other than this
12 Family Medicine Clinic?
13    A. No.
14    Q. You hesitated. Have you seen any of her
15 records?
16    A. I believe I have lab value records that were
17 sent to me.
18    Q. Lab values. So -- so lab tests results from
19 other practices or from other hospitals?
20    A. I don't recall where it was from.
21    Q. Have you reviewed Ms. Ring's chart for the
22 Family Medicine Clinic before this deposition today?
23    A. Not outside her clinic visits with me.
24    Q. When was the last clinic visit that she had
25 with you? Do you remember?

Page 15

1    A. She had a follow-up visit within the last
2 month. I don't recall the exact date.
3    Q. Okay. And so during that follow-up visit, was
4 that visit with you?
5    A. Yes.
6    Q. Okay. During that follow-up visit last month,
7 what was -- what was Ms. Ring's concern? Why was she
8 coming to see you?
9    A. From what I recall I believe she had had an
10 episode with an allergic reaction to one of the various
11 things she's allergic to and had to use her Epipen.
12    Q. Okay.
13    A. So she was coming in to follow up on that. She
14 also needed a refill of her Epipen.
15    Q. Do you remember Ms. Ring telling you this
16 allergic reaction happened at the school where she
17 works?
18    A. Yes, that's correct.
19    Q. Do you remember her telling you that this
20 allergic reaction occurred because a student had
21 brought sunflower seeds into the classroom?
22    A. I don't recall the exact circumstances, but I
23 do believe I remember sunflower seeds were involved.
24    Q. When Ms. Ring came to see you last month after
25 this allergic reaction, do you remember if she brought

Page 16

1 her dog with her?
2    A. She did.
3    Q. During that visit do you remember whether
4 Ms. Ring mentioned to you whether -- whether the dog
5 was with her when the allergic reaction happened?
6    A. Do not recall if she mentioned that or not.
7    Q. Now, Dr. Santayana, as part of this residency
8 are you permitted to practice medicine outside of this
9 setting, outside of this residency?
10    A. Yes, to an extent.
11    Q. To an extent? Okay. So what is that extent?
12 What are you permitted to do under the program?
13    A. During your second and third years, once you
14 have your practicing license, you're permitted to do
15 moonlighting shifts, which usually occur at urgent care
16 facilities.
17    Q. Okay. And so what urgent care facilities have
18 you worked at?
19    A. I have not worked.
20    Q. You have not?
21    A. No.
22    Q. Have you done any moonlighting shifts at all?
23    A. No.
24    Q. Now, as we sit here today, this morning, let
25 the record reflect that you're wearing scrubs, hospital



Page 17

1  scrubs?
2      A. Yes.
3      Q. Okay. We're here at the hospital; correct?
4      A. Yes.
5      Q. So were you working before this deposition
6  started?
7      A. Yes.
8      Q. So what was your shift then today?
9      A. I'm currently on rotation for the inpatient
10 service at the hospital, where residents take care of
11 patients who are admitted to the hospital.
12     Q. Okay. So thinking to your shift today, what
13 time does that shift start?
14     A. I arrived just before 8 a.m.
15     Q. Now, you mentioned that you had not taken any
16 of the moonlighting shifts. Have you -- have you
17 performed any other work as a doctor outside of the
18 residency program?
19     A. Nope.
20         MS. FONTUGNE: I'm going to hand you this what
21 we'll mark as Exhibit Number 1.
22         (Exhibit 1 marked for identification.)
23 BY MS. FONTUGNE:
24     Q. Okay. And so I'll represent to you that this
25 is a printout from the Florida Department of Health

Page 18

1  reflecting your -- your profile. Your medical license.
2  And under qualifications here on this sheet I just
3  wanted to clarify something. It says, "In training
4  program receives fee reduction." What are the fee
5  reductions? Reduction of what fee?
6      A. I'm not sure.
7      Q. You're not sure? Okay. Do you know if there's
8  a fee associated with, you know, being out as a
9  physician in Florida where you have to pay a certain
10 amount every year? Is there anything like that in
11 place, to your knowledge.
12     A. Not that I'm aware of.
13     Q. Okay. And underneath here it says, "NICA
14 exempt." That's an acronym.
15     A. Okay.
16     Q. Are you familiar with the NICA program?
17     A. Yes.
18     Q. What is that?
19     A. I do not recall what the acronym stands for.
20     Q. Me neither.
21     A. But it would refer to the -- the service
22 provided for women having children that have any
23 neurological problems after birth.
24     Q. Correct. So it's a fund set up by the Florida
25 legislature to -- so that in case there are any, you

Page 19

1  know, severe neurological injuries, you know, children
2  who are born with them, there's a fund to kind of
3  compensate families, you know, if the doctor did
4  something wrong. So as far as the NICA fund, were you
5  aware that once you're out in practice, out of the
6  residency program, that that's something that you need
7  to pay into?
8      A. Yes.
9      Q. Okay. Now, Dr. Santayana, other than
10 Ms. Ring's visit with you last month, have you spoken
11 to her directly in advance of this deposition?
12     A. No.
13     Q. Have you spoken to Ms. Ring's attorneys, who
14 are here with us today, in advance of the deposition or
15 earlier this morning?
16     A. Only to arrange the time for the deposition.
17     Q. Back in March or April of this year, did
18 you have any conversations or any communications with
19 Ms. Ring's attorneys, who are here with us today?
20     A. No.
21     Q. Do you remember the first time that Ms. Ring
22 came to see you?
23     A. I don't recall any specific details of the time
24 we met, no.
25         MS. FONTUGNE: I'm going to introduce what

Page 20

1  we'll mark as Defense Exhibit Number 2.
2      (Exhibit 2 marked for identification.)
3  BY MS. FONTUGNE:
4      Q. I will represent to you that this is a copy of
5  your progress note for Ms. Ring. It starts on the
6  bottom of page 11. This is dated July 16, 2018. And
7  I'll represent to you that this was part of the record
8  we received in response to subpoena from Advent Health
9  Medical -- Family Care, you know, residency. This is
10 the first date that we have that Ms. Ring actually came
11 to see you. Does that sound right, that she first came
12 to see you for the first time last summer?
13     A. Summer?
14     Q. Summer of 2018. I'm sorry.
15     A. Based on what I wrote in my note, that sounds
16 right.
17     Q. All right. So let's turn to page 2. I would
18 direct your attention to the top of the page, where
19 Ms. Ring's allergies were reviewed.
20     A. Correct.
21     Q. So Ms. Ring has a number of allergies. So this
22 list that we have here at the top of the page, this is
23 a list that she would have given you. She would have
24 told you about these different allergies; correct?
25     A. She most initially told the nurse who was doing



Page 21

1 intake that day.
2    Q.  Okay.
3    A.  And we briefly reviewed it during the visit.
4    Q.  Okay.  During your visit do you remember
5 whether you asked her when the last time was that she
6 had had any contact with any different allergens that
7 are listed here?
8    A.  I don't recall.
9    Q.  Okay.  I'll direct your attention now to the
10 bottom of page 2.  This assessment here, social
11 history, this assessment where it looks like there are
12 a lot of different questions that are asked of the
13 patient, is this an assessment that's performed by you
14 or by the nurse providing intake?
15    A.  The nurse providing intake.
16    Q.  And so for this assessment then the nurse who
17 is conducting the intake, you rely on the patient's
18 answers to these different questions; right?
19    A.  Yes.
20    Q.  Okay.  So based on this assessment here at the
21 bottom of the page, it looks like Ms. Ring didn't have
22 any difficulty with hearing.  Didn't have any
23 difficulty seeing.  Didn't have any difficulty
24 concentrating, remembering, or making decisions, or any
25 difficulty walking, or climbing stairs.  And then turn

Page 22

1 to the next page.  No difficulty dressing or bathing.
2 No difficulty doing errands alone.
3        So based on, you know, your impression with
4 Ms. Ring as a patient, would you say that all of this
5 is correct?
6    A.  Yes.  In regards to those specific ones, yes.
7    Q.  Yes.  In regards to those specific ones,
8 exactly right.  So now looking to page 3.  It looks --
9 I want to direct your attention here to the HPI history
10 section.  So there is note here about ████, which stands
11 for ████████; correct?
12    A.  Correct.
13    Q.  Okay.  And there's a note here that Ms. Ring
14 has had to move and live on her boathouse recently.  So
15 what do you remember Ms. Ring telling you about living
16 on her boat?
17    A.  I don't recall much more than her mentioning
18 having to move and it being a stressful move.  Besides
19 that, no specifics.
20    Q.  Okay.  Let's go now to a paragraph underneath
21 this one that's titled, "Anxiety/depression."  I read
22 here -- so this note, who wrote this note?  It says
23 you.
24    A.  This is me, yes.
25    Q.  And so when you write this note, is this

Page 23

1 something that you do after a patient's visit like
2 right afterwards?  How does that work?
3    A.  Some of this I may have even been typing as I
4 speak with the patient.  Some I do finish directly
5 after the visit.  I don't recall during this visit when
6 it was entered.
7    Q.  Okay.  So "Several years with history of
8 anxiety/depression."  So when you write this, is this
9 based on something that Ms. Ring is telling you?
10    A.  Correct.
11    Q.  During that first visit with Ms. Ring, was
12 she -- did you observe any signs or symptoms that would
13 tell you that she was a patient who was suffering from
14 anxiety or depression?
15    A.  I don't recall specifically, but she -- we did
16 talk about her anxiety and stressors -- life stressors
17 at that time.
18    Q.  Okay.  And so going down further in this
19 paragraph you write, "She has had more life stressors
20 recently with separation from her partner and losing a
21 lot of possessions requiring her to live on her boat to
22 save money."  Do you remember Ms. Ring you telling when
23 that separation with her partner occurred?
24    A.  I don't.
25    Q.  Do you remember whether your impression was

Page 24

1 that separation from her partner was something that was
2 very recent?
3    A.  I honestly don't recall.
4    Q.  Do you remember ever speaking to the doctor who
5 was Ms. Ring's primary-care physician before she came
6 to the clinic here?
7    A.  Speak with him directly, no.
8    Q.  Do you remember ever receiving any records from
9 that practice or asking Ms. Ring to fill out an
10 authorization for release of health information for
11 that practice?
12    A.  I don't really specifically.
13    Q.  Let's go back up now to ████.  So that's right
14 above the anxiety and depression section.  So here's
15 there's a note – so ████████████;
16 correct?
17    A.  Correct.
18    Q.  So in layman's terms that's ████████████;
19 right?
20    A.  Yes.
21    Q.  "So recent████ panel brought to visit."  So
22 would this refer to lab work that she had outside of
23 your clinic?
24    A.  Correct.
25    Q.  Okay.  And so these number here that are



Page 25

1  listed, are these numbers numbers that you would
2  transcribe from the lab record that she brought with
3  her?
4     A.  Yes.
5     Q.  Now, "Patient states that she has been on
6  statin therapy in the past though not recently."  Do
7  you remember Ms. Ring mentioning whether she had had
8  any of the typical side effects associated with statin
9  therapy; muscle cramps, that sort of thing?
10    A.  I don't recall.
11    Q.  Now, you write here -- going back to the
12 anxiety/depression section, "She has a therapy dog for
13 her anxiety present with her."  So what makes -- in
14 your experience and with your background as a doctor,
15 what makes a dog a therapy dog?
16    A.  Unrelated to my experience as a doctor, therapy
17 dogs usually are trained in providing some type of
18 psychotherapy support for an individual.
19    Q.  Okay.  So do you remember at this first visit
20 Ms. Ring actually having this dog with her at that
21 visit?
22    A.  My own memory, I do not, only from what I've
23 written.
24    Q.  As far as patients who come to the Family
25 Medicine Residency Clinic, what is the clinic's policy

Page 26

1  on people bringing animals to the clinic?
2     A.  I don't know the exact policy, if there is one
3  in place, but generally from what I've seen, if they
4  have a pet that they state is their therapy pet, or
5  required for any medical reason, they're allowed to
6  bring it with them.
7     Q.  Okay.  And so thinking back to this dog, do you
8  remember whether the dog was wearing a muzzle that day?
9     A.  I do not recall.
10    Q.  Do you know whether the dog was well-behaved
11 during the visit?
12    A.  During the initial visit?
13    Q.  Yes.  When you first met Ms. Ring?
14    A.  Couldn't recall directly, no.
15    Q.  So you mention that, you know, that a dog
16 will -- you mentioned something about a therapy dog and
17 something about psychological help with symptoms.  So
18 again, back to my initial question which is, what makes
19 a therapy dog different than just a pet, just a regular
20 dog who's a pet?
21    A.  Again, I don't think there's any medical
22 definition of a therapy dog.  But from just personal
23 knowledge, I would think it would be an animal trained
24 to like provide therapy support.
25    Q.  Did Ms. Ring have with her on that initial

Page 27

1  visit any documents showing what kind of training the
2  dog had received?
3     A.  I don't recall if she did.
4     Q.  Do you remember her talking about any sort of
5  training that the dog had received?
6     A.  I don't want to speculate, but I do believe she
7  mentioned training.
8     Q.  She mentioned training?  So do you remember
9  what she said how exactly the dog helped her?  What did
10 the dog do to help her?
11    A.  Again, I don't recall if it was in this initial
12 visit, but she had mentioned to me that the dog
13 recognizes when she's having allergic reactions.
14    Q.  Okay.  And so how does the dog do this?  What
15 did she exactly say to you about that?
16    A.  I don't recall if she mentioned specifics of
17 how the dog does it, but she mentioned it recognizes
18 when she has allergic reactions.
19    Q.  Has Ms. Ring ever had an allergic reaction that
20 you've actually observed when she's been in the clinic?
21    A.  Not that I have observed in clinic, no.
22    Q.  Have you spoken to anyone who had -- let me ask
23 it this way.  Every time that Ms. Ring has come to see
24 you, has she come with any other person to the visit?
25    A.  Anytime, yes.  At this last visit she had a

Page 28

1  friend with her.
2     Q.  And the friend she had with her, was this
3  another woman?
4     A.  Yes.
5     Q.  Do you remember this other woman that was with
6  her saying her name or anything?
7     A.  I don't recall her name.
8     Q.  Do you recall this --
9         MS. VENZA:  Can we take a quick break?
10        MS. FONTUGNE:  Okay.
11        (Off the record from 10:50 a.m. to 10:54 a.m.)
12        MS. FONTUGNE:  Back on.
13 BY MS. FONTUGNE:
14    Q.  Dr. Santayana, right before we went on break we
15 were talking about your last visit with Ms. Ring, and
16 the fact that she had another woman that came with her
17 to the visit.  You told me that you don't recall this
18 other woman's name.  Do you recall whether or not this
19 other woman said anything about Ms. Ring's condition
20 during that visit with you?
21    A.  I don't believe she did.  I remember she didn't
22 say much during the visit.
23    Q.  Dr. Santayana, when did you first become aware
24 that Ms. Ring had filed this lawsuit that we're in this
25 deposition for today?



Page 29

1    A.  Only a couple weeks ago, a few weeks ago, when
2  I first spoke with her attorneys regarding arranging a
3  time for this deposition.
4    Q.  Let's go back now to visit number two.  We're
5  going to switch over to page number 4.  And so up here
6  at the top you have a section that's this long
7  paragraph here at the top of the page.  This is the
8  subjective part of the examination where the patient is
9  telling you about symptoms; correct?
10    A.  I'm sorry.  Which page are you referring to?
11    Q.  Page 4.  There you go.  That's it.
12    A.  Okay.
13    Q.  So this section up on the top -- and we're not
14  going to go through it in any detail -- at the top of
15  page 4, this is the section where the patient is
16  telling you what's going on subjectively; correct?
17    A.  Correct.
18    Q.  Okay.  What I'm more interested in is the
19  section underneath, which is the physical exam.  Now,
20  the physical exam that you conduct, that's your
21  objective evaluation of the patient; correct?
22    A.  Correct.
23    Q.  Okay.  All right.  Let's go through your
24  physical exam here.  Under Constitutional you say that
25  she is NAD, not in any apparent distress; correct?

Page 30

1    A.  Correct.
2    Q.  Ambulating normally.  In other words, she can
3  walk without any difficulty.  And then██████, says –
4  is there a medical definition of what makes somebody
5  ██████, is it based on ██?
6    A.  Correct.
7    Q.  And then Psychiatric.  So under psychiatric it
8  looks to me from this physical exam note that you
9  didn't note any abnormalities with Ms. Ring; correct?
10    A.  At least not that it --
11    Q.  Not that day?
12    A.  Right.
13    Q.  Okay.
14        MS. LAHART:  Please don't talk over each other.
15  BY MS. FONTUGNE:
16    Q.  Looking through the rest of your physical
17  examination.  Other than the skin examination, was
18  there any part of the examination that was not within a
19  range for the system involved?
20    A.  From what I documented, it appears no.
21    Q.  Let's go to page 5, which is the last page of
22  this progress note.  And so up here at the top you
23  speak about generalized anxiety disorder, and you
24  mention that "Ms. Ring has had recent life stressors."
25  Do you remember from your discussion with her that day

Page 31

1  what those stressors were?
2    A.  I believe it was what I wrote in the original
3  HPI, her having had to move and loss of personal items.
4    Q.  Okay.  All right.  Do you remember at any point
5  during this very first visit whether Ms. Ring said
6  anything to you about the Boca Ciega Yacht Club?
7    A.  Do not recall.
8    Q.  Now, it looks from this note here at the top
9  that she was on Wellbutrin, which is a medication
10  that's commonly prescribed for anxiety and depression,
11  for both of them or for just one of them?
12    A.  It can be used for either one.
13    Q.  Okay.  All right.  And she -- she thought that
14  it was not helping her so she wanted to change it.  So
15  you mentioned switching it to an SSRI.  What does SSRI
16  stand for?
17    A.  Selective serotonin reuptake inhibitor.
18    Q.  Okay.  And so -- and so is Wellbutrin in that
19  category or is it in a different category?
20    A.  It's in a different category.
21    Q.  Okay.  And so you said -- you wrote here,
22  "Starting sertraline 50 mg daily."  That's the generic
23  name for Zoloft; correct?
24    A.  Correct.
25    Q.  Now here in your note it says, "Denies SI/HI at

Page 32

1  this time."  What is SI and HI stand for?
2    A.  Suicidal ideation, homicidal ideation.
3    Q.  Do you remember whether Ms. Ring ever spoke to
4  you about having any suicide attempts in the past?
5    A.  Not that I recall.
6    Q.  Let's go down now next to██████████a where
7  you reiterate those numbers -- her lab work performed
8  at the previous practice; correct?
9    A.  Correct.
10    Q.  Okay.  And I have a note here that says, "No
11  indication for statin."  Now when we're speaking about
12  statins we're speaking about a class of drugs that's
13  designed to lower ██████████; correct?
14    A.  Correct.
15    Q.  Now, looking at these numbers, an███ of 212,
16  why is there no indication for statin?
17    A.  That's based on her 10-year risk of stroke or
18  infarct from atherosclerotic cardiovascular disease,
19  which I noted there.
20    Q.  Okay.  Are you aware that the American College
21  of Cardiology lists severe████████████ as an LDL
22  of higher than -- higher than 70, I believe it is.
23  Under those guidelines that were just published in
24  ████, all those patients are automatically put on
25  statin.  Are you aware of that?

Page 33

1    A. Not directly.

2    Q. Okay. Now, given that Ms. Ring is also a
3  former smoker does measure her risk, her percentage,
4  this ASCVD percentage?

5    A. Correct.

6    Q. Is that fact that she was a former smoker taken
7  into account?

8    A. The calculator that we use usually asks if a
9  patient is a smoker. I don't know if I included her
10  history in that or not.

11    Q. Okay. What about her weight, where you listed
12  her as ███ based on ███ at the beginning? Does the
13  calculator take the patient's weight into account?

