### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

SAMANTHA RING,

                    Plaintiff,            Case No. 8:19-cv-00772-VCM-JSS

vs.

BOCA CIEGA YACHT CLUB, INC.,

                    Defendant.

_____/

### PLAINTIFF'S RESPONSE IN OPPOSITION TO
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

#### *Response Summary*

As to the facts proffered by Defendant BCYC in its Motion for Summary Judgment [Dkt. 122] ("BCYC's MSJ"), it has not carried its burdens. Moreover, it has not established entitlement to judgment. Ironically, the deficiencies establish Plaintiff's entitlement to summary judgment and Plaintiff renews herein her request for summary judgment in her favor [Dkt 128].[1]

### I.   APPLICABLE LEGAL STANDARD

The parties have filed cross-motions for summary judgment. Such, however, "does not give rise to any presumption that no genuine issues of material fact exist. Rather, '[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.' *Shaw Constructors v. ICF Kaiser Eng'rs, Inc*., 395 F.3d 533, 538-39 (5th Cir. 2004);[2] *see also United*

---

[1] Damages were not part of the Motion, hence the request for only partial summary judgment. *Id.*

[2] Decisions of the United States Court of Appeals for the Fifth Circuit entered before October 1, 1981, are binding precedent in the Eleventh Circuit. See *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

*States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984)(cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed); *Lancaster v. The Bottle Club, LLC d/b/a Eyz Wide Shut II*, Case No. 8:17-cv-634-T-33JSS (M.D. Fla. May 10, 2018)(J. Hernandez Covington).

Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969). If reasonable minds might differ on the inferences arising from undisputed facts, then the Court should deny summary judgment. *Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031 (5th Cir. 1982); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[T]he dispute about a material fact is 'genuine,' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

Moreover, the party opposing a motion for summary judgment need not respond to the motion with evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 160 (1970). The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or are not otherwise in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611-12 (5th Cir. 1967). The Court must resolve all ambiguities and draw all justifiable

## II.     RESPONSE TO [BCYC'S] STATEMENT OF MATERIAL FACTS

1A.     DENIED that BCYC is a private sailing club.  A majority of Plaintiff's Motion for Summary Judgment [Dkt. 128] is dedicated to challenging this contention which Plaintiff expressly incorporates herein, including: Dkt. 128-8, Cert. of Re-Inc.; Dkt. 128-9, Art. of Inc., at Articles 1.

and 3.; Dkt. 128-10, BCYC's Facebook Profile; Dkt. 28-11, Southard Depo. at 98:8-16, 58:11-21, at 58:22-60:3, 70:17-22, 70:23-71:8; Dkt. 128-15, BCYC Membership Application at 2-4; Dkt. 100-7, Pinellas County Office of Human Rights Commission Report ("PCOHR") (investigation and findings as to BCYC's operations and relationship with the City of Gulfport).

1B.    DENIED that BCYC is operated solely by volunteers. Dkt. 128-5, BCYC 01.2019 Minutes at 1, 3, 4, 5, 10, 11; Dkt. 128-20, J Buckley 2018 Business Record; Dkt. 128-21, J Buckley 2019 Business Record; Dkt. 128-5, BCYC 01.2019 Minutes at 5:7.

2.    DENIED that BCYC is a Florida not-for-profit corporation that is tax-exempt under Section 501(c)(7) of the Internal Revenue Code. The purported "Tax status confirmation letter" [Dkt. 129-22] is dated July 25, 2019, more than seven months and one tax year ago, and it merely states that in **September 1952** BCYC was granted exemption from federal income tax. It does not prove that BCYC currently maintains such tax status. In fact, because of the tenuous nature of such tax designation, under its Lease with the City of Gulfport, BCYC "[f]rom time to time, as requested by [the City]," is to provide ongoing proof of same. Dkt. 128-6, Lease at 4 §6.

3A.    ADMITTED **only** that on December 21, 2007, the City of Gulfport agreed to lease BCYC City property for thirteen (13) years which expires on December 31, 2020. Dkt. 128-6, Lease at 1:1. "Property" encompassed two waterfront parcels of land and dock/marina area, denoted as "Leased Premises." *Id.* at 1:1.; at 8-10: "Exhibit A," "Exhibit B," and Diagram to Lease. The City also agreed to lease the clubhouse building and parking area on the Leased Premises to BCYC for one dollar per year. Dkt. 128-6, Lease at 1:3.

3B.    DENIED that Exhibit C to BCYC's Motion for Summary Judgment, Dkt. 129-33, is the operative Lease inasmuch as it is not the complete Lease or leasing agreement between BCYC and the City of Gulfport. *Cf.* Dkt. 128-6, Lease with Lease Exhibits A and B.

3C.    DENIED that under the Lease, BCYC must maintain its status as a private club as a term and condition of the Lease. Dkt. 128-6, Lease at 6 §4 (merely states BCYC "shall maintain").

4.    DENIED that under BCYC's Lease with the City, only one authorized liveaboard is permitted in the BCYC **basin**. Dkt. 128-6 at 4 §9 (only pertains to who BCYC can allow; does not address to liveaboards in surrounding premises; "basin" is not a Lease term).

