# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**SAMANTHA RING,**

   **Plaintiff,**

**v.**                                           **Case No.: 8:19-cv-00772-VMC-JSS**

**BOCA CIEGA YACHT CLUB, INC.,**

   **Defendant.**

_____/

## BCYC'S RESPONSE IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

In accordance with Federal Rule of Civil Procedure 56, Defendant Boca Ciega Yacht Club, Inc. (BCYC, the Club) hereby opposes Plaintiff's Motion for Summary Judgement on the following grounds:

1.   Plaintiff may not rely on self-serving affidavits to bypass deposition testimony already on the record and introduce new evidence of disability to bolster her claims;

2.   If Plaintiff's eviscerating interpretation of the ADA's private club exemption were adopted, no organization would ever qualify for the exemption.

In determining whether the party moving for summary judgment has met its burden, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

## RESPONSE TO STATEMENT OF MATERIAL FACTS

1.   Admitted.

2.      Denied that Ms. Ring suffers from any severe allergies other than her allergies to bee venom and sunflower seeds [Dkt. 100-4].

3.      Denied that Ms. Ring has ever gone into anaphylactic shock following exposure to bee venom or sunflower seeds [Dkt. 128-2, ¶¶ 3–7 (describing anaphylactic reactions rather than anaphylactic shock)].

4.      Denied that Ms. Ring carries her medi-pack at all times [Dkt. 129-31, 23: 5–12, 25; 24: 1–25; 25: 1–10 (Ms. Ring describing one side of her body swelling up following a wasp sting, but only taking Benadryl and not receiving follow-up medical care afterwards, though the swelling lasted for two months); 36: 2–12 (Ms. Ring testifying that she had left her medical pack with the Epi Pen in her car on a day that she had gone out on her boat and been exposed to a bee)].

5.      Admitted.

6.      Denied. *See* **Exhibit A**, Ms. Ring's Responses to BCYC's Second Request for Production dated December 20, 2019, p. 1, ¶ 2 (Ms. Ring stating that she had already produced copies of all documents supporting that Piper was a service animal, though she did not produce any video depicting dog Piper finding and retrieving her EpiPen to BCYC in discovery).

7.      Admitted.

8.      Denied that Ms. Ring's Montessori teaching specialization—technology-assisted second language acquisition—has anything to do with dog training techniques [Dkt. 129-31, 10: 18–25; 11: 1–8].

9.      Denied that Ms. Ring did not obtain Piper with the idea of training her to be a service animal, and denied that she did not make any attempt to bring Piper into the Clubhouse

until she felt that Piper was trained enough. Exhibit A, p. 1, ¶ 2 (Ms. Ring stating that she had already produced copies of all documents supporting training received by Piper, though she did not produce any training records to BCYC in discovery). *See* E-mail from Samantha Ring to City of Gulfport Mayor Sam Henderson, dated January 24, 2019, attached as **Exhibit B** (Ms. Ring identifying past dog Harry as "old service animal" and Piper as "new service animal," and indicating that she did not try to bring Piper into the Clubhouse until she felt that Piper was "trained enough"); Sworn Declaration of Lee Nell, attached as **Exhibit C**, p. 3, ¶ 14 (Ms. Ring brought dog Piper into the BCYC Clubhouse on multiple occasions in 2017); Dkt. 129-25 (Dr. Santayana's note submitted to then Commodore Larry Brown well before November 2018).

  *10.*  Denied. *See* **Exhibit D**, printout of American Kennel Club (AKC) profile for dog Piper, produced by Ms. Ring in response to BCYC's First Request for Production (showing date, but not showing test results, test date, or whether dog Piper passed test for the first time; no AKC certificate was produced by Ms. Ring); *see* Exhibit A, p. 1, ¶ 2 (Ms. Ring stating that she had already produced copies of all certifications for dog Piper in her possession); *see also* Dkt. 129-24, 22: 9–16 (When Mr. Brown asked Ms. Ring what training the dog had received sometime after July 16, 2018, she gave him the name of two companies, which supports that Piper had received professional training before January 20, 2019).

  11.  Admitted.

  12.  Admitted.

  13.  Denied. *See* Deposition Transcript of Dawn Scheu, attached as **Exhibit E**, 7: 24–25; 8: 1–24 (testifying that dog Piper was already trained, and had had tests related to

anaphylaxis, but that she did not know who had trained Piper); 9: 8–23 (testifying that she had seen video of Piper finding and retrieving EpiPen); 17: 1–8 (denying that Ms. Ring had sent her any videos showing what Piper did to relieve anxiety); 27: 23–25; 28: 1–7 (specifically denying that she had ever seen video of Piper applying deep pressure therapy to Ms. Ring during anxiety attack); 31: 9–14 (agreeing with Ms. Ring's counsel that it would be difficult for Ms. Ring to create such a video during an anxiety attack); *cf* Dkt. 128-4, p. 2, ¶ 8 (Ms. Scheu making sworn declaration, contrary to her deposition testimony, that she had "personally viewed video of Piper performing these tasks [including deep pressure therapy) reliably); *see also* Exhibit D, p. 1, ¶ 2 (Ms. Ring confirming that she had already produced all records showing that Piper was a service animal, though she never produced any videos showing dog Piper finding and retrieving EpiPen to BCYC in discovery).

