UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SAMANTHA RING,

    Plaintiff,

v.                                     Case No.: 8:19-cv-772-T-33JSS

BOCA CIEGA YACHT CLUB, INC.,

    Defendant.

_____/

**ORDER**

This matter comes before the Court upon consideration of Defendant Boca Ciega Yacht Club's (BCYC's) Motion for Summary Judgment (Doc. # 122), filed on January 17, 2020, and Plaintiff Samantha Ring's Motion for Summary Judgment (Doc. # 128), filed on January 24, 2020. Both parties have filed responses in opposition. (Doc. ## 135, 137). For the reasons that follow, BCYC's Motion is granted and Ring's Motion is denied.

I.   **Background**

    A.   **BCYC**

BCYC is a tax-exempt, not-for-profit corporation. (Doc. # 129-22). According to the Mission Statement within its Bylaws, BCYC's mission is to promote safe boating activities,

1

promote instruction and education in safe boating and all
nautical activities, promote fellowship and camaraderie among
the members, and be an integral part of the community of
Gulfport. (Doc. # 129-30 at 1).

BCYC has a Board of Directors consisting of seven elected
"Flag Officers" (including the Commodore and Vice Commodore),
the immediate past Commodore, and eight other Directors who
are each elected to a two-year term. (Doc. # 129-30 at 6, 7;
Doc. # 129-24 at 11-13). The Board is responsible for managing
and controlling BCYC's affairs, approving budgets, and making
and enforcing the club's Bylaws, rules, and policies. (Doc.
# 129-30 at 6).

1.   The Lease with the City

BCYC leases the clubhouse and adjacent grounds from the
City of Gulfport. (Doc. # 122 at ¶ 3; Doc. # 135 at ¶ 3A;
Doc. # 128-6). On December 21, 2007, BCYC and the City
executed a Lease running for 13 years and expiring on December
31, 2020. (Id.).

BCYC pays the City an annual rent of $1 per year for the
lease of the clubhouse and parking area. (Doc. # 128-6 at 1).
The Lease also includes 56 wet slips and 50 dry storage slips
on the premises for exclusive use by BCYC members, with
members leasing the slips directly from the City. (Id. at 1-

3). BCYC is responsible for the payment of all utility charges, taxes, and fees. (<u>Id.</u> at 4). The Lease provides that BCYC must maintain its status as a not-for-profit Florida corporation and a tax-exempt organization for the life of the Lease. (<u>Id.</u>). If it fails to do so, the City can terminate the Lease. (<u>Id.</u> at 6).

Under the Lease, BCYC is permitted to use the premises "only for a meeting place, recreational purposes, vessel docking and storage, watercraft events and business office, for [BCYC's] members, only. [BCYC] may make no other use of the premises without written consent of [the City]." (<u>Id.</u> at 4). However, BCYC may host regattas and other nautical events "so long as the same are coordinated with [the City's] harbormaster." (<u>Id.</u>).

The boat ramp leased to BCYC is for the exclusive use of members and their guests, and BCYC cannot allow use of the boat ramp by the general public. (<u>Id.</u>). However, the Lease provides that BCYC must allow members of certain named organizations to have access to the beach. (<u>Id.</u>). In addition, only one person is allowed to live aboard their boat on the leased premises at a time. (<u>Id.</u>).

According to the Lease, BCYC is not allowed to sell or distribute alcoholic beverages on the premises to anyone

other than members of BCYC and their guests. (Id. at 6). BCYC "shall not sell or distribute any goods or merchandise to the general public in competition with items sold by Lessor at the City Marina." (Id.). "In the event [BCYC] obtains the proper licenses to dispense alcoholic beverages as a private club, the sale or consumption of such beverages shall not be available to the general public and the same shall be limited to Lessee's members and their guests." (Id.).

### 2. Membership application process

The membership application process is as follows. First, prospective members must fill out an application. (Doc. # 129-30 at 3). According to the Bylaws, membership in BCYC is open to any person who is "of good character" and at least 21 years old. (Id. at 2). Applicants must also undergo a background check. (Id. at 3). Gerri Angel, the longtime chair of the BCYC Membership Committee, submitted an affidavit averring that she sends applications to an investigator to perform these background checks. (Doc. # 137-20 at 1, 2). The investigator will verify the applicant's address, and conduct a criminal background check and an employment check. (Id. at 2). The purpose of this background check is to ensure that applicants have a valid, land-based address and are thus less likely to live aboard their boat,

4

ensure the applicant does not have any prior felonies or sexual offenses on their record, and ensure that the applicant can pay the membership dues. (Id. at 2-3).

Once an applicant passes the background check, Angel will call the prospective member to ask them general questions regarding their interest in the club. (Doc. # 129-1 at 60; Doc. # 137-20 at 3). Angel has discretion about what to ask during that initial phone call. (Doc. # 129-1 at 61). Next, the prospective member will meet with at least three Membership Committee members at the BCYC clubhouse during "interview night." (Doc. # 137-20 at 1, 3; Doc. # 129-1 at 63). According to Angel, on interview night, she provides prospective members with a history of the club, explains that the club is run by volunteers, including scheduled Saturday "workdays," and explains the parameters of BCYC's Lease with the City. (Id. at 3-4). The Membership Committee will ask applicants why they wish to join BCYC and what they will bring to the club. (Id. at 4-5). Angel represents that the committee meets with applicants in person to make sure they have an interest in nautical or maritime activities and will be "a good fit" for the club. (Id. at 4, 5).

If the applicant is approved by the Membership Committee, their application is presented to the board and

board members have a chance to object to any applicants. (Doc. # 129-30 at 3; Doc. # 137-20 at 5). Then, the applicants will come to the next general meeting and will be voted in upon a majority vote of the general membership. (Id.). Once every month, except in December, applicants' names are brought up to BCYC's board and then applicants are voted in at a general meeting. (Doc. # 128 at ¶ 34; Doc. # 137 at ¶ 34).

In 2019, annual membership dues were $145 per quarter per household. (Doc. # 128 at ¶ 40; Doc. # 137 at ¶ 40). Members pay no renewal fees or additional fees of any kind. (Id.). Members are, however, expected to attend general membership meetings and participate in "workdays," a Saturday time commitment where members attend to the maintenance and upkeep of the club facilities. (Doc. # 129-30 at 1; Doc. # 129-1 at 16-17); see also (Doc. # 129-30 at 15) (as part of the clubhouse policies, stating that BCYC "is a self-help sailing association of members willing to perform work around the Clubhouse, grounds and docks to maintain and improve the property and to keep expenses at a minimum").

### 3. BCYC's guest and pet policies

According to the Bylaws, guest and visitor privileges are determined by the Board. (Doc. # 129-30 at 13). Per the stated clubhouse policies, all guests must be accompanied by

6

club members. (Id. at 15, 17). Under "Use of Premises," the policies allow "special personal use by members" subject to certain approvals and conditions, but the club is "[n]ot for use by [the] general public." (Id. at 15). In addition, per BCYC policy, no pets or animals are allowed inside the clubhouse, although they are allowed on the grounds and on the screened porch. (Id. at 17). All pets must be on a leash and under the owner's control at all times. (Id.).

### B. Samantha Ring

During the majority of her membership in BCYC, Ring worked as a full-time schoolteacher for the Pinellas County School District, where she taught Spanish at Bay Point Middle School. (Doc. # 122 at ¶ 33; Doc. # 135 at ¶ 33). Ring teaches Spanish to 18-25 middle school students each school day, during six 47-50 minute periods. (Doc. # 122 at ¶ 35; Doc. # 135 at ¶ 35). Dena Collins, the principal of Bay Point Middle School, testified that Ring is an effective teacher; she manages her classroom well and keeps sometimes disruptive middle school students engaged. (Doc. # 122 at ¶ 36; Doc. # 135 at ¶ 36).