14    A. I do not believe so, no.

15    Q. Let's go back now to page 2 of this note.
16  There's a section in the middle of the page that's
17  titled "Family History." It looks like Ms. Ring
18  reported that her mother had diabetes mellitus and also
19  myocardial infarction, in other words, a heart attack.
20  Knowing that family history on the mother's side, would
21  that -- would that increase her risk?

22    A. Not concretely no. There are other factors
23  that come into play.

24    Q. And then underneath here under Social History,
25  on the same page. "Smoking status. Has smoked since

Page 34

1  age 20." Twenty years of tobacco use. Again, this
2  history, if the patient is not currently a smoker, that
3  history is not taken into account in calculating the
4  percentage risks?

5    A. That specific calculator, no.

6    MS. FONTUGNE: We're going to introduce what
7  I'll mark as Defense Exhibit Number 3.

8    (Exhibit 3 marked for identification.)

9  BY MS. FONTUGNE:

10    Q. Okay. In looking at Exhibit Number 3, do you
11  recognize your signature on this document?

12    A. Yes.

13    Q. And underneath your signature -- did you sign
14  this in your capacity as a medical resident?

15    A. Yes.

16    Q. Did anyone else co-sign the note with you?

17    A. Which note are you referring to?

18    Q. The note that we have in front of us. Did
19  anybody else sign it?

20    A. I don't believe so.

21    Q. Now, as part of being in the residency program,
22  when you see a patient, you have one of the practicing
23  teaching physicians go over the patient's visit with
24  you; correct?

25    A. Correct.

Page 35

1    Q. When does that happen? Does that happen at the
2  end of the visit?

3    A. Yes.

4    Q. Okay. Does the teaching physician actually
5  come in and talk to the patient or just talk to you?

6    A. In some cases they can come in and talk to the
7  patient, if we ask them to or in some instances where
8  it's required by insurance.

9    Q. When is it required by insurance?

10    A. Various different instances. Usually annual --
11  visits that are designated as annual; wellness or
12  certain Medicare requirements.

13    Q. So there are certain Medicare requirements
14  where teaching physicians have got to come in and talk
15  to the patient?

16    A. Correct.

17    Q. All right. Looking at this note, do you
18  remember writing this note?

19    A. I do.

20    Q. Did Ms. Ring ask you to write this note?

21    A. She did.

22    Q. Did she provide you with any direction as to
23  what information to include in the note?

24    A. Specifically about her service animal, her
25  therapy animal accompanying her.

Page 36

1    Q. Okay. So what is the difference between a
2  therapy animal and a service animal?

3    A. I couldn't tell you.

4    Q. Did Ms. Ring tell you on that first visit why
5  she was requesting the note?

6    A. She may have. I don't recall the specifics of
7  it.

8    Q. Do you remember Ms. Ring at any time telling
9  you that she did not bring this dog, this therapy dog,
10  to school with her when she worked?

11    A. Not that I recall.

12    Q. Okay. Let's go over this note here. As far as
13  this address here on the top of this note. We're you
14  aware that this address actually corresponds to a
15  mailbox at a UPS store?

16    A. Did not. That's her address that's on file.

17    Q. Okay. Do you know whether any mail that
18  Ms. Ring may have received from the Family Medicine
19  Clinic had been returned to the clinic as
20  undeliverable? Has that ever come to your attention?

21    A. Not that I'm aware of, no.

22    Q. All right. Let's go over this note then. And
23  so -- and so, "Samantha Ring is a patient under the
24  care of our clinic. I am familiar with this patient's
25  history and functional limitations, as well as her



Page 37

1   anaphylactic allergies." So we went over the list of
2   allergies before in your progress note; right? Okay.
3        What about functional limitations? What were
4   Ms. Ring's functional limitations?
5        A. I don't recall.
6        Q. Now, we went over your physical exam.
7        A. Correct.
8        Q. And other than noticing ████ on her back, that
9   she had mentioned to you that wanted you to look
10  at, we went over how all parts of that physical
11  examination was normal. When Ms. Ring was in your
12  office, did she exhibit any functional limitations?
13       A. Not that I recall.
14       Q. Okay. When we think about that phrase,
15  "functional limitations," what does that mean to you as
16  a physician?
17       A. It could mean physical or mental, emotional.
18  Limitations that impede their daily living.
19       Q. Do you remember Ms. Ring asking you -- telling
20  you about any limitations that impeded her daily
21  living?
22       A. The only thing that comes to mind is her
23  allergies and having to be very cognizant of the
24  allergens.
25       Q. Okay. So it would have been the allergens.

Page 38

1   Now, thinking to an allergic reaction, an anaphylactic
2   reaction.
3        A. Yes.
4        Q. You're not involved in an anaphylactic reaction
5   unless you're actually exposed to the allergens in
6   question; correct?
7        A. Yes.
8        Q. Did Ms. Ring -- other than having the Epipen,
9   having the Epipen with her, did Ms. Ring discuss with
10  you the steps that she took in her everyday life to
11  avoid those allergens that were listed?
12       A. I don't recall any specific steps besides her
13  dog.
14       Q. All right. As far as the dog, what did
15  Ms. Ring tell you about how the dog helped her with her
16  allergies?
17       A. I recall her mentioning it recognized when she
18  was having an allergic response.
19       Q. Do you remember her telling you what the dog
20  did to recognize -- what the dog did once it realized
21  she was having an allergic reaction?
22       A. From what I recall, I believe she told me it
23  retrieves her epinephrine pen.
24       Q. Have you seen Ms. Ring's dog actually retrieve
25  her Epipen out of her purse or anywhere?

Page 39

1        A. No, I haven't.
2        Q. Earlier I had asked you, you know, about
3   whether Ms. Ring had told you about when the last time
4   was she had had an allergic reaction. We did talk
5   about this last visit with you where she had had an
6   allergic reaction to sunflower seeds. But, again,
7   thinking to that visit, did she tell you anything that
8   the dog actually did to help her during that allergic
9   reaction?
10       A. Not that I can recall, no.
11       Q. Let's go back to the note now. So you write
12  here, "In order to help alleviate these functional
13  limitations due to the anxiety and to assist with her
14  allergies" -- so again, these functional limitations
15  can you describe them to us in more detail than that?
16       A. No.
17       Q. What major life activities does she have
18  trouble doing that someone who doesn't have her anxiety
19  and allergies don't have any trouble doing?
20       A. I don't recall what she described.
21       Q. Other than Ms. Ring have any of your other
22  patients asked you to write a note for a service
23  animal?
24       A. I don't believe so.
25       Q. Okay. So here's the rest of the sentence. "In

Page 40

1   order to help alleviate these functional limitations
2   due to her anxiety and to assist with her allergies, I
3   support Samantha's decision to have her service animal
4   accompany her at all times."
5        So are you surprised to learn today that she
6   does not bring the dog to work with her at all, even
7   though she's a full-time teacher?
8        A. I don't know if "surprise" is a good word.
9        Q. Okay. What would be a good word?
10       A. That it's just new information to me.
11       Q. So you support Samantha's decision. So this is
12  not a prescription from you; correct?
13       A. Correct.
14       Q. And then you say, "A specially trained service
15  animal will help to mitigate her anxiety and prevent
16  any risks with her anaphylactic allergies, improving
17  her quality of life"?
18       So, again, based on your conversations with
19  Ms. Ring, how does the dog help to mitigate her
20  anxiety?
21       A. I don't recall specifically how her dog
22  mitigated her anxiety.
23       Q. Is it something she talked to you about?
24       A. I believe so, but I don't recall what she
25  mentioned.



ANDREAS SANTAYANA, M.D.                           December 04, 2019
RING vs BOCA CIEGA YACHT CLUB                             41—44

Page 41
1    Q.  When you wrote this note, what is it -- well,
2    let me ask it this way.  Did you talk about this note
3    to any of the teaching physicians over at the residency
4    clinic?
5    A.  I do not recall.
6    Q.  Do you know whether the teaching physicians in
7    the residency clinic were aware that you wrote Ms. Ring
8    this note?
9    A.  Most likely at an encounter.
10   Q.  Okay.  So after you wrote the note and it was
11   part of Ms. Ring's chart, did anyone at the clinic, you
12   know, any of the teaching physicians or anyone who ran
13   the program talk to you about the note in any way,
14   shape, or form?
15   A.  Not that I recall.
16   Q.  Now, Dr. Santayana, you've been seeing Ms. Ring
17   as a patient now for a little over a year.  Would you
18   say she's a person with a disability?
19   A.  I don't know if I can answer that accurately.
20   Q.  Why not?  Let me just ask you a couple of
21   questions, it might be easier.
22   A.  Sure.
23   Q.  Okay.  All right.  A patient comes in to see
24   you and the patient has, you know, multiple diagnoses.
25   Hypertension.  Let's say that patient has an autoimmune

Page 42
1    disease.
2    A.  Okay.
3    Q.  Is that patient automatically disabled?
4    A.  Not automatically, based on the diagnosis.
5    Q.  Okay.  So just based on the diagnosis, that's
6    not enough; right?
7    A.  I would say no.
8    Q.  So where is the line --- what's the line
9    between a patient who is just sick and has diagnoses
10   and a patient who's disabled?
11   A.  I would say once those diagnoses or whatnot
12   limits their abilities of daily life.
13   Q.  Okay.  All right.  So for example, if it limits
14   that patient's ability to work, that would be a big
15   one; right?
16   A.  Sure.
17   Q.  Okay.  Do you know whether Ms. Ring has been
18   limited at all in her ability to work?
19   A.  Not that I'm aware of.
20   Q.  Have you seen Ms. Ring's records from the
21   Pinellas County School District?
22   A.  No.
23   Q.  Are you aware that Ms. Ring had fairly normal
24   attendance and has not used more sick days than the
25   average employee during the past school years?

Page 43
1    A.  No, I was not aware.
2    Q.  Are you aware that Ms. Ring is and has been
3    employed full time with the Pinellas County School
4    District as a middle school teacher?
5    A.  I was aware she was a teacher.  I did not know
6    about her full-time or part-time status.
7    Q.  Has Ms. Ring ever talked to you about any
8    stressors that derive from her job as a middle school
9    teacher?
10   A.  I don't recall if she mentioned any of that.
11   Q.  Do you remember whether Ms. Ring ever asked you
12   for any sort of work excuse or any work restrictions in
13   relation to her job?
14   A.  I don't recall her asking for one, no.
15   Q.  Okay.  Thinking back to your progress note, we
16   did go over the intake that was performed by the nurse
17   at the beginning of the visit.
18   A.  Yes.
19   Q.  And the nurse did note that, you know, there
20   were certain things that Mr. Ring did not have
21   difficulty with.  She didn't report any difficulty with
22   bathing, dressing herself, walking up stairs,
23   concentrating, thinking.  So those are also major life
24   activities; would you agree?
25   A.  Yes.

Page 44
1    Q.  So what major life activities does Ms. Ring
2    have trouble where she's limited in performing?  What
3    is it that she can't go about doing that a person would
4    otherwise be able to do?
5    A.  From my limited times speaking with her in
6    clinic from what I can recall it was mainly related to
7    her general anxiety, and her needing to be extra
8    cautious because of her multiple allergies.
9    Q.  Do you remember Ms. Ring ever saying anything
10   about her general anxiety or her need to be cautious
11   because of her allergies preventing her from leaving
12   her house?
13   A.  Don't recall that, no.
14   Q.  When you were interacting with Ms. Ring in
15   clinic, did you notice that she had any difficulty with
16   interacting with you on a person-to-person basis or
17   interacting with the nurse or anybody at the clinic?
18   A.  Not that I recall.
19   Q.  Would you agree with me that Ms. Ring does not
20   have agoraphobia where she can't, you know, go out in a
21   place with a lot of people?
22   A.  I don't know that I could answer that
23   accurately.
24   Q.  But based on your observation she hasn't
25   exhibited any difficulty in social interactions with



ANDREAS SANTAYANA, M.D.
RING vs BOCA CIEGA YACHT CLUB

December 04, 2019
45—48

Page 45

1  you and your staff?

2     A.  Not in my limited interactions with her, no.

3     Q.  Now, you mentioned several times now that your

4  interactions with Ms. Ring were limited.  So you've

5  never gone out to Ms. Ring's house and observed her

6  routines; correct?

7     A.  No.

8     Q.  So based on your limited visits with her, which

9  are only in the clinic; correct?

10    A.  Correct.

11    Q.  How can you make a determination whether she's

12  a person with disability?

13    A.  It's mainly my discussion with the patient with

14  regards to how she feels or how her diagnoses affect

15  her daily life.

16    Q.  So how do they affect her daily life?

17    A.  I don't recall specifically what she mentioned

18  that mainly affected her daily life.

19    Q.  Do you remember Ms. Ring ever mentioning a

20  clubhouse, a place on the water, where she -- where

21  there was a real problem with bees inside and around

22  the building?  Do you remember her ever saying anything

23  about that?

24    A.  Don't recall.

25    Q.  In all of your visits with Ms. Ring, do you

Page 46

1  remember Ms. Ring ever saying anything to you about

2  feeling that she was targeted or discriminated against

3  by anybody because of her allergies and her generalized

4  anxiety disorder?

5     A.  I don't recall her using those exact terms, no.

6     Q.  What terms did she use?  What did she tell you?

7     A.  All that I recall was her requesting that note

8  so she could take her dog with her because she needed

9  to have some type of documentation that the dog was

10  needed by her.

11    Q.  Did she tell you who the documentation would be

12  provided to?

13    A.  She vaguely mentioned it, but I don't recall

14  who she mentioned it was for, whether it was where she

15  lived or something she was a part of.

16    Q.  Do you remember when Ms. Ring requested this

17  letter whether she requested any copies of her medical

18  records from the clinic?

19    A.  I do not know.  She would have requested them

20  from someone other than me at the front.

21    Q.  Now, is it fair to say that if she had

22  requested her records that there would be a form, an

23  authorization form in her chart?

24    A.  Most likely.  I'm not sure of the exact process

25  that --

Page 47

1     Q.  Right.

2     A.  -- the patient goes through.

3     Q.  Because that's an administrative function;

4  right?

5     A.  Correct.

6     Q.  And you're the resident?

7     A.  Correct.

8     Q.  Okay.

9        MS. FONTUNGE:  We're not going to spend too

10    much time on this next exhibit.  We're just going

11    to go over it very quickly.  We'll mark this

12    exhibit as Defense Exhibit Number 4.

13       (Exhibit 4 marked for identification.)

14  BY MS. FONTUNGE:

15    Q.  The reason why we're going to go over it very

16  quickly is because this is not your progress note.  So

17  this is a visit -- I'll represent to you that Ms. Ring

18  came back, and this was the day after her visit with

19  you, where she saw another resident by the name of

20  Carley Befler.  Is Carley Befler a resident in the

21  program?

22    A.  She is not.  She is one of the attending

23  physicians.

24    Q.  She is.  Okay.  So what about Patrick

25  Del Santo?  Is he one of the residents?

Page 48

1     A.  He was.  He graduated.

2     Q.  He graduated.  Okay.  All right.  And so the

3  only thing I want to direct your attention to --

4  because, again, this is not your progress note -- is on

5  the last page.  On the last page at the top of the

6  page here, it looks like Dr. Del Santo made a referral

7  to a pulmonologist, because they were concerned that

8  Ms. Ring was having █████████.  She was reporting not

9  █████ enough and having trouble.

10       So do you know -- based on your conversations

11  with Mr. Ring, do you know if she ever followed up on

12  that referral?

13    A.  I do not recall, no.

14    Q.  Do you remember her ever mentioning anything to

15  you about█████?  About feeling tired or anything

16  like that?

17    A.  Not that I recall.

18    Q.  Okay.  And we just went over your first

19  progress note for Ms. Ring, and there was nothing in

20  there about █████; correct?

21    A.  Correct.

22    Q.  Okay.  All right.  That's all for that.

23       MS. FONTUNGE:  Now, we'll introduce this as

24    Defense Exhibit Number 5.

25       (Exhibit 5 marked for identification.)



ANDREAS SANTAYANA, M.D.
RING vs BOCA CIEGA YACHT CLUB

December 04, 2019
49—52

Page 49

1   BY MS. FONTUGNE:
2       Q.  I'll represent that this is a progress note for
3   you that starts here at the bottom of the first page.
4   And we've -- a lot of this information is the same, so
5   we're going to skip over to page 3 of this note on the
6   bottom.  First of all, looking back to the first page,
7   it looks like this appointment was on August 8, 2018.
8   This was not too far away from your first visit.
9           Okay.  So looking at page 3 at the bottom of
10  the page, it looks like during this visit you basically
11  followed up.  During the first visit you had switched
12  her from Wellbutrin over to Zoloft to 50 mg; right?
13      A.  Yes.
14      Q.  So during this visit she reported tolerating
15  the new medication well.  She also felt some mild
16  improvement in anxiety symptoms.  And then you write
17  here at the bottom of your HPI, "Has been handling her
18  life stressors better and is happy going back to work
19  as a teacher this week."
20          So do you remember any discussion with
21  Ms. Ring about her job as a middle school teacher?
22      A.  Not more than the fact that she was a teacher.
23      Q.  Okay.  Did she ever mention whether she had
24  requested some sort of accommodation from the Pinellas
25  School District?

Page 50

1       A.  I don't recall that.
2       Q.  Okay.  So looking to the next page, which is
3   page 4 of this exhibit.  It looks like you increased
4   her Zoloft dose, you doubled it.  You brought the dose
5   up to 100 mg.  Now is that based on her telling you
6   that she was still anxious, but it was mild compared to
7   before?
8       A.  Yes.
9       Q.  So based on that is that why you increased the
10  dose?
11      A.  Yes.
12      Q.  Do you remember whether she bought her dog with
13  her to this visit?
14      A.  I don't recall.
15      Q.  Do you recall whether she had a visit where she
16  didn't bring the dog?
17      A.  I don't recall.
18      Q.  During this time between July 2018 and now,
19  do you remember any other resident who has examined
20  Ms. Ring and conducted a visit with her mentioning
21  anything about the dog?
22      A.  I don't recall that.
23          (Exhibit 6 marked for identification.)
24  BY MS. FONTUGNE:
25      Q.  This is another progress note, not written by

Page 51

1   you so we won't spend much time on it.  This is marked
2   as Defendant's 6.  If you would, I'd like for you to
3   look through this note and tell me whether there's any
4   mention of Ms. Ring's dog.
5       A.  I do not believe I see any mention of it, no.
6       Q.  Thank you.  That's all for that.
7           MS. FONTUGNE:  All right.  We'll introduce what
8   we'll mark as Defense Exhibit Number 7.
9           (Exhibit 7 marked for identification.)
10  BY MS. FONTUGNE:
11      Q.  I'm pretty sure this is the last progress note
12  that we have.  We'll move along here.  Okay.  Again,
13  this is a visit on March 13, 2019, and it looks like it
14  wasn't you who conducted this visit.  So first of all,
15  same question as the last exhibit.  Do you see any
16  mention in here of Ms. Ring's dog.
17      A.  I don't believe I do.
18      Q.  So we'll go to page 3.  Now, I understand that
19  the resident that conducted this examination on March
20  13, 2019 was a Dr. Caleb.  Is Caleb in the residency
21  program?
22      A.  Dr. McCaleb?
23      Q.  Dr. McCaleb.  I'm sorry.  Yes.
24      A.  He was, but he also graduated.
25      Q.  He also graduated.  Okay.  All right.  Have you

Page 52

1   worked -- did you work with Dr. McCaleb when he was a
2   resident here?
3       A.  Yes.
4       Q.  Okay.  Do you have any reason to doubt that
5   anything that he writes in his note is his observations
6   with the patient that day?
7       A.  I have no reason to doubt him.
8       Q.  All right.  So I'll direct your attention to
9   page 3 of this note.  And here in the middle with
10  the History of Present Illness, there's a note about
11  Ms. Ring's having a ▮▮▮▮▮▮ at work and
12  her ▮▮▮▮▮▮▮▮ that day, which is high;
13  correct?
14      A.  Correct.
15      Q.  And then the next day she goes to Publix
16  apparently and checks it with one of the stations at
17  the pharmacy and it's ▮▮▮▮.  So then she comes to
18  the clinic.  And then at the end of this Dr. McCaleb
19  states that Ms. Ring told him that she's been having a
20  lot of stress at work and gets headaches during those
21  stress responses.  Do you remember Ms. Ring telling you
22  about having stress at work?
23      A.  I don't recall.
24      Q.  In this note written by Dr. McCaleb, is there
25  any mention of Boca Ciega Yacht Club?