5A.     DENIED that no Board member of BCYC serves on the Gulfport City Council, and no Gulfport City Council member is a member of BCYC.  Dkt. 128-16, BCYC Calendar at 2 ("New Business[:] Use of the Club by Gulfport Elementary School from 12 to 4 pm on June 3rd, 2009"); at 4 ("Ad Hoc Committee Reports[:] **Chamber of Commerce liaison – Bob Newcomb** – Thursday February 3rd the chamber will have at meeting at BCYC…On November 8th the Gulfport Casino will have a 'Casino Royale' night")(de facto cross membership).

5B.     DENIED that the City of Gulfport has never used the clubhouse for a specific function or event. Dkt. 128-6, at 4 §5(i) (BCYC is to coordinate Regattas and nautical events with City), at 4 §7 (City retains beach area access); Dkt. 128-16, BCYC Calendar at 2 ("New Business[:] Use of the Club by Gulfport Elementary School from 12 to 4 pm on June 3rd, 2009"), at 4 ("Ad Hoc Committee Reports[:] Chamber of Commerce liaison – Bob Newcomb – Thursday February 3rd the chamber will have at meeting at BCYC…On November 8th the Gulfport Casino will have a 'Casino Royale' night"), and at 5 (tickets for Gulfport's 2016 Pink Flamingo Tour of Homes, "an event sponsored by the Gulfport Area Chamber of Commerce," were sold and registration was held at BCYC; it was mandated that "Everyone, including ticket holders, will need to register at the [BCYC] on the day of the event in order to receiver your tour book with map…), at 6 ("East Lake High School Drama Club" hosting covered dish night at BCYC "the cost is $5.00").

6.     ADMITTED that "Open House" is sometimes referred to as "Fun Day"; otherwise DENIED. Dkt. 128-16, BCYC Calendar at 6 ("East Lake High School Drama Club" hosting covered dish night at BCYC "the cost is $5.00"), at 1-30; Dkt. 128-7, History; Dkt. 128-10, Mission; Dkt. 128-5, BCYC 01.2019 Mins. at 1, 2, 3, 5, 6, and 9; Dkt. 128-17, Affidavit of Charon Wood; Dkt. 128-18, Notarized Declaration of Kelli LaPuma; Dkt. 128-19, Notarized Declaration of Renee S. Best; Dkt. 128-14; Dkt. 128-2, Ring Aff.; Dkt. 128-16, BCYC Calendar at 4 (from 2009 to the present, BCYC hosted events and gatherings to nonmembers such as ROTC at USF, Gulfport Elementary School, Eckerd College, East Lake High School Drama Club, etc.); Dkt.128-5, BCYC 01.2019 Minutes at 5:10 (February 2019, nonmember Chris Krietlein used BCYC to teach his course on Celestial Navigation); Dkt. 128-11, Southard Depo. at 103:12-15, at 103:12-104:6, at 104:7-107:6, at 106:9-14; 105:10-23, at 99:25-100:4, at 100:5-15, at 102:11-24, 102:23-24; Dkt. 128-2, Ring Aff. at 5-6, ¶¶ 19-26; Affidavit of Samantha Ring in Support of Response to Summ. Judgment (marked and attached as "Exhibit 25") at 1-2 ¶¶3, 8.

7.       DENIED. *Id.;* Dkt. 128-11, Southard Depo. at 92:22-93:8.

8.       DENIED. *Id.;* Dkt. 128-11, Southard Depo. at 93:9-13; Dkt. 100-7 at 3-4.

9.       ADMITTED that during Fun Day BCYC provides free food; otherwise DENIED. Dkt. 128-16, BCYC Calendar at 6 "Standing Committee Reports: Activities" ("East Lake High School Drama Club" hosting covered dish night at BCYC "the cost is $5.00" guests and visitors can attend); Advertisement for One Design Race (marked and attached as "Exhibit 30") (showing BCYC charges non-members for meals, drinks, and lodging); Dkt. 128-16 at 3 "Sea Scouts" ("Eckerd College and our Sea Scouts host the Cat's Point Regatta…need boats to be volunteered for sleeping spaces for scouts. It's a great event for us to be sponsoring.")

10.      ADMITTED.

11.      DENIED that "youth sailing school participants are treated as Sea Scout members, who are in turn considered guests of the BCYC member volunteers who sponsor the Sea Scouts." Dkt. 129-24, Brown Depo. at 74: 18 ("The Sea Scouts are not members…").

12.      DENIED that BCYC is **formally** governed by a Board of member volunteers who are elected by the general membership and serve one-year terms. What time period? Dkt. 129-24, Brown Depo. at 13:22-15:16 (acknowledging that BCYC was "[as of October 14, 2019] changing verbiage…written back in the '60s…[with] legal enhancements…looked over by [defense] counsel [hired by BYC's insurance carrier to defend BCYC in this lawsuit]").