14.     Denied. Exhibit E, 14: 12–17 (Ms. Scheu testifying that Ms. Ring and dog Piper would graduate from her program in six to eight months from date of deposition, January 2, 2020); 17: 12–23 (confirming that Ms. Ring's last video-conferenced session with her was on November 22, 2019, forty-one days earlier); 22: 16–25; 23: 1–5 (confirming that Piper has not taken the scent detection test yet, as Piper still needs to learn not to eat the food on a plate if she is asked to check the food for the allergen); 31: 17–25; 32: 1–15 (explaining that taking the odor detection test is a condition of graduating from the program, and testifying that Piper was not ready to take the test yet).

15.     Admitted.

16.     Denied that the BCYC Clubhouse is open to the elements and empty of other people. Exhibit C, p. 2, ¶¶ 7–14 (confirming that the BCYC Clubhouse is surrounded by a

completely screened-in porch on two sides, and that Ms. Ring had brought Piper into the Clubhouse on multiple occasions in 2017); *see also* Sworn Declaration of Jennifer Buckley, attached hereto as **Exhibit F**, pp. 2-3, ¶¶ 9–14 and photograph exhibits to declaration, 3–6 (depicting Clubhouse, screened-in porch on two sides, windows giving onto screened-in porch, and sliding glass doors giving onto screened porch); Dkt. 129-31, 41: 25; 42: 1–5, 17–19; 45: 2–20 (admitting that the sliding glass doors go onto the screened porch; that there is only one door in the back that opens to the outside; and admitting that she does not know how many windows there are in the building).

17.     Denied that Ms. Ring's decision not to seek an accommodation from the Pinellas County School District is "reasonable under the circumstances," as Ms. Scheu attests [Dkt. 128-4, p. 3, ¶ 12]. *See* Exhibit E, 37: 1–5 (Ms. Scheu admitting on the record that if Ms. Ring is exposed to sunflower seeds and dog Piper is not with her, the dog cannot help her); Dkt. 128-2, pp. 2, 4 ¶¶ 6, 14 (Ms. Ring attesting to suffering an allergic reaction to sunflower seeds in another teacher's classroom at work on November 14, 2019, and having to rush back to her own classroom to retrieve her EpiPen; and confirming that she does not bring dog Piper to Bay Point Middle School with her).

18.     Denied. *See* Exhibit B (Ms. Ring conveying to Mayor Henderson that she felt that Piper was trained enough in November 2018); Dkt. 129-25 (Ms. Ring provided note from Dr. Santayana, which was dated July 16, 2018, to then Commodore Larry Brown around that same time).

19.     Denied. Dkt. 129-24, 19: 1–20; 22: 9–16 (According to Mr. Brown, the verification provided by Dr. Santayana was insufficient, as he just "agreed" with Ms. Ring's

decision; when Mr. Brown asked Ms. Ring what training the dog had received, she gave him the name of two companies, nothing more).

20.     Denied. *See* Dkt. 100-5 (Motion for suspension of Ms. Ring's membership privileges); Dkt. 129-1, 39: 9–25 (then BCYC Commodore Nicholas Southard explaining that the BCYC Board had obtained conclusive evidence that four different land-based addresses provided by Ms. Ring were false); Dkt. 129-24, 49: 1–25 (Mr. Brown testifying that Ms. Ring wanted to be able to bring dog Piper into the Clubhouse because she was living on her boat, and it was more comfortable in the Clubhouse); Dkt. 129-40 (Motion for expulsion of Ms. Ring dated February 10, 2016, based on her continual violations of Club rules and living aboard her boat without permission long before she ever requested an accommodation to BCYC's Clubhouse pet policy for dog Piper); Dkt. 129-31, 120: 6–9, 13–25; 121: 1–5; 122: 6–8, 12–25; 123: 1 (Ms. Ring herself testifying that the reason she needed to bring dog Piper into the Clubhouse was that she could not leave the dog tied up on the porch or outside, and would need to call a friend to watch Piper every time that she visited the Clubhouse ); Dkt. 129-43, p. 3 (Dr. Santayana documenting on July 16, 2018 that Ms. Ring is living on her boat to save money); *see also* composite **Exhibit G**, showing notes from Ms. Ring's other treating physicians documenting that she had been living aboard her boat since 2014.