According to Collins, Ring's attendance record during the 2019-2020 school year had been normal and predictable. (Doc. # 122 at ¶ 34; Doc. # 135 at ¶ 34). Collins testified

that Ring had never requested any reasonable accommodations from Bay Point Middle School and had never approached the school with a request to bring a service animal. (Doc. # 122 at ¶ 37; Doc. # 135 at ¶ 37). Based on her review of Ring's personnel file from the Pinellas County School District, Collins testified that Ring had worked for at least several years as a full-time teacher, posting full hours annually for many years, and she had not disclosed any health impairments on an employee information form in August 2016. (Doc. # 122 at ¶ 38; Doc. # 135 at ¶ 38). Ring does not bring her dog, Piper, to work because of concerns regarding students with dog allergies, dog phobias, and that a dog's presence would be distracting to middle school students. (Doc. # 128 at ¶ 15; Doc. # 137 at ¶ 15).

Ring avers that she has "severe allergies" to bee venom or bee stings and sunflower seeds. (Doc. # 128-2 at 1). She claims that these allergens trigger an anaphylactic reaction, making it hard for her to breathe. (Id. at 1-2). She also suffers from anxiety with panic attacks.[1] (Id. at 4). Ring

---

[1] The Court agrees with BCYC that Ring's allegations raised in her January 23, 2020 affidavit, regarding her poor eyesight and being legally blind in one eye, are unsupported by any other record evidence. (Doc. # 137 at 16-18; Doc. # 128-2 at 3-4). Since the beginning of this litigation, Ring's

uses an EpiPen when she has an allergic reaction, and she had to use her EpiPen twice in November and December 2019. (Id. at 2).

Ring obtained Piper in August 2015 but did not obtain her to be a service animal. (Id. at 2). However, according to Ring, one day while Ring and Piper were out on Ring's boat, Piper, untrained, killed a bee buzzing nearby. (Id. at 2-3). At that point, Ring decided to start training Piper to be her service animal. (Id. at 3). According to Ring, Piper passed the Canine Good Citizen test in January 2019. (Id.). She avers that Piper is trained to retrieve her medi-pack or apply "deep pressure therapy" when she is having a panic attack. (Id. at 3-4). Additionally, Piper has been working with a dog trainer, Dawn Scheu, to "fine tune Piper's ability to detect sunflower seeds." (Id. at 4).

### C.  Ring's interactions with BCYC concerning Piper

Ring is a sailor and joined BCYC in 2007. (Doc. # 128 at ¶ 7; Doc. # 137 at ¶ 7). Piper made a bad first impression on Larry Brown, the BCYC Commodore in 2018. When Brown first observed Piper, the dog was "out of control" and would bark and lunge at people. (Doc. # 129-24 at 48). At that time, in

---

disability allegations have hinged on her allergies and anxiety.

Brown's opinion, Ring "clearly did not have control over the dog." (Id.). Brown admits that as time went on, and Piper received training, her behavior improved. (Id.).

In approximately August 2018, Ring texted Brown a photograph of a note prepared by Dr. Andres Santayana. (Doc. # 129-24 at 17). This note read:

> Samantha Ring is a patient under the care of our clinic. I am familiar with this patient's history and functional limitations, as well as her anaphylactic allergies. In order to help alleviate these functional limitations due to her anxiety and to assist with her allergies, I support Samantha's decision to have her service animal accompany her at all times. A specially trained service animal will help to mitigate her anxiety and prevent any risks with her anaphylactic allergies, improving her quality of life.

(Doc. # 100-2).

Ring testified that, along with this note, she made a request for accommodation under the ADA to Brown requesting that Piper be allowed into the clubhouse as a service animal. (Doc. # 129-31 at 117-18, 120-21). Brown testified that he understood this note to be a request for an exemption to the club's general prohibition against having dogs inside the clubhouse and that Ring believed Piper to be a service dog. (Doc. # 129-24 at 17, 19, 23-24). According to Brown, he did not think this note was sufficient, so he asked Ring to

demonstrate Piper's training, and "maybe she could change minds of people that are on the board." (Id. at 19, 21-22).

When Ring argued that she was allowed to bring Piper into the clubhouse under the Americans with Disabilities Act (ADA), Brown testified that he researched the ADA and determined that BCYC was a private club and therefore exempt from the ADA's requirements. (Id. at 24-25).

On December 23, 2018, Brown issued Ring a written reprimand for violating the Club's pet policy for bringing Piper into the clubhouse and warned her that any subsequent violations would trigger the imposition of a fine. (Doc. # 122 at ¶ 22; Doc. # 135 at ¶ 22). According to Brown, Ring wanted to bring Piper into the clubhouse because she was living on her boat at the time, it was "freezing" out, and the clubhouse would be more comfortable than her boat. (Doc. # 129-24 at 48-49). It was around this time that Ring threatened to file a complaint with the Pinellas County Office of Human Rights (the "PCOHR"), and Brown "told her to go ahead and do that and that we would talk to them." (Id. at 28, 95-96). On January 2, 2019,[2] Ring filed a signed and verified

---

[2] The Charge of Discrimination is date stamped January 2, 2018, but Ring signed the document on December 28, 2018, and so it appears that the agency's staff inadvertently forgot to switch the stamp to reflect the new year.

Charge of Discrimination with the PCOHR, alleging that BCYC had discriminated against her on the basis of her disability by failing to allow her service animal on BCYC's premises. (Doc. # 28-1).

In January 2019, Nick Southard, the Commodore who took over after Brown, decided to hire an investigator to verify Ring's current address because BCYC officers were concerned about Ring living aboard her boat. (Doc. # 129-1 at 39-41, 159). On January 21, 2019, Ring again brought Piper to the clubhouse and Southard confirmed that a fine would be imposed. (Doc. # 122 at ¶ 24; Doc. # 135 at ¶ 24; Doc. # 100-4). On or about January 22, 2019, BCYC became suspicious that Ring was using electricity from an electrical unit installed at the BCYC dock that was unmetered and paid for by the City. (Doc. # 129-1 at 184-86; Doc. # 129-12). Southard testified that this electricity was meant to be used only intermittently for minor repairs but that BCYC felt Ring was "stealing" this electricity by having a line running from the outlet to her boat while she was not there. (Id. at 186).

### D. BCYC suspends, and ultimately expels, Ring

On January 31, 2019, the Board moved to suspend Ring's membership. (Doc. # 100-5). The motion states that Ring had lived for three years as a non-sanctioned liveaboard on her

boat in contravention of the Lease. (Id. at 2). "During that time, she has provided the Club and the City with four false addresses as her land-based residence." (Id.). In addition, according to the motion, Ring had been "stealing City electricity by keeping an extension cord plugged into the City's 110v electrical outlet on the pedestal near her boat in the Club basin." (Id. at 3). Ring denies that she stole electricity from the City or lied about her address. (Doc. # 135 at 8; Doc. # 129-31 at 142-43, 179-80). She spoke in her own defense at the January 31 Board meeting. (Doc. # 129-31 at 141).

In April 2019, the general membership of the club voted to expel Ring.[3] (Doc. # 100-6). The stated reasons for expulsion were: (1) providing false addresses; (2) a pattern of violations of club rules; (3) a pattern of dishonesty; (4) undermining the club's mission to be part of the Gulfport Community by damaging the club's relationship with the City; (5) sowing discord among members; (6) two previous attempts to expel; and (7) a pattern of offensive and boorish conduct – toward members and guests – that is not aligned with the

---

[3] BCYC claims that the expulsion took place on April 19, 2019, while Ring alleges in the operative complaint that it took place on April 1, 2019. (Doc. # 100 at 7; Doc. # 122 at 8).

standards of the BCYC community." (Id. at 2). Ring amended her administrative complaint in April 2019 to add charges of retaliation. (Doc. # 100-7 at 1).