Page 53

1     A. I don't see anything, no.
2     Q. Okay. All right. Now, that note dated March
3  13, 2019, do you remember seeing Ms. Ring at any point
4  during this time?
5     A. I --
6     Q. The records from the clinic don't show that you
7  did.
8     A. I don't believe that I did.
9        MS. FONTUGNE: We'll introduce this as Defense
10    Exhibit Number 8.
11       (Exhibit 8 marked for identification.)
12  BY MS. FONTUGNE:
13    Q. All right. Dr. Santayana, do you recognize
14  your signature on this note?
15    A. Yes.
16    Q. Did anybody co-sign the note with you?
17    A. I don't believe so.
18    Q. Are you sign -- did you sign this note in your
19  capacity as a medical resident?
20    A. Yes.
21    Q. Okay. Do you remember the circumstances that
22  prompted you to write this second note?
23    A. I believe Ms. Ring asked me to write it with
24  some change to the original note, yes.
25    Q. Did she tell you why?

Page 54

1     A. From what I recall something about it needed to
2  have more specific verbiage.
3     Q. Do you know whether this note was ever provided
4  to Boca Ciega Yacht Club?
5     A. I'm not sure who it was provided to.
6     Q. Did Ms. Ring -- other than mentioning that the
7  note needed to be more specific, did Ms. Ring say
8  anything to you about the purpose for writing the note?
9     A. I think it was because she was having issues
10  still with having her dog with her.
11    Q. Did she tell you where she was having issues?
12    A. She may have but I don't recall.
13    Q. Okay. So one big change that I see on this
14  note is that instead of just writing "in order to
15  help alleviate these functional limitations," in this
16  note you write, "In order to help alleviate these
17  functional limitations (disability)." So, again, what
18  is Ms. Ring's disabilities specifically?
19    A. I think in her case it would be her limited
20  abilities due to her diagnoses with her --
21    Q. So --
22    A. -- allergies and anxiety.
23       MS. LAHART: Please don't talk over the doctor.
24  BY MS. FONTUGNE:
25    Q. So going back to some of my earlier questions.

Page 55

1     What are the specific limitations that her diagnoses of
2  anxiety triggers her?
3     A. In her specific case I don't recall exactly
4  what they were at this time.
5     Q. Do you remember Ms. Ring discussing the
6  limitations with you?
7     A. I believe she may have but I don't recall.
8     Q. Now, when you wrote this note, and based on the
9  records we received from the clinic, Ms. Ring didn't
10  actually have a visit with you; correct?
11    A. From what? I'm sorry. Can you repeat that?
12    Q. When Ms. Ring requested this second note from
13  you, she actually didn't come to see you as a patient
14  visit; correct?
15    A. Correct.
16    Q. So how did she make the request?
17    A. I believe she called.
18    Q. Do you remember speaking to her directly around
19  the time that you wrote this note?
20    A. I don't recall if I spoke directly with her or
21  if it was through a message that she left.
22    Q. Do you know whether she came to the clinic to
23  pick up the note?
24    A. I don't recall. Sometimes we mail letters,
25  other times they pick them up.

Page 56

1     Q. Now, you write here, "A specially trained
2  service animal will help her anxiety and prevent any
3  risks with her anaphylactic allergies." Did Ms. Ring
4  ever talk to you about when she obtained this dog?
5     A. When?
6     Q. Yes.
7     A. I don't recall if she did.
8     Q. Did she ever mention to you whether the dog had
9  received any training before she got it?
10    A. I believe she -- I don't know before she got
11  it, but she did mention the dog receiving training.
12    Q. Okay. Did she tell you with who the dog was
13  receiving training?
14    A. I don't recall.
15    Q. Did she tell you what sort of training the dog
16  was receives specifically?
17    A. In regards to being able to recognize her
18  allergies or allergic responses.
19    Q. Okay. So to do with the sunflower seeds?
20    A. I don't know if she only specified sunflower
21  seeds or all of her allergic reactions.
22    Q. Okay. Do you know what the dog -- did she tell
23  you what the dog does in relation to her allergy with
24  bee venom?
25    A. I don't recall if she spoke directly of her



Page 57

1  allergy to bee venom.
2      Q.  Do you know whether she told you exactly what
3  the dog does with respect to her sunflower seed
4  allergy?
5      A.  I think she only spoke with regards to her
6  allergies in general, not to one specific one.
7      Q.  Okay.  And so your understanding of what the
8  dog did was to retrieve her Epipen if she needed it?
9      A.  I believe so.
10     Q.  But, again, this is not something you ever
11  observed directly?
12     A.  No, because she didn't have an allergic
13  reaction on my office.
14     Q.  Okay.  Did she -- so this is something that she
15  told you; correct?
16     A.  Correct.
17     Q.  As far as the anxiety, did she tell you what
18  has dog did specifically to mitigate her anxiety?
19     A.  I believe that it provided her emotional
20  support having the dog with her.
21     Q.  Okay.  Other than providing emotional
22  support -- so first of all, let me ask you this.  When
23  she was in your office with her dog, did you notice
24  that the dog was having, you know, have a support, like
25  an emotional support?

Page 58

1      A.  I don't recall if I saw her without the dog, so
2  I don't know if there was any difference.
3      Q.  Okay.  Do you remember any of the other
4  residents ever talking to you about the effect of the
5  dog having on Ms. Ring?
6      A.  Not that I recall.
7      Q.  Do you know whether she, Ms. Ring, brought the
8  dog to any of the visits with the other residents that
9  she had at the clinic?
10     A.  I'm not aware.  I wasn't present.
11     Q.  Do you know why Ms. Ring asked you to write
12  these letters rather than any of the other residents
13  that had seen her?
14     A.  I can only assume because I was assigned as her
15  primary doctor.
16     Q.  Okay.  So how does that work in the context of
17  the residency?
18     A.  Within our residency clinic?
19     Q.  Yes.
20     A.  Patients who establish care with us are usually
21  assigned a primary provider, being one of the
22  residents.  If they ever have to come for any acute
23  visits with an issue with that primary doctor and that
24  primary didn't have any availability or wasn't in the
25  clinic, then they would see one of the other residents.

Page 59

1      Q.  Okay.  As the primary resident care provider is
2  one of your duties to coordinate the whole care of the
3  patient?
4      A.  Yes, as a primary care provider.
5      Q.  Okay.  So we had gone over earlier Dr. Patrick
6  Del Santo, I think it was, he had a note referring
7  Ms. Ring to a ██████████t.  Do you remember that?
8      A.  Okay.
9      Q.  Did you actually follow up with Ms. Ring as to
10  whether she had actually seen a ██████████?
11     A.  I don't think I had any follow-up with her
12  after that visit.
13     Q.  Okay.  Even though her visit with Dr. Del Santo
14  was July 19th right after the first visit with you and
15  then you saw her on August 8th, you don't remember
16  following up with her about a ██████████t?
17     A.  I don't recall.
18     Q.  Now, Dr. Santayana, are you aware that you've
19  been named in this case as an expert in this case for
20  the plaintiff?
21     A.  I'm not sure as an expert.  I know in regards
22  to this.
23     Q.  Okay.  Now, Dr. Santayana, do you have any sort
24  of legal training?
25     A.  No.

Page 60

1      Q.  Have -- have you ever sat down and read the
2  Americans with Disabilities Act, as far as what it
3  means to be a person with a disability and how that's
4  defined?
5      A.  I've not read it specifically, no.
6      Q.  Have you ever looked at the regulations under
7  the ADA that detail the definition of a service animal,
8  and what a service animal has to do?  In order to be
9  considered a service animal what does a dog have to do?
10     A.  I have not read the definition, no.
11     Q.  How is a regular dog different than a service
12  animal?
13     A.  Again, I've not read that definition so I don't
14  know.
15         MS. FONTUGNE:  I want to introduce what we'll
16     mark as Defense Exhibit Number 9.
17         (Exhibit 9 marked for identification.)
18  BY MS. FONTUGNE:
19     Q.  I'll represent to you that this is a document
20  filed -- not filed in this case, but served in this
21  case.  These are expert disclosures filed by Ms. Ring's
22  attorneys in order to disclose any witness who is
23  called to testify as an expert at trial.  Now, first of
24  all, looking at this document, have you ever seen this
25  document before?



Page 61

1    A. I have not.

2    Q. All right. So do you see your name here listed

3 in this disclosure on the first page?

4    A. I do.

5    Q. And so there's a paragraph that starts at the

6 bottom of the first page that essentially describes you

7 and what your testimony is going to consist of. So

8 here -- so here are the subjects you're expected to

9 give in trial testimony. "Ms. Ring's mental health and

10 anaphylactic allergies condition, including severe

11 anxiety and life-threatening allergic reactions."

12    So we had talked about all those conditions

13 through your progress notes; correct

14    A. The ones mentioned in my notes, yes.

15    Q. Yes. "And Ms. Ring's concordant functional

16 limitations." Now, that's a topic we keep going back

17 to because we're having some trouble establishing what

18 the limitations actually are.

19    MS. VENZA: Object to form.

20 BY MS. FONTUGNE:

21    Q. So do you have --

22    MS. VENZA: Object to form. You can answer.

23 BY MS. FONTUGNE:

24    Q. -- so as far as Ms. Ring's functional

25 limitations due to her severe anxiety and her

Page 62

1 life-threatening allergic reaction, again, what are

2 those limitations?

3    A. I can't recall what her specific limitations

4 are in regards to her anxiety. But the apparent

5 limitations are allergic reaction in that she has to

6 avoid multiple things that are pretty common in

7 everyday life.

8    Q. Now, based on your visits with Ms. Ring, she is

9 aware of what those allergies are; correct?

10    A. I believe she is, yes.

11    Q. And in speaking with her, she has taken steps

12 to limit her exposure or limit the risks of having an

13 allergic reaction; correct?

14    A. I would say yes.

15    Q. Based on your experience having Ms. Ring as a

16 patient would you say that having an allergic -- the

17 allergies that she described to you, does that have any

18 bearing on her anxiety? Does that -- are the two

19 related in some way?

20    A. I think they are.

21    Q. Okay. So how do you think that they are?

22    A. In the fact that she has to be more cautious in

23 regards to her possible exposure to any of these

24 allergens and the anxiety associated with possible

25 anaphylactic reactions.

Page 63

1    Q. Now, based on your last progress note that we

2 had looked at you had increased Ms. Ring's dosage of

3 Zoloft up to 100 mg. Now, the last time that you saw

4 her, which was this year, did you go over whether that

5 dosage of Zoloft was still appropriate -- still

6 effective in helping her with the anxiety?

7    A. I don't think we talked about the dose of the

8 medication.

9    Q. Okay. Do you remember her mentioning anything

10 about her anxiety during this last visit that she had

11 with you last month?

12    A. Yes.

13    Q. What specifically did she say about her anxiety

14 at that visit?

15    A. That she was having some anxiety related to

16 events going on.

17    Q. Okay. So what events did she mention to you?

18    A. She only vaguely mentioned her legal process

19 she was going through.

20    Q. Okay. Do you remember exactly what she said

21 about that?

22    A. I don't recall exactly, but I do remember it

23 was short.

24    Q. So was it something she just mentioned in

25 passing very quickly?

Page 64

1    A. Yes.

2    Q. Do you remember whether she mentioned being

3 stressed out at all at work in her last visit with you?

4    A. Don't recall if she mentioned stress, only

5 about her allergy incident at work.

6    Q. Going back to Exhibit Number 9. Another topic

7 of your testimony is, "Ms. Ring's long-term struggle

8 with those conditions" -- so with the allergies and the

9 anxiety. Let me ask you a question. Ms. Ring has

10 mentioned panic attacks as well. Is that like a

11 subgroup of an anxiety disorder that involves panic

12 attacks or are they different?

13    A. It probably does follow under anxiety. One is

14 not always associated with the other though.

15    Q. So you can have panic attacks without having a

16 diagnosis of anxiety, can't you? If you have major

17 event --

18    A. Speaking simply, yes.

19    Q. Okay. But you wouldn't expect to have those on

20 a regular basis if you didn't have some sort of

21 underlying anxiety disorder or something?

22    A. Can you repeat that?

23    Q. Sure. So somebody who is prone to having panic

24 attacks, you would anticipate that that person more

25 likely than not would be diagnosed with an anxiety



ANDREAS SANTAYANA, M.D.                                December 04, 2019
RING vs BOCA CIEGA YACHT CLUB                                    65–68

Page 65

1  disorder eventually?
2     A. I would agree that I would anticipate it, but
3  again, it's not always the case.
4     Q. Not always the case. Okay. What about in
5  Ms. Ring's case? Is it the case for Ms. Ring that her
6  panic attacks are part and parcel of her anxiety
7  diagnosis?
8     A. I think it would depend on -- I guess I'm not
9  familiar enough with her panic attacks to be able to
10 answer that.
11    Q. Okay. She -- has she mentioned panic attacks
12 to you at all?
13    A. I don't recall if she has or not.
14    Q. So if a patient -- let's say a patient is
15 having a panic attack -- let's say Ms. Ring is having a
16 panic attack. Can you -- is that something that you
17 can see? Can you observe anything?
18    A. Yes, most often you can.
19    Q. So what sort of signs or symptoms would you
20 expect to observe in a patient who's having a panic
21 attack, a severe one?
22    A. Most likely agitation, sweating. Possibly --
23 sorry.
24    Q. Jitters?
25    A. Yes. That's the word, yes. Fidgety. As far

Page 66

1  as observable things, but also usually associated with
2  increased heart rate and usually an impending feeling
3  of doom or increased worry.
4     Q. Okay. So that impending feeling of doom,
5  that's something that the patient would have to tell
6  you; correct?
7     A. Sure.
8     Q. Thinking to the symptoms and signs, has
9  Ms. Ring ever had a visit with you where you've seen
10 her in this state; agitated, fidgety?
11    A. Not during a visit with me.
12    Q. Not during a visit with you?
13    A. That I recall.
14    Q. Now, what about anxiety? She did have one
15 visit with you, the second one on August 8, 2018, where
16 she mentioned to you that she still had mild anxiety,
17 but that the new medication was working and she had
18 noticed a decrease. So during that visit did she
19 exhibit any sort of signs or symptoms of anxiety that
20 would lead you to say, "yeah, this patient's still
21 anxious"?
22    A. I don't recall if she did.
23    Q. So thinking to anxiety, just as we went through
24 panic attacks, if somebody's got severe anxiety and
25 they're currently having it in front of you, would you

Page 67

1  expect to see any sort of signs or symptoms that you
2  could observe objectively?
3     A. Not always, no. In some cases they may have
4  some of those similar fidgety, pressure speech, but
5  other times it may not manifest effectively.
6     Q. Now, when a patient has an anaphylactic
7  reaction, now that is something where you would observe
8  the signs and symptoms; correct?
9     A. Correct.
10    Q. Okay. And so what would you observe -- let's
11 say Ms. Ring got stung by a bee. A severe anaphylactic
12 reaction. What would have -- in your experience what
13 would happen if she got stung by a bee that you would
14 observe?
15    A. I don't know in Ms. Ring's case from a bee
16 sting, but in general, someone having an anaphylactic
17 reaction I would expect any combination of possibly
18 hives or rash on their skin. Difficulty breathing
19 because of throat inflammation, swelling. Sometimes
20 swelling of the actual face around the mouth and neck,
21 swelling around the eyes as well. If it was from
22 exposure to something that made contact with the skin
23 there might be an inflamed maybe red area where they
24 were exposed to that allergen.
25    Q. Okay. And in a patient that had a severe like

Page 68

1  anaphylactic shock would you expect a patient's blood
2  pressure to drop?
3     A. For the definition of anaphylactic shock, yes.
4     Q. Okay. Have you ever had any patient that
5  you've been taking care of here in the clinic or in the
6  hospital where they've had a severe anaphylactic --
7  where they are in anaphylactic shock? Have you seen
8  it?
9     A. Yes.
10    Q. How recently have you seen it?
11    A. The last time maybe about a year ago, but I
12 couldn't be positive about the date.
13    Q. Okay. So when somebody's got a -- goes into
14 anaphylactic shock, that's a medical emergency;
15 wouldn't you agree?
16    A. Correct.
17    Q. And so you get them in the (inaudible) and at
18 that point you have to take action quickly, right, to
19 reverse it?
20    A. Yes.
21    Q. So what would you do? In the case of the
22 patient that you saw about a year ago what was done?
23    A. With anaphylactic shock, at least in the case
24 of the patient I saw, I believe they were having severe
25 respiratory distress, they were intubated. They were



Page 69

1  given epinephrine.  They were given antihistamines.
2  They were given some steroids, and probably some
3  magnesium as well.
4      Q.  Why magnesium?
5      A.  It helps with the inflammation and airway
6  response.  In that case -- well, yes.  Because they
7  were in shock they were given large amounts of fluid,
8  IV fluids.  I don't recall what more specifically that
9  patient did.
10     Q.  That's fine.  Okay.  Let's go back now to
11 Exhibit Number 9.  "Ms. Ring's long-term struggle with
12 these conditions."  Now Ms. Ring only became your
13 patient in July of 2018; correct?
14     A.  Correct.
15     Q.  What did she say to you exactly about her
16 long-term struggle with her anxiety and
17 life-threatening allergies?
18     A.  From what I recall it was that she had
19 struggled with anxiety for a long period of time, and
20 that she had had these allergies with history of
21 anaphylaxes like anaphylactic response.
22     Q.  Okay.  Do you remember what she told you when
23 the last time was that she had an exposure to bee
24 venom?
25     A.  I don't recall if she told me an exact time,

Page 70

1  no.
2      Q.  Okay.  And "That said condition substantially
3  limit one or more of Ms. Ring's major life activities."
4  And, again, as we sit here today can you tell us what
5  those activities are that are limited for Ms. Ring?
6      A.  I don't know if I can say any specific
7  activities other than her need to always be cognizant
8  of exposer to those allergens and her anxiety
9  associated with them.
10     Q.  But that need to be cognizant of allergens and,
11 you know, to always be aware of them, she's been
12 exposed and that's big trouble.  Is that something that
13 based on your conversations with her has stopped her
14 from working?
15     A.  I don't believe so.
16     Q.  Is it something that -- she's told you stops
17 her from leaving the house and interacting with other
18 people as anyone else would?
19     A.  I don't recall.
20     Q.  Now, the first precaution for somebody with
21 these sorts of allergies would take is just to prevent
22 exposure; correct?
23     A.  Correct.
24     Q.  All right.  So if you've got a patient like
25 Ms. Ring who is severely allergic to bee venom, you

Page 71

1  would avoid places that are known to have a lot of
2  bees; correct?
3      A.  I'm not sure I would know how to know what
4  places have a lot of bees.
5      Q.  So I'll represent to you that during her
6  deposition that Ms. Ring testified that one of the
7  areas that she knew had a lot bees was the Boca Ciega
8  Yacht Clubhouse, and she went on to explain that the
9  reason why was because they had a lot of open windows
10 and doors.  And she said that there were a ton of bees
11 in the building.
12     Now, based on that, which is her testimony,
13 would you recommend that Ms. Ring visit a place that's
14 filled with bees?
15     MS. VENZA:  Object to form.  You can answer.
16     A.  I don't know what that means.
17 BY MS. FONTUGNE:
18     Q.  It's just for the record.
19     A.  I would likely recommend that she do limit her
20 exposure to known bees.  But if she has to or wishes to
21 be in that area that she take whatever precautions that
22 she can.
23     Q.  All right.  Now as far as windows and doors
24 being open, would you agree with me one way to solve
25 the problem would be to just put screens up?