13.      DENIED. See Plaintiff's Motion for Summary Judgment [DE 128] "Statement of Material Facts" at 6-7, ¶¶ 33-38:

¶33. After an application and payment are submitted, Gerri Angel decides if an applicant is "okay." Ex. 11, Southard Depo. at 60:4-62:6. If she does, an investigation check is done. Id. at 61:23-62:6. Once its back, the "[Membership] Committee" calls the applicant to come to BCYC's clubhouse. Id. at 62:7-63-8. That "Committee" is just Mrs. Angel. Id. at 62:7-63:5. Mrs. Angel is an 80-year old BCYC member and has made the calls for fifteen (15) years. Id. at 60:22-61:11. It's up to her what applicants are asked. Id. at 61:19-22. She asks questions based upon her experience and general questions about "why" an applicant wants to join BCYC. Id. at 60:4-61:18." **See also Dkt. 129-24, Brown Depo. at 70:23-71:10 (confirming the one-woman "Committee" and process" of applicant interviews).**

¶34.   Once every month, except December, applicants' names are brought up to BCYC's board and then applicants are "voted in" at a general meeting. Id. at 63:11-14; 66:5-23; 71:19-72:1.

¶35.   Admission standards do not include sailing experience, home ownership, level of wealth, or level of education. Id. at 68:14-69:21.

¶36.   Mrs. Angel decides whether to bring up an applicant's name to BCYC's Board. Id. at 67:7-15. If she does "It's fait accompli. It's already decided once [Gerri Angel] brings those people up." Id. at 67:7-16. If applicants are at the board meeting will be up   for   vote   to become a member. Id. at 67:12-15. Voting is by a panel at the general   meeting. Id. at 71:11-18.

¶37.   In his sixteen (16) years with BCYC, at no general meeting BCYC's Commodore attended has an applicant not been voted in, and he knows of no applicant that has not been admitted. Ex. 11, Southard Depo. at 72:2-10. If an applicant's name is passed to BCYC's board, the only reason an applicant wouldn't be voted in is because he/she   didn't show up to the general meeting. Id. at 72:11-17. If an applicant attends the general   meeting, "they're in." Id. at 70:8-15. **See also Dkt. 128-24, Brown Depo. at 73:14-19 ("in   the   meetings   I have been in…maybe around 40 or 50 different   meetings…nobody   has   been   turned down.").**

38.   At no time before Plaintiff brought this lawsuit did BCYC have a membership cap. Id. at 72:22-73:9; 79:20-23. In 2018-2019 BCYC had about 200 members. *Id.* at  101:9-11.

14.   DENID. Affidavit of Samantha Ring in Support of Response to Defendant's Motion for Summary Judgment (marked and attached as "Exhibit 25") at 2 ¶6.

15.   DENIED. See Plaintiff's Motion for Summary Judgment [DE 123] "Statement of Material Facts" at 6-7, ¶¶ 9:

¶55.   Members of the general public, "without knowing a soul" at BCYC, can have unfettered access to BCYC's facilities. Exhibit 5, BCYC 01.2019 Minutes at 3.

¶56.   Nonmembers of BCYC, including both guests of member and "members of the general public," have unfettered access to BCYC's facilities. Exhibit 17, Affidavit of  Charon Wood; Exhibit 18, Notarized Declaration of Kelli LaPuma; Exhibit 19, Notarized   Declaration of Renee S. Best; Ex. 14, Aerial Map View Front Gate Open. Some   nonmembers   have   visited more than hundred times and have not been required to show  identification, asked for identification, asked to sign a "sign-in" sheet or Visitor's Log,   asked for a security deposit, or asked to justify their presence. Ex. 17, Wood Aff.; Ex. 18,   LaPuma Aff., Ex. 19 Best Aff.

16.     DENIED. Dkt. 128-14, Aerial View BCYC Leased Premises Front Gate Open [thus Unlocked]; Dkt. 128-2, Ring Aff. at 5 ¶22; Ex. 25, Ring Aff. in Support of Response to D's MSJ at 1 ¶3.

17.     DENIED that Samantha Ring obtained dog Piper **around** August 2015 [Plaintiff's Deposition, at 35:9-11 ("The **end** of August 2015.").

18.     DENIED.  Dkt. 128-11, Southard Depo. at 43:12-44:4; BCYC's Response to Plaintiff's Second Request for Production of Documents at 2, ¶2 (marked and attached to the within Response as "Exhibit 26"); March 1-4, 2019 BCYC BOG Email Exchange Re Calling Script (marked and attached to the within Response as "Exhibit 27"); April 3-4, 2019 BCYC BOG Email Exchange Re Improved Calling Script and (marked and attached to the within Response as "Exhibit 28"); Dkt. 128-11, Dkt. 128-12:Exh. 20, Southard Depo. Exhibits at Exh. 20 BCYC Will Have Scripts to Read to Members to Encourage Expulsion (Blow Up); Dkt. 128-12:Exh. 21, Southard Depo. Exhibits at Exh. 2 BCYC Will Have Scripts to Read to Members to Encourage Expulsion (Email Source); Dkt. 129-29, Brown Depo. at 42:7-44:9;

19.     DENIED. Sometime on or after July 16, 2018, Ms. Ring texted then BCYC Commodore Larry Brown a photograph of a note prepared by medical resident Andres Santayana. This note identified Ms. Ring as a patient who suffered from anxiety as well as severe allergies to bees and sunflower seeds. In the note, Dr. Santayana stated that dog Piper alleviated Ms. Ring's anxiety, thereby improving her quality of life. He closed the note by adding that he supported Ms. Ring's decision to have dog Piper with her "at all times." Dkt. 100-2.