21.     Denied. *See* Exhibit C, p. 2, ¶ 10 (Rule prohibiting dogs in the Clubhouse was passed, in part, because of Ms. Ring's inability or unwillingness to accommodate other members' wishes and levels of comfort around her dog); p. 3, ¶¶ 11–12 (describing one incident illustrating Ms. Ring's complete lack of concern for other members with respect to her dog); p. 7, ¶¶ 29–30 (Ms. Ring never identified herself as an individual with a disability in

6

2016 or 2017, nor did she identify Piper as a service animal); p. 2, ¶¶ 8–9 (the only place where dogs are not allowed is the inside of the Clubhouse proper, beyond the screened-in porch); p. 2, ¶¶ 5–6 (area around Clubhouse was fogged as needed; few bees around Clubhouse, and no bees in the Clubhouse); *see also* Exhibit F, pp. 2–3, ¶¶ 9–14 (Clubhouse proper is not exposed to the outside); p. 5, ¶¶ 24–26 (bees do not get into the Clubhouse, and dogs are allowed on the screened-in porch and the patios outside); pp. 5-6, ¶¶ 27–32 (describing Ms. Ring's odd and aggressive request for funds for her dog made to Ms. Buckley, with no explanation provided); *see also* Sworn Declaration of James Meyer, attached as **Exhibit H**, pp. 2-3, ¶¶ 14–20 (describing Ms. Ring's conduct when asked by the daughter of another BCYC member to keep her dog Piper away from a small dog); pp. 3-4, ¶¶21–24 (on December 23, 2018, dog Piper was not under Ms. Ring's control and did not respond to her verbal commands); Dkt. 129-41, 75: 17–25; 76: 1–18 (Dr. Santayana, Plaintiff's expert treating physician, was not aware of any major life activity that Ms. Ring is significantly impaired in performing due to her anxiety or allergies); *See* Dkt. 100-5 (Motion for suspension of Ms. Ring's membership privileges); Dkt. 129-1, 39: 9–25 (then BCYC Commodore Nicholas Southard explaining that the BCYC Board had obtained conclusive evidence that four different land-based addresses provided by Ms. Ring were false); Dkt. 129-24, 49: 1–25 (Mr. Brown testifying that Ms. Ring wanted to be able to bring dog Piper into the Clubhouse because she was living on her boat, and it was more comfortable in the Clubhouse); Dkt. 129-40 (Motion for expulsion of Ms. Ring dated February 10, 2016, based on her continual violations of Club rules and living aboard her boat without permission long before she ever requested an accommodation to BCYC's Clubhouse pet policy for dog Piper); Dkt. 129-31, 120: 6–9, 13–25; 121: 1–5; 122: 6–8, 12–

**COLE, SCOTT & KISSANE, P.A.**
4301 WEST BOY SCOUT BOULEVARD · SUITE 400 · TAMPA, FLORIDA 33607 · (813) 289-9300 · (813) 286-2900 FAX

25; 123: 1 (Ms. Ring herself testifying that the reason she needed to bring dog Piper into the Clubhouse was that she could not leave the dog tied up on the porch or outside, and would need to call a friend to watch Piper every time that she visited the Clubhouse ); Dkt. 129-43, p. 3 (Dr. Santayana documenting on July 16, 2018 that Ms. Ring is living on her boat to save money); *see also* Exhibit G (Ms. Ring's other treating physicians documenting that she had been living aboard her boat since 2014).

22.     Denied that BCYC was founded in the 1940's for the purpose of deceiving Tampa Bay government and conducting drinking activities on a dock. *See* **Exhibit I**, old photograph depicting the original Boca Ciega Yacht Club, which was located in Gulfport, accessible at https://www.sailbcyc.org/history; *see also* Dkt. 129-22 (showing certificate of incorporation); Dkt. 100-1 (BCYC's Lease with City of Gulfport); Dkt. 129-30, p. 1, BCYC Mission Statement; *see also* **Exhibit J**, Sworn Declaration of Gerri Angel, p. 6, ¶ 30 (Applicants must be of good moral character, have a genuine interest in promoting the goals of BCYC, and be willing to work for the good of the Club and surrounding community).

23.     Admitted.

24.     Admitted.

25.     Denied as incomplete. *See* Dkt. 129-30, p. 1, BCYC Mission Statement.

26.     Denied. Dkt. 129-1, 98: 4–17 (Nicholas Southard clarifying that boating and being on the water are the focus of social activities at BCYC, and explaining that "throwing a party, or 2, or 10" refers to BCYC's Potluck dinners; counsel for Ms. Ring commented on the record: "it sounds like a very social, rum-loving, alcohol loving group of people.").