According to an investigative report dated May 29, 2019, the PCOHR investigated Ring's claims of discrimination against BCYC (the "Investigative Report"). (Doc. # 47-7). At the end of the Investigative Report, under "Conclusions," the report's author wrote that, "based upon the available evidence, there is reasonable cause to believe that an unlawful act of discrimination based on disability . . . and retaliation has occurred." (Id. at 15).

## II.  Procedural Background

Ring initiated the instant action in federal court on March 29, 2019, asserting claims against BCYC for failure to make reasonable modifications and retaliation under Title III of the ADA. (Doc. # 1). Following several rounds of motions to dismiss, the operative complaint is Ring's third amended complaint. In that complaint, Ring brings three causes of action against BCYC: failure to make reasonable modifications under the ADA (Count I); retaliation in violation of the ADA (Count II); and discrimination in violation of the Florida Civil Rights Act (FCRA) (Count III). (Doc. # 100).

Both parties now seek summary judgment in their favor on all claims. (Doc. # 122 at 1; Doc. # 128 at 25). The Motions are ripe for review.

## III. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260

(11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538–39 (5th Cir. 2004); see also United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984)("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."(quotation omitted)).

## IV. **Analysis**

To prevail under Title III of the ADA, Ring must demonstrate that (1) she is an individual with a disability, (2) BCYC is a place of public accommodation, and (3) she was denied full and equal treatment because of her disability. Schiavo ex rel Schindler v. Schiavo, 358 F. Supp. 2d 1161, 1165 (M.D. Fla. 2005). Disability-discrimination claims under the FCRA are analyzed using the same framework as ADA claims. Holly v. Clairson Indus., LLC, 492 F.3d 1247, 1255 (11th Cir. 2007). The parties dispute each of these prongs.

For the reasons discussed below, this Court need not determine whether Ring suffers from a disability that substantially limits a major life activity. The Court will assume for the purposes of summary judgment, without deciding, that Ring does have a disability.

### A. Whether BCYC is a private club

According to BCYC, it is a "genuinely private club," making it exempt from the public accommodation requirements of Title III of the ADA and the FCRA. (Doc. # 122 at 1, 11-18). Ring argues in her own motion that BCYC is a place of public accommodation. (Doc. # 128 at 18-25).[4] The parties agree that whether BCYC qualifies for the private club exemption as a "public accommodation" under the ADA is a question of law for the Court to decide. (Doc. # 145); see United States v. Richberg, 398 F.2d 523, 526 (5th Cir. 1968) (explaining that whether an institution is a "private club"

─────────────────────

[4] Ring also argues that BCYC bears the burden of proving that it is entitled to the private-club exemption. The cases cited by Ring in support of that proposition are not binding on this Court. The Court is also aware of contrary decisions within this Circuit. See Jenkins v. Wholesale Alley, Inc., No. 1:05-cv-03266-JEC, 2007 WL 9701996, at *6 (N.D. Ga. Sept. 11, 2007) ("Before the plaintiff may succeed on a public accommodations claim under the ADA, he must first establish that the defendant operated a public accommodation."). Under either standard, summary judgment in BCYC's favor is appropriate.

under the Civil Rights Act of 1964 is a question of law); see also Jankey v. Twentieth Century Fox Film Corp., 14 F. Supp. 2d 1174, 1178 (C.D. Cal. 1998) ("Whether a particular facility is a 'public accommodation' under the ADA is a question of law.").

Title III of the ADA provides that:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). For purposes of Section 12182(a), discrimination includes a failure to make reasonable modifications in policies, practices, or procedures. Id. § 12182(b)(2)(A)(ii).

Private clubs or establishments are exempt from Title III of the ADA. 42 U.S.C. § 12187 ("The provisions of this subchapter shall not apply to private clubs or establishments exempted from coverage under Title II of the Civil Rights Act of 1964 (42 U.S.C. § 2000-a(e))[.]"). Title II of the Civil Rights Act, in turn, exempts "private club[s] or other establishment[s] not in fact open to the public, except to the extent that the facilities of such establishment[s] are made available to the customers or patrons of [certain

businesses like hotels and restaurants] "affecting interstate commerce or supported in their activities by State action." 42 U.S.C. § 2000a (b),(e).[5]

To determine whether an establishment is truly a private club or establishment for purposes of the ADA, both parties point to the eight-factor test set forth in <u>United States v. Lansdowne Swim Club</u>, 713 F. Supp. 785 (E.D. Pa. 1989). The eight <u>Lansdowne</u> factors are: (1) the genuine selectivity of the group in the admission of members; (2) the membership's control over the operations of the establishment; (3) the history of the organization; (4) the use of the facilities by non-members; (5) the purpose of the club's existence; (6)

---

[5] The ADA provides that certain listed private entities will be considered public accommodations, including, in pertinent part: (1) a restaurant, bar, or other establishment serving food or drink; (2) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;(3) an auditorium, convention center, lecture hall, or other place of public gathering; (4) a park, zoo, amusement park, or other place of recreation; (5) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education; and (6) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation. 42 U.S.C. § 12181(7)(B),(C),(D),(I), (J), (L). Despite Ring's arguments to the contrary, BCYC falls outside the umbrella of the listed statutory places of public accommodation. While members may go there for recreation and potluck dinners, BCYC is not similar to or like a restaurant, bar, or gymnasium. Thus, the Court will look to the <u>Lansdowne</u> factors in determining whether BCYC is a place of public accommodation.

whether the club advertises for members; (7) whether the club is for profit or not for profit; and (8) the formalities observed by the club, e.g., bylaws, meetings, and membership cards. Id. at 795-805; see also Lobel v. Woodland Golf Club of Auburndale, 260 F. Supp. 3d 127, 140-47 (D. Mass. 2017) (looking to Lansdowne factors to determine if golf club was a place of public accommodation under the ADA); Jankey, 14 F. Supp. 2d at 1180-84 (looking to same with respect to studio lot facilities).

### 1. Genuine selectivity in admission of members

Because "genuine selectivity is an integral characteristic of a private club," courts have found this factor to be the "most important" in ascertaining private-club status. Lansdowne, 713 F. Supp. at 797; see also EEOC v. Chicago Club, 86 F.3d 1423, 1436 (7th Cir. 1996) ("[S]elective membership practices are the essence of private clubs."). A variety of characteristics can reflect whether a club is truly selective, including the formality of the club's admissions procedures, the standards or criteria for admission, the membership's control over the selection of new members, the numerical limit on club membership, the substantiality of the membership fees, and the extent to which applicants are denied

admission. See Lobel, 260 F. Supp. 3d at 140 (citing
Lansdowne, 713 F. Supp. at 797-98).

### a. Formality of admission procedures

According to the BCYC Bylaws, prospective members must
fill out an application, pass a background check, be "vetted
by the Membership Committee," have their application read at
a board meeting, and be admitted upon a majority vote of the
general membership. (Doc. # 129-30 at 3). The record evidence
reflects that BCYC follows this process. See (Doc. # 129-1 at
58-69). Thus, BCYC utilizes a multi-step and formalized
process in admitting members, and this factor supports a
finding of private-club status. See Lobel, 260 F. Supp. 3d at
140 ("Woodland's procedures for evaluating and selecting new
members exhibit several characteristics that are relatively
formal," including a set procedure that applicants must
follow, "and thus support a finding of genuine
selectivity.").

### b. The standards or criteria for admission

Applicants may be anyone over 21 years of age. (Doc. #
129-1 at 58). Applicants need not own a boat or have any prior
sailing experience, but should have an interest in sailing
and nautical activities. (Id. at 56-60). Applicants need not
be sponsored by a current BCYC member or receive

recommendations. (Id. at 70). They must pass a background
check to ensure that they have a land-based address, a clean
criminal record, and are employed. (Doc. # 137-20).