Page 72

1      A.  Maybe.  I don't know if that's adequate to
2  handle that problem or not.  I'm not a bee expert.
3      Q.  Okay.  All right.  So the next thing on this
4  list here -- now we're on page 2 of Exhibit Number 9.
5  "That her service dog, Piper, helps ameliorate the
6  symptoms of those conditions and/or decreases the risk
7  of exposure to anaphylactic reaction inducing
8  exposure."
9      So, again, thinking about the dog.  How does
10 the dog help with the allergies?
11     MS. VENZA:  Asked and answered.
12     A.  From what I recall of her explanations, the dog
13 recognizes her allergic response to bees, allergens.
14 BY MS. FONTUGNE:
15     Q.  Okay.  So if Ms. Ring is having a severe
16 anaphylactic reaction, which you testified earlier is a
17 medical emergency, how is the dog going to help her?
18 How fast does it happen?  Let me ask it this way.  She
19 gets stung by a bee, how often -- how quickly do the
20 symptoms develop?
21     A.  It would depend on the number of times she's
22 been exposed to it.  If she's had a history of
23 anaphylactic reactions, it can be very quickly as far
24 as minutes.  It can be over an hour or two.  It's
25 variable.



**ANDREAS SANTAYANA, M.D.**
**RING vs BOCA CIEGA YACHT CLUB**

December 04, 2019
73–76

Page 73

1    Q.  Now, I'll represent to you that Ms. Ring
2  testified that the last time she was actually stung by
3  a bee was when she was in kindergarten many, many years
4  ago.  Does that information help you to narrow down the
5  time that you would have before she developed symptoms?
6    A.  No, it would not.
7    Q.  Now, if Ms. Ring is stung either by a bee or by
8  any other sort of insect where she develops a reaction,
9  swelling, would you expect her to get medical treatment
10  for that, if it actually happened?
11    A.  Depending on the severity of her reaction, yes.
12    Q.  Let's say that Ms. Ring was stung by a wasp and
13  was swollen on the entire side of her body for a full
14  two months.  Would you expect her to go and get medical
15  attention for that?
16    A.  I would recommend it.
17    Q.  Is there any reason why she would not get
18  medical attention under those circumstances?
19    A.  Not to my knowledge.
20    Q.  Okay.  So the next part on this -- back to
21  Exhibit Number 9, "That it is his professional
22  opinion" -- this is your opinion -- "that in order for
23  Ms. Ring to have the same opportunity as any
24  non-disabled person to use and enjoy the clubhouse of
25  the Boca Ciega Yacht Club, she requires the ability

Page 74

1  to have Piper to assist her in coping with her
2  anxiety and to decrease the risk of exposure to
3  anaphylactic-reaction situations and thus related
4  anxiety fear of exposure."
5       So this right here is that link that we talked
6  about, right, between her allergies and the anxiety,
7  you know, that there can be a link there.
8    A.  Yes.
9    Q.  Now, as far as her opportunity to use and enjoy
10  the clubhouse at the Boca Ciega Yacht Club, again,
11  before we just discussed it in this deposition today,
12  had Ms. Ring said anything to you about the Boca Ciega
13  Clubhouse?
14    A.  She may have.  I just don't recall.
15    Q.  So I'll represent to you that Ms. Ring
16  testified that the reason she needed to bring the dog
17  in the clubhouse with her was because she couldn't
18  leave the dog outside or she would have to call
19  somebody to watch the dog while she went in the
20  clubhouse.
21       Now, knowing that information, if she's able
22  to go in the clubhouse while somebody watches the dog
23  outside, is there any indication that Ms. Ring doesn't
24  have the same opportunity as somebody that doesn't have
25  anxiety or allergies to enjoy the clubhouse?

Page 75

1       MS. VENZA:  Object to form.
2    A.  Can you repeat the question?
3  BY MS. FONTUGNE:
4    Q.  Let me go back.  So Ms. Ring testified that the
5  reason she had to bring the dog into the clubhouse was
6  because she couldn't leave the dog outside.  She would
7  always have to call somebody to watch the dog.
8       MS. VENZA:  Object to form.
9  BY MS. FONTUGNE:
10    Q.  So when she called others to watch the dog, she
11  would still go in the clubhouse.  Based on their
12  discussions with you, did she ever mention to you that
13  she couldn't enjoy that clubhouse without bringing the
14  dog with her?
15    A.  I don't recall if she mentioned she couldn't
16  enjoy the clubhouse without bringing her dog.
17    Q.  Dr. Santayana, do you think that Ms. Ring is
18  disabled?
19    A.  Without knowing the definition -- sorry.  In
20  terms of my personal interpretation of disability, I
21  would say she has at least some small amount.  A very
22  small factor of disability, yes.
23    Q.  Okay.  So what is that factor?
24    A.  That she has to limit her normal daily life
25  activities due to her conditions.

Page 76

1    Q.  Okay.  Is that something that you know that's
2  affected her ability to perform her job at all?
3    A.  I do not know.
4    Q.  Did she ever mention that to you?
5    A.  Not that I recall.
6    Q.  Has she ever mentioned something in particular
7  that she could not do because of these allergies?
8    A.  Not a thing in particular, but that it affected
9  her normal daily life.
10    Q.  Okay.  So how does it affect her normal daily
11  life?
12    A.  In that it causes her increased anxiety
13  worrying about the exposure to bees and how she
14  obtained the dog to help her deal with those things.
15    Q.  So how does her anxiety stop her from doing
16  anything that any regular person can go out and do?
17    A.  I'm not aware of it stopping her from doing
18  anything in particular.
19    Q.  Okay.  Do you know of -- has she told you of
20  any specific thing that she can't do in her daily life
21  because of her anxiety?
22    A.  I don't recall if she mentioned anything she
23  specifically cannot do.
24    Q.  Okay.  So there's a note here -- going back to
25  Exhibit 9.  "But the mood stabilization benefit of



ANDREAS SANTAYANA, M.D.
RING vs BOCA CIEGA YACHT CLUB

December 04, 2019
77–80

Page 77

1 service animals is well documented." So when we speak
2 of "mood stabilization benefits," that goes back I
3 think to our earlier discussion about therapy dogs and
4 how they provide emotional support. And, again, is
5 that something you've observed when she's in front of
6 the dog? Do you find that she's relaxed when she's
7 talking to you?
8     A. From what I recall she has been relaxed. But,
9 again, I don't recall if I've seen her without her dog
10 to know if it's any different from her without it.
11     Q. Okay. So when you've seen her with her dog, as
12 far as the dog, what have you observed the dog doing
13 during the visits with you?
14     A. Of what I recall the dog would lay next to her.
15 If she got up and moved to the exam table, it got up
16 and followed her and laid next to the exam table. I
17 don't recall anything more than that.
18     Q. Do you remember whether she had the dog on a
19 leash and was holding it or had the leash around her
20 wrist?
21     A. I don't recall.
22     Q. Do you remember whether the dog ever barked on
23 any of the visits with you?
24     A. Not that I recall.
25     Q. Do you remember anybody at the clinic making

Page 78

1 any comment at all, either staff or other residents, or
2 teaching physicians, making comment about the dog being
3 in the clinic?
4     A. Not that I recall.
5     Q. So going back to mood stabilization of service
6 animals. That's an emotional benefit; correct?
7     A. Yes.
8     Q. Okay. Dr. Santayana, do you have a dog at
9 home?
10     A. Yes.
11     Q. I think that we all have a dog at home. Would
12 you agree with me that dogs do provide emotional
13 companionship and support to people?
14     A. Personally, yes.
15     Q. Okay. "Ms. Ring's disability-related need to
16 have Piper with her in exposed areas." Now, we speak
17 about "exposed" areas, exposed to what?
18     A. I'm sorry. Was that a question for me?
19     Q. Yes.
20     A. I do not know what -- I did not write this, so
21 I don't know.
22     Q. So are you talking about areas that are exposed
23 to bees, for example?
24     A. I would interpret it as such.
25     Q. Okay. So do you remember Ms. Ring saying

Page 79

1 something to you about the need to have Piper with her
2 in an area where there are bees?
3     A. Yes. In speaking in the general terms of
4 needing to have her dog with her, any possible exposure
5 to allergens.
6     Q. So what about -- what about sunflower seeds?
7 Would that be the same?
8     A. If that was listed as one of the anaphylactic
9 allergies I would agree, yes.
10     Q. So, again, thinking back to your last visit
11 with Ms. Ring, which was last month, she had the dog
12 with her; correct?
13     A. She did.
14     Q. But she didn't say anything to you about
15 whether the dog was there when she had the reaction?
16     A. I don't recall if she did.
17     Q. Okay. All right. "Ms. Ring's mental health
18 since Piper's" -- that's the dog -- "as a service
19 animal." So, again, going back to Piper, do you know
20 when her training started?
21     A. I do not know when it started, no.
22     Q. Do you remember Ms. Ring mentioning to you that
23 the dog was already in training on her first visit with
24 you on July 18 -- 16, 2018?
25     A. From what I recall she did mention the dog's

Page 80

1 training. But I don't remember if she specifically
2 mentioned being in training or having already completed
3 it.
4     Q. Again, she didn't show you any forms that had
5 to do with training; correct?
6     A. Not that I recall.
7     Q. As far as Mr. Ring's mental health. So from my
8 understanding in our conversation today during this
9 deposition I understand you saw her in July 2018, in
10 August 2018, and then again last month. So during that
11 period of time -- it's not that many visits to gauge
12 it -- but have you noticed an improvement in her mental
13 health since the first day she came to see you?
14     A. I would say I don't recall from memory the
15 details of her first two visits to make a comparison.
16     Q. All right. And the last part of this is, "And
17 Ms. Ring's anxiety and distress suffered as a proximate
18 result of being deprived access to the clubhouse of the
19 Boca Ciega Yacht Club and ultimately to Boca Ciega
20 Yacht Club as a whole upon her expulsion, harassed,
21 threatened, and publicly humiliated, fearing the
22 removal of and separation from her service animal, and
23 fearing further hostile and adverse deprivation of the
24 same opportunities in and around the club as any
25 non-disabled person."



**ANDREAS SANTAYANA, M.D.**
**RING vs BOCA CIEGA YACHT CLUB**

December 04, 2019
81—84

Page 81

1   Thinking to that long sentence.  Has Ms. Ring
2   ever mentioned any of this to you?
3      A.  If she did, I don't recall any specific
4   details.
5      Q.  Okay.  Again, thinking back to your visits with
6   Ms. Ring.  Between January of 2019 and May of 2019, she
7   didn't have any visits with you; correct?
8      A.  Correct.
9      Q.  So as far as any increased anxiety or any sort
10  of distress, you know, during that time period, January
11  of 2019 and May of 2019, that's not something that
12  you're aware of because you hadn't seen her during that
13  time period; correct?
14     A.  Correct.
15     Q.  Now thinking to this disclosure and the fact
16  that you've been named as an expert, you have not been
17  specifically retained by Ms. Ring; correct?  No one
18  paid you a retainer fee to testify in this case?
19     A.  No.
20     Q.  Thinking to your residency program.  Something
21  like this or rather testifying in court on behalf of a
22  patient, a patient of the clinic, is this something
23  that's permitted?
24     A.  I would belive so, yes.  I did speak with my
25  program director about the fact that I had a

Page 82

1   deposition, and there was never anything brought up
2   about it not being permitted.
3      Q.  Okay.  So who -- who is your program director?
4      A.  Dr. Lorna Fountain.
5      Q.  Okay.  So when is it that you spoke to
6   Dr. Lauren Fountain about your deposition that we're
7   having today?
8      A.  The day that I received the email from one of
9   her clinic coordinators that I had -- that I was
10  requested that I contact one of Ms. Ring's lawyers
11  regarding a deposition.  I spoke with my program
12  director asking her essentially, you know, what I need
13  to do.  So ...
14     Q.  Okay.  So based on that conversation with that
15  program director she didn't say anything to you about,
16  you know, "Oh, you know, you're a resident and maybe
17  this is not permitted"?
18     A.  No.  She recommended that I contact the lawyer
19  and speak with Ms. (Inaudubile) to see if there were
20  any actions I needed to take.
21     Q.  Okay.  Is your program director, Dr. Fountain,
22  aware that this case is currently scheduled for trial
23  in May of 2020?
24     A.  Unless somebody else has told her, I don't
25  think she is.

Page 83

1      Q.  Do you anticipate you will be testifying during
2   the trial in May of 2020?
3      A.  I don't know the answer to that.
4      Q.  Let me put it his way.  Have you been asked to
5   come to trial in May 2020 to testify on behalf
6   Miss Ring?
7      A.  I have not been asked specifically about May
8   2020, no.
9      Q.  Again, Dr. Santayana, in advance of this
10  deposition have you prepared any notes about this
11  particular patient or about the deposition?
12     A.  No.
13     Q.  And I think I asked you this already, but did
14  you review Ms. Ring's chart before the deposition?
15     A.  Not outside my progress notes, no.
16     Q.  And, again, you did speak to your program
17  director, Dr. Fountain, but you only spoke to her about
18  the logistics of how to go about, you know, this
19  request for deposition?
20     A.  Yes.  It was before I had contacted anyone
21  regarding this.
22     Q.  Okay.  And so at that time, did Dr. Fountain
23  talk to you at all about Ms. Ring, or about what this
24  was about at all?
25     A.  No.  I only told her it was a patient that it

Page 84

1   had been quite a while since I had seen and -- yeah, we
2   didn't speak about it very long.
3      Q.  Okay.  Other than Dr. Fountain, did you speak
4   to any of the teaching physicians who are here part of
5   the family residency clinic?
6      A.  In regards to this?
7      Q.  In regards to this?
8      A.  No.
9      Q.  Have you spoken to any of the other residents
10  in relation to this deposition today or your care of
11  Ms. Ring?
12     A.  No.
13     Q.  In preparation for this deposition today have
14  you reviewed any standards for providing expert
15  testimony that have been published by the AMA or any
16  other organization, you know, that has to do with the
17  medical profession rather than the legal profession?
18     A.  No.
19     Q.  In preparation for your deposition today have
20  you consulted any resources to gain any more
21  information about Ms. Ring's diagnoses or
22  qualifications of diagnoses or anything like that?
23     A.  No.
24     Q.  Do you know whether Ms. Ring has any other
25  visits scheduled with you coming up?



Page 85

1     A. Not that I am aware of, no.
2     Q. And, again, your anticipated -- you referred to
3  it as a graduated date, you graduating from the
4  program. So your anticipated date of graduation is
5  June 2020; correct?
6     A. Correct.
7     Q. And so given that the trial for this case is in
8  May 2020, at that time you'll still be a resident in
9  the program; correct?
10    A. Correct.
11    Q. I'm going to go through this list. As part of
12 your residency program have you received any training
13 that had to do with conducting functional assessment
14 limitation?
15    A. Not specifically.
16   Q. Okay.
17        MS. VENZA: Do you need to take a break?
18        MS. FONTUGNE: I actually don't have any more
19 questions.
20        THE WITNESS: I was going to say, I don't need
21 a break. I hope we're done soon.
22        (Ms. Venza left the room.)
23            CROSS-EXAMINATION
24 BY MS. LAHART:
25    Q. Dr. Santayana, is there any reason why people

Page 86

1  with disabilities can't work full time?
2     A. In many cases, yes.
3     Q. Can a person with disabilities still work full
4  time?
5     A. In many cases, yes.
6     Q. Can people with disabilities have normal work
7  attendance?
8     A. I would think so, yes.
9     Q. If someone requires medication for depression
10 or anxiety, is it fair to say that the symptoms are
11 impacting their daily life activities?
12    A. Yes. It's usually one of the criteria I use
13 for medication.
14    Q. So why is Ms. Ring on medication for her
15 anxiety?
16    A. After my discussion with her it seemed like her
17 anxiety was moderate to severe enough that she would
18 benefit from having medication helping her.
19    Q. Is there any blood test for anxiety?
20    A. No, there is not.
21    Q. Is there a blood test for depression?
22    A. No, there is not.
23    Q. So do you rely on patients to self-report those
24 symptoms to assess whether they suffer from those
25 conditions?

Page 87

1     A. Yes, for the most part.
2     Q. Do you recall Piper growling at you or biting
3  at you?
4     A. No, I do not.
5     Q. Can you tell if someone suffers from anxiety by
6  looking at them?
7     A. No.
8     Q. Can you tell if someone suffers from depression
9  by looking at them?
10    A. No.
11    Q. Can you tell by looking at me that I suffer
12 from a major depressive disorder?
13    A. No.
14    Q. Does it surprise you that even though I have
15 that disability I can practice law?
16    A. Absolutely not.
17    Q. Does a potentially fatal allergy (inaudible)
18 limitation affect your daily life activities?
19    A. I would consider it, no.
20    Q. Would you ever ask a patient for a
21 demonstration of what their service dog does?
22    A. No. Unless I had a pure interest, but for a
23 medical reason, no.
24    Q. Who is the best person to know how a disability
25 impacts a patient's life, the patient or the patient's

Page 88

1  doctor?
2     A. The patient.
3     Q. So does the fact that you've never observed
4  Ms. Ring having a panic attack mean that she doesn't
5  ever have panic attacks?
6     A. No.
7     Q. Is it possible to avoid every place where bees
8  might be present?
9     A. I'm sorry. What was that?
10    Q. Is it possible to avoid every place where bees
11 might be present?
12    A. I wouldn't think so, no.
13    Q. I recognize that you're a doctor and not an
14 entomologist.
15    A. Yes.
16        (Ms. Venza entered the room.)
17        MS. LAHART: I've asked my questions. I'll
18 hand it over to you.
19            CROSS-EXAMINATION
20 BY MS. VENZA:
21    Q. The Yacht Club's attorney asked you some
22 questions about moonlighting, and you were explaining
23 it. Is your limitation on your doing outside work due
24 to your clinic policy and not through your limitations
25 on practicing medicine?



Page 89

1    A. Yes. It's due to the employer policy/schedule.
2  We're not allowed to do any outside work if we're
3  scheduled for anything where we would be needed here in
4  the hospital or in the clinic or in our normal
5  residency.
6    Q. It doesn't limit your ability to practice
7  medicine?
8    A. Absolutely not.
9    Q. Do you think Samantha Ring, the patient, is
10  faking her allergies?
11     MS. FONTUGNE: Object to form.
12    A. I have no reason to believe she is.
13  BY MS. VENZA:
14    Q. Do you think she's faking her need to have a
15  service dog?
16    A. I have no reason to think she is, no.
17    Q. Have you treated anyone or had a patient who
18  was faking? For example, have you had someone come in
19  and say, "I have a bad back" --
20     THE COURT REPORTER: Ma'am, I couldn't hear
21     you.
22  BY MS. VENZA:
23    Q. And then later on you observe them in the
24  hallway fine, for example, or something -- have you had
25  any experience like that?