20.     DENIED. Dkt. 129-29, Brown Depo. Exh. at 3-5.

20.FN 3.  DENIED. Dkt. 129-24 at 17:2-20.

21.     DENIED. Dkt. 129-24, Brown Depo. at 98:25-100:11, at 100:12-22.

22.     ADMITTED.

23.     DENIED.   Southard Deposition [Vol. II] (marked and attached as "Exhibit 29") at 191:2-192:14; Plaintiff Voter Registration and License Address Verification (marked and attached collectively as "Exhibit 31").

24.     ADMITTED that in January of 2019, on Martin Luther King Day, when BCYC Commodore Southard saw Ms. Ring in the BCYC Clubhouse with her dog Piper he told her that her dog needed to get out and that a fine would be imposed and that Dkt. 100-4 is a copy of Notice of Fine; otherwise DENIED. Dkt. 128-11, Southard Depo. at 129:11–24.

25.     DENIED. James Masson 3/4/2019 Email Debunking BCYC's Claims of Electricity Theft (marked and attached as "Exhibit 32"); Ex. 29, Southard Depo. Vol II at 183:13-185:5, 185:7-186:25, 187:1-188:4; Dkt. 128-12, Southard Depo. Exh. Index and Exhibits at Exh.12.

26.     DENIED. *Id.;* also not authenticated.

27A.    DENIED. *Id.*; [same as 27B

27B.    DENIED. Dkt. 100-7, PCOHR Report at 8-9.

28.     DENIED. Dkt. 129-31, Plaintiff's Depo. at 110:16-24, 120:6-122:24, 172:9-17.

29.     DENIED. Dkt. 129-31, Plaintiff's Depo at 148:1-25, 20:15-22:21; Dkt. 128-2, Ring Aff. at ¶¶ 3, 4, 6, and 7.

30.     DENIED. Dkt. 129-31, Plaintiff's Depo at 149:13-17 ("maybe once a year"); Dkt. 128-2, Ring Aff. at ¶¶ 3, 4, 6, and 7.

31.     DENIED. Dkt. 129-31, Plaintiff's Depo at 155:19-25 ("probably about").

32.     DENIED.  Dkt. 129-42, Dr. Santayana Depo. at 75:17-76:14.

33.     ADMITTED.

34.     ADMITTED.

35.     ADMITTED.

36.     ADMITTED.

37.     ADMITTED that Ms. Collins testified that Ms. Ring had not made any requests for accommodations from the school to Ms. Collins, not requested disability leave, and not requested any accommodations to Ms. Collins, and Ms. Collins was not aware of requests for disability accommodations from Ms. Ring; otherwise DENIED. Dkt. 129-51, Collins Depo. at 6:25-7:11, 7:17-20, 13:1-24, 15:3-4, 28:19-24.

38.     ADMITTED that based on review of a file, Ms. Collins testified that Ms. Ring had worked for several years as a full-time teacher, full capacity, full hours, and did not disclose any sort of physical or medical impairment on an August 29, 2016, form; otherwise DENIED. Dkt. 129-51, Collins Depo. at 19:13-20, 20:2-5, 20:25-21:6.

39.     The City of Gulfport has influence and control over BCYC's internal governance and operations. Dkt. 128-6, Lease; Ex. 27, Email Exchange re Calling Script; Ex. 28, Email Exchange re "Improved" Calling Script; Dkt. 129-24, Brown Depo. at 37:14-38:25; Dkt. 128-11, Southard Depo. at 135:25-137:13.

40.     The City of Gulfport has increased influence and control over BCYC's internal governance and operations because its Lease Agreement with BCYC expires on December 31, 2020. *Id.*

41.     BCYC operates its facilities and hosts many of its gatherings on public property. Dkt. 128-6, Lease.

42.     BCYC operates its facilities and hosts many of its gatherings on government-owned property. Dkt. 128-6, Lease.

43.     PCOHR is a public agency and its records are public records. Fed. R. Ev. 201.

44.     Piper, Plaintiff's dog, fetches Plaintiff's Epipen. Dkt. 128-2, Ring Aff. at 3-4 ¶12; Dkt.128-3, Trainer Scheu Dec. at 2 ¶8; Dkt. 117-3, Deposition of Trainer Dawn Scheu ("Trainer Scheu Depo.") at 9:8-19, 31:3-8.[3]

45.     Piper is a service animal. *Id.*

46.     On social media BCYC's lists among its four missions: "To be an integral part of the Community of Gulfport." Dkt. 128-10, BCYC's Facebook "Mission."

47.     BCYC has an 80th Anniversary committee, on of the purposes of which is to advertise for and recruit new members, participate more fully in Gulfport activities.

## II. ARGUMENT

The parties agree that there are four elements of proof to a Title III ADA claim: (A) Plaintiff has a disability; (B) Defendant is a place of public accommodation; (C) Defendant denied its goods/services/privileges to Plaintiff; (D) because of Plaintiff's disability. *Cohan v. Rist Props., LLC*, No. 2:14-cv-439-FtM-38DNF, 2015 WL 224640, at *2 (M.D. Fla. Jan. 15, 2015) (quoting *Schiavo ex rel Schindler v. Schiavo,* 358 F. Supp.2d 1161, 1165 (M.D. Fla. 2005).