**COLE, SCOTT & KISSANE, P.A.**
4301 WEST BOY SCOUT BOULEVARD  -  SUITE 400  -  TAMPA, FLORIDA 33607  -  (813) 289-9300  -  (813) 286-2900 FAX

27.     Denied that one Dollar per year represents the full consideration underlying the Lease. Dkt. 100-1, p. 5, ¶¶ 10–12 (BCYC bears the cost of any improvements, maintenance, and dredging of the channel if necessary).

28.     From the outset, denied that undated aerial shots from Google Earth, marked up by Ms. Ring and/or her attorneys off the record and introduced as Exhibit 14, constitute competent evidence. Further, denied. Dkt. 100, p. 3, ¶¶ 15–16 (Ms. Ring limiting her denial of public accommodations claims to the BCYC Clubhouse); *see* Exhibit F, p. 2, ¶¶ 6–8 and associated composite exhibits 1 and 2 (gate is closed, and nearby pedestrian gate is padlocked); pp. 4-5, ¶ 21 (gate used to be open for the convenience of members, but had to be closed to ward off trespassers); p. 5, ¶ 22 (there is a code to open the gate, but it is only provided to members of BCYC; the only way that a non-member of BCYC would know the code is if a current or former member disclosed the code instead of keeping it secret); Exhibit C, pp. 4–5, ¶¶ 16–18 (the main gate to BCYC's parking lot used to be left open, but was closed due to trespassers and sealing ice; BCYC has a policy in place for non-members who access the BCYC Clubhouse area and grounds); Dkt. 100-1, p. 4, ¶ 7 (under the Lease, members of certain other clubs named in this provision of the Lease have access to the beach behind the Lions' Club Clubhouse, which is separate from the BCYC Clubhouse).

29.     Denied that applicants did not have to meet any particular standards in 2018. *See* Exhibit J, pp. 2–3, ¶¶ 8–14 (BCYC performs a specific background check on prospective members to weed out potential liveaboards, verify their ability to pay dues, and exclude persons whose criminal history would pose a risk of harm to the Sea Scouts); pp. 3–5, ¶¶ 17–23 (prospective members who pass the background check are invited to interview night, where

**COLE, SCOTT & KISSANE, P.A.**
4301 WEST BOY SCOUT BOULEVARD · SUITE 400 · TAMPA, FLORIDA 33607 · (813) 289-9300 · (813) 286-2900 FAX

they are screened anew during an in-person meeting with the BCYC Membership Committee);

p. 5, ¶¶ 24–26 (prospective members who "pass" interview night are identified at next Board

meeting so that any objections to their membership can be lodged).

30.     Denied, on the basis that this list is incomplete. Dkt. 128-15, p. 4 (requiring

prospective members to pledge to follow BCYC's By-Laws and Rules, and to acknowledge

that living on one's boat without permission in violation of BCYC's Lease with the City of

Gulfport is equivalent to automatically resigning from membership).

31.     Denied. Dkt. 128-15, p. 1, Membership approval process (showing a $200 one-

time initiation fee).

32.     Denied. Dkt. 129-1, 8: 4–12 (Mr. Southard asked about the application that he

filled out); 9: 12–25 (referring to the background check that would have been performed on

Nicholas Southard, not on any other member); 10: 1–5 (Mr. Southard testifying that he did not

know whether BCYC had run a background check on him when he had joined the Club in

2004).

33.     Denied. *See* Exhibit J, p. 1, ¶ 3 (Mrs. Angel has served on the BCYC Committee

for the past twelve years); p. 1, ¶ 4 (since 2016, there have been at least three BCYC volunteers,

including Mrs. Angel, serving on the BCYC Membership Committee at any given time); pp.

2–3, ¶¶ 8–14 (BCYC performs a specific background check on prospective members to weed

out potential liveaboards, verify their ability to pay dues, and exclude persons whose criminal

history would pose a risk of harm to the Sea Scouts); pp. 3–5, ¶¶ 17–23 (prospective members

who pass the background check are invited to interview night, where they are screened anew

during an in-person meeting with the BCYC Membership Committee); p. 5, ¶¶ 24–26

(prospective members who "pass" interview night are identified at next Board meeting so that any objections to their membership can be lodged).

34.     Admitted.

35.     Denied. *See* Exhibit J, p. 3, ¶ 14 (Background check includes employment verification, which is performed to confirm that a prospective member will be able to pay dues).

36.     Denied. *See* Exhibit J, p. 5, ¶¶ 24–25 (Mrs. Angel reads the names of all of the applicants out loud at the first Board meeting following interview night so that any objections to the applicants can be raised; the applicants themselves do not attend the Board meeting); p. 5, ¶ 28 (at the next general meetings, Mrs. Angel introduces all of the applicants who have passed the background check, "passed" interview night, and received no objections at the Board meeting, and then calls for a vote of the general membership; there is no "panel").