It is undisputed that Gerri Angel will make the initial
telephone calls to applicants and that what questions she
asks are generally up to her. (Doc. # 129-1 at 61). Applicants
must then meet with additional Membership Committee members
at the clubhouse and answer questions as to why they wish to
join. According to Angel, since 2016, there have been three
to six other members who have served with her on the BCYC
Membership Committee. (Doc. # 137-20 at 1). At this interview
night, applicants are asked about why they wish to join BCYC
and Membership Committee members evaluate whether the
applicants would be a "good fit." (Id. at 3-5). If they pass
the Membership Committee, the applicants' names are read to
the Board, and applicants must then attend the general
membership meeting, at which a vote will take place. (Id. at
5).

Southard testified that he could not recall any instance
at which an applicant who appeared before the general meeting
was denied admission. (Doc. # 129-1 at 72). Southard described
it as "fait accompli" – that once Angel passes an applicant
to the general meeting, his or her admission is assured. (Id.

at 67). However, Angel represented in her declaration that, in 2017 and 2018, she has chosen not to invite certain applicants to interview night or the general meeting because, based on either their answers in the initial telephone call or at interview night, it was determined that they were not a good fit for BCYC. (Doc. # 137-20 at 6). Certain applicants have also had objections lodged against them by the board. (Id.). Angel did not state which proportion of applicants failed to progress to interview night or the general vote. See generally (Id.).

Ring's point is well-taken that BCYC's admissions procedures and criteria are less stringent than those found to confer private-club status by other courts. For example, the social club at issue in Chicago Club utilized two paths to admission:

> The board of directors extends invitations to membership under one of two provisions in the Club's bylaws. Under one provision, one member proposes a candidate and two members second the proposal. Two directors must be acquainted with candidates for resident membership, and one director must be acquainted with nonresident candidates. The names of the candidates are published to the Club, and members may comment upon the candidates. The Club's secret membership commission reviews the proposed candidates and the membership's comments and makes recommendations to the board. The board may then extend invitations to membership. Another provision of the bylaws allows the board of governors, upon its own motion and

without any formal procedure, to elect a person to
any class of membership in which there is a vacancy.
In no case under either procedure may an invitation
to membership issue if two or more directors
present for the vote are opposed.

This procedural gauntlet incorporates a screening
process that emphasizes personal interaction
between members and candidates for membership.

. . .

The undisputed facts demonstrate that the Club is
extremely selective in admitting new members.

86 F.3d at 1426, 1437; see also Bommarito v. Grosse Pointe
Yacht Club, No. 05-cv-73359, 2007 WL 925791, at *11 (E.D.
Mich. Mar. 26, 2007) (holding that defendant yacht club
qualified for the exemption where it required a written
application, the sponsorship of three current members, the
posting of the candidacy at the clubhouse, consideration by
the board of directors, and a secret ballot).

However, membership selection need not always meet such
a lofty standard to confer private-club status. The Court is
cognizant of the Seventh Circuit's admonition in Chicago Club
that "by no stretch of the imagination should the practices
of the Club outlined above be considered as the minimum
necessary to qualify as a bona fide membership club under
[Section] 2000e(b). To the contrary, it is clear that less
stringent membership policies and guest arrangements than

those employed by the Club would easily meet [Section] 2000e(b)'s bona fide private membership club requirements." 86 F.3d at 1437.

For example, a district court within this Circuit has held that a golf course clubhouse was exempt from Title III of the ADA where the club "*de facto* offer[ed] membership" to any homeowner within a residential subdivision. Huene v. Landings Club, Inc., No. CV411-282, 2012 WL 515674, at *3 (S.D. Ga. Feb. 15, 2012), report and recommendation adopted, No. 4:11-CV-282, 2012 WL 777183 (S.D. Ga. Mar. 6, 2012). As the Huene court reasoned, "broadly allowing Landings-subdivision homeowners to join is not the same as allowing anybody to walk in off the street and obtain a membership." Id.

Here, by ensuring that applicants pass a background check, have an interest in sailing or other nautical activities, are willing to help volunteer and attend club events, requiring applicants to personally meet with several members of the Membership Committee, and be voted in by a majority vote of the general membership, BCYC has meaningful standards or criteria for admission of new members. The record evidence demonstrates that BCYC members are knit together by a common love of sailing, or a desire to learn more about

nautical activities, and a willingness to expend their time maintaining the club's premises and supporting club activities. As former Commodore Brown explained when asked what makes BCYC a private club, "I think that the idea of having a club with people that are like-minded, that want to do the same things, should be able to come together as a group and do that thing that they like to do together. And so if having it being a public club means that just anybody can be a member, then what's the point of having it as a club?" (Doc. # 129-24 at 56-57).

"A private club is a group of individuals who imagine the membership as a personification of whatever priorities or interests the club professes to embrace. Whether these priorities or interests are laudatory or mundane is beside the point, which is that they are shared by a group who have chosen their social intimates on the basis of these values." Chicago Club, 86 F.3d at 1437. Thus, this factor weighs in favor of the private-club exemption.

> c.  *The membership's control over the selection of new members*

"[M]embership participation in the selection of new members is a critical attribute of a private club." Chicago Club, 86 F.3d at 1436. For the reasons described above, the

Membership Committee screens potential members at interview night, and the BCYC membership gets to vote at a general meeting as to whether applicants should be admitted. Members of the Board also get a chance to object to new members prior to the general meeting. This factor weighs in favor of the private-club exemption.

### d. The numerical limit on club membership

While the Bylaws do not contain a formal numerical limit on membership, Southard testified that the number of members has stayed stable, at around 200. (Doc. # 129-1 at 12). This factor is neutral.

### e. The substantiality of the membership fees

In 2019, annual membership fees were $145 per quarter per household. (Doc. # 128 at ¶ 40; Doc. # 137 at ¶ 40). Members pay no renewal fees or additional fees of any kind. (Id.).

This amount is negligible in comparison to the substantial sums charged by other private clubs. See, e.g., Lobel, 260 F. Supp. 3d at 142 (determining that club charged new members a non-refundable $55,000 initiation fee and required dues of approximately $14,000 per year). However, BCYC does impose volunteer requirements on its members, requiring them to participate in Saturday "workdays" to

maintain the clubhouse and premises. As stated in the clubhouse policies, this volunteer time is expected in order "to keep expenses at a minimum." (Doc. # 129-30 at 15).

The Court has not located, nor have the parties pointed to, any case law determining whether an organization was exempt where financial fees were low but members were nonetheless required to put in "sweat equity." The Court finds the opinion in Rasmussen v. Cent. Fla. Council Boy Scouts of Am., Inc., to be instructive on this point. In Rasmussen, a local council of the Boy Scouts of America owned a "reservation" encompassing five camps, which included lodging, activity areas, dining areas, and other facilities for use by Boy Scout troops. No. 6:07-cv-1091-Orl-19UAM, 2008 WL 681055, at *2 (M.D. Fla. Mar. 7, 2008). The court found that although the reservation was staffed by seven permanent staff members, adult volunteers "play an important role in the Scouts." Id. While council members had to pay a fee to use the camp, the council overall lost money on the camping program due to its "affordable camping fees." Id.

When faced with a claim brought under Title III of the ADA, the council asserted the private-organization exemption. Id. at *6. The court ultimately determined that, except for a gift shop that was open to the public, the remainder of the

council's facilities were not open to the public and, thus, the council qualified for the exemption. Id. at *9. Thus, the low fees did not deprive the camp of private-club status. This factor is, at most, neutral.

    *f. The extent to which applicants are denied admission*

While Southard testified that he could not recall any potential applicant being denied membership once they progressed to the general meeting vote, Angel stated in her affidavit that candidates had been denied admission at earlier stages of the process in 2017 and 2018, although she did not state what percentage of applicants were denied admission. The Court also notes the Rasmussen court's determination of the exemption's applicability despite the fact that the council sponsored scouting programs involving 24,406 child members and 8,630 adult volunteers because the council had a "plan or purpose of exclusiveness" by requiring scouts to adhere to the Scout Oath and Law, as well as profess their belief in God. Id. at *1, *8. This factor is also neutral.