Page 90

1    A. In my own clinic with my private patients, no.
2  But in medical school training and in the hospital I
3  have seen maybe a couple of instances where I had
4  suspicion of that.
5    Q. Do you see anything similar to that with
6  Samantha Ring?
7    A. Not that I've observed.
8    Q. If you noted a patient -- let's say you had a
9  personal experience with someone who had a back issue
10  that I was describing or badly imitating, is that
11  something you would note in your records?
12    A. Yes.
13    Q. When you see a new patient, do you request or
14  require that he or she bring all of their past medical
15  records with them?
16    A. No. We do sometimes ask for them to give
17  authorization for us to request records from other
18  providers.
19    Q. Especially if it's like diagnostic like maybe
20  an X-ray or an MRI report or something?
21    A. Sure.
22    Q. You don't -- it's not required to see a
23  patient; correct?
24    A. No, it's not required.
25    Q. It's standard for any patient to come in and

Page 91

1  give you a history, meaning him or her telling you
2  about their past treatment?
3    A. Definitely, Yes.
4    Q. And it's standard practice for you to rely on
5  that history; correct?
6    A. Yes.
7    Q. With regards to the exhibits that the Yacht
8  Club's attorney went through with you and whether you
9  signed them in your capacity as a resident, did you
10  also sign them in your capacity as a medical doctor?
11    A. Yes.
12    Q. That would be with all of those documents?
13    A. Correct. Being a resident implies that I am a
14  medical doctor.
15    Q. Whether a dog retrieved an anaphylactic
16  life-saving treatment device such as an Epipen for a
17  patient, would it matter to you whether you labeled
18  that dog a service animal or a therapy animal?
19    A. No, not to me.
20    Q. The Yacht Club's attorney asked you whether you
21  knew if during Ms. Ring's last allergic
22  anaphylactic-inducing episode if her dog helped her.
23  Do you remember those questions?
24    A. Yes.
25    Q. You said you did not know; correct?

Page 92

1    A. Correct.
2    Q. Would it surprise you to know that her dog
3  didn't help her because her dog was not there?
4    A. If her dog was not there of course not.
5    Q. That question was a little misleading; correct?
6     MS. FONTUGNE: Objection.
7  BY MS. VENZA:
8    Q. You're smiling. Let the record show that you
9  smiled to the response. Would you agree that whether a
10  person has a disability also depends on their
11  environment? For example, might somebody who is a
12  quadriplegic be fine if they were sitting and talking
13  and answering the phone versus that same person in a
14  pool?
15    A. Be fine in regards to what?
16    Q. (Two people speaking at once) have any
17  disability. Would you say somebody who's a
18  quadriplegic that doesn't have any arms or legs and is
19  in a pool trying to swim, they're disabled, versus that
20  same individual who maybe has a job as a telemarketer
21  who is wearing a headset and is answering a phone
22  through voice? Would you agree that person, one would
23  say, "swimming in a pool, that person is disabled;
24  using their voice as a telemarketer they're not"?
25    A. I think I would have to say that that patient

Page 93

1  is disabled, that they have a lessened ability to do
2  their daily activities.  But in those two circumstances
3  it's not affecting them in the same way.
4      Q.  Would you say that having some -- would you say
5  that having claustrophobia is a disability for some
6  people?
7      A.  In my interpretation of disability for some
8  people it may be, yes.
9      Q.  So somebody who is a coal miner perhaps might
10  be disabled from their job -- let's say somebody that's
11  a coal miner that got trapped in a cave and thereafter
12  felt an intense claustrophobic condition.  Would you
13  say they were disabled in terms of their job being a
14  coal miner?
15      A.  In terms of their job, yes.
16      Q.  And if that same person decided to become a
17  medical doctor and went through the residency program,
18  they would not be disabled?
19      A.  In regards to the job yes, I agree they would
20  not be disabled.
21      Q.  So circumstances play a factor, you would
22  agree?
23      A.  They play a factor in how their diagnosis
24  affects their life, yes.
25      Q.  Do you typically follow patients home?

Page 94

1      A.  No.
2      Q.  For the agency for whom you've provided
3  functional assessments, you talked to the Social
4  Security Disability Administration, et cetera, are you
5  required to follow them home in order to report to the
6  agency whether or not he or she is disabled?
7      A.  To the best of my knowledge, no.
8      Q.  So when you are -- in certain cases when you
9  are determining if a patient has a functional
10  limitation, you are relying on him or her to report it
11  to you; is that correct?
12      A.  In the limited time attempted to provide that
13  assessment, yes.
14      Q.  Do you increase or double a dosage for a
15  patient just because a patient asks you to?
16      A.  No.  I try to make more evaluation of how their
17  symptoms are affecting them.
18      Q.  A medical assessment?
19          MR. FONTUGNE:  Can you clarify, double dosage
20  of what?
21          MS. VENZA:  He answered the question.  If you
22  want to clarify on your time you can.
23  BY MS. VENZA:
24      Q.  With regard to allergies that are fatal.  That
25  means that the person can die, correct, simple terms?

Page 95

1      A.  Definition of fatal, yes.
2      Q.  Would you agree that it's not unreasonable for
3  someone who has anaphylactic reactions to allergens
4  that can be fatal, that it would not be unreasonable
5  for that person to worry about exposure to those
6  allergens constantly?
7      A.  Can you repeat the question?  I understood
8  part.
9      Q.  Okay.  If someone has allergies that induce
10  anaphylactic reactions that can be fatal, that person,
11  would it be unreasonable for him or her to worry about
12  it daily, on a constant basis about exposure to that
13  level of consequence?
14      A.  I don't think it would be unreasonable, no.
15      Q.  Would it be unreasonable for him or her to have
16  a service dog or pet that can alert them to that risk?
17      A.  I don't think it would be unreasonable.
18      Q.  And to retrieve their Epipen for them if they
19  have such exposure?
20      A.  I think it would be effective.
21      Q.  After a patient has an anaphylactic shock that
22  is averted or eliminated by an Epipen, is it necessary
23  for that person to be examined by a physician?
24      A.  In strict term "necessary."  Usually I would
25  counsel a patient on the severity of their symptoms.

Page 96

1  If they're exposed to something that they know they're
2  allergic to and use the Epipen and they feel relatively
3  fine afterwards, I don't think they would need
4  immediate attention.  But if they experience
5  significant symptoms, I would recommend that they have
6  medical attention.
7      Q.  Would you agree that sleeping is a major life
8  activity?
9      A.  Yes.
10      Q.  Would you agree that socializing is a major
11  life activity?
12      A.  Yes.
13      Q.  Do you agree that medical treatment for
14  allergies includes an Epipen?
15      A.  If we're saying that these allergies have the
16  risk of causing anaphylactic or severe enough response,
17  then yes.
18      Q.  So an Epipen is a form of medical treatment in
19  and of itself?
20      A.  Yes.
21      Q.  Do you see budget-conscious patients?  Meaning
22  people who are not well-off?  Is that a yes?
23      A.  Yes.  Yes.
24      Q.  Are you aware and do you know the grade of
25  selectivity about the medical treatment some of those



ANDREAS SANTAYANA, M.D.                    December 04, 2019
RING vs BOCA CIEGA YACHT CLUB                        97—100

Page 97

1  patients who are budget-conscious might pursue?
2      A.  Sorry.
3      Q.  So somebody who is budget-conscious, somebody
4  who's on a budget, and you say, "Well you might need to
5  go get this test, this test, or this test."  And the
6  person says, "Well, can we just wait and maybe choose a
7  different form of medical follow-up," than someone who
8  has great insurance and lots of money?
9      A.  Yes.  Unfortunately, I see that often.
10      Q.  So just because someone might not follow up on
11  medical care that you recommend may be due to budget
12  reasons; correct?
13      A.  Yes, it may be.
14      Q.  Were you ever afraid of Samantha Ring's dog?
15      A.  Not that I recall.
16      Q.  And when you were giving all your responses to
17  the Yacht Club's attorney about Ms. Ring's dog, tell me
18  if I'm wrong.  I thought that you were describing a
19  calm, obedient trained dog.  Would that be a fair
20  assessment?
21      A.  The time that I recall seeing him, yes.
22      Q.  And just because a patient doesn't see you --
23  doesn't make appointments to come in and see you, do
24  you automatically include -- conclude, rather, they're
25  fine, they're healthy, there's nothing wrong with them

Page 98

1  just because they're not coming in?
2      A.  No, not automatically.
3      Q.  There's a variety of reasons why someone -- a
4  patient might not come for a year or so?
5      A.  Yes.
6      Q.  Have you been offered any inducement by
7  Samantha Ring or from us, her attorneys, for your
8  testimony today?
9      A.  I have not, no.
10      Q.  Have you been told by Ms. Ring or us, her
11  attorneys, what to say or what not to say here today?
12      A.  I have not, no.
13      Q.  And if we asked you to come to testify at
14  trial, whether that was May 2020 or after, would you?
15      A.  If possible, yes.
16      Q.  Okay.
17      MS. FONTUGNE:  I have just a few follow-up
18  questions.
19          REDIRECT EXAMINATION
20  BY MS. FONTUGNE:
21      Q.  Dr. Santayana, as we sit here today, how long
22  have you actually practiced medicine?
23      A.  For about two and a half years now.
24      Q.  And you were asked earlier whether you could
25  observe signs and symptoms of anxiety or depression,

Page 99

1  and you answered that that was not a diagnosis that you
2  could make by looking at the patient; is that right?
3      MS. VENZA:  Object.  Beyond the scope of our --
4      MS. FONTUGNE:  No.  No.  You asked him
5  specifically whether depression is something he
6  could observe by looking at the patient.
7  BY MS. FONTUGNE:
8      Q.  So I'm just going back and asking.  That's
9  something --
10      MS. VENZA:  That's not what was asked.
11      MS. FONTUGNE:  This is what was asked.  Can you
12  go back and look at the record?
13      MS. LAHART:  "Can you tell if someone suffers
14  from depression by looking at them," was the
15  question.
16      MS. FONTUGNE:  All right.
17  BY MS. FONTUGNE:
18      Q.  And so when you were asked, can you tell if
19  someone has depression by looking at the person, you
20  answered no; correct?
21      A.  Correct.
22      Q.  And later you were asked about patients who
23  were faking illnesses and you answered that in Samantha
24  Ring's case that you had not observed anything that
25  would lead you to think that she was faking depression;

Page 100

1  right?
2      A.  Correct.
3      Q.  So since you can't tell by looking at a person
4  that a person is depressed, how would you know if the
5  person is faking it?
6      A.  It would be difficult to know.
7      Q.  Okay.  You were asked whether -- a lot of
8  questions about what was reasonable and not reasonable.
9  Is it reasonable for a patient with the risk of a fatal
10  allergic reaction to visit a place where the risk of
11  exposure to the allergens is much higher?
12      A.  I'm sorry.  Are you asking if I was already
13  asked that?
14      Q.  No.  No.  This is a new question.  Is it
15  reasonable for a patient who is at risk for a fatal
16  allergic reaction to visit a place known to have a
17  greater risk that the allergen will be there?
18      A.  I suppose not.
19      Q.  You were also asked about whether insurance
20  considerations or income considerations could modify a
21  patient's ability or -- or to follow up on a
22  recommendation that was made by the clinic; correct?
23      A.  Yes.
24      Q.  And would you say that someone who makes around
25  $47,000 a year is somebody who's got an economic



ANDREAS SANTAYANA, M.D.
RING vs BOCA CIEGA YACHT CLUB

December 04, 2019
101—104

Page 101

1  impediment to obtain proper medical care?
2       MS. VENZA:  Object to form.
3       A.  That would be very difficult for me to know
4  without knowing their other financial situations.
5  BY MS. FONTUGNE:
6       Q.  Okay.  What about a patient who is employed
7  full time by the State of Florida and who has very good
8  insurance?  Do you think that that very good insurance
9  would stop them in any way from getting good medical
10  care?
11       MS. VENZA:  Object to form.
12       A.  Depends on your definition of "very good
13  insurance."
14  BY MS. FONTUGNE:
15       Q.  Okay.  "Very good insurance," I'm talking
16  about, you know, low co-pays, and very low co-pays for
17  preventive visits such as what you would have at the
18  Family Medicine Clinic?
19       MS. VENZA:  Object to form.
20       A.  You're asking me if that would impede what?
21  BY MS. FONTUGNE:
22       Q.  If there would be any good reason for a patient
23  who's got good insurance like what we've just talked
24  about, to not visit your clinic when they needed to?
25       MS. VENZA:  Same objection.

Page 102

1       A.  I would -- only knowing that information think
2  it would not be reasonable, but again, I would not know
3  any other factors of their life or financial situations
4  to make any judgment on that.
5  BY MS. FONTUGNE:
6       Q.  All right.  During all visits with Ms. Ring did
7  she every mention her salary or insurance being any
8  sort of impediment to obtaining medical care at the
9  Family Medical Clinic?
10       A.  Not that I specifically remember.
11       Q.  Okay.
12       MR. FONTUGNE:  I don't have any more questions.
13       MS. LAHART:  I have just one.
14            RECROSS-EXAMINATION
15  BY MS. LAHART:
16       Q.  Do you know what the deductible is on
17  Ms. Ring's insurance?
18       A.  I have absolutely no idea.
19       MS. FONTUGNE:  Okay.  Thank you very much.
20       THE WITNESS:  Okay.
21       THE COURT REPORTER:  Are you ordering this,
22  ma'am?
23       MS. FONTUGNE:  Yes, we are.
24       THE COURT REPORTER:  Do you each want copies?
25       MS. LAHART:  No.

Page 103

1       MS. FONTUGNE:  Dr. Santayana, you have the
2  right to read your deposition transcript if you
3  wish.
4       THE WITNESS:  I waive that right.  Thank you.
5  (The deposition concluded at 11:50 a.m.)
6       - - - - - - - -
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 104

1                 CERTIFICATE OF REPORTER
2
3  STATE OF FLORIDA        )
4  COUNTY OF HILLSBOROUGH  )
5
6       I, Lynda B. Lunseth, certify that I was authorized
7  to and did stenographically report the deposition of
8  ANDRES SANTAYANA, M.D.; that a review of the transcript
9  was not requested; and that the foregoing pages are a
10  true and complete record of my stenographic notes taken
11  during said deposition.
12
13       I further certify that I am not a relative,
14  employee, attorney, or counsel of any of the parties,
15  nor am I a relative or employee of any of the parties'
16  attorneys or counsel connected with the action, nor am
17  I financially interested in the action.
18
19       Dated this 6th day of December, 2019.
20
21       _____
22            Lynda B. Lunseth
23
24
25



Page 105

```
 1              CERTIFICATE OF OATH
 2
 3   STATE OF FLORIDA        )
 4   COUNTY OF HILLSBOROUGH  )
 5
 6
 7
 8       I, the undersigned authority, certify that the
 9   witness in this matter personally appeared before me
10   and was duly sworn on the 4th of December, 2019.
11
12       WITNESS my hand and official seal the 4th of
13   December, 2019.
14
15   IDENTIFICATION:  Hospital Photo ID Badge
16
17
18           Lynda B. Lunseth
19
20           Lynda B. Lunseth
             Notary Public
21           State of Florida at Large
             My Commission Number: FF 956287
22           Expires:  4/18/2020
23
24
25
```



**$**

**$47,000**
  100:25

---

**1**

**1**
  17:21,22

**10**
  12:23

**10-year**
  32:17

**100**
  50:5 63:3

**10:50**
  28:11

**10:54**
  28:11

**11**
  20:6

**13**
  51:13,20
  53:3

**15**
  12:24

**16**
  20:6
  79:24

**160/110**
  52:12

**171/111**
  52:17

**18**
  79:24

**19th**
  59:14

---

**2**

**2**
  20:1,2,17
  21:10
  33:15
  72:4

**20**
  34:1

**2012**
  32:24

**2017**
  7:15

**2018**
  20:6,14
  49:7
  50:18
  66:15
  69:13
  79:24
  80:9,10

**2019**
  51:13,20
  53:3
  81:6,11

**2020**
  6:20,22
  82:23
  83:2,5,8
  85:5,8
  98:14

**212**
  32:15

---

**3**

**3**
  22:8
  34:7,8,10
  49:5,9
  51:18

  52:9

---

**4**

**4**
  29:5,11,
  15 47:12,
  13 50:3

**4-year**
  8:24

---

**5**

**5**
  30:21
  48:24,25

**50**
  31:22
  49:12

---

**6**

**6**
  50:23
  51:2

---

**7**

**7**
  51:8,9

**70**
  32:22

---

**8**

**8**
  7:4 8:14
  17:14
  49:7
  53:10,11
  66:15

**8th**
  59:15

---

**9**

**9**
  60:16,17
  64:6
  69:11
  72:4
  73:21
  76:25

---

**A**

**a.m.**
  17:14
  28:11

**abilities**
  42:12
  54:20

**ability**
  42:14,18
  73:25
  76:2 89:6
  93:1
  100:21

**abnormaliti es**
  30:9

**absolutely**
  87:16
  89:8
  102:18

**accepts**
  7:4

**access**
  80:18

**accommodati on**
  49:24

**accompany**
  40:4

**accompanyin g**
  35:25

**account**
  33:7,13
  34:3

**accurately**
  41:19
  44:23

**acronym**
  18:14,19

**Act**
  60:2

**action**
  68:18

**actions**
  82:20

**activities**
  10:7
  39:17
  43:24
  44:1
  70:3,5,7
  75:25
  86:11
  87:18
  93:2

**activity**
  96:8,11

**actual**
  67:20

**acute**
  58:22

**ADA**
  60:7

**add**
  6:7

**address**



36:13,14,
16

**adequate**
72:1

**administeri
ng**
14:1

**Administrat
ion**
10:16
11:5 94:4

**administrat
ive**
47:3

**admitted**
17:11

**advance**
19:11,14
83:9

**Advent**
20:8

**adverse**
80:23

**affect**
12:14
45:14,16
76:10
87:18

**affected**
45:18
76:2,8

**affecting**
93:3
94:17

**affects**
93:24

**afraid**
97:14

**age**
34:1

**agency**
10:16
94:2,6

**agitated**
66:10

**agitation**
65:22

**agoraphobia**
44:20

**agree**
43:24
44:19
65:2
68:15
71:24
78:12
79:9
92:9,22
93:19,22
95:2
96:7,10,
13

**airway**
69:5

**alert**
95:16

**allergen**
67:24
100:17

**allergens**
21:6
37:24,25
38:5,11
62:24
70:8,10
72:13
79:5
95:3,6
100:11

**allergic**
15:10,11,
16,20,25
16:5

27:13,18,
19 38:1,
18,21
39:4,6,8
56:18,21
57:12
61:11
62:1,5,
13,16
70:25
72:13
91:21
96:2
100:10,16

**allergies**
20:19,21,
24 37:1,
2,23
38:16
39:14,19
40:2,16
44:8,11
46:3
54:22
56:3,18
57:6
61:10
62:9,17
64:8
69:17,20
70:21
72:10
74:6,25
76:7 79:9
89:10
94:24
95:9
96:14,15

**allergy**
56:23
57:1,4
64:5
87:17

**alleviate**
39:12

40:1
54:15,16

**allowed**
26:5 89:2

**AMA**
84:15

**Ambulating**
30:2

**ameliorate**
72:5

**American**
32:20

**Americans**
60:2

**amount**
18:10
75:21

**amounts**
69:7

**anaphylacti
c**
37:1
38:1,4
40:16
56:3
61:10
62:25
67:6,11,
16 68:1,
3,6,7,14,
23 69:21
72:7,16,
23 79:8
91:15
95:3,10,
21 96:16

**anaphylacti
c-inducing**
91:22

**anaphylacti
c-reaction**
74:3

**anaphylaxes**
69:21

**and/or**
72:6

**Andres**
5:18

**animal**
26:23
35:24,25
36:2
39:23
40:3,15
56:2
60:7,8,9,
12 79:19
80:22
91:18

**animals**
26:1 77:1
78:6

**annual**
35:10,11

**answering**
92:13,21

**answers**
5:25
21:18

**anticipate**
64:24
65:2 83:1

**anticipated**
85:2,4

**antihistami
nes**
69:1

**anxiety**
9:11,12,
13,17,23
11:9,11,
16 12:3,
9,12,19
13:1,5,9,



10,11,19,
24 23:14,
16 24:14
25:13
30:23
31:10
39:13,18
40:2,15,
20,22
44:7,10
46:4
49:16
54:22
55:2 56:2
57:17,18
61:11,25
62:4,18,
24 63:6,
10,13,15
64:9,11,
13,16,21,
25 65:6
66:14,16,
19,23,24
69:16,19
70:8
74:2,4,6,
25 76:12,
15,21
80:17
81:9
86:10,15,
17,19
87:5
98:25