In the case *sub judice*, Plaintiff has the burden of proving elements A, B, and D, but because Defendant BCYC claims "private club" exemption, it has the burden of proving element C. *United States v. Lansdowne Swim Club,* 713 F. Supp. 785, 795-96 (E.D. Penn. 1989)("[Defendant] bears the burden of demonstrating that it is a private club"); citing *Anderson v. Pass Christian Isles Golf Club, Inc.*, 488 F.2d 855, 857 (5th Cir.1974); *United States v. Richberg*, 398 F.2d 523, 529 (5th Cir. 1968); *Nesmith v. YMCA*, 397 F.2d 96, 101 (4th Cir.1968); Brown v. Loudoun Golf & Country Club, Inc., 573 F. Supp. 399, 402 (E.D.Va.1983); Wright v. Cork Club, 315 F. Supp. 1143, 1150 (S.D.Tex.1970). "The defendant possesses this burden

---

[3] The complete, substantive transcript was provided in Dkt. 117-3; omitted was the playful bantering among the witness and counsel regarding training canines to do things like laundry.

'because [it] claimed the shelter of an exception…and because the facts of proof are with [it].'"

*Landsdowne Swim Club* at 795-796 quoting *Richberg*, 398 F.2d at 529 (citations omitted in original). This element C burden shift affects summary judgment analysis.

To prevail on its summary judgment, Defendant must prove that there is no genuine issue of material fact that Plaintiff has *not* satisfied elements A, B, and D, but that there is no genuine issue of material fact that it [Defendant] has proven element C. Further, Defendant must prove that it is entitled to judgment as a matter of law as to each of these elements.[45] For the reasons explained *infra*, Defendant's Motion for Summary Judgment [DE 122] should be denied.

## A. PLAINTIFF IS AN INDIVIDUAL WITH A DISABILITY INASMUCH AS HER UNDISPUTED ANAPHAYLAXIS ALLERGIES ARE, BY MEDICAL AND LEGAL DEFINITION, A CONDITION WHICH AFFECTS HER RESPIRATION AND THUS A MAJOR LIFE ACTIVITY.

Plaintiff has proven that she is suffering from a health condition (i.e., anaphylactic-inducing allergies) that substantially impairs her ability to perform the "major life activities" of living and breathing. Dkt. 129-31, Plaintiff's Depo. at 20:15-17; Dkt. 128-2, Ring Aff. at 1-3, ¶¶ 3, 4, and 9; Dkt. 128-3, J.D. Woehler Aff.; Dkt. 129-42, Dr. Santayana Depo. at 94:24-95:1, 95:9-20, 96:13-20; Dkt.100-2, Medical Note.

According to the Mayo Clinic "anaphylaxis is a severe, potentially life-threatening allergic reaction. It can occur within seconds or minutes of exposure to something you're allergic to, such as peanuts or bee stings."[6] Anaphylaxis requires an injection of epinephrine, and, if not

---

[4] This case is also a discrimination claim under the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01, *et seq.* ("FCRA"). In the Eleventh Circuit both claims are analyzed under the same framework. *Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1221 (11th Cir. 2000)(disability discrimination claims under FCRA analyzed under same framework as ADA claims).

[5] However, it is the rule in this District that

[6] https://www.mayoclinic.org/diseases-conditions/anaphylaxis/symptoms-causes/syc-20351468.

treated, it can be fatal. *Id.* Symptoms include constriction of airways and a swollen tongue or throat, which can cause wheezing and trouble breathing. *Id.* When someone goes into anaphylactic shock, "that's a medical emergency." Dkt. 129-42, Dr. Santayana Depo. at 68:13-20. Such as has been proven in the Plaintiff's case. Dkt. 129-31, Plaintiff's Depo. at 20:15, 21:7-22:6, 23:7-24, 29:13-16;  Dkt. 128-2, Ring Aff. at 1-2 ¶¶ 3, 6, and 7; Dkt. 129-42, Dr. Santayana Depo. at 36:22-23:3, 61:5-62:14, and 69:10-21.

A medical doctor testified that Plaintiff has a disability. Dr. Santayana Depo. at 75:17-25.[7] That same physician also acknowledged that while he does not "know the ADA law" or what it requires," he has "no reason to think [the Plaintiff] is faking her allergies" or "her need to have her service dog." *Id.* at 60:1-14, 89:9-16. He also testified that while he doesn't "think there's any medical definition of a therapy dog [,] [b]ut from just personal knowledge, I would think it would be an animal trained to like provide therapy support." *Id.* at 26:21-24. He does, however, know that which falls in his purview of knowledge:  allergies which can be fatal mean a person can die. *Id.* at 94:24-95:1. He testified that allergies that bear risk of an anaphylactic response include an Epipen as medical treatment, and further that it is reasonable for a person with such an allergic response proclivity to have a service animal that could alert him/her to a risk of exposure to such allergen and retrieve his/her Epipen in the event of exposure. *Id.* at 96:13-20, 95:9-20. Consequently, while Dr. Santayana may not have had the requisite legal ADA "buzz" words available to him when he was testifying, his overall testimony confirms that

---

[7] To whether Dr. Santayana "think[s] [the Plaintiff] has a disability," he explained: "[w]ithout knowing the definition – sorry. In terms of my personal interpretation of disability, I would say yes she has at least some small amount. A very small factor of disability, yes." *Id.*

[8] Although BCYC impliedly touts that Dr. Santayana is "[*only*] a resident"[8] in an effort to minimize the value of his opinion, a resident *is* a medical doctor. Dr. Santayana Deposition at 88:2-89:8; 91:7-11; Fla. Stat. § 458.313.  Moreover, the ADA does not require certification by a medical doctor.

anaphylaxis-inducing allergies are a condition which substantially impair one or more major life activities. In short, Dr. Santayana's testimony confirms that Plaintiff has a "disability."