37.     Denied. *See* Exhibit J, p. 6, ¶ 29 (Applicants who show up to the general meeting are usually voted in, because members were given a chance to object in advance).

38.     Denied as incomplete. Dkt. 129-1, 12: 21–24 (Number of members has hovered around 200 since 2004 when Mr. Southard joined the Club).

39.     Admitted.

40.     Admitted.

41.     Denied. Dkt. 129-1, 87: 4–25; 88: 1 (Nicholas Southard discussing BCYC's concerns about having the BCYC Newsletter, the Windward, accessible to the public through the Club's website, because of the necessity of protecting members' contact information; at the time of his deposition, he did not know whether this had been taken care of or not).

11

42.     Denied. Dkt. 129-1, 93: 9–25; 94: 1–9; Dkt. 129-24, 82: 11–13 (While BCYC offers adult sailing school to members of the public in the spring and fall on a limited space available basis, enrollment in BCYC's adult sail school includes a 90-day limited membership in BCYC).

43.     Admitted.

44.     Denied. Dkt. 129-1, 93: 9–25; 94: 1–9; Dkt. 129-24, 82: 11–13; Dkt. 129-30, p. 2, § 1.01 (c) (sailing school participants gain a temporary, non-voting 90-day BCYC membership in BCYC that starts on the first day of sail school).

45.     Denied. Dkt. 129-1, 110: 2–21; 111: 11–25; Dkt. 129-24, 74: 16–19. *See also* Sea Scouts BSA website, accessible at: https://seascout.org/about/, clarifying that young men and women between 14 and 20 years of age are eligible to join the Sea Scouts, so that many of the Sea Scouts may not need any chauffeurs.

46.     Denied that any member of the public can freely access BCYC's clubhouse except during Fun Day, BCYC's annual open house. Dkt. 129-1, 92: 22–25; 93: 1, 4–8; Dkt. 129-24, 78: 16–18. Dkt. 100, p. 3, ¶¶ 15–16 (Ms. Ring limiting her denial of public accommodations claims to the BCYC Clubhouse, while regattas, fishing tournaments, boat parades, cruises, and other events do not take place in the Clubhouse or even on BCYC grounds); Exhibit C, p. 6, ¶ 26 (BCYC's policy has always been that outside events at the Clubhouse must be sponsored by a BCYC member and approved by the BCYC Board). *See also* BCYC Club calendar, attached hereto as **Exhibit K**, p. 1, top (Containing the following clarification: "Note: Events listed here are private club events open to members and invited guests.").

**COLE, SCOTT & KISSANE, P.A.**
4301 WEST BOY SCOUT BOULEVARD - SUITE 400 - TAMPA, FLORIDA 33607 - (813) 289-9300 - (813) 286-2900 FAX

47.     Denied. Dkt. 129-1, 89: 13–18 (BCYC encourages new membership on its website); 92: 14–21 (clarifying that BCYC might advertise Open House and sailing school in the *Gabber*); 95: 4–11 (again clarifying that BCYC encourages new membership through its website).

48.     Denied as incomplete. Dkt. 100-1, p. 4, ¶ 7 (under the Lease, members of certain other clubs named in this provision of the Lease and City of Gulfport officials and their guests have access to the beach behind the Lions' Club Clubhouse, which is separate from the BCYC Clubhouse); Dkt. 100, p. 3, ¶¶ 15–16 (Ms. Ring limiting her denial of public accommodations claims to the BCYC Clubhouse, not the beach behind the Lions' Club Clubhouse or any other part of the premises).

49.     Denied as incomplete. Dkt. 129-1, 245: 12–20 (Nicholas Southard testifying that to his knowledge, no City of Gulfport had ever used the BCYC Clubhouse); Exhibit C, pp. 6-7, ¶ 28 (a City of Gulfport official wishing to use the Clubhouse for a specific purpose would still request the sponsorship of a member).

50.     Denied that the faded pages bearing notes or inscriptions drawn in by Ms. Ring and/or her attorneys and included in Plaintiff's exhibit 16 as "BCYC Calendar and meeting minutes excerpts" constitute competent evidence. Further, denied. *See* Exhibit C, p. 6, ¶¶ 26-27 (confirming that other persons and organizations may use the Clubhouse with the sponsorship of a BCYC member and Board approval); Exhibit H, pp. 1-2, ¶¶ 5–10 (Confirming that no member of any other organization or sailing club is invited to the BCYC Clubhouse without having the sponsorship of a BCYC member and Board approval); Dkt 129-1, 245: 8–

11, 254: 11–15; Dkt. 129-24, 78: 13–15 (BCYC has never rented out the Clubhouse for a fee to a non-member of BCYC).