In short, the "genuine selectivity in admission of members" factor weighs in BCYC's favor.

2. The membership's control over the operations of the establishment

Control of an organization's operations by its members is another factor weighing in favor of private-club status. Lobel, 260 F. Supp. 3d at 143. Here, the evidence establishes that the BCYC Board, which is composed of BCYC members, controls the affairs of the club and has the power to promulgate and enforce its by-laws, policies, and rules. While BCYC members do not invest funds as property owners would, they nonetheless maintain the premises and organize events. While Ring points to BCYC's Lease with the City, there is no record evidence that the City, in fact, exercises control over BCYC's day-to-day operations. Ring has failed to direct this Court to any case in which the mere fact that a municipality leased land to an otherwise private organization was sufficient to destroy the organization's status as a private club. This factor weighs in favor of private-club status.

3. The history of the organization

BCYC was incorporated in 1966. (Doc. # 128 at ¶ 23; Doc. # 137 at ¶ 23). BCYC's purpose, as stated in the articles of incorporation, was to (1) promote safe boating activities in Pinellas County and adjacent areas; and (2) promote

instruction and education in safe boating and nautical activities." (Doc. # 128 at ¶ 24; Doc. # 137 at ¶ 24). According to its Lease with the City, BCYC's premises are to be used solely by its members and their guests. This factor weighs in favor of private-club status.

### 4. The use of the facilities by non-members

BCYC hosts an annual "Fun Day" when the BCYC clubhouse is open to members of the public. (Doc. # 122 at ¶ 6; Doc. # 135 at ¶ 6). During Fun Day, BCYC provides free food to visitors. (Doc. # 122 at ¶ 9; Doc. # 135 at ¶ 9).

According to Brown, other than Fun Day, the clubhouse is not indiscriminately open to members of the public at large and access to the clubhouse for any purpose, including any entertainment and educational events, is limited to members and their guests. (Doc. # 129-24 at 78, 81). Other than Fun Day, when the club provides free food, the club does not sell food or drinks on the premises, nor is it used for lodging. (Id. at 78). Once an individual becomes a member, they are issued a key to the clubhouse, giving them unlimited access to the clubhouse. (Id.). Non-members are not issued keys. (Id.). Southard testified that, unless a member is at the clubhouse, the clubhouse is kept locked. (Doc. # 129-1 at 256). In addition, the gate that provides access to the BCYC

dock is also normally kept locked, as Ring herself admitted in her deposition. (Doc. # 129-31 at 159-60).

BCYC offers adult sailing school to members of the public in the spring and fall on a limited, space-available basis, and enrollment in the adult sailing school includes a 90-day limited membership to BCYC, which entitles sail school participants to access the clubhouse. (Doc. # 122 at ¶ 10; Doc. # 135 at ¶ 10). In addition, the Sea Scouts are a youth sailing club that is run by members of BCYC for kids. (Doc. # 122-1 at 109-10; Doc. # 129-24 at 74). While neither the children nor their parents need be members of BCYC, a BCYC member or members act as a sponsor for the Sea Scout troop and work with the children. (Doc. # 129-1 at 110; Doc. # 129-24 at 74).

According to Brown, for any event held at the club other than Fun Day, "there has to be a club member who is responsible for any of the activity that happens." (Doc. # 129-24 at 81). For example, if a member were to host a paint your own wine glass event or a regatta at BCYC, an event which non-members would attend, the member is there to make sure "everything gets taken care of" and ensures "people aren't just running around doing whatever they want." (Id. at 81, 82).

Ring points out that BCYC hosts 10 or more potlucks a year. (Doc. # 129-1 at 98). According to Southard, nonmembers are allowed to attend potluck dinners only as guests of members. (Id. at 99-100). Ring states that, per the Lease with the City, BCYC has to allow members of the Gulfport Lions Club, Gulfport Yacht Club, Gulfport Youth Sailing, the Sea Scouts, and the City's authorized invitees and their guests access to the beach area located behind the Lions Club clubhouse. (Doc. # 129-30 at 4). Ring also points to BCYC's meeting minutes and calendar reflecting that events held by or benefitting certain community organizations will be held on BCYC's premises. (Doc. # 128-16). By way of example: (1) BCYC sponsored the "Cat's Point Regatta," an event hosted by the BCYC Sea Scouts and nearby Eckerd College; (2) BCYC participated in a tour of homes sponsored by the Gulfport Area Chamber of Commerce by being the place tour participants registered and got their maps; and (3) a local high school drama club hosted a "covered dish" at BCYC as a fundraiser. (Id. at 3, 5, 6).

Ring submitted her own affidavit attesting that the clubhouse was rarely locked and she often saw "strangers" freely walking about. (Doc. # 128-2 at 5). She attested that the key pad at the entrance to the parking lot has a 4-digit

code has been the same for 12 years. (Doc. # 135-2 at 1).
She claims that, even when the gate is locked, the gate code
is "common knowledge." (Id.). Similarly, the door to the
clubhouse has both a key-lock and a key pad, which code has
not been changed in many years. (Id. at 2).

Ring also submits three affidavits from individuals who
are not members of BCYC and aver that they have used the BCYC
facilities on multiple occasions and have never been asked
for identification, or to sign in. (Doc. ## 128-17, 128-18,
128- 19). They claim that they have been able to use BCYC's
facilities "freely," including the restroom, kitchen, and
parking area. (Id.).

According to the affidavit of BCYC member Lee Nell, the
gate to BCYC's parking lot "used to be left open" but in
approximately 2018, BCYC decided to keep this gate closed at
all times — except during events — to discourage trespassers.
(Doc. # 137-4 at 4). Nell attested that before BCYC adopted
the closed-gate policy, there were occasions when non-members
would access the grounds. (Id.). However, according to Nell,
BCYC's policy has "always" been that members question any
non-members about why they are on the premises, and guests
must always be accompanied by members. (Id. at 4-5). According
to Nell, Ring is the "only person who ever violated this rule

while she was a member of BCYC. Club members have reported intercepting non-members on Club grounds, only to learn that these visitors had been instructed by Ms. Ring to just 'come on in.'" (Id. at 5).

"Regular" or "indiscriminate" use of an establishment's facilities by nonmembers "contradicts private status." Jankey, 14 F. Supp. 2d at 1179. However, a private club with a limited guest policy in which guests are not permitted "unfettered use of facilities" will not defeat the private-club exemption. See Kelsey v. Univ. Club of Orlando, Inc., 845 F. Supp. 1526, 1530 (M.D. Fla. 1994).

While BCYC does sponsor community events at which non-members will be present, Southard testified that non-members are always there as guests of the attending members. (Doc. # 129-1 at 100, 102, 110). Ring has not directly refuted this evidence regarding community events; she merely points to the community events themselves as obviating private-club status. Not only are these events consistent with BCYC's stated guest policy, but courts considering this issue have consistently held that "occasional use of the Club facilities by non-members . . . does not convert [an establishment] into a place of public accommodation under the ADA." Reimer v. Kuki'O Golf & Beach Club. Inc., No. 12-00408 LEK-BMK, 2013 WL 1501522, at

*3 (D. Haw. Apr. 11, 2013); see also Jankey, 14 F. Supp. 2d at 1178 ("A private club . . . is not converted into a public accommodation under the ADA because it is occasionally used by the general public."). As one district court explained, "[o]ccasionally allowing local charities or civic organizations to use an establishment's facilities to host public events is not the sort of public use that is inconsistent with private-club status. Indeed, a contrary rule would actively discourage clubs from hosting charitable functions, for fear of losing their private-club status." Lobel, 260 F. Supp. 3d at 146 (citation omitted).