**anxiety/**
**depression**
22:21
23:8
25:12

**anxious**
50:6
66:21

**Anytime**
27:25

**apnea**
48:8,15,
20

**apparent**
29:25
62:4

**apparently**
52:16

**appears**
30:20

**appointment**
49:7

**appointment**
**s**
97:23

**April**
19:17

**area**
67:23
71:21
79:2

**areas**
71:7
78:16,17,
22

**arms**
92:18

**arrange**
19:16

**arranging**
29:2

**arrived**
17:14

**ASCVD**
33:4

**asks**
33:8
94:15

**assess**
86:24

**assessment**
10:11
11:8
21:10,11,
13,16,20
85:13
94:13,18
97:20

**assessments**
10:2,3,4
11:4 94:3

**assigned**
58:14,21

**assist**
39:13
40:2 74:1

**assume**
58:14

**atheroscler**
**otic**
32:18

**attack**
33:19
65:15,16,
21 88:4

**attacks**
11:16
12:14
64:10,12,
15,24
65:6,9,11
66:24
88:5

**attempted**
94:12

**attempts**
32:4

**attend**
7:12 8:25

**attendance**
42:24
86:7

**attending**
47:22

**attention**
20:18
21:9 22:9
36:20
48:3 52:8
73:15,18
96:4,6

**attorney**
88:21
91:8,20
97:17

**attorneys**
19:13,19
29:2
60:22
98:7,11

**August**
49:7
59:15
66:15
80:10

**authorizati**
**on**
24:10
46:23
90:17

**autoimmune**
41:25

**automatical**
**ly**
32:24
42:3,4
97:24
98:2

**availabilit**
**y**
58:24

**average**
42:25

**averted**

95:22

**avoid**
38:11
62:6 71:1
88:7,10

**aware**
18:12
19:5
28:23
32:20,25
36:14,21
41:7
42:19,23
43:1,2,5
58:10
59:18
62:9
70:11
76:17
81:12
82:22
85:1
96:24

---

B

**back**
6:8,10
19:17
24:13
25:11
26:7,18
28:12
29:4
33:15
37:8
39:11
43:15
47:18
49:6,18
54:25
61:16
64:6
69:10
73:20



75:4
76:24
77:2 78:5
79:10,19
81:5
89:19
90:9
99:8,12

**background**
25:14

**bad**
89:19

**badly**
90:10

**barked**
77:22

**based**
20:15
21:20
22:3 23:9
30:5
32:17
33:12
40:18
42:4,5
44:24
45:8
48:10
50:5,9
55:8
62:8,15
63:1
70:13
71:12
75:11
82:14

**basically**
49:10

**basis**
44:16
64:20
95:12

**bathing**

22:1
43:22

**Bayfront**
6:16,24
7:1 10:9,
13

**bearing**
62:18

**bee**
56:24
57:1
67:11,13,
15 69:23
70:25
72:2,19
73:3,7

**bees**
45:21
71:2,4,7,
10,14,20
72:13
76:13
78:23
79:2
88:7,10

**Befler**
47:20

**beginning**
33:12
43:17

**behalf**
81:21
83:5

**belive**
81:24

**benefit**
76:25
78:6
86:18

**benefits**
77:2

**big**
42:14
54:13
70:12

**Biology**
9:4

**birth**
18:23

**bit**
7:3

**biting**
87:2

**blood**
52:12
68:1
86:19,21

**BMI**
30:5
33:12

**board**
8:12 9:21

**boat**
22:16
23:21

**boathouse**
22:14

**Boca**
31:6
52:25
54:4 71:7
73:25
74:10,12
80:19

**body**
73:13

**born**
19:2

**bottom**
20:6
21:10,21
49:3,6,9,

17 61:6

**bought**
50:12

**branch**
8:18

**breadth**
8:20

**break**
6:3 28:9,
14 85:17,
21

**breathing**
67:18

**briefly**
21:3

**bring**
26:6 36:9
40:6
50:16
74:16
75:5
90:14

**bringing**
26:1
75:13,16

**brought**
15:21,25
24:21
25:2 50:4
58:7 82:1

**budget**
97:4,11

**budget-
conscious**
96:21
97:1,3

**building**
45:22
71:11

**C**

**calculating**
34:3

**calculator**
33:8,13
34:5

**Caleb**
51:20

**call**
74:18
75:7

**called**
55:17
60:23
75:10

**calm**
97:19

**capacity**
34:14
53:19
91:9,10

**Cardiology**
32:21

**cardiovascu
lar**
32:18

**care**
16:15,17
17:10
20:9
36:24
58:20
59:1,2,4
68:5
84:10
97:11
101:1,10
102:8

**Carley**
47:20



case
    14:8
    18:25
    54:19
    55:3
    59:19
    60:20,21
    65:3,4,5
    67:15
    68:21,23
    69:6
    81:18
    82:22
    85:7
    99:24

cases
    35:6 67:3
    86:2,5
    94:8

category
    31:19,20

causing
    96:16

cautious
    44:8,10
    62:22

cave
    93:11

cetera
    94:4

change
    31:14
    53:24
    54:13

chart
    14:21
    41:11
    46:23
    83:14

checks
    52:16

children

    18:22
    19:1

cholesterol
    24:18
    32:13

choose
    97:6

Ciega
    31:6
    52:25
    54:4 71:7
    73:25
    74:10,12
    80:19

circumstanc
es
    15:22
    53:21
    73:18
    93:2,21

clarify
    6:2 7:3
    18:3
    94:19,22

class
    9:12,16
    32:12

classes
    9:9 10:1

classificat
ions
    9:17

classroom
    15:21

claustropho
bia
    93:5

claustropho
bic
    93:12

clear

    6:1

climbing
    21:25

clinic
    14:12,22,
    23,24
    24:6,23
    25:25
    26:1
    27:20,21
    36:19,24
    41:4,7,11
    44:6,15,
    17 45:9
    46:18
    52:18
    53:6
    55:9,22
    58:9,18,
    25 68:5
    77:25
    78:3
    81:22
    82:9 84:5
    88:24
    89:4 90:1
    100:22
    101:18,24
    102:9

clinic's
    25:25

club
    31:6
    52:25
    54:4
    73:25
    74:10
    80:19,20,
    24

Club's
    88:21
    91:8,20
    97:17

clubhouse

    45:20
    71:8
    73:24
    74:10,13,
    17,20,22,
    25 75:5,
    11,13,16
    80:18

co-pays
    101:16

co-sign
    34:16
    53:16

coal
    93:9,11,
    14

cognizant
    37:23
    70:7,10

College
    32:20

combination
    11:13
    67:17

comment
    78:1,2

common
    62:6

commonly
    31:10

communicati
ons
    19:18

companionsh
ip
    78:13

compared
    50:6

comparison
    80:15

compensate
    19:3

competitive
    7:1

complete
    6:18,21
    7:16 8:5
    10:14
    11:3,7

completed
    80:2

completing
    9:21

concentrati
ng
    21:24
    43:23

concern
    15:7

concerned
    48:7

conclude
    97:24

concordant
    61:15

concretely
    33:22

condition
    28:19
    61:10
    70:2
    93:12

conditions
    61:12
    64:8
    69:12
    72:6
    75:25
    86:25

conduct
    10:10



29:20

**conducted**
50:20
51:14,19

**conducting**
10:17
21:17
85:13

**consequence**
95:13

**considerati
ons**
100:20

**considered**
60:9

**consist**
61:7

**consistent**
13:5

**consists**
8:19

**constant**
95:12

**constantly**
95:6

**Constitutio
nal**
29:24

**consulted**
84:20

**contact**
21:6
67:22
82:10,18

**contacted**
83:20

**context**
58:16

**conversatio
n**
80:8
82:14

**conversatio
ns**
19:18
40:18
48:10
70:13

**coordinate**
59:2

**coordinator
s**
82:9

**copies**
46:17
102:24

**coping**
74:1

**copy**
20:4

**correct**
7:6 15:18
17:3
18:24
20:20,24
22:5,11,
12 23:10
24:16,17,
24 29:9,
16,17,21,
22,25
30:1,6,9
31:23,24
32:8,9,
13,14
33:5
34:24,25
35:16
37:7 38:6
40:12,13
45:6,9,10
47:5,7

48:20,21
52:13,14
55:10,14,
15 57:15,
16 61:13
62:9,13
66:6
67:8,9
68:16
69:13,14
70:22,23
71:2 78:6
79:12
80:5
81:7,8,
13,14,17
85:5,6,9,
10 90:23
91:5,13,
25 92:1,5
94:11,25
97:12
99:20,21
100:2,22

**corresponds**
36:14

**counsel**
95:25

**County**
42:21
43:3

**couple**
29:1
41:20
90:3

**courses**
9:6,13

**court**
5:23
81:21
89:20
102:21,24

**cover**
8:20

**cramps**
25:9

**criteria**
86:12

**CROSS-
EXAMINATION**
85:23
88:19

**current**
6:13

———————

**D**

———————

**daily**
10:6
12:14
31:22
37:18,20
42:12
45:15,16,
18 75:24
76:9,10,
20 86:11
87:18
93:2
95:12

**date**
15:2
20:10
68:12
85:3,4

**dated**
20:6 53:2

**day**
8:14 21:1
26:8
30:11,25
47:18
52:6,12,
15 80:13
82:8

**days**
8:14

42:24

**deal**
76:14

**dealing**
6:10

**decently**
14:4

**decided**
93:16

**decision**
40:3,11

**decisions**
21:24

**decrease**
66:18
74:2

**decreases**
72:6

**deductible**
102:16

**Defendant's**
51:2

**Defense**
20:1 34:7
47:12
48:24
51:8 53:9
60:16

**defined**
60:4

**definition**
26:22
30:4
60:7,10,
13 68:3
75:19
95:1
101:12

**Del**
47:25



48:6
59:6,13

**demonstration**
87:21

**Denies**
31:25

**Department**
17:25

**depend**
65:8
72:21

**Depending**
73:11

**depends**
92:10
101:12

**deposed**
5:19

**deposition**
6:3 14:6,
22 17:5
19:11,14,
16 28:25
29:3 71:6
74:11
80:9
82:1,6,11
83:10,11,
14,19
84:10,13,
19 103:2

**depositions**
14:7

**depressed**
100:4

**depression**
13:19,23,
24 23:14
24:14
31:10
86:9,21

87:8
98:25
99:5,14,
19,25

**depressive**
87:12

**deprivation**
80:23

**deprived**
80:18

**derive**
43:8

**describe**
10:3
39:15

**describes**
61:6

**describing**
90:10
97:18

**designated**
35:11

**designed**
32:13

**detail**
29:14
39:15
60:7

**details**
19:23
80:15
81:4

**determination**
10:18
45:11

**determining**
10:5 94:9

**develop**
72:20

**developed**
73:5

**develops**
73:8

**device**
91:16

**diabetes**
33:18

**diagnose**
13:11

**diagnosed**
13:9
64:25

**diagnoses**
41:24
42:9,11
45:14
54:20
55:1
84:21,22

**diagnosis**
42:4,5
64:16
65:7
93:23
99:1

**diagnostic**
90:19

**die**
94:25

**difference**
36:1 58:2

**difficult**
100:6
101:3

**difficulty**
21:22,23,
25 22:1,2
30:3
43:21
44:15,25

67:18

**direct**
5:14
20:18
21:9 22:9
48:3 52:8

**direction**
35:22

**directly**
19:11
23:4 24:7
26:14
33:1
55:18,20
56:25
57:11

**director**
81:25
82:3,12,
15,21
83:17

**disabilities**
54:18
60:2
86:1,3,6

**disability**
10:5,17
41:18
45:12
54:17
60:3
75:20,22
87:15,24
92:10,17
93:5,7
94:4

**disability-related**
78:15

**disabled**
42:3,10
75:18

92:19,23
93:1,10,
13,18,20
94:6

**disclose**
60:22

**disclosure**
61:3
81:15

**disclosures**
60:21

**discriminated**
46:2

**discuss**
38:9

**discussed**
9:14
74:11

**discussing**
55:5

**discussion**
10:1
30:25
45:13
49:20
77:3
86:16

**discussions**
75:12

**disease**
32:18
42:1

**diseases**
9:7

**disorder**
11:9,11,
12,13,14,
16,17
12:19
13:1,10,



24 30:23
46:4
64:11,21
65:1
87:12

**disorders**
9:11,14,
17,23

**distress**
29:25
68:25
80:17
81:10

**District**
42:21
43:4
49:25

**doctor**
17:17
19:3 24:4
25:14,16
54:23
58:15,23
88:1,13
91:10,14
93:17

**document**
34:11
60:19,24,
25

**documentati
on**
46:9,11

**documented**
30:20
77:1

**documents**
27:1
91:12

**dog**
16:1,4
25:12,15,
20 26:7,

8,10,15,
16,19,20,
22 27:2,
5,9,10,
12,14,17
36:9
38:13,14,
15,19,20,
24 39:8
40:6,19,
21 46:8,9
50:12,16,
21 51:4,
16 54:10
56:4,8,
11,12,15,
22,23
57:3,8,
18,20,23,
24 58:1,
5,8 60:9,
11 72:5,
9,10,12,
17 74:16,
18,19,22
75:5,6,7,
10,14,16
76:14
77:6,9,
11,12,14,
18,22
78:2,8,11
79:4,11,
15,18,23
87:21
89:15
91:15,18,
22 92:2,
3,4 95:16
97:14,17,
19

**dog's**
79:25

**dogs**
25:17
77:3

78:12

**doom**
66:3,4

**doors**
71:10,23

**dosage**
63:2,5
94:14,19

**dose**
50:4,10
63:7

**double**
94:14,19

**doubled**
50:4

**doubt**
52:4,7

**dressing**
22:1
43:22

**drop**
68:2

**drugs**
32:12

**due**
39:13
40:2
54:20
61:25
75:25
88:23
89:1
97:11

**duties**
59:2

---

**E**

---

**earlier**
19:15

39:2
54:25
59:5
72:16
77:3
98:24

**earn**
7:20

**easier**
41:21

**economic**
100:25

**education**
8:16

**effect**
11:24
12:5 58:4

**effective**
63:6
95:20

**effectively**
67:5

**effects**
25:8

**eliminated**
95:22

**email**
82:8

**emergency**
68:14
72:17

**emotional**
37:17
57:19,21,
25 77:4
78:6,12

**employed**
43:3
101:6

**employee**

42:25

**employer**
89:1

**encounter**
41:9

**end**
6:20 8:11
12:4,7
35:2
52:18

**enjoy**
73:24
74:9,25
75:13,16

**entered**
23:6
88:16

**entire**
73:13

**entomologis
t**
88:14

**environment**
92:11

**epinephrine**
38:23
69:1

**Epipen**
15:11,14
38:8,9,25
57:8
91:16
95:18,22
96:2,14,
18

**episode**
15:10
91:22

**errands**
22:2

**essentially**



61:6
82:12

**establish**
58:20

**establishing**
61:17

**evaluation**
29:21
94:16

**event**
64:17

**events**
63:16,17

**eventually**
65:1

**everyday**
38:10
62:7

**exact**
10:23
12:21
15:2,22
26:2
46:5,24
69:25

**exam**
8:10,12,
13,19
9:22
29:19,20,
24 30:8
37:6
77:15,16

**examination**
5:14 8:16
29:8
30:17,18
37:11
51:19
98:19

**examined**
50:19
95:23

**examples**
12:10

**excuse**
43:12

**exempt**
18:14

**exhibit**
17:21,22
20:1,2
34:7,8,10
37:12
47:10,12,
13 48:24,
25 50:3,
23 51:8,
9,15
53:10,11
60:16,17
64:6
66:19
69:11
72:4
73:21
76:25

**exhibited**
44:25

**exhibits**
91:7

**expect**
64:19
65:20
67:1,17
68:1
73:9,14

**expected**
61:8

**experience**
14:1
25:14,16
62:15

67:12
89:25
90:9 96:4

**expert**
59:19,21
60:21,23
72:2
81:16
84:14

**explain**
71:8

**explaining**
88:22

**explanations**
72:12

**exposed**
38:5
67:24
70:12
72:22
78:16,17,
22 96:1

**exposer**
70:8

**exposure**
62:12,23
67:22
69:23
70:22
71:20
72:7,8
74:2,4
76:13
79:4
95:5,12,
19 100:11

**expulsion**
80:20

**extent**
16:10,11

**extra**

44:7

**eyes**
67:21

---

**F**

---

**face**
67:20

**facilities**
16:16,17

**fact**
28:16
33:6
49:22
62:22
81:15,25
88:3

**factor**
75:22,23
93:21,23

**factors**
33:22
102:3

**faculty**
6:23

**fair**
46:21
86:10
97:19

**fairly**
7:1 42:23

**faking**
89:10,14,
18 99:23,
25 100:5

**fall**
12:2,13

**familiar**
18:16
36:24
65:9

**families**
19:3

**family**
6:14
14:12,22
20:9
25:24
33:17,20
36:18
84:5
101:18
102:9

**fast**
72:18

**fatal**
87:17
94:24
95:1,4,10
100:9,15

**fear**
74:4

**fearing**
80:21,23

**features**
12:9,11

**federal**
10:17

**fee**
18:4,5,8
81:18

**feel**
96:2

**feeling**
46:2
48:15
66:2,4

**feels**
45:14

**felt**
49:15
93:12



ANDREAS SANTAYANA, M.D.
RING vs BOCA CIEGA YACHT CLUB

December 04, 2019
Index: fidgety..handle

**fidgety**
65:25
66:10
67:4

**file**
36:16

**filed**
28:24
60:20,21

**fill**
14:2 24:9

**filled**
71:14

**final**
8:12

**finally**
6:6

**financial**
101:4
102:3

**find**
77:6

**findings**
13:3,4

**fine**
69:10
89:24
92:12,15
96:3
97:25

**finish**
6:9,18
23:4

**Florida**
7:9,11,
13,24 8:4
9:2 17:25
18:9,24
101:7

**fluid**
69:7

**fluids**
69:8

**follow**
15:13
59:9
64:13
93:25
94:5
97:10
100:21

**follow-up**
15:1,3,6
59:11
97:7
98:17

**FONTUGNE**
5:15
17:20,23
19:25
20:3
28:10,12,
13 30:15
34:6,9
47:9,14
48:23
49:1
50:24
51:7,10
53:9,12
54:24
60:15,18
61:20,23
71:17
72:14
75:3,9
85:18
89:11
92:6
94:19
98:17,20
99:4,7,
11,16,17
101:5,14,
21 102:5,
12,19,23