More importantly, in the eyes of the ADA drafters and legislators, anaphylaxis-inducing allergies are a disability inasmuch as, as a matter of law, respiration and living are "major life activities." 42 U.S.C. § 12101(2)(B).

Infrequent occurrence of a disabling condition does not defeat a disability finding. *KAW v. School District of Hillsborough County* (Case No. 8:07-cv-2222-T-33TGW) (M.D. Fla. Jan. 30, 2009)(J. Hernandez Covington)(vasovagal syncope episodes occurring only twice in an employee's work year, did not defeat disability status under the ADA); 29 C.F.R. §1630.2(j)(1)(vii)(episodic impairment such as an allergy is considered a disability if it substantially limits a major life activity when active). Under the ADA, Plaintiff's allergies, as a matter of law, are disabilities.

In short, contrary to BCYC's motion for summary judgment assertion, there is no genuine issue of material fact that Plaintiff *DOES* have a disability. In fact, one of BCYC's own Commodore's concedes he has no reason whatsoever to disbelieve that Plaintiff has the allergies she has. Dkt. 129-24, Brown Depo. at 98:13-20. As a matter of law -- Plaintiff and not Defendant -- is entitled to judgment as to **element A**.

## B. DEFENDANT BCYC LEASES AND OPERATES A PLACE OF PUBLIC ACCOMMODATION.

When confronting the "what is a place of public accommodation" question, the U.S. Supreme Court looked at 42 U.S.C. § 12182(a) and determined that:

Title III of the ADA prescribes, as a '[g]eneral rule':

'No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by

any person who owns, leases (or leases to), or operates a place of public accommodation.' 42 U. S. C. § 12182(a).

**The phrase '*public accommodation*' is defined in terms of 12 extensive categories, which the legislative history indicates '*should be construed liberally' to afford people with disabilities 'equal access' to the wide variety of establishments available to the nondisabled.***

*PGA Tour, Inc. v. Martin.* 532 U.S. 661, 676-77 (2001)(holding that the PGA, "as a public accommodation during its tours and qualifying rounds[,]…may not discriminate against either spectators or competitors on the basis of disability")(quoting S. Rep. No. 101-116, at 59 (1989) and H.R. Rep. No. 101-485, pt. 2, at 100 (1990)) (internal footnotes omitted)(emphasis supplied). It is from the bent of liberal construction that this Court is bound to evaluate BCYC's claim of "private club."

BCYC gatherings sometimes involve sailing. Sailing involves the transportation of persons (and goods) by sea. See Dkt. 128-16, BCYC Calendar & Minutes at 6 "Standing Committee Reports," "Annual Open House" ("She needs boats to take [guests/visitors/etc.]…"), and "Blessing of the Fleet" ("photo cruise"); at 10 "April 4, 2020 BCYC Funday" ("BCYC invites Gulfport and the surrounding community to the club for a day of sailboat rides…"); at 12-20. It falls within the penumbra of commerce. The ADA prescribes that private entities are considered public accommodations, including banks or other service establishments, if, *inter alia,* the operations of such entities affect commerce. See 42 U.S.C. § 12181(7).  For example, while "[f]ederal credit unions are not specifically listed in the definition of public accommodations," it has been held that "a federal credit union qualifies as an 'other service establishment' under the statute because of its similarity to a bank and the fact that the operations of a federal credit union **affect commerce**." *Muneer Mustafa Tawam v APCI Federal Credit Union*, Case No. 5:18-cv-00122 (E.D. Pa. Aug. 3, 2018)(J. Leeson) (emphasis added); citing

*PGA Tour, Inc. v. Martin*, 532 U.S. 661, 676-77 (2001) ("[T]he legislative history indicates [the phrase public accommodation] 'should be construed liberally' to afford people with disabilities 'equal access' to the wide variety of establishments available to the nondisabled."). That BCYC's activities, gatherings, and operations affect commerce, alone, is indicative of BCYC's public accommodation status.

BCYC is not selective. See Dkt. 128, Plaintiff's Motion for Summary Judgment. One of its purposes is for "social reasons." *Id.*; Dkt. 129-24, Brown Depo. at 71:19-21. This is evident from the Application it has used since the 1960s, which has only undergone the changes of adding whether an applicant has a spouse/partner, a preferred phone, and the gender, phone, and email of applicant's spouse/partner. Ex. 24, BCYC's Response to Second Request for Production. As established in Plaintiff's Motion for Summary Judgment, one need not be invited to join, and "anybody can apply." Dkt. 129-24, Brown Depo. at 73:20-25. And though it calls itself a sailing club, applicants are not required to be sailors or even know nautical terms. *Id.* at 72:1-5. Just like BCYC's 2019 Commodore, BCYC's 2018 Commodore confirmed that in the "40 or 50" general meetings involving applications that he's attended, "nobody has been turned down" for membership. *Id.* at 73:14-19.