51.     Denied. Dkt. 129-1, 103: 12–20 (clarifying that the winner receives one free sail school space, which entails a 90-day limited membership; not a free general membership in BCYC).

52.     Denied as incomplete. *See* Exhibit C, p.5, ¶ 19; p. 6, ¶¶26-27 (clarifying that sponsoring BCYC members are responsible for their guests, and that no outside person or organization can use the Clubhouse without a sponsoring BCYC member and Board approval).

53.     Denied as incomplete. Dkt. 129-1, 101: 9–25 (explaining that around 80 people would usually attend the potluck dinners, and denying that the members who attended potluck had ever each brought two guests); Dkt. 100, p. 3, ¶¶ 15–16 (Ms. Ring limiting her denial of public accommodations claims to the BCYC Clubhouse, not the channel or open waters where the Christmas Boat Parade is held).

54.     Denied. Dkt. 129-1, 101: 4–8 (Nicholas Southard testifying that members who attend the BCYC Potluck Dinners would recognize any guests, as they are familiar with the members who usually attend the potluck dinners).

55.     Denied. *See* Exhibit C, p. 5, ¶ 19 (members are responsible for their guests and must accompany their guests at all times); ¶ 20 (To Lee Nell's knowledge, Samantha Ring was the only member of BCYC who violated this rule, by inviting guests to BCYC's premises and then not being on the premises to accompany them); p. 6, ¶ 26 (sponsorship of a member and Board approval is required for outside persons and organizations to be invited to the Clubhouse); pp. 4-5, ¶ 18 (BCYC's policy with respect to non-members who gain access to

the premises is to provide information to those non-members who are interested in joining the Club); Dkt. 128-5, p. 3 (clarifying that non-member had stopped by to inquire about membership, which supports that she had been invited into the Clubhouse even if she did not know a soul).

56.     Denied that undated aerial shots from Google Earth, marked up by Ms. Ring and/or her attorneys off the record and introduced as Exhibit 14, constitute competent evidence. Dkt. 128-19, p. 2, ¶ 7 (Affiant Renee Best admitted that she has been invited to the BCYC Clubhouse as a guest and as the parent of a Sea Scout, which would make her the guest of the BCYC member who sponsors the sea scouts); Exhibit C, pp. 4-5, ¶ 18 (BCYC's policy with respect to non-members who gain access to the premises is to provide information to those non-members who are interested in joining the Club); p. 5, ¶¶ 19-20 (members are to accompany their guests at all times, but Samantha Ring would invite guests to the premises and then not show up); pp. 4-5, ¶ 18 (clarifying BCYC's policy concerning intercepting non-members spotted on the premises); Exhibit F, p. 2, ¶ 8 and composite exhibit 2 (showing closed parking lot gate and padlocked pedestrian gate); pp. 3-4, ¶¶ 16-19 and associated exhibits 7-10 (all gates to docks are locked and only accessible to those who have a key); p. 4, ¶ 20 (non-members who rent slips from the City of Gulfport are provided with a key that unlocks the padlock on the pedestrian gate as well as the gates to each of the docks, so that they have access to the premises but no key to the Clubhouse).

57.     Denied. *See* Exhibit C, pp. 4-7, ¶¶ 18–28; Exhibit F, p. 2, ¶ 8 and composite exhibit 2 (showing closed parking lot gate and padlocked pedestrian gate); pp. 3-4, ¶¶ 16-19 and associated exhibits 7-10 (all gates to docks are locked and only accessible to those who

**COLE, SCOTT & KISSANE, P.A.**
4301 WEST BOY SCOUT BOULEVARD · SUITE 400 · TAMPA, FLORIDA 33607 · (813) 289-9300 · (813) 286-2900 FAX

have a key). Dkt. 129-24, 78: 16–24 (no food or lodging provided to members of the public);
Dkt. 129-1, 93: 3 (food provided to members of the public during Fun Day is free).

58.     Denied. *See* Exhibit F, pp. 6-7, ¶¶ 33-36 (Jennifer Buckley is not an employee
of BCYC); Exhibit H, p. 4, ¶ 25 (BCYC is a volunteer-run Club that has no employees); BCYC
merchandise is only available to members. *See* BCYC website, accessible at:
https://www.sailbcyc.org/merchandise (clarifying that merchandise can be purchased only "at
monthly club meetings and at some work days and club events and by appointment").

59.     Admitted.

## MEMORANDUM OF LAW

### A. ARGUMENT

BCYC hereby reincorporates the arguments already made in its original motion for
summary judgment, filed on January 17, 2020 in response to Plaintiff's Motion [Dkt. 129].