Finally, the self-serving affidavit submitted by Ring herself is insufficient, by itself, to show that BCYC allows unfettered use of the facilities. See Reimer, 2013 WL 1501522, at *3 (holding that unsupported claims made in plaintiff's declaration were insufficient to show that nonmember use of the club was so pervasive as to make it a place of public accommodation). As for the three affidavits submitted by members of the public in support of the proposition that BCYC allows unfettered use of its facilities to non-members, it is unclear when these incidents occurred, over what span of time, or if Ring herself encouraged these individuals to enter BCYC's premises without a member. These isolated incidents

are insufficient to raise a genuine dispute of material fact on this issue in light of the testimony that only members are given key cards, that once BCYC realized trespassers were on the property, it kept the gates locked, and the Club's stated policy that club premises are for the use only of members and that nonmembers are only allowed when accompanied by a member.

"[I]solated accounts of incidents when members failed to abide by defendant's rules" are insufficient to defeat private-club status. See Kelsey, 845 F. Supp. at 1530; see also Jankey, 14 F. Supp. 2d at 1180-81 (finding private-club status despite plaintiff's contention that he had been "waved through" to the property on approximately a dozen occasions). On this record, it is plain that BCYC does not intend or allow unfettered or regular use of its facilities by non-members. BCYC's limited guest policy and isolated incidents of non-compliance do not demand a different result. See Jankey, 14 F. Supp. 2d at 1178; Kelsey, 845 F. Supp. at 1530. This factor weighs in favor of private-club status.

### 5. The purpose of the club's existence

As stated in the Bylaws, BCYC's purpose is to promote safe boating activities, boating education, and fellowship among its members. (Doc. # 129-30 at 1). No board member or flag officer is allowed to use the club to aid any political

party or use the clubhouse to further a private business. (Id. at 7). While Ring points to the social aspect of BCYC and it's "rhumb-loving roots," the fact that part of BCYC's purpose is that of a social club is not dispositive. For example, the Chicago Club clearly had a purpose of both forwarding business connections among the city's business titans, but also functioned as a social club and gathering place for members and their guests. See Chicago Club, 86 F.3d at 1426-27. This factor weighs in favor of private-club status.

6. <u>Whether the club advertises for members</u>

BCYC maintains an active website and Facebook page, runs an adult sailing school, advertises events and the sailing school in "The Gabber," a Gulfport publication, and recruits new members at its boat show. (Doc. # 129-1 at 88-90, 95, 98, 231; Doc. # 128-7). Other courts that have examined this question have found similar efforts insufficient to confer public-accommodation status. See Lobel, 260 F. Supp. 2d at 144 ("There is no evidence that [defendant] actively uses its website or Facebook page to solicit or recruit new members. It does not, for example, use either platform to send 'form letters to certain individuals soliciting applications for membership.'"); Jankey, 14 F. Supp. 2d at 1181-82 (finding

commissary located on movie studio lot to be exempt from ADA despite being advertised for four years in a subscription publication); Bommarito, 2007 WL 925791, at *9-10 (finding yacht club to be exempt from ADA despite newspaper articles and advertisements promoting a fishing event, sailing classes, and a "Yachtsmen's Weekend" to nonmembers). As the Seventh Circuit has noted, "[p]rudently increasing membership to increase revenue while not abandoning selective membership practices exhibits nothing more than fiscal responsibility." Chicago Club, 86 F.3d at 1435. This factor weighs in favor of private-club status.

> 7. **Whether the club is for profit or not for profit and the formalities observed by the club**

BCYC is a tax-exempt, not-for-profit organization and observes formalities such as the election of officers and board members. This factor weighs in favor of private-club status. See Pappion v. R-Ranch Prop. Owners Ass'n, 110 F. Supp. 3d 1017, 1025 (E.D. Cal. 2015).

Based on its review of these factors, the Court determines that BCYC is a private club or organization as a matter of law. Although this case presents a closer call than most, when viewing the Lansdowne factors as a whole, BCYC meets the requirements of being a private club.

Accordingly, BCYC is exempt from the requirements of Title III of the ADA.

The Court thus turns to the private-organization exemption under the FCRA. The FCRA provides that: "[a]ny violation of any Florida statute making unlawful discrimination because of . . . handicap . . . in the area[] of . . . public accommodations gives rise to a cause of action[.]" Fla. Stat. § 760.07. The statute defines "public accommodations" as:

> places of public accommodation, lodgings, facilities principally engaged in selling food for consumption on the premises, gasoline stations, places of exhibition or entertainment, and other covered establishments. Each of the following establishments which serves the public is a place of public accommodation within the meaning of this section:
>
> (a) Any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building which contains not more than four rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his or her residence.
>
> (b) Any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment, or any gasoline station.

> (c) Any motion picture theater, theater, concert
> hall, sports arena, stadium, or other place of
> exhibition or entertainment.
>
> (d) Any establishment which is physically located
> within the premises of any establishment
> otherwise covered by this subsection, or
> within the premises of which is physically
> located any such covered establishment, and
> which holds itself out as serving patrons of
> such covered establishment.

Fla. Stat. § 760.02 (11).

> The statute further provides that:

> The term "public accommodations" does not include
> lodge halls or other similar facilities of private
> organizations which are made available for public
> use occasionally or periodically.

Fla. Stat. § 760.07.

As BCYC is not principally engaged in selling food, drinks, or lodging to the general public and does not provide recreation to the general public in the same way a theater or concert hall does, the definitions in Section 760.02 are inapplicable. That leaves the "private organizations" exemption in Section 760.07. Another court in this district has noted that "[n]o reported Florida cases have discussed the 'private organizations' exemption to the FCRA," and so the court turned to federal law for guidance. Rasmussen, 2008 WL 681055, at *11. As described above, the Rasmussen court determined that a chartered organization of the Boy Scouts

42

was a private club under Title III of the ADA, with the exception of its "Trading Post," which was available to the general public. Id. at *8. Turning to the FCRA claim, the court reasoned:

> The Council is . . . a "private club" within the meaning of Title III of the ADA. . . . In plain English, a "private club" qualifies as a type of "private organization," because a club is necessarily an organization. Thus, the term "private organization" appears to be as broad in application, if not broader, than the term "private club." As a result, the Council's status as a "private club" under federal law qualifies it as a "private organization" within the meaning of the FCRA.

Id. at *11. This Court agrees. Because it has determined that BCYC is a private club within the meaning of Title III, it follows that it is also a "private organization" under the FCRA. Thus, BCYC is also exempt under the FCRA.

The Court notes at this juncture that the Eleventh Circuit has not issued a ruling as to whether a facility that is not a public accommodation under Title III of the ADA might nevertheless be subject to a retaliation claim under Title V of the Act. The likely answer is that these claims rise and fall together. The ADA's retaliation provision states that the "remedies and procedures available under sections 12117, 12133, and 12188 of this title shall be available to aggrieved persons for violations of subsections (a) and (b), with

respect to subchapter I, subchapter II and subchapter III, respectively." 42 U.S.C.A. § 12203(c). In other words, the remedy for a violation of the ADA's retaliation provision is tied to the respective remedies available in Titles I, II, and III of the ADA.

The Court has located only one other district court that has analyzed this question, and it held, persuasively, that "Defendants who are not otherwise subject to ADA remedies cannot be sued for retaliation under the ADA." Saniefar v. Moore, No. 117-CV-00823-LJOBAM, 2018 WL 3020458, at *6 (E.D. Cal. June 18, 2018). The Saniefar court reasoned that, because the retaliation provision does not provide its own remedial provision, the most reasonable inference is that "Congress did not intend to create a remedy for retaliation allegedly perpetrated by [defendants] not covered by Subchapter III." Id. at *7.

Thus, because BCYC is not a place of public accommodation, all of Ring's claims fail as a matter of law. However, even if BCYC were a place of public accommodation, Ring's claims would still fail for the reasons detailed below.