**form**
11:25
41:14
46:22,23
61:19,22
71:15
75:1,8
89:11
96:18
97:7
101:2,11,
19

**forms**
10:14
11:8 80:4

**Fountain**
82:4,6,21
83:17,22
84:3

**friend**
28:1,2

**front**
34:18
46:20
66:25
77:5

**full**
5:16 43:3
73:13
86:1,3
101:7

**full-time**
40:7 43:6

**function**
47:3

**functional**
10:2,3,11
11:4,8
36:25
37:3,4,
12,15
39:12,14

**40:1**
54:15,17
61:15,24
85:13
94:3,9

**fund**
18:24
19:2,4

**G**

**GAD**
13:24

**gain**
84:20

**Gainesville**
9:2

**gauge**
80:11

**general**
8:20 12:3
13:24
44:7,10
57:6
67:16
79:3

**generalized**
12:9
30:23
46:3

**generally**
26:3

**generic**
31:22

**give**
12:10,20
61:9
90:16
91:1

**giving**
97:16

**good**
40:8,9
101:7,8,
9,12,15,
22,23

**grade**
96:24

**graduate**
7:8,14

**graduated**
7:19
48:1,2
51:24,25
85:3

**graduating**
8:1 85:3

**graduation**
85:4

**great**
97:8

**greater**
100:17

**growling**
87:2

**guess**
65:8

**guidelines**
32:23

**H**

**half**
98:23

**hallway**
89:24

**hand**
17:20
88:18

**handle**
72:2



**handling**
49:17

**happen**
35:1
67:13
72:18

**happened**
15:16
16:5
73:10

**happy**
49:18

**harassed**
80:20

**headaches**
52:20

**headset**
92:21

**health**
17:25
20:8
24:10
61:9
79:17
80:7,13

**healthy**
97:25

**hear**
89:20

**hearing**
21:22

**heart**
33:19
66:2

**helped**
27:9
38:15
91:22

**helping**
31:14
63:6

**helps**
69:5 72:5

**hesitated**
14:14

**high**
24:18
52:12

**higher**
32:22
100:11

**history**
11:9
21:11
22:9 23:7
33:10,17,
20,24
34:2,3
36:25
52:10
69:20
72:22
91:1,5

**hives**
67:18

**HLD**
24:13,15

**holding**
77:19

**home**
78:9,11
93:25
94:5

**homicidal**
32:2

**honestly**
24:3

**hope**
85:21

**hospital**
16:25

86:18

**helps**
69:5 72:5

17:3,10,
11 68:6
89:4 90:2

**hospitals**
14:19

**hostile**
80:23

**hour**
72:24

**hours**
8:14

**house**
44:12
45:5
70:17

**HPI**
22:9 31:3
49:17

▮
22:10

**humiliated**
80:21

▮

32:21

▮

24:15
32:6

▮

22:11
41:25
52:11

──────

**I**

**idea**
102:18

**ideation**

32:2

**identificat
ion**
17:22
20:2 34:8
47:13
48:25
50:23
51:9
53:11
60:17

**Illness**
52:10

**illnesses**
99:23

**imitating**
90:10

**impacting**
86:11

**impacts**
87:25

**impede**
37:18
101:20

**impeded**
37:20

**impediment**
101:1
102:8

**impending**
66:2,4

**implies**
91:13

**impression**
22:3
23:25

**improvement**
49:16
80:12

**improving**

40:16

**inaudible**
68:17
87:17

**Inaudubile**
82:19

**incident**
64:5

**include**
35:23
97:24

**included**
33:9

**includes**
96:14

**including**
61:10

**income**
100:20

**increase**
33:21
94:14

**increased**
50:3,9
63:2
66:2,3
76:12
81:9

**indication**
32:11,16
74:23

**individual**
25:18
92:20

**individuals**
12:13

**induce**
95:9

**inducement**
98:6



ANDREAS SANTAYANA, M.D.
RING vs BOCA CIEGA YACHT CLUB

December 04, 2019
Index: inducing..legal

**inducing**
72:7

**infarct**
32:18

**infarction**
33:19

**inflamed**
67:23

**inflammation**
67:19
69:5

**information**
24:10
35:23
40:10
49:4 73:4
74:21
84:21
102:1

**inhibitor**
31:17

**initial**
26:12,18,
25 27:11

**initially**
20:25

**injuries**
19:1

**inpatient**
17:9

**insect**
73:8

**inside**
45:21

**instances**
35:7,10
90:3

**insurance**
35:8,9

97:8
100:19
101:8,13,
15,23
102:7,17

**intake**
21:1,14,
15,17
43:16

**intense**
12:6
93:12

**interacting**
44:14,16,
17 70:17

**interactions**
44:25
45:2,4

**interest**
87:22

**interested**
29:18

**internship**
7:16

**interpret**
78:24

**interpretation**
75:20
93:7

**introduce**
19:25
34:6
48:23
51:7 53:9
60:15

**intubated**
68:25

**involved**
15:23

30:19
38:4

**involves**
64:11

**issue**
58:23
90:9

**issues**
13:6
54:9,11

**items**
31:3

**IV**
69:8

**J**

**January**
81:6,10

**Jitters**
65:24

**job**
43:8,13
49:21
76:2
92:20
93:10,13,
15,19

**judgment**
102:4

**July**
20:6
50:18
59:14
69:13
79:24
80:9

**June**
6:20,21
85:5

**K**

**kind**
8:19 19:2
27:1

**kindergarten**
73:3

**knew**
71:7
91:21

**knowing**
33:20
74:21
75:19
101:4
102:1

**knowledge**
7:10
18:11
26:23
73:19
94:7

**L**

**lab**
14:16,18
24:22
25:2 32:7

**labeled**
91:17

**LAHART**
30:14
54:23
85:24
88:17
99:13
102:13,
15,25

**laid**

77:16

**large**
69:7

**Lauren**
82:6

**law**
87:15

**lawsuit**
28:24

**lawyer**
82:18

**lawyers**
82:10

**lay**
77:14

**layman's**
24:18

■
32:15,21

**lead**
66:20
99:25

**learn**
40:5

**leash**
77:19

**leave**
74:18
75:6

**leaving**
44:11
70:17

**left**
55:21
85:22

**legal**
59:24
63:18
84:17



ANDREAS SANTAYANA, M.D.
RING vs BOCA CIEGA YACHT CLUB

December 04, 2019

legislature
    18:25

legs
    92:18

lessened
    93:1

letter
    46:17

letters
    55:24
    58:12

level
    10:17
    95:13

license
    7:21,23
    8:3,4,11
    16:14
    18:1

life
    11:24
    12:5
    23:16,19
    30:24
    38:10
    39:17
    40:17
    42:12
    43:23
    44:1
    45:15,16,
    18 49:18
    62:7 70:3
    75:24
    76:9,11,
    20 86:11
    87:18,25
    93:24
    96:7,11
    102:3

life-saving
    91:16

life-
threatening
    61:11
    62:1
    69:17

limit
    62:12
    70:3
    71:19
    75:24
    89:6

limitation
    10:11
    85:14
    87:18
    88:23
    94:10

limitations
    36:25
    37:3,4,
    12,15,18,
    20 39:13,
    14 40:1
    54:15,17
    55:1,6
    61:16,18,
    25 62:2,
    3,5 88:24

limited
    42:18
    44:2,5
    45:2,4,8
    54:19
    70:5
    94:12

limits
    42:12,13

link
    74:5,7

lipid
    24:21

list
    20:22,23

37:1 72:4
85:11

listed
    21:7 25:1
    33:11
    38:11
    61:2 79:8

lists
    32:21

live
    22:14
    23:21

lived
    46:15

living
    12:15
    22:15
    37:18,21

logistics
    83:18

long
    6:15
    8:13,23
    29:6
    69:19
    81:1 84:2
    98:21

long-term
    64:7
    69:11,16

looked
    60:6 63:2

Lorna
    82:4

losing
    23:20

loss
    31:3

lot
    21:12
    23:21

44:21
49:4
52:20
71:1,4,7,
9 100:7

lots
    97:8

low
    101:16

lower
    32:13

_____

**M**

_____

made
    48:6
    67:22
    100:22

magnesium
    69:3,4

mail
    36:17
    55:24

mailbox
    36:15

major
    9:3 39:17
    43:23
    44:1
    64:16
    70:3
    87:12
    96:7,10

make
    45:11
    55:16
    80:15
    94:16
    97:23
    99:2
    102:4

makes
    25:13,15
    26:18
    30:4
    100:24

making
    21:24
    77:25
    78:2

manifest
    67:5

manifestati
on
    11:16

March
    19:17
    51:13,19
    53:2

mark
    17:21
    20:1 34:7
    47:11
    51:8
    60:16

marked
    17:22
    20:2 34:8
    47:13
    48:25
    50:23
    51:1,9
    53:11
    60:17

matter
    91:17

Mccaleb
    51:22,23
    52:1,18,
    24

meaning
    91:1
    96:21



means
   60:3
   71:16
   94:25

measure
   33:3

medical
   7:7,8,11,
   12,19
   8:1,16,
   20,22,23,
   25 9:5,
   10,25
   14:11
   18:1 20:9
   26:5,21
   30:4
   34:14
   46:17
   53:19
   68:14
   72:17
   73:9,14,
   18 84:17
   87:23
   90:2,14
   91:10,14
   93:17
   94:18
   96:6,13,
   18,25
   97:7,11
   101:1,9
   102:8,9

Medicare
   35:12,13

medication
   31:9
   49:15
   63:8
   66:17
   86:9,13,
   14,18

medicine

6:14
7:21,23
8:18
14:12,22
16:8
25:25
36:18
88:25
89:7
98:22
101:18

mellitus
   33:18

memory
   25:22
   80:14

mental
   9:6
   11:12,14
   37:17
   61:9
   79:17
   80:7,12

mention
   26:15
   30:24
   49:23
   51:4,5,16
   52:25
   56:8,11
   63:17
   75:12
   76:4
   79:25
   102:7

mentioned
   16:4,6
   17:15
   26:16
   27:7,8,
   12,16,17
   31:15
   37:9
   40:25

43:10
45:3,17
46:13,14
61:14
63:18,24
64:2,4,10
65:11
66:16
75:15
76:6,22
80:2 81:2

mentioning
   22:17
   25:7
   38:17
   45:19
   48:14
   50:20
   54:6 63:9
   79:22

message
   55:21

met
   19:24
   26:13

mg
   31:22
   49:12
   50:5 63:3

middle
   33:16
   43:4,8
   49:21
   52:9

mild
   49:15
   50:6
   66:16

mildest
   11:23,25

mind
   12:6
   37:22

miner
   93:9,11,
   14

minutes
   72:24

misleading
   92:5

mitigate
   40:15,19
   57:18

mitigated
   40:22

moderate
   86:17

modify
   100:20

moles
   37:8

money
   23:22
   97:8

month
   15:2,6,24
   19:10
   63:11
   79:11
   80:10

months
   73:14

mood
   76:25
   77:2 78:5

moonlighting
   16:15,22
   17:16
   88:22

morning
   16:24
   19:15

mother
   33:18

mother's
   33:20

mouth
   67:20

move
   22:14,18
   31:3
   51:12

moved
   77:15

MRI
   90:20

multi-
effect
   12:8

multiple
   41:24
   44:8 62:6

muscle
   25:9

muzzle
   26:8

myocardial
   33:19

─────────
      N
─────────

NAD
   29:25

named
   59:19
   81:16

narrow
   73:4

neck
   67:20

needed
   15:14



46:8,10
54:1,7
57:8
74:16
82:20
89:3
101:24

**needing**
44:7 79:4

**neurological**
18:23
19:1

**NICA**
18:13,16
19:4

**non-disabled**
73:24
80:25

**normal**
37:11
42:23
75:24
76:9,10
86:6 89:4

**note**
20:5,15
22:10,13,
22,25
24:15
30:8,9,22
31:8,25
32:10
33:15
34:16,17,
18 35:17,
18,20,23
36:5,12,
13,22
37:2
39:11,22
41:1,2,8,
10,13

43:15,19
46:7
47:16
48:4,19
49:2,5
50:25
51:3,11
52:5,9,
10,24
53:2,14,
16,18,22,
24 54:3,
7,8,14,16
55:8,12,
19,23
59:6 63:1
76:24
90:11

**noted**
32:19
90:8

**notes**
61:13,14
83:10,15

**notice**
44:15
57:23

**noticed**
66:18
80:12

**noticing**
37:8

**number**
17:21
20:1,21
24:25
29:4,5
34:7,10
47:12
48:24
51:8
53:10
60:16
64:6

69:11
72:4,21
73:21

**numbers**
25:1
32:7,15

**nurse**
20:25
21:14,15,
16 43:16,
19 44:17

---

**O**

**obedient**
97:19

**obese**
30:3,5
33:12

**Object**
61:19,22
71:15
75:1,8
89:11
99:3
101:2,11,
19

**objection**
92:6
101:25

**objective**
13:3
29:21

**objectively**
13:2 67:2

**observable**
13:4 66:1

**observation**
44:24

**observations**

52:5

**observe**
13:2
23:12
65:17,20
67:2,7,
10,14
89:23
98:25
99:6

**observed**
13:4
27:20,21
45:5
57:11
77:5,12
88:3 90:7
99:24

**obtain**
8:2,4
101:1

**obtained**
56:4
76:14

**obtaining**
102:8

**occupation**
6:13

**occur**
16:15

**occurred**
15:20
23:23

**offered**
98:6

**office**
37:12
57:13,23

**open**
71:9,24

**opinion**

73:22

**opportunities**
80:24

**opportunity**
73:23
74:9,24

**opposed**
7:9 9:6

**order**
8:11
39:12
40:1
54:14,16
60:8,22
73:22
94:5

**ordering**
102:21

**organization**
84:16

**original**
31:2
53:24

---

**P**

**paid**
81:18

**panel**
24:21

**panic**
11:15
12:14
64:10,11,
15,23
65:6,9,
11,15,16,
20 66:24
88:4,5



**paragraph**
22:20
23:19
29:7 61:5

**parcel**
65:6

**part**
9:16 10:9
16:7 20:7
29:8
30:18
34:21
41:11
46:15
65:6
73:20
80:16
84:4
85:11
87:1 95:8

**part-time**
43:6

**partner**
23:20,23
24:1

**parts**
37:10

**passing**
63:25

**past**
25:6 32:4
42:25
90:14
91:2

**patient**
10:6,14,
22 11:7,
9,15
12:25
13:8,14,
15,16
21:13
22:4

23:4,13
25:5
29:8,15,
21 33:9
34:2,22
35:5,7,15
36:23
41:17,23,
24,25
42:3,9,10
45:13
47:2 52:6
55:13
59:3
62:16
65:14,20
66:5
67:6,25
68:4,22,
24 69:9,
13 70:24
81:22
83:11,25
87:20,25
88:2
89:9,17
90:8,13,
23,25
91:17
92:25
94:9,15
95:21,25
97:22
98:4
99:2,6
100:9,15
101:6,22

**patient's**
11:24
12:5
21:17
23:1
33:13
34:23
36:24
42:14

66:20
68:1
87:25
100:21

**patients**
10:2 11:3
12:18,24
14:2
17:11
25:24
32:24
39:22
58:20
86:23
90:1
93:25
96:21
97:1
99:22

**Patrick**
47:24
59:5

**pay**
18:9 19:7

**pen**
38:23

**people**
12:12
26:1
44:21
70:18
78:13
85:25
86:6
92:16
93:6,8
96:22

**percent**
12:24

**percentage**
33:3,4
34:4

**perform**

11:8
13:20
76:2

**performed**
8:7 17:17
21:13
32:7
43:16

**performing**
10:2 44:2

**period**
69:19
80:11
81:10,13

**permitted**
16:8,12,
14 81:23
82:2,17

**person**
27:24
41:18
44:3
45:12
60:3
64:24
73:24
76:16
80:25
86:3
87:24
92:10,13,
22,23
93:16
94:25
95:5,10,
23 97:6
99:19
100:3,4,5

**person-to-
person**
44:16

**personal**
26:22
31:3

75:20
90:9

**Personally**
78:14

**pet**
26:4,19,
20 95:16

**pharmacy**
52:17

**phone**
92:13,21

**PHQ**
13:23

**phrase**
37:14

**physical**
9:7
11:10,12
29:19,20,
24 30:8,
16 37:6,
10,17

**physician**
6:14 18:9
24:5 35:4
37:16
95:23

**physicians**
34:23
35:14
41:3,6,12
47:23
78:2 84:4

**pick**
55:23,25

**Pinellas**
42:21
43:3
49:24

**Piper**
72:5 74:1



78:16
79:1,19
87:2

Piper's
79:18

place
18:11
26:3
44:21
45:20
71:13
88:7,10
100:10,16

places
71:1,4

plaintiff
59:20

plan
6:22

play
33:23
93:21,23

point
6:3,22
31:4 53:3
68:18

policy
25:25
26:2
88:24

policy/
schedule
89:1

pool
92:14,19,
23

position
6:24

positive
68:12

possessions

23:21

possibly
65:22
67:17

postgraduat
e
8:5,6

potentially
87:17

practice
7:21,23
16:8 19:5
24:9,11
32:8
87:15
89:6 91:4

practiced
98:22

practices
14:19

practicing
16:14
34:22
88:25

precaution
70:20

precautions
71:21

preference
7:7,11

preparation
14:5
84:13,19

prepared
83:10

prescribed
31:10

prescriptio
n
40:12

present
25:13
52:10
58:10
88:8,11

pressure
52:12
67:4 68:2

pretty
51:11
62:6

prevent
40:15
56:2
70:21

preventing
44:11

preventive
101:17

previous
6:8 32:8

primarily
11:12

primary
58:15,21,
23,24
59:1,4

primary-
care
24:5

printout
17:25

private
90:1

problem
45:21
71:25
72:2

problems
18:23

process
46:24
63:18

profession
84:17

professiona
l
73:21

professor
9:16

profile
18:1

program
6:16 7:4
8:7,8,23,
24 12:17
16:12
17:18
18:4,16
19:6
34:21
41:13
47:21
51:21
81:20,25
82:3,11,
15,21
83:16
85:4,9,12
93:17

progress
20:5
30:22
37:2
43:15
47:16
48:4,19
49:2
50:25
51:11
61:13
63:1
83:15

prompted
53:22

prone
64:23

proper
101:1

proportion
12:17,23

provide
26:24
35:22
77:4
78:12
94:12

provided
18:22
46:12
54:3,5
57:19
94:2

provider
14:11
58:21
59:1,4

providers
90:18

providing
21:14,15
25:17
57:21
84:14

proximate
80:17

psychiatric
30:7

psychologic
al
26:17

psychothera
py
25:18



**PTSD**
  12:13

**publicly**
  80:21

**published**
  32:23
  84:15

**Publix**
  52:15

**pulmonologist**
  48:7
  59:7,10,16

**pure**
  87:22

**purpose**
  10:5 54:8

**purse**
  38:25

**pursue**
  97:1

**put**
  32:24
  71:25
  83:4

---

**Q**

---

**quadriplegic**
  92:12,18

**qualifications**
  18:2
  84:22

**quality**
  40:17

**question**
  6:8,9

26:18
38:6
51:15
64:9 75:2
78:18
92:5
94:21
95:7
99:15
100:14

**questionnaires**
  13:23
  14:2,3

**questions**
  5:23,24
  6:11
  9:22,24
  13:25
  21:12,18
  41:21
  54:25
  85:19
  88:17,22
  91:23
  98:18
  100:8
  102:12

**quick**
  28:9

**quickly**
  47:11,16
  63:25
  68:18
  72:19,23

---

**R**

---

**ran**
  41:12

**range**
  30:19

**rash**

67:18

**rate**
  66:2

**reaction**
  15:10,16,20,25
  16:5
  27:19
  38:1,2,4,21 39:4,6,9 57:13
  62:1,5,13
  67:7,12,17 72:7,16 73:8,11 79:15
  100:10,16

**reactions**
  27:13,18
  56:21
  61:11
  62:25
  72:23
  95:3,10

**read**
  22:21
  60:1,5,10,13
  103:2

**real**
  45:21

**realized**
  38:20

**reason**
  6:5 26:5
  47:15
  52:4,7
  71:9
  73:17
  74:16
  75:5
  85:25
  87:23
  89:12,16

101:22

**reasonable**
  100:8,9,15 102:2

**reasons**
  97:12
  98:3

**recall**
  9:24
  14:20
  15:2,9,22
  16:6
  18:19
  19:23
  21:8
  22:17
  23:5,15
  24:3
  25:10
  26:9,14
  27:3,11,16 28:7,8,17,18
  31:7 32:5
  36:6,11
  37:5,13
  38:12,17,22 39:10,20 40:21,24 41:5,15 43:10,14 44:6,13,18
  45:17,24
  46:5,7,13
  48:13,17
  50:1,14,15,17,22
  52:23
  54:1,12
  55:3,7,20,24
  56:7,14,25 58:1,6
  59:17