Moreover, BCYC leases, under the now almost infamous "dollar-a-year deal," the facilities and premises from which it operates and hosts gatherings from a government entity and follows the dictates set forth by that entity. Dkt. 128-6, Lease at 1. BCYC's assertion that "the City has no control whatsoever over the internal governance and affairs of BCYC" (Dkt. 129, BCYC's MSJ at 1) is severely undermined by the Lease which establishes the City's control and governance of both BCYC's external and internal affairs.

BCYC documents and witness deposition transcripts are replete with references to its "Lease with the City" and its impending expiration, as well as BCYC's manipulation of events in anticipation of the Lease expiration, including BCYC's retaliatory expulsion of the Plaintiff for complaining to a City Manager about BCYC's discriminatory practices. See Ex. 27, Email Exchange re Calling Script; Ex. 28, Email Exchange re "Improved" Calling Script; Dkt. 129-24, Brown Depo. at 37:14-38:25; Dkt. 128-11, Southard Depo. at 135:25-137:13. The City's control over BCYC's actions and governance is pervasive.

In a well-reasoned and detailed report, the Pinellas County Office of Human Rights ("PCOHR") previously determined that BCYC is not a private club when it found that BCYC discriminated against the Plaintiff when it denied her service animal access to the clubhouse. Dkt. 100-7, PCOHR Report. This Court may take judicial notice of the investigator's findings in the Report as to, *inter alia*, BCYC's relationship with the City of Gulfport, which are a matter of public record. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir.1999) (quoting Fed. R. Evid. 201(b)(2)("courts may take judicial notice of public records, such as a pleading filed in another court, because such documents are 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned'"); *Universal Express, Inc. v. U.S. SEC*, 177 Fed.Appx. 52, 53 (11th Cir.2006) (holding that judicial notice of public records, such as court filings, is proper); *Klopfenstein v. Deutsche Bank Sec., Inc.*, 592 Fed.Appx. 812, 816 n. 5 (11th Cir.2014) (same); *Martin v. Hogue*, No. 8:11-CV-228-T-33MAP, 2011 WL 2894986, at *2 (M.D.Fla. July 20, 2011) (taking judicial notice of the Clerk of Court for the 13th Judicial Circuit's progress docket which showed that a jury found plaintiff guilty of robbery).

BCYC asserts that in *Golden v. Biscayne Bay Yacht Club*, 530 F.2d 16 (5th Cir. 1976) the Court "was presented with a set of circumstances nearly identical to those at issue in this case." Dkt. 122 at 18.  This is inaccurate.

First, *Golden* is not an ADA case and did not consider whether the Defendant Yacht Club was a "private club" for purposes of exemption from the ADA. In fact, the ADA was not signed into law until fourteen years later. The issue in *Golden* was whether a lease of sovereign land beneath the club's docks constituted "significant state involvement." *Id.*

Second, unlike BCYC, the Defendant club in *Golden* itself owned the land adjacent to the sovereign submerged lands underneath its docking facilities: "A city leased to a private yacht club the bay bottom land underlying club-constructed and club-maintained dock facilities *connected to the club lands on shore*." *Id.* (emphasis added). In other words, unlike the BCYC, the Yacht Club in *Golden* owned the land its clubhouse was on, as well as the clubhouse. In fact, the en banc Court questioned why the District Court had not simply cancelled the lease and enjoined use of the docks. *Id.* According to the Appellate Court "[t]his would have left this private club free to use its own club house, situated on its private property, as it saw fit, which, under the Constitution of the United States it clearly would have had the right to do." *Id.*

In the case at bar, BCYC has zero ownership interest in the clubhouse itself and the land on which it sits. BCYC has not directed the Court to a single case holding that an organization which conducts its activities *solely* upon leased public land is a "private club" exempt from the ADA.

Furthermore, according to BCYC, the Club's purpose is limited to "promot[ing] safe boating activities, boating education, and fellowship between members." Dkt. 122 at 16. According to the BCYC's social media statement, a part of its four part "Mission" is "[t]o be an

integral part of the Community of Gulfport." Dkt. 128-10, BCYC Facebook Mission. Exclusive private clubs do not strive to be an integral part of the community. In fact, in BCYC's February 2020 *Windword* newsletter, BCYC's Rear Commodore promoted more advertising, recruiting, and participation in community events. BCYC Windword 80th Anniversary Club Purpose February 2020 at 3 (marked and attached as "Exhibit 33"). In her report regarding the "80th Anniversary Committee," she announced that the Committee's purpose is "to advertise for and recruit new members, participate more fully in Gulfport activities" along with the need to ***undo*** BCYC's image as "classist, rich, snobbish elitists," i.e., the very type of people that actually comprise the membership of a "private club." *Id.* While integration into the community providing its $1.00/year lease deal is a noble goal, such is inconsistent with being a private club. exempt from the ADA.