### I.     Ms. Ring cannot rely on self-serving affidavits to bypass the substance of her own deposition testimony

The purpose of summary judgement is "to separate real and genuine issues from those
that are formal or pretended, so that only the former may subject the moving party to the burden
of trial." *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980) (citation omitted).
A party cannot create a genuine issue of material fact by filing self-serving affidavits that
eliminate or negate the substance of the party's prior deposition testimony. Thus, "[w]hen a
party has given clear answers to unambiguous questions which negate the existence of any
genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit
that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins*

*& Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). While "every discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence," *Kennett-Murray Corp.*, 622 F.2d at 894 (5th Cir. 1980), an affidavit that "contradicts, without explanation, previously given clear testimony" should be disregarded as evidence. *Van T. Junkins*, 736 F.2d at 657 (11th Cir. 1984).

From the outset of litigation, Ms. Ring has limited this ADA action to three alleged conditions:

- Severe anxiety with panic attacks;

- Severe allergy to bee venom;[1]

- Severe allergy to sunflower seeds.

[Dkt. 1, ¶ 4; Dkt. 47, ¶ 4; Dkt. 100, ¶ 4].

Now that discovery is closed, Ms. Ring submits an affidavit in which she attests that she is legally blind in one eye. Dkt. 128-2, pp. 3–4, ¶ 12. There is no dispute that seeing is a major life activity. 29 C.F.R. §1630.2(j)(3)(iii). There is no evidence of a visual impairment in any of Ms. Ring's medical records obtained via subpoena to date, but Ms. Ring did not identify any provider who would have treated her for such a visual impairment. While Ms. Ring asserts that she keeps an extra pair of eyeglasses in her medical bag, presumably so that she would be able to see if she loses her regular pair of eyeglasses while sailing, this is irrelevant to the analysis under the ADAAA unless the eyeglasses that she uses are ordinary eyeglasses. 29

---

[1] In the operative Complaint, this allergy is referred to as an allergy to "bee stings" [Dkt. 100, ¶ 4].

**COLE, SCOTT & KISSANE, P.A.**
4301 WEST BOY SCOUT BOULEVARD · SUITE 400 · TAMPA, FLORIDA 33607 · (813) 289-9300 · (813) 286-2900 FAX

C.F.R. §1630.2 (j)(1)(vi). At this point in time, there is no testimony on the record concerning Ms. Ring's vision. There is no testimony on the record concerning her eyeglasses, and discovery is closed.

Even if Ms. Ring admits that she uses ordinary eyeglasses, the effect of this affidavit statement is to automatically present Ms. Ring as an individual with a disability under the ADAAA without shouldering any burden of proof. Plaintiff filed no fewer than four different complaints in this action, the last filed on December 16, 2019—just 18 days before the close of discovery [Dkt. 87, Dkt. 100]. She had ample time to assert other conditions as bases for her claimed disability status, but did not do so. Instead, she filed an affidavit, placing gratuitous evidence of a heretofore undisclosed disability on the record without any opportunity for rebuttal. Meanwhile, BCYC's inquiry into Ms. Ring's disability status has been consistently limited to the specific conditions that Ms. Ring has identified all along [Dkt. 59].

Introducing evidence of a visual impairment via affidavit also offers Ms. Ring a way to bypass her expert treating physician's unhelpful testimony:

Q:    Has she [Ms. Ring] ever mentioned something in particular that she could not do because of these allergies?

**A:    Not a thing in particular, but that it affected her daily life.**

Q:    Okay. So how does it affect her normal daily life?

**A:    In that it causes her increased anxiety worrying about the exposure to bees and how she obtained the dog to help her deal with those things.**

Q:    So how does her anxiety stop her from doing anything that any regular person can go out and do?

**A:    I'm not aware of it stopping her from doing anything in particular.**

**COLE, SCOTT & KISSANE, P.A.**
4301 WEST BOY SCOUT BOULEVARD - SUITE 400 - TAMPA, FLORIDA 33607 - (813) 289-9300 - (813) 286-2900 FAX

[129-41, 76: 6–18].

Next, Ms. Ring files an affidavit made by her dog trainer expert, Dawn Scheu. Dkt. 128-4. Ms. Scheu was deposed on January 2, 2020. Exhibit E. While Ms. Scheu's affidavit reflects that she had viewed videos on dog Piper reliably finding and retrieving Ms. Ring's Epipen, she specifically denied ever seeing any video of dog Piper performing deep pressure therapy on Ms. Ring. Dkt. 128-4, p. p. 2, ¶ 8; *cf* Exhibit E, 27: 23–25; 28: 1–7]. Finally, even if video depicting dog Piper finding and retrieving Ms. Ring's EpiPen exists, Ms. Ring has not produced such a video to BCYC in response to BCYC's Second Request for Production. *See* Exhibit D, p. 1, ¶ 2 (Ms. Ring confirming that she had already produced all records showing that Piper was a service animal, though she never produced any videos showing dog Piper finding and retrieving EpiPen to BCYC in discovery). Given the evidentiary value of such a video in the context of this case, that Ms. Ring would withhold it from production is inexplicable; unless, of course, the video does not exist.