## B. Retaliation and causation

BCYC argues that it neither took Ring's alleged disability into account nor retaliated against her. (Doc. #

122 at 1). Instead, according to BCYC, Ring was expelled for "continually violating the Club's By-Laws and rules since 2014." (Id.). Ring responds that BCYC's actions were taken because of her disability and in retaliation for exercising her rights. (Doc. # 135 at 20).

As an initial matter, while Ring now argues in her summary judgment motion that BCYC expelled her "for seeking assistance in addressing BCYC's discriminatory conduct from the city of Gulfport" (Doc. # 128 at 4), this is not the basis for the retaliation claim in her complaint. According to the allegations in the third amended complaint, BCYC took the adverse actions of fining, suspending, and ultimately expelling Ring because she filed a charge with the PCOHR, and "[t]he adverse actions against Ring were taken in retaliation for Ring having filed an administrative complaint." (Doc. # 100 at 10).

As such, BCYC only had fair notice that Ring's retaliation claim was based on her action of filing a charge with the PCOHR, not on her communications with City officials. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (stating that the purpose of Rule 8's liberal pleading guidelines is to "give the defendant fair notice of what the claim is and the grounds upon which it rests" (ellipsis

omitted)). Summary judgment briefing is not the appropriate time to raise a new claim, and Ring's claim that BCYC retaliated against her in violation of the ADA for raising BCYC's alleged discriminatory conduct with the City is thus not properly before this Court. See Corey Airport Servs., Inc. v. Decosta, 587 F.3d 1280, 1282 n.2 (11th Cir. 2009) ("Because Corey cannot amend its Complaint by adding a new claim in its summary judgment papers, we will not discuss conduct beyond the scope of the Second Amended Complaint."); accord Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with [Federal Rule of Civil Procedure] 15(a).").

Moving onto the merits of the retaliation claim, the record reflects that Ring and BCYC have had a tumultuous relationship. In February 2016, a motion was presented to expel Ring from membership. (Doc. # 129-40). The motion stated that a similar motion had been made in 2015 because of, among other things, "her boorish behavior, both publicly and in private, against some other BCYC members and officers." (Id. at 3). However, after a discussion with certain BCYC officers, the 2015 motion was never brought forward. (Id.).

The February 2016 motion stated that Ring had "repeatedly, willfully, and continually violat[ed] one or more of the BCYC rules and policies." (Id.). An attached bill of particulars set forth the specific bases for the motion. (Id.). The bill of particulars included: (1) after hosting a potluck dinner, Ring did not clean up the food, instead leaving the mess for others to clean up; (2) publicly criticizing other members; (3) Ring shirked certain responsibilities regarding the BCYC Christmas boat parade; (4) Ring brought her "very large, very furry" dog to a large gathering honoring a longtime BCYC member who was ill, refused to remove the dog when asked, and "harangued" another member about this; (5) Ring was living aboard her boat without the necessary authorization; (6) Ring took club supplies without asking; (7) Ring exceeded her allotted time on the T-docks; (8) allowing Piper to run, unrestrained and off leash, on the premises; and (9) generally acting in a rude and aggressive manner to other club members, including sending threatening and mocking emails to one of the officers. (Id. at 4-9). According to the bill of particulars, these infractions began in August 2014 and continued until January 2016. (Id.); see also (Doc. # 137-4 at 3) (BCYC member describing Ring bringing another dog, Harry, to a crowded event where Harry "kept

bumping into members, including the terminally ill lifetime member" being honored at the event, and stating that Ring "verbally attacked the Chair of the event for asking her to remove her dog from the banquet area"). Despite this motion, Ring was ultimately allowed to keep her BCYC membership. See (Doc. # 122 at 5). In addition, Ring's deposition is replete with accusations of other BCYC members making derogatory comments to or about her or engaging in disagreements with her during her time as a BCYC member. See, e.g., (Doc. # 129-31 at 57-61, 64-66, 76-78, 83-84, 93-94, 127-28).

In approximately August 2018, Ring forwarded her note regarding her purported need for a service animal to Commodore Brown. (Doc. # 129-24 at 17). Brown testified that he researched the ADA and discussed the matter with Ring. (Id. at 95). When it became apparent to Brown that they were not going to reach a resolution, he encouraged Ring to file a complaint with the PCOHR. (Id. at 95-96).

On December 23, 2018, Brown issued Ring a written reprimand for bringing Piper into the clubhouse against BCYC rules. (Doc. # 129-26). Ring filed her complaint with the PCOHR on January 2, 2019. (Doc. # 28-1).

It was in this early to mid-January time frame that Ring both contacted City officials to complain of BCYC's treatment

of her and also when Southard reached out to an investigator to verify Ring's address. (Doc. # 129-1 at 39-41, 159; Doc. # 129-4 through 129-8).

On January 21, 2019, Ring again brought Piper into the clubhouse, and then-Commodore Southard issued Ring a fine. (Doc. # 100-4). On January 31, 2019, the BCYC Board suspended Ring's membership privileges. (Doc. # 100-5). According to the suspension motion, board member Anthony Angel moved to suspend Ring "due to her fraud on the City, which conduct is likely to endanger the welfare of BCYC by negatively impacting [BCYC's] efforts to negotiate a favorable lease with the City of Gulfport, thereby jeopardizing BCYC's future existence." (Id. at 1). The explanatory notes in support of the motion explain that, since the City installed a new mooring field, preventing boaters from living aboard their vessels has become "of heightened interest to the City." (Id. at 2).

According to the motion, Ring had lived for three years "as a non-sanctioned 'liveaboard' despite the provision in BCYC's lease with the City prohibiting such liveaboards. During that time, she has provided the Club and the City with four false addresses as her land-based residence. . . . Ms. Ring has been stealing City electricity by keeping an extension cord plugged into the City's 110v electrical outlet

on the pedestal near her boat in the Club basin. . . . As Ms. Ring is well aware, the City strongly objects to boat owners using that electrical power on a constant or ongoing basis." (Id. at 2-3).[6]

In conclusion, the motion stated that the Board believed that "the City has stalled the start of the Club's lease negotiations awaiting the Club's actions to comply with its obligations under the current Lease. Regardless, it is clear that Ms. Ring has in the past violated a number of lease provisions and rules, and she continues to do so. Her actions have jeopardized the likelihood that the Club will be able to secure favorable terms in a new lease, without which the Club's future survival is extremely uncertain. For this reason, [the Board] believe[s] Ms. Ring's conduct is likely to endanger the welfare of BCYC, and therefore, it is necessary to suspend Ms. Ring from the Club immediately." (Id. at 3).

---

[6] During her deposition, Ring never explicitly denied ever living on board her boat. She admitted that she applied at one point to be the authorized liveaboard. (Doc. # 129-31 at 124-25). It is unclear when this request occurred, although it likely took place in 2018 because Ring made her request to Brown, the Commodore at the time. (Id.). It's also unclear whether this request was ever granted or denied, although Brown expressed his "concern" about Ring having Piper with her on board the boat. (Id.).

Ring appeared in person at the January 31, 2019, Board meeting to defend herself against the charges and implied that the accusations of stealing electricity and providing false land-based addresses were untrue. (Doc. # 129-31 at 139, 141-43). During her deposition, she referred to another BCYC member, Ray Rodriguez, as her "roommate." (Id. at 140). But, while Ring provided the address of the Rodriguez family home to BCYC, Rodriguez's ex-wife had informed the BCYC Board that Ring did not live at that residence and never had. (Doc. # 129-1 at 158-65; Doc. # 129-7). The record also reflects that, on January 25 and 28, 2019, BCYC sent letters to Ring at two different addresses, both of which were marked "return to sender; not deliverable as addressed." (Doc. # 129-40 at 19).

Although Ring disputed the charges, the general membership of BCYC voted to expel Ring from membership in April 2019. (Doc. # 100-6). Ring has cited to evidence suggesting that certain members of the club worked together on a "script" of what they wanted to say in support of her expulsion. (Doc. # 135-4; Doc. # 135-5).