62:3
63:22
64:4
65:13
66:13,22
69:8,18,25 70:19
72:12
74:14
75:15
76:5,22
77:8,9,14,17,21,24 78:4
79:16,25
80:6,14
81:3 87:2
97:15,21

**received**
  20:8
  27:2,5
  36:18
  55:9 56:9
  82:8
  85:12

**receives**
  18:4
  56:16

**receiving**
  24:8
  56:11,13

**recent**
  24:2,21
  30:24

**recently**
  22:14
  23:20
  25:6
  68:10

**recognize**
  34:11
  38:20
  53:13
  56:17



88:13

**recognized**
38:17

**recognizes**
27:13,17
72:13

**recommend**
71:13,19
73:16
96:5
97:11

**recommendat
ion**
100:22

**recommended**
82:18

**record**
5:17
16:25
20:7 25:2
28:11
71:18
92:8
99:12

**records**
14:11,15,
16 24:8
42:20
46:18,22
53:6 55:9
90:11,15,
17

**RECROSS-
EXAMINATION**
102:14

**red**
67:23

**REDIRECT**
98:19

**reduction**
18:4,5

**reductions**
18:5

**refer**
18:21
24:22

**referral**
48:6,12

**referred**
85:2

**referring**
29:10
34:17
59:6

**refill**
15:14

**reflect**
16:25

**reflecting**
18:1

**regard**
94:24

**regular**
26:19
60:11
64:20
76:16

**regulations**
60:6

**reiterate**
32:7

**related**
44:6
62:19
63:15
74:3

**relation**
43:13
56:23
84:10

**relaxed**

77:6,8

**release**
24:10

**reliable**
14:3,4

**rely**
21:17
86:23
91:4

**relying**
94:10

**remember**
6:6 9:19,
20 10:21
14:25
15:15,19,
23,25
16:3
19:21
21:4
22:15
23:22,25
24:4,8
25:7,19
26:8
27:4,8
28:5,21
30:25
31:4 32:3
35:18
36:8
37:19
38:19
43:11
44:9
45:19,22
46:1,16
48:14
49:20
50:12,19
52:21
53:3,21
55:5,18
58:3

59:7,15
63:9,20,
22 64:2
69:22
77:18,22,
25 78:25
79:22
80:1
91:23
102:10

**remembering**
21:24

**removal**
80:22

**repeat**
55:11
64:22
75:2 95:7

**report**
43:21
90:20
94:5,10

**reported**
33:18
49:14

**reporter**
5:23
89:20
102:21,24

**reporting**
48:8

**represent**
17:24
20:4,7
47:17
49:2
60:19
71:5 73:1
74:15

**request**
55:16
83:19
90:13,17

**requested**
10:22
46:16,17,
19,22
49:24
55:12
82:10

**requesting**
36:5 46:7

**require**
90:14

**required**
11:4 26:5
35:8,9
90:22,24
94:5

**requirement
s**
35:12,13

**requires**
73:25
86:9

**requiring**
23:21

**residency**
6:15,19,
21,25
7:17 8:7
9:21 10:9
12:16
13:7
16:7,9
17:18
19:6 20:9
25:25
34:21
41:3,7
51:20
58:17,18
81:20
84:5
85:12
89:5
93:17



ANDREAS SANTAYANA, M.D.
RING vs BOCA CIEGA YACHT CLUB

December 04, 2019
Index: resident..Santo

**resident**
6:14
10:13
34:14
47:6,19,
20 50:19
51:19
52:2
53:19
59:1
82:16
85:8
91:9,13

**residents**
7:5 17:10
47:25
58:4,8,
12,22,25
78:1 84:9

**resources**
84:20

**respect**
57:3

**respiratory**
68:25

**response**
20:8
38:18
69:6,21
72:13
92:9
96:16

**responses**
52:21
56:18
97:16

**rest**
30:16
39:25

**restriction s**
43:12

**result**
80:18

**results**
14:18

**retained**
81:17

**retainer**
81:18

**retrieve**
38:24
57:8
95:18

**retrieved**
91:15

**retrieves**
38:23

**returned**
36:19

**reuptake**
31:17

**reverse**
68:19

**review**
83:14

**reviewed**
14:6,10,
21 20:19
21:3
84:14

**Ring**
15:15,24
16:4
19:21
20:5,10,
21 21:21
22:4,13,
15 23:9,
11,22
24:9
25:7,20
26:13,25

27:19,23
28:15,24
30:9,24
31:5 32:3
33:2,17
35:20
36:4,8,
18,23
37:11,19
38:8,9,15
39:3,21
40:19
41:7,16
42:17,23
43:2,7,
11,20
44:1,9,
14,19
45:4,19,
25 46:1,
16 47:17
48:8,11,
19 49:21
50:20
52:19,21
53:3,23
54:6,7
55:5,9,12
56:3
58:5,7,11
59:7,9
62:8,15
64:9
65:5,15
66:9
67:11
69:12
70:5,25
71:6,13
72:15
73:1,7,
12,23
74:12,15,
23 75:4,
17 78:25
79:11,22
81:1,6,17

83:6,23
84:11,24
86:14
88:4 89:9
90:6
98:7,10
102:6

**Ring's**
14:10,21
15:7
19:10,13,
19 20:19
24:5
28:19
37:4
38:24
41:11
42:20
45:5
51:4,16
52:11
54:18
60:21
61:9,15,
24 63:2
64:7 65:5
67:15
69:11
70:3
78:15
79:17
80:7,17
82:10
83:14
84:21
91:21
97:14,17
99:24
102:17

**risk**
32:17
33:3,21
72:6 74:2
95:16
96:16
100:9,10,

15,17

**risks**
34:4
40:16
56:3
62:12

**room**
85:22
88:16

**rotation**
17:9

**routines**
45:6

---

**S**

**salary**
102:7

**Samantha**
14:10
36:23
89:9 90:6
97:14
98:7
99:23

**Samantha's**
40:3,11

**Santayana**
5:16,18,
19 6:13
14:5 16:7
19:9
28:14,23
41:16
53:13
59:18,23
75:17
78:8 83:9
85:25
98:21
103:1

**Santo**



47:25
48:6
59:6,13

**sat**
60:1

**save**
23:22

**scale**
13:23

**scheduled**
6:18
82:22
84:25
89:3

**school**
7:7,12,19
8:2,22,
23,25
9:5,10,25
15:16
36:10
42:21,25
43:3,4,8
49:21,25
90:2

**schools**
7:8

**scope**
99:3

**screening**
13:18,21
52:11

**screenings**
13:20

**screens**
71:25

**scrubs**
16:25
17:1

**section**
22:10

24:14
25:12
29:6,13,
15,19
33:16

**Security**
10:15
11:5 94:4

**seed**
57:3

**seeds**
15:21,23
39:6
56:19,21
79:6

**Selective**
31:17

**selectivity**
96:25

**self-report**
86:23

**sentence**
39:25
81:1

**separate**
11:17,19

**separation**
23:20,23
24:1
80:22

**serotonin**
31:17

**sertraline**
31:22

**served**
60:20

**service**
17:10
18:21
35:24
36:2

39:22
40:3,14
56:2
60:7,8,9,
11 72:5
77:1 78:5
79:18
80:22
87:21
89:15
91:18
95:16

**set**
18:24

**setting**
16:9

**severe**
12:6,12,
14 19:1
32:21
61:10,25
65:21
66:24
67:11,25
68:6,24
72:15
86:17
96:16

**severely**
70:25

**severity**
73:11
95:25

**shape**
41:14

**sheet**
18:2

**shift**
17:8,12,
13

**shifts**
16:15,22
17:16

**shock**
68:1,3,7,
14,23
69:7
95:21

**short**
63:23

**show**
53:6 80:4
92:8

**showing**
27:1

**SI**
32:1

**SI/HI**
31:25

**sick**
42:9,24

**side**
25:8
33:20
73:13

**sign**
34:13,19
53:18
91:10

**signature**
34:11,13
53:14

**signed**
91:9

**significant**
96:5

**signs**
13:1
23:12
65:19
66:8,19
67:1,8
98:25

**similar**

67:4 90:5

**simple**
94:25

**simply**
64:18

**sit**
16:24
70:4
98:21

**sitting**
92:12

**situations**
74:3
101:4
102:3

**skin**
30:17
67:18,22

**skip**
49:5

**sleep**
48:8,15,
20

**sleeping**
48:9 96:7

**small**
75:21,22

**smiled**
92:9

**smiling**
92:8

**smoked**
33:25

**smoker**
33:3,6,9
34:2

**Smoking**
33:25

**social**
10:15



11:4
12:12
21:10
33:24
44:25
94:3

**socializing**
96:10

**solve**
71:24

**somebody's**
66:24
68:13

**sort**
7:16
12:18
13:1 25:9
27:4
43:12
49:24
56:15
59:23
64:20
65:19
66:19
67:1 73:8
81:9
102:8

**sorts**
70:21

**sound**
20:11

**sounds**
20:15

**South**
7:13

**speak**
23:4 24:7
30:23
77:1
78:16
81:24
82:19

83:16
84:2,3

**speaking**
13:12,13,
14,15
24:4
32:11,12
44:5
55:18
62:11
64:18
79:3
92:16

**specially**
40:14
56:1

**specialties**
8:21

**specialty**
7:5 8:18

**specific**
9:12,24
10:12
19:23
22:6,7
34:5
38:12
54:2,7
55:1,3
57:6 62:3
70:6
76:20
81:3

**specifically**
9:11 10:8
23:15
24:12
35:24
40:21
45:17
54:18
56:16
57:18

60:5
63:13
69:8
76:23
80:1
81:17
83:7
85:15
99:5
102:10

**specifics**
22:19
27:16
36:6

**spectrum**
11:18,20,
21 12:5,
7,19

**speculate**
27:6

**speech**
67:4

**spend**
47:9 51:1

**spoke**
29:2 32:3
55:20
56:25
57:5
82:5,11
83:17

**spoken**
19:10,13
27:22
84:9

**SSRI**
31:15

**stabilization**
76:25
77:2 78:5

**staff**

45:1 78:1

**stairs**
21:25
43:22

**stand**
31:16
32:1

**standard**
90:25
91:4

**standardized**
13:22,25

**standards**
84:14

**stands**
18:19
22:10

**start**
17:13

**started**
6:11 17:6
79:20,21

**starting**
7:17
31:22

**starts**
20:5 49:3
61:5

**state**
5:16 7:24
10:16
26:4
66:10
101:7

**states**
25:5
52:19

**statin**
25:6,8
32:11,16,

25

**statins**
32:12

**stations**
52:16

**status**
33:25
43:6

**staying**
6:23

**steps**
38:10,12
62:11

**steroids**
69:2

**sting**
67:16

**stop**
76:15
101:9

**stopped**
70:13

**stopping**
76:17

**stops**
70:16

**store**
36:15

**stress**
52:20,21,
22 64:4

**stressed**
64:3

**stressful**
22:18

**stressors**
23:16,19
30:24
31:1 43:8
49:18



strict
  95:24

stroke
  32:17

struggle
  64:7
  69:11,16

struggled
  69:19

student
  15:20

students
  7:8,11

stung
  67:11,13
  72:19
  73:2,7,12

subgroup
  64:11

subjective
  29:8

subjectivel
y
  29:16

subjects
  61:8

submitted
  10:15

subpoena
  20:8

substantial
ly
  70:2

suffer
  86:24
  87:11

suffered
  80:17

suffering
  23:13

suffers
  87:5,8
  99:13

Suicidal
  32:2

suicide
  32:4

summer
  20:12,13,
  14

sunflower
  15:21,23
  39:6
  56:19,20
  57:3 79:6

support
  25:18
  26:24
  40:3,11
  57:20,22,
  24,25
  77:4
  78:13

suppose
  100:18

surprise
  40:8
  87:14
  92:2

surprised
  40:5

suspicion
  90:4

sweating
  65:22

swelling
  67:19,20,
  21 73:9

swim
  92:19

swimming

92:23

switch
  29:5

switched
  49:11

switching
  31:15

swollen
  73:13

symptoms
  13:1
  23:12
  26:17
  29:9
  49:16
  65:19
  66:8,19
  67:1,8
  72:6,20
  73:5
  86:10,24
  94:17
  95:25
  96:5
  98:25

system
  30:19

---

**T**

table
  77:15,16

taking
  5:24 68:5

talk
  23:16
  30:14
  35:5,6,14
  39:4
  41:2,13
  54:23
  56:4

83:23

talked
  40:23
  43:7
  61:12
  63:7 74:5
  94:3
  101:23

talking
  11:23
  27:4
  28:15
  58:4 77:7
  78:22
  92:12
  101:15

Tampa
  7:13

targeted
  46:2

teacher
  40:7
  43:4,5,9
  49:19,21,
  22

teaching
  34:23
  35:4,14
  41:3,6,12
  78:2 84:4

telemarkete
r
  92:20,24

telling
  15:15,19
  22:15
  23:9,22
  29:9,16
  36:8
  37:19
  38:19
  50:5
  52:21

91:1

tells
  11:15

term
  95:24

terms
  11:24
  24:18
  46:5,6
  75:20
  79:3
  93:13,15
  94:25

test
  86:19,21
  97:5

testified
  71:6
  72:16
  73:2
  74:16
  75:4

testify
  60:23
  81:18
  83:5
  98:13

testifying
  81:21
  83:1

testimony
  61:7,9
  64:7
  71:12
  84:15
  98:8

tests
  13:21
  14:18

therapy
  25:6,9,
  12,15,16



26:4,16,
19,22,24
35:25
36:2,9
77:3
91:18

**thing**
25:9
37:22
48:3 72:3
76:8,20

**things**
15:11
43:20
62:6 66:1
76:14

**thinking**
17:12
26:7 38:1
39:7
43:15,23
66:8,23
72:9
79:10
81:1,5,
15,20

**thought**
31:13
97:18

**threatened**
80:21

**throat**
67:19

**time**
10:21
13:7,10
17:13
19:16,21,
23 20:12
21:5
23:17
27:23
29:3 32:1
36:8 39:3

43:3
47:10
50:18
51:1 53:4
55:4,19
63:3
68:11
69:19,23,
25 73:2,5
80:11
81:10,13
83:22
85:8
86:1,4
94:12,22
97:21
101:7

**times**
40:4 44:5
45:3
55:25
67:5
72:21

**tired**
48:15

**titled**
22:21
33:17

**tobacco**
34:1

**today**
5:20
14:22
16:24
17:8,12
19:14,19
28:25
40:5 70:4
74:11
80:8 82:7
84:10,13,
19 98:8,
11,21

**told**

20:24,25
28:17
38:22
39:3
52:19
57:2,15
69:22,25
70:16
76:19
82:24
83:25
98:10

**tolerating**
49:14

**ton**
71:10

**top**
20:18,22
29:6,7,
13,14
30:22
31:8
36:13
48:5

**topic**
10:1
61:16
64:6

**topics**
8:15,17

**trained**
25:17
26:23
40:14
56:1
97:19

**training**
8:5,6
10:10
18:3
27:1,5,7,
8 56:9,
11,13,15
59:24

79:20,23
80:1,2,5
85:12
90:2

**transcribe**
25:2

**transcript**
103:2

**transcripts**
14:7

**trapped**
93:11

**treated**
89:17

**treatment**
73:9
91:2,16
96:13,18,
25

**trial**
60:23
61:9
82:22
83:2,5
85:7
98:14

**triggers**
55:2

**trouble**
39:18,19
44:2 48:9
61:17
70:12

**turn**
20:17
21:25

**Twenty**
34:1

**type**
25:17
46:9

**types**
12:15

**typical**
10:6 25:8

**typically**
13:16,18
93:25

**typing**
23:3

_____

         **U**

**ultimately**
80:19

**Um-hmm**
11:1

**undeliverable**
36:20

**undergraduate**
9:1

**underlying**
64:21

**underneath**
18:13
22:20
29:19
33:24
34:13

**understand**
6:25
51:18
80:9

**understanding**
7:4 57:7
80:8

**understood**
95:7



**University**
  7:13  9:2

**unreasonable**
  95:2,4,
  11,14,15,
  17

**Unrelated**
  25:16

**UPS**
  36:15

**urgent**
  16:15,17

**USF**
  8:23
  9:10,25

**USMLE**
  8:12  9:21

---

**V**

**vaguely**
  46:13
  63:18

**values**
  14:18

**variable**
  72:25

**variety**
  98:3

**venom**
  56:24
  57:1
  69:24
  70:25

**Venza**
  28:9
  61:19,22
  71:15
  72:11
  75:1,8

85:17,22
88:16,20
89:13,22
92:7
94:21,23
99:3,10
101:2,11,
19,25

**verbiage**
  54:2

**versus**
  92:13,19

**visit**
  14:24
  15:1,3,4,
  6  16:3
  19:10
  21:3,4
  23:1,5,11
  24:21
  25:19,21
  26:11,12
  27:1,12,
  24,25
  28:15,17,
  20,22
  29:4  31:5
  34:23
  35:2  36:4
  39:5,7
  43:17
  47:17,18
  49:8,10,
  11,14
  50:13,15,
  20  51:13,
  14  55:10,
  14  59:12,
  13,14
  63:10,14
  64:3
  66:9,11,
  12,15,18
  71:13
  79:10,23

100:10,16
101:24

**visits**
  14:23
  35:11
  45:8,25
  58:8,23
  62:8
  77:13,23
  80:11,15
  81:5,7
  84:25
  101:17
  102:6

**voice**
  92:22,24

---

**W**

**wait**
  97:6

**waive**
  103:4

**walk**
  30:3

**walking**
  21:25
  43:22

**wanted**
  18:3
  31:14
  37:9

**wasp**
  73:12

**watch**
  74:19
  75:7,10

**watches**
  74:22

**water**
  45:20

**wearing**
  16:25
  26:8
  92:21

**week**
  49:19

**weeks**
  29:1

**weight**
  33:11,13

**well-behaved**
  26:10

**well-off**
  96:22

**Wellbutrin**
  31:9,18
  49:12

**wellness**
  35:11

**whatnot**
  42:11

**windows**
  71:9,23

**wishes**
  71:20

**woman**
  28:3,5,
  16,19

**woman's**
  28:18

**women**
  18:22

**word**
  40:8,9
  65:25

**words**
  30:2
  33:19

**work**
  17:17
  23:2
  24:22
  32:7  40:6
  42:14,18
  43:12
  49:18
  52:1,11,
  20,22
  58:16
  64:3,5
  86:1,3,6
  88:23
  89:2

**worked**
  16:18,19
  36:10
  52:1

**working**
  17:5
  66:17
  70:14

**works**
  5:22
  15:17

**worry**
  66:3
  95:5,11

**worrying**
  76:13

**wrist**
  77:20

**write**
  22:25
  23:8,19
  25:11
  35:20
  39:11,22
  49:16
  53:22,23
  54:16
  56:1
  58:11



78:20

**writes**
   52:5

**writing**
   35:18
   54:8,14

**written**
   25:23
   50:25
   52:24

**wrong**
   19:4
   97:18,25

**wrote**
   20:15
   22:22
   31:2,21
   41:1,7,10
   55:8,19

━━━━━━━━━━━

   **X**

━━━━━━━━━━━

**X-RAY**
   90:20

━━━━━━━━━━━

   **Y**

━━━━━━━━━━━

**Yacht**
   31:6
   52:25
   54:4  71:8
   73:25
   74:10
   80:19,20
   88:21
   91:7,20
   97:17

**year**
   6:17 7:14
   8:5,6,11
   9:21
   10:23,24,

25  11:2
18:10
19:17
41:17
63:4
68:11,22
98:4
100:25

**years**
   16:13
   23:7 34:1
   42:25
   73:3
   98:23

━━━━━━━━━━━

   **Z**

━━━━━━━━━━━

**Zoloft**
   31:23
   49:12
   50:4
   63:3,5