"Selectivity," or, in this instance absence thereof, is a critical factor in the weighting of public accommodation status. As to element B, BCYC has not substantiated its hollow claims of "selectivity" and thus has not met its burden of proving it is truly a private club. To the contrary, BCYC exists on public land by the grace of the City, actively recruits to boost its membership, and, *inter alia*, has no real membership criteria.  Its claims of "private club" ring hollow.

## C. DEFENDANT BCYC DENIED PLAINTIFF FULL AND EQUAL ENJOYMENT OF BCYC'S GOODS, SERVICES, FACILITIES AND PRIVILEGES.

"Service animal means any guide dog, signal dog, or other animal individually trained to work or perform tasks for an individual with a disability, including, but not limited to…fetching dropped items." 49 CFR § 37.3.  Plaintiff established in her Motion for Summary Judgment [Dkt. 122] that "Piper" performed several tasks, which include finding and fetching Plaintiff's Epipen if she is suffering an allergic reaction. See also Dkt. 128-2, Ring Aff. at 3-4 ¶12;

Dkt.128-3, Trainer Scheu Dec. at 2 ¶8; Dkt. 117-3, Trainer Scheu Depo. at 9:8-19, 31:3-8. BCYC has not and cannot credibly dispute that Piper is a service animal.

It is indisputable that BCYC denied Piper entrance into the clubhouse. Dkt. 129-24, Brown Depo. at 21:10-17; 23:21-24:18; Dkt. 128-11, Southard Depo. at 44:18-45:3; Dkt. 102, BCYC's Answer to Third Amended Complaint at 4 ¶20, 7 ¶44e. 8 ¶44h, and 18 ¶76.

And although it is baldly asserted in BCYC's Motion for Summary Judgment that a "good faith dialogue" was held between past Commodore Brown and Plaintiff as to the denial of Piper's access, Commodore Brown's testimony evidences otherwise. He testified he did not think the documentation (i.e., Dr. Santayana's Medical Note [Dkt. 100-3]) Plaintiff provided him was "sufficient,"  but if worded differently, Piper would have been allowed into BCYC's clubhouse. Dkt. 129-24, Brown Depo. at 17:1-24, 18:22-19:11, 19:12-20:4.

Commodore Brown also said he sent Plaintiff an email essentially stating that until a court agreed with Plaintiff that BCYC was not a private club, Piper could not be brought into the clubhouse. *Id.* at 26:25-27:22. Brown declared that the BCYC was willing "to spend a lot of the BCYC's money" to defend the position that BCYC is exempt from the ADA. *Id.* at 52:9-12.

When specifically asked about the purported "good faith dialogue," Brown testified that in response to Plaintiff's fear that a complaint by her to the PCOHR might be "too abrasive," he told Plaintiff "No. If that's where you need to go, then that's where you need to go," after which he made no effort to contact the PCOHR]. *Id.* at 98:25-100:11, 100:12-22.

It is axiomatic that simply telling one to whom you just denied equal access to "go where you need to go" to file a complaint is not in any way "good faith" nor a "dialogue" under any dictionary, much less within the ADA definitions.  Any good faith dialogue is wholly mythical.

As a matter of law, BCYC denied Plaintiff the full and equal enjoyment of its services, facilities, and privileges. Plaintiff and not BCYC, is entitled to judgment as to element C.

## D. DEFENDANT'S DENIAL WAS IN RETALIATION FOR PLAINTIFF'S EXERCISE OF HER RIGHTS & THUS ON THE BASIS OF HER DISABILITY.

Plaintiff incorporates her Motion for Summary Judgment [Dkt. 128] and submits that the Defendant has not offered any evidence in its Motion [Dkt. 122] which contradicts Plaintiff's evidence as to her entitlement to a finding, as a matter of law, in her behalf on element D.

## III. CONCLUSION

False claims of service animal (and emotional support animal) status are evident throughout our culture and operate as a disservice to everyone. **This is not that case**. Anaphylactic-inducing allergies are a disability. A service animal in training is entitled to the same accessibility available to an experienced service animal.  Denying a service animal's access simply because one doesn't believe the owner, like the owner, discovered a  "private club" loophole during a fifteen minute Google search, or has an independent sense of "what's fair," is not an exoneration pass under either the ADA or FCRA.

BCYC's Motion for Summary Judgment is neither factually nor legally supported and should be denied. Moreover, the deficiencies therein ironically serve to further establish Plaintiff's entitlement to the granting of her cross-motion for partial summary judgment.

Respectfully submitted,

MARCY I. LAHART, P.A.
207 SE Tuscawilla Road
Micanopy, FL 32667
Telephone: (352) 545-7001
Facsimile: (888) 400-1464
marcy@floridaanimallawyer.com
BY: *s/ Marcy I. LaHart*
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
*Counsel for Plaintiff*

VENZA LAW, PLLC
931 Village Boulevard, #905-322
West Palm Beach, FL 33409
office: (561) 596-6329
email: dvenza@venzalawpllc.com
BY: *s/Denese Venza*
Denese Venza, Esq.
Florida Bar No. 599220
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on 31st day of January, 2020 a true and correct copy of the foregoing has been furnished via CM/ECF electronic mail service to the Clerk of the Court. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

BY: s/Denese Venza
*Counsel for Plaintiff*