For the foregoing reasons, Plaintiff's Motion for Summary Judgment should be denied. Further, Paragraph 12 of Ms. Ring's affidavit and Paragraph 8 of Ms. Scheu's affidavit should be stricken from the record under Federal Rule of Civil Procedure 56 (h).

## II.    BCYC is a bona fide private membership club

"A private club is a group of individuals who imagine the membership as a personification of whatever priorities and interests the club professes to embrace." *EEOC v. Chicago Club*, 86 F. 3d 1423, 1437 (7th Cir. 1996). BCYC is a self-governed group of volunteers who devote their personal time and efforts to realizing the Club's goals. BCYC has no employees. Exhibit H, p. 4, ¶ 25. BCYC has adopted a formal set of By-Laws that members

**COLE, SCOTT & KISSANE, P.A.**
4301 WEST BOY SCOUT BOULEVARD  ·  SUITE 400  ·  TAMPA, FLORIDA 33607  ·  (813) 289-9300  ·  (813) 286-2900 FAX

follow. Dkt. 129-30. Prospective members are informed in advance that they will be expected to work for the good of the Club if they join. Exhibit J, p. 4, ¶ 18. BCYC has a guest policy in place. Dkt. 129-30, pp. 15, 17; Exhibit B, p. 5, ¶ 19. Non-members cannot freely use the Clubhouse, as Ms. Ring asserts. Exhibit B, p. 6, ¶ 26.

In *Chicago Club*, just as Ms. Ring in this action, the EEOC asserted that the Chicago Club engaged in a membership recruitment drive to increase revenue; that non-members had little to no restrictions on their access and use of Chicago Club facilities; and that the Chicago Club lacked any meaningful guest criteria. *Chicago Club*, 86 F. 3d 1423, 1435 (7th Cir. 1996). In dispelling these conclusory statements, Judge Canne found that "prudently increasing membership to increase revenue while not abandoning selective membership practice exhibits nothing more than fiscal responsibility." *Id.* There, just as obtains with BCYC in this case, "non-members are allowed access to the Club only as authorized guests of members." *Id.* Finally, that guests do not sign a log, or obtain a pass, or are subject to general monitoring by BCYC while they are in the Clubhouse is irrelevant. "The [guest] criteria is that a guest must be invited to the Club as a member. The depth and intimacy to which a member knows the guest is irrelevant; that the member knows them well enough to invite them is the end of the matter." *Id.* at 1436. This case is on all four with *Chicago Club*.

## CONCLUSION

If Plaintiff's self-serving affidavits and conclusory statements were accepted, no club would ever qualify for the private club exemption. For the foregoing reasons, Plaintiff's Motion for Summary Judgment should be denied.

Dated this 7th Day of February, 2020.

**COLE, SCOTT & KISSANE, P.A.**
4301 WEST BOY SCOUT BOULEVARD · SUITE 400 · TAMPA, FLORIDA 33607 · (813) 289-9300 · (813) 286-2900 FAX

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of February, 2020, I filed a true and accurate copy of this document using the ECF/ CM system, which will provide notification to the following: Ms. Marcy I. LaHart, Esq., c/o Marcy I. LaHart, P.A., 207 S.E. Tuscawilla Rd., Minacopy, FL 32667, (352) 545-7001 (T), (888) 400-1464 (F), marcy@floridaanimallawyer.com; and Ms. Deneze Venza, c/o Venza Law, PLLC, 931 Village Blvd., #905-322, West Palm Beach, FL 33409, (561) 596-6329 (T), dvenza@venzalawpllc.com.

> COLE, SCOTT & KISSANE, P.A.
> *Counsel for Defendant Boca Ciega Yacht Club, Inc.*
> 4301 West Boy Scout Boulevard
> Suite 400
> Tampa, Florida 33607
> Telephone (813) 864-9324
> Facsimile (813) 286-2900
> Primary e-mail:
> brian.rubenstein@csklegal.com
> Secondary e-mail:
> elisabeth.fontugne@csklegal.com
> Alternate e-mails:  patricia.toney@csklegal.com
> hollis.simmons@csklegal.com
>
>
> By:   s/ Elisabeth A Fontugne
>      BRIAN D. RUBENSTEIN
>      Florida Bar No.:  16997
>      ELISABETH A FONTUGNE
>      Florida Bar No.:  115954