Here, Ring has brought a retaliation claim under the ADA. The ADA provides that "no person shall discriminate against any individual because such individual has opposed

any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]." <u>Stewart v. Happy Herman's Cheshire Bridge</u>, 117 F.3d 1278, 1287 (11th Cir. 1997) (quoting 42 U.S.C. § 12203(a)). Section 12203 provides remedies to individuals who have been retaliated under Title I, Title II, or Title III of the ADA. 42 U.S.C. § 12203(c). <u>See</u> <u>Higdon v. Jackson</u>, 393 F.3d 1211, 1218 (11th Cir. 2004) (noting that a plaintiff may assert a claim for retaliation under the ADA outside of the employment context).

The ADA's anti-retaliation provision, 42 U.S.C. § 12203(a), is similar to Title VII's prohibition on retaliation, <u>Shannon v. Postmaster General of U.S. Postal Service</u>, 335 F. App'x 21, 26 (11th Cir. 2009), so Title VII retaliation standards are permissibly imported into ADA cases. <u>Stewart</u>, 117 F.3d at 1287. Under that standard, a plaintiff must establish a prima facie case of retaliation to avoid summary judgment. This showing contains three elements: first, the plaintiff engaged in statutorily protected conduct; second, the plaintiff suffered an adverse action; and finally, the adverse action was causally related to the protected expression. <u>Farley v. Nationwide Mut. Ins. Co.</u>, 197 F.3d 1322, 1336 (11th Cir. 1999) (citing <u>Stewart</u>, 117 F.3d at 1287). Once a prima facie case has been established, the

defendant has the burden of articulating a legitimate nondiscriminatory reason for the challenged decision. <u>Farley</u>, 197 F.3d at 1336. The plaintiff then must "demonstrate that [she] will be able to establish at trial that the [defendant's] proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation." <u>Id.</u>

Even assuming that Ring's complaint to the PCOHR qualifies as statutorily protected conduct and that she suffered an adverse action by being suspended and expelled from BCYC membership, that leaves the question of whether the actions were causally related.

The Supreme Court has stated that "mere temporal proximity between . . . knowledge of protected activity and an adverse . . . action . . . must be 'very close.'" <u>Clark Cty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273 (2001) (citations omitted). The Court cited with approval decisions in which a three- to four-month disparity was found to be insufficient to show causal connection. <u>See</u> <u>Id.</u>

However, the rule of temporal proximity is "not absolute." <u>Singleton v. Pub. Health Tr. of Miami-Dade Cty.</u>, 725 F. App'x 736, 739 (11th Cir. 2018). Where, for example, there was no evidence that a plaintiff's employer's adverse action was motivated by the accommodations request, but the

evidence instead "overwhelmingly indicate[d] the [adverse action] resulted from [plaintiff's] inability to keep up with the daily demands of his job," the Eleventh Circuit determined that an exception to the general rule of temporal proximity was warranted. Id.

Here, there is no evidence of BCYC officers, board members, or club members stating that they wished to suspend or expel Ring from membership because she was seeking to exercise her rights under the ADA by bringing a purported service animal into the clubhouse or because she filed a charge of discrimination with the PCOHR. True, it is apparent from the record that BCYC felt Ring was jeopardizing its ongoing lease negotiations with the City. But there is no indication from the record that her filing the complaint with PCOHR was causally related to later adverse events. Instead, the only evidence linking these events is their temporal proximity.

As an initial matter, there was a lag of more than three months between when Ring filed her complaint with PCOHR in January 2019 and when she was expelled in April 2019, and an even longer gap between her expulsion and when she sought to present Piper as a service animal in July 2018. A time gap of this length is insufficient to show the requisite causal

connection. See Breeden, 532 U.S. 268, 273 (citing with approval cases holding that a three or four month gap is insufficient to show causal connection).

However, the Court is cognizant that there was less than a month between the time Ring filed her complaint with PCOHR in early January 2019 and when the board moved to suspend her membership privileges on January 31, 2019. But even with this close temporal proximity, in light of the other evidence in the record regarding the reasons BCYC had to suspend Ring, the Court believes that this case calls for an exception to the general rule of temporal proximity. See Singleton, 725 F. App'x at 739; see also Whatley v. Metro. Atlanta Rapid Transit, 632 F.2d 1325, 1329 (5th Cir. 1980)("The evidence reveals . . . the dismissal was a culmination of problems growing out of appellant's manner of handling his job.").

For a similar reason, even if Ring had met her burden of proving a prima facie case of retaliation, BCYC has more than met its burden of showing that it had legitimate and non-discriminatory reasons for expelling Ring from membership. The record reflects that, as far back as 2015, the club had sought to expel Ring for various rule infractions and boorish behavior. In addition, the motion for suspension demonstrates that BCYC sought to expel Ring because she was living aboard

her boat without authorization, in violation of its Lease with the City, was accused of using City electricity without permission, and, in BCYC's opinion, had provided false land-based addresses.

Thus, BCYC had legitimate and non-discriminatory reasons for expelling Ring. Ring has provided this Court with no evidence demonstrating that these stated reasons were pretextual — either directly by persuading the Court that a discriminatory reason more likely motivated BCYC or indirectly by showing that BCYC's proffered explanations are unworthy of credence. <u>See</u> <u>Wofsy v. Palmshores Retirement Cmty.</u>, 285 F. App'x 631, 634 (11th Cir. 2008). Indeed, regarding Ring's alleged false addresses, the record evidence establishes that a club member disputed that she ever lived at one provided address and mail sent to two other addresses was returned as undeliverable. Ring has not met her burden of demonstrating that BCYC's reasons for expelling her were pretextual.

Accordingly, BCYC is entitled to summary judgment on Ring's retaliation claim.

The Court also notes that causation is a necessary element in both Title III and the FCRA, because FCRA discrimination claims track the analysis used for ADA claims.

Title III of the ADA prohibits a public accommodation from discriminating "on the basis of disability." 42 U.S.C. § 12182(a). The Eleventh Circuit has interpreted this language to establish a "but-for" causation standard for ADA claims. Schwarz v. City of Treasure Island, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008); McNely v. Ocala Star-Banner Corp., 99 F.3d 1068, 1073-77 (11th Cir. 1996) (discussing Titles I, II, and IV of the ADA, and holding that "the ADA imposes liability whenever the prohibited motivation makes the difference in the employer's decision"). That is, to succeed on an ADA claim, a plaintiff must show that the defendant's discriminatory actions would not have occurred but for the plaintiff's disability.

For the reasons previously described, Ring has not demonstrated a reasonable dispute of material fact on the issue of whether BCYC's suspension and expulsion would not have occurred but for her disability. The record demonstrates that BCYC had many reasons for wanting to expel Ring, including that she had a pattern of violating club rules, was endangering their Lease with the City or, perhaps, was plainly disliked by many members. None of this establishes, however, that BCYC acted against Ring because of her disabilities. Thus, her Title III and FCRA claims for disability

discrimination fail for this reason as well. See <u>Estate of</u> <u>Smith v. Forest Manor, Inc.</u>, No. 7:16-CV-01774-RDP, 2018 WL 2770203, at *9 (N.D. Ala. June 8, 2018) (granting summary judgment to defendant on Title III claim where the "undisputed Rule 56 evidence demonstrates that Forest Manor personnel had a reason other than Smith's disability for not installing foot rests on her wheelchair and not using a lap restraint").

Accordingly, BCYC is entitled to summary judgment on all of Ring's claims.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendant Boca Ciega Yacht Club's Motion for Summary Judgment (Doc. # 122) is **GRANTED.** Plaintiff Samantha Ring's Motion for Summary Judgment (Doc. # 128) is **DENIED.**

(2) The Clerk is directed to enter judgment in favor of Boca Ciega Yacht Club and against Plaintiff Samantha Ring on all counts of the complaint.

(3) Thereafter, the Clerk is directed to **CLOSE THE CASE.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 27th day of March, 2020.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE